17

## DECLARATION AND AFFIDAVIT OF MICHELLE ARMONT
## PURSUANT TO 28 U.S.C. § 1746

Michelle Armont, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.     My name is Michelle Armont.  Alfred Bourgeois is my brother.  We have the

Case 2:02-cr-00216    Document 397-3    Filed 05/15/2007    Page 2 of 164

same father but different mothers.

2.     Our father is Alfred Sterling.  Alfred and I are both "outside children" meaning that our father was having affairs outside his marriage with our mothers.  Our father had many outside children.  I am the oldest of them.  We were not raised by our father and we were not treated the same as the children he had with his wife.  The children by his wife basically look down on us and try to deny that we are even any relation to them.  If we wanted to see our father we had to go to the washiteria where he worked to see him and we had to make sure his wife wasn't there when we went.

3.     Alfred and I both love our father but it is not a nurturing father-child relationship like children need.  He did not acknowledge us until we were almost grown.  He would say "it's their momma's child".  Our father's life has been full of lying, cheating and denial of his children.  He did not pay child support for any of us but the youngest, who is now about 13 years old.  He totally denies some of his kids to this day, including a set of twin boys who are now about eighteen years old.   When I heard recently that my father was in the hospital I could not even go see him because if his children by his wife would see me there it would cause a lot of trouble.  Being treated like that is hurtful to me and it was hurtful to Alfred.

4.     When the woman that Alfred stayed with died he did not want to go back to live at his mother's house.  He could not live with our father so he came to stay with me.  He had a

strong bitterness toward his mother because she treated him so badly. Some days he could not say her name.

5.    Alfred had some serious problems. Aside from being almost ignored by his father most of his life, he was abused by his mother. She caused him so much pain that he was a damaged person because of the abuse that he suffered. It was hard for Alfred to talk about the

Case 2:02-cr-00216    Document 397-3    Filed 05/15/2007    Page 3 of 164

abuse he went through. Alfred had trouble trusting people. Alfred was similar to my nephew that had ADD. They both had tantrums. Alfred would not be himself when he got angry. He looked different. He told me he blacked out sometimes when he got angry.

6.    I know Beatrice Bourgeois. She is not a stable person. She was well known in the community for being crazy. Anyone that knew her would not trust her or believe what she said.

7.    Robin is a compulsive liar. There was always a lot of drama around Robin and Alfred. I got along with her but if you knew her you knew you could not trust anything she said. I saw Robin and Alfred a couple days before the baby died. They were all lovey-dovey. Robin and I had the kind of relationship that she knew if Alfred gave her any trouble she could come to me and I would help her out

8.    Alfred wanted to be accepted. Because of his limitations he tried to gain the acceptance he wanted by getting possessions and by telling people things he thought would make them like him. He did not understand that he could not afford the things he bought and he didn't understand that people would know the things he was telling them were not true. Many women were attracted to Alfred but he could not maintain a relationship. He did not have the ability to think of different ways to solve problems with his wives and girlfriends. His mind just did not work that way. He could not reason through a problem. The same things caused him financial

problems. He just bought things without understanding how hard it would be to make the payments. Alfred could not consider the consequences of his actions. Things that would be obvious to a normal person were not obvious to Alfred.

9.    I was only contacted a couple days before Alfred's trial. I tracked down the attorney who was representing Alfred and called him to find out what was going on. Then

Case 2:02-cr-00216    Document 397-3    Filed 05/15/2007    Page 4 of 164

someone called me. The person who talked to me had me confused with someone else. If they had gotten to know Alfred's family they would have known the difference between his mother's children and his father's children. When I was on the stand I was shown horrible pictures of the baby that died. It was the first time I had seen the pictures and it really shook me up. I wish I had been better prepared.

10.    When I saw Alfred in the courtroom he was acting inappropriately. He winked at me during my testimony. He was being very strange.

11.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michelle Armont

Dated: 4/26/07

18

## DECLARATION AND AFFIDAVIT OF NATHANIEL BANKS
## PURSUANT TO 28 U.S.C. § 1746

Nathaniel Banks, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.    My name is Nathaniel Banks. I grew up in Paulina, Louisiana. I now live in

Bonner Springs, Kansas. I am juvenile probation officer. I am also a pastor at a

local church in Bonner Springs.

2.    Alfred and I grew up together in Paulina, Louisiana. I know his whole family.

We lived right in the same little area. We are close in age. I am just a little bit

younger. We were in the same ~~class~~ grade ??. in school.

3.    Alfred was a fragile child. He spent a lot of time by himself. People used to pick

on Alfred a lot. Children sometimes do that. I just remember Alfred crying at

anything. Someone would tease him and he would break down crying. People

used to call him names – they called him "white punk". Alfred has a real light

complexion. Kids used the word punk to mean that he was weak. Alfred wasn't

any good at sports. He didn't play sports with us. ~~At recess he wasn't good at those games we played outside.~~ In my opinion

4.    Alfred always looked up to his older brother Lloyd. As an adult Alfred has been

trying to keep up with Lloyd. Lloyd does well for himself. Alfred wanted that for

himself. Alfred wanted to impress people. Alfred lied a lot. I remember that

Alfred would say things that you just knew weren't true. I used to work for the

sheriff's office. Alfred told people he worked there. He was never a proper

deputy. Alfred tried to build himself up present himself ~~I think Alfred needed to feel important and that is why he lied, to cover~~ as more than he was. ~~up his shortcomings.~~ I think Alfred lied so much he started to believe it.

5. Alfred told me that he was driving an 18-wheeler truck. I didn't believe him.
When he pulled up to my house in his tractor-trailer I was shocked. There was no
~~N.B. coordination~~
way Alfred had the ~~intelligence~~ and skill to drive that thing. I wondered to myself
who in the world would allow him to drive that truck.

6. I hereby certify that the facts set forth above are true and correct to the best of my
personal knowledge, information, and belief, subject to the penalty of perjury,
pursuant to 28 U.S.C. § 1746.

Nathaniel Banks

Dated: 5-10-07

19

## DECLARATION AND AFFIDAVIT OF ISAAC BOURGEOIS III
## PURSUANT TO 28 U.S.C. § 1746

Isaac Bourgeois III, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Isaac Bourgeois III.  Alfred Bourgeois is my cousin.  My father, Isaac Bourgeois, Jr. and Alfred's mother, Eunice, are brother and sister.  Their father was Isaac Bourgeois, Sr.

2.      Isaac Bourgeois, Sr. left land to the family when he died.  Issues about the land have never been formally settled and sometimes it causes problems among the descendants of my grandfather.  We did not always see eye to eye with Alfred's mother, Eunice.  I've had my troubles with Alfred but I do not want to see him executed.

3.      Alfred's mother used to pick at his nose until it was disfigured and one side was bigger than the other.  Eunice was so abusive to Alfred that he was sent to live with a neighbor lady, Miss Mary. Out of all her kids, Alfred was the only one that she abused. I don't know why this was so. JBII

4.      Alfred used to be very close to my brother, Wardell.  Alfred and I used to hang out together too.  Unfortunately we lost Wardell to cancer.

5.      I did not want to testify against Alfred.  My mother and I were given subpoenas and told we had to leave right away for Corpus Christi.  I told the people prosecuting my cousin

about the abuse he suffered.  Alfred's attorneys never talked to me or I would have told them

about the abuse just like I told the people working against Alfred.


6.    I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28

U.S.C. § 1746.


Isaac Bourgeois

Dated: 5-10-07

Case 2:02-cv-00216 Document 397-3 Filed 05/15/2007 Page 11 of 164

20

## AFFIDAVIT / DECLARATION OF MURRAY BOURGEOIS
## PURSUANT TO 28 U.S.C. § 1746

Murray Bourgeois, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' cousin. My father was Harry Bourgeois. He and Alfred's mother, Eunice, were cousins.

2.      My family and Alfred's family lived on Bend Lane in Paulina. My Dad started a car repair business on the Bend and he taught me and Alfred's older brother Lloyd how to repair cars. Lloyd caught on quick and eventually took over the garage. My Dad really helped Lloyd get started and now he is a successful businessman.

3.      Eunice was the kind of person who yelled at her kids and whipped them all the time, but Alfred got more beatings than any of them. She was really hard on Alfred.

4.      For a long time, Alfred didn't even live in his Mom's house. He lived down the street with an older lady from church. Miss Mary was the Mother of the Church and didn't have a husband. Alfred's Mom said that he had to stay with her because Miss Mary was frail. Even though Miss Mary treated him better than his own mother, Alfred was hurt by being sent out of the family household. By taking care of Miss Mary, Alfred missed a lot of family outings. He didn't feel like he was a full member of the family and it ate away at him inside.

5.      Alfred had a hard time at home and had a hard time at school. He was always getting teased at school. He was scared of the other boys and would come home from school crying, saying that a certain kid had been messing with him. He would ask his older brother Lloyd to fight for him, even though Lloyd was physically smaller than him. Down deep, Alfred was afraid. He was the kind of kid who took the teasing inside. It scarred him for life.

6.      Lloyd was Alfred's idol since Alfred didn't grow up with his own dad. Alfred tried to copy everything that Lloyd did. If Lloyd bought something, then Alfred

would try to buy the same thing. If Lloyd started a business, then Alfred would try to start a business. The only problem was that Alfred was not as smart as Lloyd, so Alfred would fail. Still, Alfred kept trying to be like Lloyd.

7.     Alfred would not talk about his problems directly, but you could see them. He always had something to prove and would try to make people believe that he was better than he was. He became known as a braggart who would exagerate or lie on himself in order to impress everybody. He would cover up his failures by telliing tales that he thought made him look good. We used to say that Alfred would lie faster than a horse could trot. I always thought that Alfred's tall tales were related to him being scared as a child.

8.     No one from Alfred's legal team talked to me at the time of his trial. Someone talked to my Dad, Harry Bourgeois, but not me. If they had spoken to me, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Murray Bourgeois

Dated: May 10, 2007

21

## AFFIDAVIT / DECLARATION OF WILMER BOURGEOIS, SR
## PURSUANT TO 28 U.S.C. § 1746

Wilmer Bougeois, Sr., pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' maternal uncle. Eunice Bourgeois was my younger sister.

2.      All of us were raised up in the church. We all walked the straight line because our parents were church people and were very strict with us. Even Eunice was obedient to our parents when she was growing up.

3.      Eunice was a weak person. She was not that smart and slow in understanding. She was the slowest of all of my brothers and sisters.

4.      Eunice did not know how to raise children. She didn't raise them right or teach them the right things. She didn't spend enough time with her kids. My sister Eunice should have never been a mother.

5.      Eunice let other people raise her children. Anyone could just come by the house and pick up a child. She just turned those children aloose and let them go with anyone. That is how her son Clyde drown. She let him go swimming with these people. The whole family was mad about her letting Clyde go with them. Daddy used to tell her that the boy should not be ripping and running with just anyone.

6.      Lloyd is my sister's olderst living boy. He turned out all right because my daddy, his grandfather, helped raised him. Later, his Uncle Harry taught him about car mechanics. Lloyd was lucky that he had my dad and his uncle around him growing up.

7.      Eunice took our mother's death hard. Mom took sick all of a sudden and died of a "stroke of the brain". Mom was a worrier and would go to pieces when things went wrong. Worry killed her. Eunice was like Mom in that she worried a lot. At the time of Mom's death, Eunice was pregnant and couldn't come to her funeral. Soon afterward,

she gave birth to Anthony. He is an invalid and has always needed someone to help with his activities of daily living.

8. After Mother's death, Eunice got loose. She was up and down the street and went to "juke joints" to drink, which was different than the way we were raised. Even though Dad didn't like it, he put up with it because he needed Eunice's help around the house after Mom died.

9. Soon after Anthony was born, Eunice started dating Alfred Sterling, a married man. He was a nice guy, but he didn't stick around after Alfred was born. Alfred had a rough time. He didn't have his daddy and didn't know what a daddy was. He had it rough.

10. In later life, Alfred would drop by my house. I didn't enjoy the visits because of the way he talked. He used to exhggerated things and wanted me to think that he was doing really well. I could understand him pretending that he had more than he did because there were so many things that he didn't have as a child. He grew up poor. The talk that I really didn't like was his saying that everyone was trying to do something to him. He was paranoid. He said that people were always doing this or that to him or talking about him. I listened to him and I could understand it because Alfred had a really hard life growing up.

11. No attorney or investigator representing Alfred ever spoke to me before or during his trial in Texas. If someone from Alfred's defense team had asked, I would have told them about Alfred and his family and would have been willing to testify in court.

12. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Wilmer Bourgeois, Sr.

Dated: May 9, 2007

22

## DECLARATION AND AFFIDAVIT OF LAWANDA COOK
## PURSUANT TO 28 U.S.C. § 1746

Lawanda Cook, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Lawanda Cook, and Ivy Thomas is my cousin. I knew Alfred Bourgeois during the time that Ivy and him dated.

Case 2:02-cr-00216    Document 397-3    Filed 05/15/2007    Page 18 of 164

2. From the second I met Alfred I knew that he wasn't right. He always acted crazy and I never could see what my cousin saw in him. You could tell that his mind wasn't all there.

3. He would take crazy chances in the truck he drove. I remember one time he was driving the truck and I was sitting in the back near the sleeper compartment. He stood up in his seat and turned around to talk to me than he acted like he was going to walk back to me. I was scared to death and it didn't seem to affect him at all.

4. I always thought Alfred was really slow like a child. He never seemed to understand anything. I used to have to repeat the same thing over and over again to him and even then I'm not sure he understood what I was saying to him.

5. I remember one time Ivy was making ox tail for dinner, and Alfred asked us what it was. I thought that was really strange. At first I thought he was kidding us, but it became clear he wasn't joking so I explained to him that ox tail was from a cow. He got all red in the face and looked really upset. Then he asked us well is it an ox or a cow. I was stunned. I kept trying to explain to him that it was the same thing but he insisted that it couldn't be the same.

5. I always thought that Alfred acted like a child. When Alfred would see something as ordinary as a tree he acted like it was the first time he ever saw it. He had to have seen a tree a million times but he always acted like it was so amazing. It seemed like something a really

young child would do.

6.    No attorney or investigator ever contacted me and asked me about Alfred when he

was on trial. I would have answered any questions by Alfred's attorney and I would have

testified for Alfred if I had been asked.

7.    I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28

U.S.C. § 1746.

Lawanda Cook

Dated: 5-1-07

Case 2:02-cv-00216   Document 397-3   Filed 05/15/2007   Page 20 of 164

23

<u>DECLARATION AND AFFIDAVIT OF ANTHONY DUMAS</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Anthony Dumas, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Anthony Dumas. Robin Bourgeois is my niece. My sister, Veronica Batiste, is Robin's mother. I lived with Robin and her husband, Alfred Bourgeois, prior to his arrest.

2.      I had to live with Robin and Alfred because Veronica had put me out of our mother's house. Veronica Batiste had gotten our mother to sign some papers when she was not in her right mind. Those papers allowed Veronica to take our mother's house right out from under me. Veronica did a wrong thing when she did that and it hurt me a lot that my own sister would pull something like that.

3.      Besides living with Alfred and Robin I also went on trips in Alfred's truck with him. I had a nice time with Alfred on his truck, but I could also sense that something was wrong with Alfred. I was around when he got the letter saying that he had another daughter. It was very hard for Alfred to understand that letter. I paid a lot of attention to him around that time. He went into a state of depression.

4.      Alfred would just go off sometimes. I have seen him go into a frenzy. He would pull at his head like he was pulling his own hair out. Only thing was that he had a shaved head. There was no hair there to pull but he kept tugging at something only he could feel. He would mutter and not be able to answer me or hear me when I spoke to him. He talked nonsense. He was very agitated and his movements were jerky. At those times it was like something satanic got hold of him. He was not Alfred at those times. Nothing I would do or say would calm him

down. I left him alone, but I kept an eye on him when he was like that until he snapped out of it.

5.     I spoke with the FBI and testified at Alfred's trial. I would have been willing to talk to Alfred's attorneys and testify about the things in this affidavit if I had been asked.

6.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Anthony Dumas

Dated: 5/9/7

Case 2:02-cv-00216   Document 397-3   Filed 05/15/2007   Page 23 of 164

24

Case 2:02-cv-00216   Document 397-3   Filed 05/15/2007   Page 23 of 164

## DECLARATION AND AFFIDAVIT OF ANITA FERDINAND
## PURSUANT TO 28 U.S.C. § 1746

Anita Ferdinand, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Anita Ferdinand. I am married to Alfred Bourgeois' brother, Lloyd. I have known Alfred for over ten years.

2.      Alfred's mother, Eunice, was not the kind of mother who upheld her kids when others accused them of something. She told me if she whipped the wrong one she just figured they probably deserved it anyway.

3.      Alfred acted oddly in regards to money matters. It was weird how he could be very generous and then incredibly tight with money. I remember the last family Christmas we had with him. He was the most generous one there. He gave every person a present. He gave the girls perfume. He gave his brothers boots. He gave me a "worry box" with angels on it.

4.      But then at home Alfred would put a lock on the thermostat so it could not be changed. He would mark the mileage in the car so he would know exactly how much it had been driven. He was very concerned with money but then he would imitate what Lloyd and I had. When we got a pool he got a pool. When we got a jacuzzi, he got a jacuzzi. He would buy a big Ford Expedition and then the electricity would be turned off at his house. It was like he did not understand the relationship between spending too much money and then not having enough to pay bills.

5.      When Alfred got that baby, Robin told my daughter that she was not going to do anything for her and she was not happy to have two babies that were not toilet trained.

6.      The FBI spoke to me and when they found out I worked in Ochsner they said I

must know Robin because she was a nurse there. I told them she was not a nurse. She was a nursing assistant and should not have been representing herself as a nurse. Robin was bold. She was also a liar. One time Lloyd and Alfred's sister Michelle and I were at their house and just remarked about a chair we liked. Robin had a whole story about this chair. When Alfred walked in the room and we said something about it he gave a whole different story about the same chair.

7. The FBI talked to me, but nobody working on Alfred's behalf ever spoke to me before his trial. I went to Corpus Christi with Lloyd, and since I was not subpoenaed to be a witness, I went to go into the courtroom. Patti Booth stopped me and told me I was not allowed in the courtroom. After a while we were told by someone on the defense team that we should leave, so we went back to Louisiana. Then we got a call to come back and we were threatened with a bench warrant if we didn't return all the way to Corpus Christi right away. We went back but we were still not allowed in the courtroom and Lloyd was never called to testify.

8. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Anita Ferdinand

Dated: 5 /8 /07

25

DECLARATION AND AFFIDAVIT OF LLOYD FERDINAND
PURSUANT TO 28 U.S.C. § 1746

Lloyd Ferdinand, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Lloyd Ferdinand.  Alfred Bourgeois is my younger brother.  I have been asked by his lawyers to tell them what I know about Alfred's life.

2.      Alfred has always had a hard time with life.  He has tried to do many things, but everything he tried seemed to fail.  He was never able to maintain healthy relationships with women.  His marriages always failed.  He has gone from job to job and had many financial problems.

3.      Alfred and I have the same mother but different fathers.  My sister Claudia and I have the same father, Lloyd Ferdinand, Sr.  Our brother Anthony has a different father.  His father was Mr. Baker.  Anthony is seriously handicapped and has never been able to live on his own.  Alfred has a different father than any of the rest of us.  Keith and Michelle were my mother's children born after Alfred.  Their father is Godfrey Rixner.

4.      Maybe it was because of who his father was, but our mother was more brutal to Alfred than the rest of us.  She gave all of us whippings but  Alfred got more whippings than the rest of us.  She would pick on Alfred more and grab the belt quicker for him.  She would beat him for the slightest thing or for no good reason.

5.      Her beatings of Alfred got so bad that he went to live with a very old neighbor, Miss Mary.  I'm not sure how this happened, but I think she was aware of how terrible it was for Alfred in our home and she reached out to protect him.  Once he moved in with her we would see

1

him on the way to or from school but he missed being part of our family and didn't get to go on family outings with us.  Alfred had no rules and no discipline at Miss Mary's.  His father had no involvement with him as a boy.

6.  Things were no better at school.  The school was also rough, and Alfred got picked on and teased a lot because of his light complexion and green eyes.  They said he was a white boy with green eyes.  They beat him up and he was helpless.  Michael Clayton, one of Miss Mary's relatives, beat him up repeatedly.  Alfred was a coward and all he could do was cry when they picked on him.  My uncle told me that I should deal with it so I taught him how to fight back.

7.  In later years I came to know that the violence he suffered and his separation from the family had a bad effect on Alfred.  One time, as adults, we were at my sister's house and Alfred let loose with all the things that our mother did to him and how miserable he was being apart from us.  It was obvious that Alfred was deeply troubled by all the bad things that happened to him as a kid.

8.  Alfred was always slow.  He had slow reactions.  He was late doing things.  He was not good at riding a bike.  Alfred always wanted to be like me.  My Uncle Harry took me under his wing and taught me a lot of things that helped me become a success.  Alfred did not have anyone to do that for him.  He over-stressed himself trying to have what I had.  He was competitive with me.  But he was not able to do what I could do.  He tried hard to make it look like he was a success.  He would buy cars he could not afford.  He would buy cars for other people that he could not afford to pay for.  I helped him with car notes sometimes.  I would try and help him but sometimes he got himself in so deep that it was impossible to get him out of the

2

mess he had made. He made a mess out of everything he ever tried. One time he signed an agreement with a trucking company that resulted in him working for them and making money for them but not getting paid himself for months. When I looked at the agreement I could tell right off that it was a bad deal for him and I don't even read that well.

9. The more Alfred struggled, the deeper in trouble he got. He wanted to be the model family man. As each relationship failed, he would hook up with another woman. The kids and relationships mounted along with the financial strains. So, the more he tried to look like a normal family man, the farther he got from that. He was just unable to make things work.

10. Alfred had a lot of pressure on him by the time he found out that he had another child he hadn't even known about. He had pressure trying to keep his house, problems making child support payments, his wife, Robin, had an affair with another man, and he wasn't even getting paid regular pay checks. Everything was coming crashing down on him.

11. When Robin found out that Alfred was getting the baby for a lengthy visit she told my step-daughter that she wasn't happy that she would have two babies in diapers to care for. She said she was not going to do anything for that baby. My step-daughter told Robin that it wasn't right for her take it out on the baby.

12. I could have helped Alfred deal with the reality of his situation prior to trial if I had been able to meet with him face to face. I could have had a heart to heart talk with him and he would have listened to me. I would have told him he had to tell the truth and take the consequences of his actions. I am the one person that could have been helpful in getting him to understand the reality of his situation and that a plea resulting in a life sentence would have been a much better thing than risking his life like he did. His attorneys were working to get me a visit

3

with my brother but at the last minute it was stopped. That visit could have saved so much trouble and pain for everyone involved.

13. I told Alfred's attorneys that we could bring a bus load of people from our church to Corpus Christi for Alfred's trial. They did not want me to arrange that. I thought it would have helped to have people there that cared about Alfred and wanted to support him.

14. Before his trial, a woman who was working on Alfred's behalf came and talked to me at the McDonald's in La Place. She asked me a few questions about Alfred and talked a lot about what a good time she had on Bourbon Street in the French Quarter of New Orleans the night before. She really enjoyed her trip to Louisiana.

15. My wife and I made the trip to Corpus Christi to be there for Alfred's trial. I was willing to testify for my brother but they never permitted me to testify. At one point they told us to go home so we did. Then they told us to turn around and get back to Texas. We did what they asked but they never asked me to get on the stand.

16. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Lloyd Ferdinand

Dated: 5- 8- 07

4

Case 2:02-cv-00216   Document 397-3   Filed 05/15/2007   Page 31 of 164

26

<u>DECLARATION AND AFFIDAVIT OF BEVERLY FRANK</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Beverly Frank, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the

following is true and correct:

1.      My name is Beverly Frank.  I grew up in Saint James Parish in Louisiana.  I lived

in Paulina until I was 12 or 13 years old, then my parents moved to Lutcher which

is only a mile or so away.  I now live nearby in LaPlace, Louisiana.  I still have

lots of family who live in Paulina.

2.      My grandmother was Mary Clayton.  She was my father, Herman Clayton, Sr.'s

mother.  My grandmother raised Alfred Bourgeois from about the age of eight

until he was grown.  Alfred's mother's name was Eunice Bourgeois.  Eunice had

several children including Alfred.  I know Alfred's older brother, Lloyd, and his

older sister, Claudia.  I know their father.  He played the organ at Evergreen

Baptist Church.  I know Alfred had a different father than his older brother and

sister.

3.      Alfred's mother treated him differently than her other children.  She talked to

Alfred differently and she treated him differently too.  I saw her give her other

children money and not give Alfred any money.  I also saw her give cookies to her

other children and not give Alfred any cookies.

4.      Eunice whipped all her children.  She was a single parent for several years and she

disciplined the children herself.  Eunice would use a switch or anything else she

could get her hands on to whip the children.  I know she would whip the children

1

so much that they would have welts on their body. I believe you should never whip a child that much.

5.   My grandmother saw the way that Eunice mistreated Alfred. She took him in because of the terrible way that Eunice treated Alfred. My grandmother had a good sense of right and wrong and she wanted to help Alfred. She believed that every child deserves love.

6.   Eunice used to always mess with Alfred's nose. She would pick his nose and irritate it really bad. I saw Eunice do this to him. She would pick and scratch his nose with her fingernails. I have no idea why she would irritate his nose like that. I never saw Eunice touch her other children's noses. I never saw the other children with irritated noses. Alfred's nose was frequently bleeding. He walked around with cotton or tissue in his nose. Over the years this disfigured Alfred's nose. It wasn't like that when he was little. Alfred would cry a lot and complain that his nose hurt. He wouldn't let anyone touch it. My grandmother used to put Vaseline on his nose to heal it, to soothe it. She did this to offer him some relief. But just as soon as my grandmother had gotten Alfred's nose healed his mother would mess it up again. This upset my grandmother so much. As fast as my grandmother would heal his nose, his mother would mess it up again. That child was afraid to blow his nose. I know that when he was older he had trouble breathing through his nose.

7.   Growing up, Alfred wasn't a bright child. His grasp of learning was weaker than the rest of the children. People would notice this in conversations with him, in

2

little things he would say. Alfred didn't catch on to things as fast as the other children. I know children used to play games and Alfred had to have the rules explained to him over and over again.

8.    My grandmother used to sell things out of her house, including candy and frozen treats. Alfred tried to help her make change. He had a lot of trouble counting the change. My grandmother ended up doing that herself. My grandmother had a lot of patience with Alfred. She tried to teach him to cook simple things, like frying an egg or frying toast. He had trouble following directions, remembering simple tasks. Alfred was very slow to pick these things up. She was really patient with him.

9.    Deep down inside I feel bad for Alfred. I know he suffered hardships as a child. His mother mistreated him and was too harsh in disciplining him. His mother made Alfred feel unwanted within his own family. My grandmother did her best to help Alfred but his mother continued to hurt him.

10.   No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

11.   I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Beverly Frank_
Beverly Frank

Dated: _May 9, 2007_

3

27

**AFFIDAVIT / DECLARATION OF ALLEN HENRY
PURSUANT TO 28 U.S.C. § 1746**

Allen Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.     I am Alfred Bourgeois' cousin. My mother is cousins with Alfred's mom Eunice. I grew up with him on Bend Lane in Paulina, La..

2.      When we were growing up, All of Eunice's boys would rather sleep at other people's houses than their own. They would rather lay on the floor at my house than sleep at home. All the boys would go wherever they wanted to go. When night came, Eunice would not call them home or even call to see where they were. Those kids rambled. One of the boys, Clyde, drown when he was spending the 4th of July away from his family. That is what happens when you ramble from house to house.

3.     Eunice used to be rough on Alfred. She used to chastise him more that her other kids and used to beat him more than the others.

4.     There was an older lady from church named Miss Mary that lived on the Bend. She lived alone and Eunice sent Alfred to stay with her. After school, Alfred would play with us, but while we were still playing, Miss Mary would be ready to go home and Alfred would have to go with her. He would be sad when he had to leave us to go in early to take care of Miss Mary. It hurt him to have to live outside of his family.

5.     Alfred was a clumsy kid growing up. He could barely ride a bicycle and we would tease him about being so awkward.

6.     Alfred was kind of dumb, but he tried to hide it by telling tall tales. He would lie to cover up what he didn't know or understand. It was hard to tell exactly what he knew because he exaggerated about himself, but when you really looked into it, the story didn't make any sense. Even though he wasn't smart, he was motivated to measure up to his older brother Lloyd's example. He wanted to be like Lloyd, but couldn't because he just was not bright enough.

7.     Alfred wanted everyone to believe that he knew about cars. His brother

Lloyd was known to be a great mechanic. One time Alfred had a bad engine leak, but still drove the car. We told him that he might hurt the engine, but he drove it anyway. He didn't understand the consequences of the engine problem, but didn't want to admit it.

8.      I was never contacted by Alfred's lawyers or investigator before his trial. If someone had asked, I would have told them what I knew about Alfred and would have been willing to testify in court.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Allen Henry

Dated: May 10, 2007

# 28

## AFFIDAVIT / DECLARATION OF JERSEY HENRY
## PURSUANT TO 28 U.S.C. § 1746

Jersey Henry, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1.      I am Alfred Bourgeois' cousin, but he considered me his aunt. I am his mother Eunice's cousin. We lived in Bend Lane in Paulina, La.

2.      My cousin Eunice was a neat freak. She kept her house very clean and you could eat off her floors. Her mother Edna was the same way.

3.      Eunice seemed depressed after she was divorced from her first husband Lloyd Fedinand, Sr.. She looked like she was always worried about something. After the divorce, she moved back in with her parents in Paulina.

4.      Eunice let her kids spend time with anyone. She was not discriminating. Her boys would regularly prefer to sleep on the floor in my house than to go home. They would be here late and I was surprised that Eunice never even called to see where they were. Those children rambled from house to house. Clyde was Eunice's son by Ferdinand and he drowned in a spillway when he was out with some people. Eunice was hurt by Clyde's death and I am not sure that she ever recovered from it.

5.      Eunice treated Alfred differently from her other children. She scolded him more and whipped him more. She also didn't pay enough attention to him. She sent him to live with an elderly woman named Miss Mary. Even though Miss Mary treated him better than his own mother, I thought that it was not very motherly for Eunice to send him away. I never could figure out why she did it, but I wondered if there was some money behind it.

6.      Alfred's being sent away from his family to live with Miss Mary hurt him. He felt rejected by his mother. After school, he would play with his brothers and the other children on the bend while Miss Mary visited families in the neighborhood. However, when Miss Mary was be ready to go home, then Alfred would have to go with her. She went home early and Alfred was sad when he could not keep playing with the other kids.

7.      Alfred had a problem with telling the truth. He started lying about things when he was in elementary school. Sometimes it was for attention and sometimes it was to make people think that he was more than he was. When he was young, it was pretty easy to catch him in fibs because some of them were so obviously not true. Telling tales became a habit with Alfred as he got older. I oftern wondered if he started to believe his own tales. It was difficult to know how smart he was because he was always exaggerating.

8.      I would have been willing to testify about all the things in this statement.

9.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jersey Henry

Dated: May 10, 2007

29

## DECLARATION AND AFFIDAVIT OF YVONNE ROBINSON JOSEPH
## PURSUANT TO 28 U.S.C. § 1746

Yvonne Robinson Joseph, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Yvonne Robinson Joseph. I am Alfred Bourgeois' cousin. My mother, Lovenia Bourgeois Robinson, and his mother, Eunice, were sisters.

2. I am about eight years older that Alfred. My family lived in Lutcher, but my mother would leave us with the extended family on Bend Road during the day. We spent a lot of time with Alfred's family on Bend Road in Paulina.

3. Alfred's mother used to pick on him and treat him bad. She treated him much worse than she did her other children. She was always fussing at him and whipped him more than the others. She used to call him "little yellow bastard" and slap him for nothing.

4. His mother used to mess with Alfred's nose. He always had a big sore on his nose and his mother would put her finger nail on it and make it bleed. Grandfather Isaac used to ask Alfred's mother why she kept messing with that boy's nose. She wouldn't answer.

5 After a while, Alfred lived with an older church lady in Paulina. She took him in because he was being treated so bad by his mother. That old lady treated Alfred better than his own mother.

6. Even though his mother treated him bad, Alfred was crazy about his momma and always treated her very good.

7. When I was spending time in Paulina, I thought that Alfred was the nicest one in his family, but I worried about him when he grew up. He was raised around violence and I worried that it might affect him in later life.

8.	No attorney or investigator for Alfred spoke to me before or during Alfred's trial. If anyone would have asked, I would have told them what I knew about Alfred.

9.	I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dated: 5/9/07

30

## DECLARATION AND AFFIDAVIT OF KATHLEEN KAIB
## PURSUANT TO 28 U.S.C. § 1746

1.      My name is Kathleen Kaib, and I am employed as an investigator/mitigation specialist with the Community Defender Office.

2.      I interviewed Orlando Campos on May 7th, 2007 from 9:05 a.m. - 10:15 a.m. along with James McHugh, Esq. at North Texas Intermediate Sanction, in Fort Worth, Texas.

3.      On May 27, 1999, Mr. Campos pled guilty in Bee County to burglary of a habitation (2d degree) (B-99-2-055-CR-B.)  On January 23, 2003 his probation was revoked due to a delivery of cocaine case (B-02-2-114-0-CR-B) and was sentenced to twelve years incarceration.

4.      Mr. Campos was sent to Bee County Jail in 2002 where he was housed with Alfred Bourgeois and Wiley Taylor.  They were housed on a very small pod.

5.      At some point while he was incarcerated with Wiley,  Wiley told him he had spoken to the FBI about Bourgeois and they were going to help him (Taylor) with his case.

6.      Mr. Campos was interviewed telephonically on December 20th, 2002 by FBI agent, Megan Beckett.  He told Beckett about his conversations with Bourgeois.  Sometime thereafter Campos met with Beckett and Patti Booth in person prior to the trial.

7.      Mr. Campos asked AUSA Booth or FBI Agent Beckett if they could help him by writing a letter to the parole board.  They told him they could not help him now but they could after the trial.

1

8.   Campos testified against Bourgeois in both phases of the trial. Campos served his sentence and missed his first parole date. He then asked his mother to call Patti Booth to see if she had written the letter she had promised.

9.   Mr. Campos did make parole on his second date in October, 2005 less than three years into his 12 year sentence . He is currently serving sixty days in jail for a parole violation and traffic offense.

10.   I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Kathleen Kaib

Dated: 5/14/07

2

31

<u>Affidavit of Adam Longoria</u>

1) I Adam Longoria hereby declare and swear as follows:

2) I was a witness against Alfred Bourgeois in his federal capital case.

3) I met Alfred while in the Nueces County Jail.

4) I was in jail because I had a robbery case and a probation violation for evading the police.

5) My original attorney was Mickey Kolpack but he died. Then I was represented by attorney Jerry Gonzales.
After that I was represented by Bill May.

6) I spoke with prosecutor Patti Booth prior to my testimony in Bourgeois' trial. She told me she could not promise me anything now but after I testified she would be happy to help me in the future with my cases or parole.

7) My original offer was 35 years for my robbery case and probation violation.

8) I eventually pled guilty and recieved a 7 year sentence for both my robbery case and probation violation

9.) Since the Bourgeois trial Patti Booth has written a letter on my behalf to the parole board and she mentioned in that my cooperation in the Bourgeois trial.

10.) At the time I was housed with Bourgeois and at the time I testified against Bourgeois I had post traumatic stress disorder and was on medication for this. These were anti-psychotic drugs and Paxil. Patti Booth knew about the medications I was on.

11.) I hereby swear that all of the above is truthful.

#1033335
Stiles Unit
3060 F.M. 3514
Beaumont, Tx.
77705-7635
April 24, 2007

This sworn statement was written and the signature witnessed by James McHugh this date: 4/24/07

The writing & signing of this statement was witnessed by Victor J. Abreu this date: 4/24/07

32

## AFFIDAVIT/DECLARATION OF BILL MAY
## PURSUANT TO 28 U.S.C. §1746

I, Bill May, hereby declare and swear as follows:

1.      I am presently retired from the practice of law and residing in Corpus Christi, Texas. In 1978 I was admitted to practice law in the state of Texas.

Case 2:02-cr-00216 Document 397-3 Filed 05/15/2007 Page 51 of 164

2.      From 1978 to 1980 I was in private practice. From 1980 to 1989 I was an Assistant District Attorney for the county of Nueces in the state of Texas. For the last four years, I was the First Assistant District Attorney. During my time in the District Attorney's office, I personally prosecuted and won convictions in capital murder cases. Also, while at the District Attorney's Office, I personally drafted and developed the written plea agreement form that is still being used in Nueces County for pleas of guilty with agreements.

3.      In 1989, I left the District Attorney's Office and went into private practice. My practice consisted primarily of criminal defense in both state and federal court. I retired from the practice of law in 2006.

4.      On November 13, 2003, I entered my appearance on behalf of Mr. Adam Longoria. Mr. Longoria was in custody in Nueces County Prison charged with aggravated robbery (F1) habitual felony offender. This charge arose from a bank robbery which had taken place on May 30, 2003. On that charge alone, Mr. Longoria was facing a mandatory sentence of twenty-five years to ninety-nine years. This case was No. 03-CR-1884-E.

5.      Mr. Longoria, at the time of the robbery offense, was three months into a ten year probation sentence arising in Nueces County from a plea of guilty to evading arrest or detention using vehicle and for endangering a child. This case was No. 02-CR-3585-E. This probationary sentence resulted *only* after the state had agreed to waive the habitual offender

B.M.                                              Page 1 of 3

mandatory sentencing enhancement.

6.  I knew, based on these two cases, that Mr. Longoria was facing a life sentence or the equivalent if he was convicted of bank robbery.

7.  Mr. Longoria's defense to the bank robbery was that he did it - but was forced to do it by members of the gang he had belonged to, Texas Syndicate. I knew this would

Case 2:02-cr-00216  Document 397-3  Filed 05/15/2007  Page 52 of 164

be a *very* difficult defense to prevail upon in front of a jury

8.  At some point in the winter or spring of 2004, Mr. Longoria advised that he was considering cooperating with the FBI against Mr. Alfred Bourgeois in his federal capital case.

9.  I then recall receiving a telephone call from A.U.S.A. Mrs. Patty Booth. She asked if it would be ok to speak with Mr. Longoria and I granted her permission to do so.

10.  Some time after that phone call with Mrs. Booth, Mr. Longoria told me that he had in fact spoken with Mrs. Booth. He was expecting that she would help him after his testimony in the Bourgeois case. I told him that in my experience, if he testified well in the Bourgeois case, he could expect to get some type of benefit in his Nueces County cases.

11.  Mr. Longoria testified against Mr. Bourgeois in his federal capital case in March 2004.

12.  On April 19, 2004, I appeared in Nueces County Court. Mr. Longoria's robbery case (No. 03-CR-1884-E) and his probation violation case (No. 02-CR-3585-E) were ~~listed~~ posted they for disposition that day. I spoke with the state prosecutor, Jimmy Sales and asked him if he had spoken with Mrs. Patty Booth. He told me that he had spoken to her. Assistant District Attorney Sales dropped the habitual offender mandatory aspects of the robbery case and offered Mr. Longoria a seven year sentence on the robbery case and a seven year sentence on the probation

B.M.                               Page 2 of 3

violation case. These sentences were to run concurrently. He also offered to reduce the sentence *July*

even further to 5 years if Mr. Longoria ~~corroborated with him~~ *Cooperated as a witness in a ~~state~~ case* in the next thirty days.

13.    The main reason for Mr. Sales dropping the habitual offender mandatory

aspects of the robbery case and offering Mr. Longoria a total of 7 years incarceration was because

of his conversation with Mrs. Patty Booth and his testimony in the Bourgeois case.

14.    I hereby certify that the facts set forth above are true and correct to the best of

my personal knowledge, information and belief, subject to 28 U.S.C. §1746.

_____
Bill May

Dated: ___May 1, 2007___

_B.M._                                           Page 3 of 3

Case 2:02-cv-00216   Document 397-3   Filed 05/15/2007   Page 54 of 164

33

## AFFIDAVIT / DECLARATION OF ELNORA BOURGEOIS MCGUFFEY PURSUANT TO 28 U.S.C. § 1746

Elnora Bourgeois McGuffey, pursuant to 28 U.S.C. § 1746, swears, affirms, and deposes that the following is true and correct:

1. I am the maternal aunt of Alfred Bourgeois. His mother Eunice was my younger sister.

2. Eunice was married to a man named Lloyd Ferdinand and had three children by him. They lived as a family in Lutcher. It seemed like she was happy, but Ferdinand ran around a lot with other women. Then, out of the blue, Ferdinand asked Eunice for a divorce. This crushed her and she was never the same after they divorced. It was like she had something on her mind all the time.

3. After Eunice divorced from Ferdinand, she and her three children moved back into our parent's house on Bend Road in Paulina. She needed extra help with the kids and got it from our parents. She depended on Mother quite a bit. Eunice got pregnant and while she was in the hospital for delivery, mother suddenly got sick and died. Eunice couldn't go to the funeral because she was in the hospital getting ready to deliver. The baby that was born was named Anthony and ended up having developmental problems that were life long.

4. Eunice started dating a married man and got pregnant. This was Alfred's father. After Alfred was born, his father didn't have anything to do with him.

5. When he was young, Alfred had a problem with his sinuses. My sister used to pick his nose with her fingernail, causing it to bleed. All of us use to get after her for picking his nose, but she would just ignore us. She sure dealt with his sinus problem in a strange way.

6. I lived in Baton Rouge and would visit Eunice in Paulina. I was surprised to find that Alfred was not living with his mother. He was staying with an elderly lady from church. Even though the elderly lady needed help, I never undstood why little Afred stayed with her instead of living with his family.

7.  Alfred's older brother Lloyd was a role model for him. Lloyd was kind of well off and Alfred would always try to do what Lloyd did. Alfred was not as smart as Lloyd, but he wanted everyone to think that he was. Alfred would brag on himself, even when it wasn't true. You never knew how much Alfred knew about anything because he was always exaggerating so much. He had a problem with that. Alfred would try to make himself seem like he was doing better that he was, more successfull than he was and smarter than he was.

8.  I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Elnora Bourgeois McGuffey

Dated: May 9, 2007

34

<u>DECLARATION AND AFFIDAVIT OF ALTON PRESTON</u>
<u>PURSUANT TO 28 U.S.C. § 1746</u>

Alton Preston, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.  My name is Alton Preston. I live in LaPlace, Louisiana. I work at Winn-Dixie. I have been there over 30 years. I have a Bachelor's Degree from Southern University in Business Administration. I also have a Master's Degree in Divinity. Alfred Bourgeois and I have been close friends for over 20 years.

2.  Alfred talked to me about his childhood from time to time. Alfred told me that his mother, Miss Eunice Bourgeois, mistreated him. Alfred told me that his mother didn't treat him the same way she treated her other kids. Eunice saw Alfred as an unwelcome reminder of his father. Alfred said that Eunice used to whip him very badly. He told me she beat him for no reason and that it happened quite frequently. Alfred said that he received more whippings than any of his brothers or sisters. Alfred confided in me about his childhood before he was arrested in this case. We talked about this many years ago.

3.  Alfred also told me that he was raised by an older lady in the community. Alfred also told me that his mother burned him with cigarettes. Alfred talked to me about being mistreated several times while were discussing our families. He was definitely hurt by it.



4.　　I would have testified for Alfred if I had been asked.

5.　　I hereby certify that the facts set forth above are true and correct to the best of my

personal knowledge, information, and belief, subject to the penalty of perjury,

pursuant to 28 U.S.C. § 1746.

Alton Preston

Dated: 5/1/07

35

DECLARATION AND AFFIDAVIT OF JEVONA JEANETTE RIXNER
PURSUANT TO 28 U.S.C. § 1746

Jevona Jeanette Rixner, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name Jevona Jeanette Rixner.  My husband, Keith Rixner, and Alfred Bourgeois are brothers.  They have the same mother but different fathers.

2.      I knew Alfred's wife, Robin, from high school.  We were in the same grade in East St. John High School.  Robin and I got along well.  Because we both married into the family we could share our thoughts about our husbands and their families.  We used to have what I call "out of family talks" since we were both kind of outsiders.  It was a bond we shared.

3.      Alfred clowned around with me a lot.  He was very good to my middle son, who is not my husband's child.   One Christmas a cousin forgot to get my son a present.  Alfred just went in his pocket and gave him $50.00.

4.      My husband, Keith, was his mother's favorite.  She spoiled Keith.  Alfred did more for his mother though, he gave her money for trips and bought her things.   Keith was favored by her just for being Keith but Alfred kept trying to earn her favor.

5.      My mother-in-law was very concerned about keeping her house neat.  Nothing could be out of place or she would be upset.  Even on wash day everything was neat.

6.      One Christmas Alfred's mother nitpicked with him about why the gathering was not at his house.  She was teasing him but he took her seriously and was very hurt over her comments.

7.      Just days before the baby died Robin and Alfred were at our house.  I saw Alfredesha and Alfreda but did not see the baby.  I asked about her and was told she was in the

truck, which was parked at the end of the road. They all came and visited and had lunch and didn't seem concerned about the baby. Robin and I went to the store and we passed right by the truck and I asked her if we could give the baby some food or something to drink and she said no. I tried everything I could think of to get Robin to let me see the baby but she kept me from the truck. Robin said she would figure a way out. I did not know what she meant by that.

8. Someone called Keith and spoke to him on the phone about Alfred. I told him he shouldn't talk to someone on the phone like that because he did not really know who it was. Someone was talking to people trying to help Alfred and I kept waiting on them to call me but nobody ever tried to talk to me about Alfred and the things in this affidavit before Alfred's trial. I would have met with them and I would have been willing to testify for Alfred if I had been asked.

9. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jevona Jeanette Rixner

Dated: x 5 / 10 / 07

36

DECLARATION AND AFFIDAVIT OF KEITH RIXNER

PURSUANT TO 28 U.S.C. § 1746

Keith Rixner, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Keith Rixner. Alfred Bourgeois is my brother. I am the youngest of my mother's children. Alfred has a different father than me or any of my brothers or sisters.

2. One of our brothers, Clyde, died at an early age. Clyde loved music. Even though he was just a boy he had decided he wanted to be an undertaker. He used to have pretend funerals for animals. It was very hard on all of us when Clyde died in an accident in a lake.

3. Alfred didn't stay with us growing up. I was so young that I couldn't understand why he wasn't living with us. He stayed with an elderly lady, Miss Mary. We called Miss Mary the mother of the church because she was the oldest woman in the congregation. Alfred had to be in the house with her early because she went to bed early. When we used to go to Baton Rouge to visit our Aunt Dorothy, Alfred couldn't go because he had to take care of Miss Mary. He was really disappointed when he couldn't go with us.

4. Alfred's dad was not around when he was growing up. He had to go looking for him when he was in high school. Alfred saw my dad spending time with me and that made him feel even worse about not having a father in his life.

5. Our family home burnt down shortly before Alfred got in this trouble. Our mother was living there with our brother, Anthony. Anthony always had to live with our mother because he had disabilities. It was also the house that our grandparents had lived in and there were a lot of family pictures and things that brought back memories in that house. When it burnt down everything was lost. Alfred asked us not to bulldoze it until he could come back and take a last look at the family home.

6. I met with someone that was working with Alfred's attorneys before his trial. We just met at the McDonalds in La Place and I wasn't really comfortable talking about personal things in a public place like that.

7. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Keith Rixner

Keith Rixner

Dated: 5/9/07

37

## DECLARATION AND AFFIDAVIT OF LOUIS RUSSELL, JR
## PURSUANT TO 28 U.S.C. § 1746

Louis Russell, Jr., pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.     My name is Louis Russell, Jr.  I grew up in Paulina, Louisiana.  I now live in Baton Rouge, Louisiana.

2.     My family lived right next door to Alfred Bourgeois, all his brothers and sisters and his mother, Eunice Bourgeois.  We are distant relatives.

3.     Growing up Alfred had a hard time.  He was a big and awkward kid.  We would all laugh at how he played sports.  He had big feet that he was always falling over.  Alfred always tried to fit in with other kids.  Alfred has always had an awkward nature.  At lunch we all tried to make Alfred laugh at the lunch table.  We would do it until milk ran out of his nose.

4.     I remember when he was a teenager that he was driving a four wheeler near the sugar cane fields.  He drove that four wheeler straight into a pole.  The whole neighborhood heard it when he hit the pole.  We couldn't believe it.  He ended up hurting himself pretty bad.  I know an ambulance came and took him away.

5.     Growing up Alfred was someone with a pretty good temper.  Alfred had a slow temper but once it boiled over it was hard to cool down.  It seemed like Alfred didn't know how to back down.  Alfred would be fighting with someone and getting the better of him but keep on hitting the guy.  During these instances Alfred was extremely intense.  He didn't respond to verbal requests to stop.  Short of physical restraint it seemed Alfred would not stop.  I never saw an instance where somebody didn't have to pull him off.  He was hard to calm down.

6.     No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified if I had been asked.

7.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_____
Louis Russell, Jr.

Dated: 5/9/07

38

DECLARATION AND AFFIDAVIT OF IVY THOMAS
PURSUANT TO 28 U.S.C. § 1746

Ivy Thomas, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Ivy Thomas.  I dated Alfred Bourgeois from 1995 to 1997.

Case 2:07-cv-00223    Document 2-2    Filed 05/15/2007    Page 69 of 164 I live in Birmingham, Alabama and I met Alfred at a friend's wedding. We started dating immediately. I would see Alfred about five times every three months.  We would talk on the phone all the time.

3.      When Alfred had a truck load that had to go through Birmingham he would stay with me for a night and some of the next day.  We always had such a good time together. Alfred was always very respectful, and kind to me.

4.      Alfred was really slow. I remember that I used to have to explain things to him several times, and even then it seemed like he didn't always understand what I was trying to say.

5.      One time I was frying pork chops, and he asked me what they were.  I was really surprised that someone as old as he was had never heard of a pork chop.  I told him what they were and that it came from a pig.  He seemed really confused about that.  At first I thought it was a cultural thing like they didn't have them in New Orleans, but he didn't even seem to understand how to cook so I know it wasn't just cultural.

6.      I really thought it was strange that he asked so many questions about cooking.  I would think that a grown man would have been around cooking and baking all his life.  His interest in my cooking was very childlike.

7.      Alfred used to talk a lot about how he grew up, and he would get very upset about his childhood.  He told me that his mother kept all his other siblings but gave him away.  Alfred

said that his mom treated him differently than all the other kids and it depressed him. His mom said he looked just like his father, and that is why she hated him so much. One time Alfred's mom got so angry at him she threw a cup at him and it cut his ear.

8.    I could tell that it really hurt Alfred the way his mom treated him. He would get so upset and cry when he would talk about it. He said he was sent to live with an old lady while his brothers and sisters got to stay with his mom.

Case 2:02-cr-00216    Document 397-3    Filed 05/15/2007    Page 70 of 164

9.    No attorney or investigator ever contacted me and asked me about Alfred when he was on trial. I would have answered any questions by Alfred's attorney and I would have testified for Alfred if I had been asked.

10.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Ivy Thomas

Dated: 5/1/07

39

DECLARATION AND AFFIDAVIT OF MICHELLE WARREN
PURSUANT TO 28 U.S.C. § 1746

Michelle Warren, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.     My name is Michelle Warren.  Alfred Bourgeois is my older brother.  We have the same mother but different fathers.

2.     Our mother had seven children.  Claudia was born first.  Then came Clyde, Lloyd and Anthony.  Alfred had a different father than any of the rest of us.  His father's name is Alfred Sterling.  Our mother was never married to Alfred Sterling.  Keith and I were born after Alfred and we both have the same father, Godfrey Rixner.

3.     Our brother Clyde died when he was just a boy.  He used to spend time with people in Mt. Airy and on the fourth of July he went on a fishing trip with an older man from that area.  He fell out of the boat and drowned.  Our mother felt awful about Clyde for a long time but then she saw him in a dream and after that she got some peace about his death.

4.     Our brother Anthony is handicapped.  He did not learn to walk until much later than normal.  He never learned to say more than a few words.  He always needed a lot of extra care.  He cannot live on his own.  Alfred helped to take care of Anthony and would buy him things.

5.     Alfred had trouble when he was a child.  Sometimes he would do just the opposite of what he was supposed to do.  He seemed to need more attention than the rest of us did and sometimes the things he did to get attention just got him in trouble.  Our mother was harder on Alfred than the rest of us.  I remember times I was allowed out but my older brother, Alfred, was not, so I would stay in the house with him.

6.      The children in our house, including Alfred, had a lot of chores to do. Our mother was a fanatic cleaner. There is a character in a movie, Sleeping With The Enemy, who is a fanatic about his house being in order. My mother reminded me of that character. Everything had to be lined up exactly. The cans in the cupboard had to have labels pointing in the right direction. Glasses had to be perfectly lined up. We had to get down on our hands and knees and scrub the baseboards. Every dish that was used had to be immediately washed, dried and lined up where it belonged. We had to wipe our shoes clean before coming into the house. Sometimes we got whippings for messing things up. Other times cleaning was used as a punishment. Alfred would have trouble listening to directions, so he would mess up more than the rest of us and get beatings more often.

Case 2:02-cr-00216    Document 397-3    Filed 05/15/2007    Page 73 of 164

7.      I have the tendency to be a fanatic about my house like my mother was. I resist the urge because I believe it is more important for my children to be comfortable and happy in my house than for everything to be perfect. I deliberately put glasses that don't match on one of my shelves so that I won't be like my mother. Alfred wanted a clean house when he was married and this caused some tension in his relationships.

8.      Our mother used to clean Alfred's nose all the time. She would stick her fingers deep inside and this caused sores. She cleaned it so deep, hard and often that the sore wouldn't heal.

9.      Alfred did not play sports in school. He got teased a lot. Sometimes it was because of his looks. He had bright green eyes which were very unusual. Sometimes they would call him "cat eyes". Alfred could not stand to be teased. He would get very mad when kids teased him. I remember telling my older brother Alfred that they were just jealous of his eyes. When he got older he started to realize that girls were attracted to his looks.

10.     When he was a boy, Alfred went to stay with an older woman.  Her name was Miss Mary.  She needed someone to be there with her and her own family was not providing the help she needed, so Alfred went to live with her.  Because she didn't live far from us we still saw Alfred but he was not really a part of the family when he went to live with her.

Case 2:02-cr-00216   Document 397-3   Filed 05/15/2007   Page 74 of 164

11.     Alfred had a couple accidents that I can remember.  One was very bad.  He was riding a three wheeler and slammed right into a tree.  Another time he was out of state driving an 18 wheeler and came home in casts and we had to take care of him.

12.     Sometimes Alfred would just "click out".  He would be in his own zone.  You couldn't get through to him.  He would stare off into space, and would not respond to questions or voices.  Then he would suddenly snap out of it.

13.     My oldest brother, Lloyd, worked very hard from the time he was a teenager.  While Alfred was spending time with Miss Mary, Lloyd used to spend time with our uncle Harry.  Harry had a shop and taught Lloyd a lot at a young age about working and repairing cars.  Lloyd was able to succeed in whatever he did.  Alfred felt like he was compared to his older brother.  Alfred tried to be like Lloyd and wanted to be successful like he was but he just wasn't able to do what Lloyd was able to do.  He stressed himself out over trying to be like Lloyd.  He wanted Lloyd's approval but always ended up feeling second best.  My younger brother, Keith, was not like that.  He worked hard and was just happy with whatever he was able to achieve.

14.     Alfred had odd rules around the house.  He did not want any lights on in the house during the day.  He would not let the air conditioner be turned on.

15.     One Christmas when Alfred was an adult he got upset over something minor with our mother.  He went into a rant about how unloved and mistreated he felt as a child.  He brought

up a lot of very old stuff that bothered him about his childhood. He said he was always the "other child" and the "disliked child". He said he didn't think any of us liked him. We all tried to calm him down and told him to just let it go. Our mother told him that if she hadn't given him those whippings he would have ended up in jail. Alfred was very upset and finally got so mad that he left even though it was Christmas.

16.    When Alfred got something stuck in his mind it was impossible to redirect him. He would come and ask me for advice but then he could not follow any suggestions I made to him. It was like he had a block and could not reason things out or change his behavior. Sometimes in his dealings with Robin the authorities had to get involved because he could not control his behavior. He was unable to calm himself down.

17.    My daughter and my niece babysat for Alfred's daughter, Alfredesha. They had a hard time keeping her from doing things that weren't safe. Alfredesha made stuff up about the girls being too hard on her. When Alfred came she had fake tears and a made up story to tell him. Alfredesha knew how to put on a show. He believed everything this little girl told him and yelled at my daughter and my niece. We really didn't want to watch Alfredesha after that.

18.    Alfred's wife, Robin, cheated on Alfred while they were married. This really shook my brother up. Alfred just could not handle it. He flipped out. He just kind of went into his own zone. They broke up but then got back together but Alfred could not get over the affair. He thought the second daughter that Robin had was not his. He would bring up the affair over and over. We might be at a family gathering and in front of everyone Alfred would start obsessing about Robin's affair. It would ruin his day and keep the rest of us from having a good time, too. I stopped going to family gatherings because I just didn't want to see Alfred like that.

19.      Robin was very smart.  She figured out the code to his phone once so she could check his messages.  Robin told Alfred that Al, the man she had the affair with, had a plan to kill Alfred.  Alfred was afraid to eat food for a while because he thought he might be poisoned.

20.      I spoke to someone working on Alfred's behalf before his trial.  I answered any questions they asked me.  I was in Corpus Christi while the trial was going on and I was willing to testify but I was never called into the courtroom to be put on the stand.  I would have been willing to testify about all the things in this affidavit if I had been given the chance.

Case 2:02-cr-00216    Document 397-3    Filed 05/15/2007    Page 76 of 164

21.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michelle Warren

Dated: 4-25-07

40

<u>DECLARATION AND AFFIDAVIT OF CLAUDIA WILLIAMS</u>

<u>PURSUANT TO 28 U.S.C. § 1746</u>

Claudia Williams, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1. My name is Claudia Williams. Alfred Bourgeois is my brother. I am the oldest of my mother's children. Alfred has a different father than me or any of my brothers or sisters.

2. Tragedy hit our family when we were children. Our brother, Clyde, was drowned on the 4th of July when he was a child. His death effected all of us, including Alfred. Even as a child, Alfred could not take pressure. Having our mother and our whole family grieving over losing Clyde added to the pressures in our house.

3. We lost Clyde and then our brother Anthony took a lot of extra care due to his disabilities. Both those things took a lot of our mother's attention and may have contributed to the beatings she gave us. We got beat sometimes if we would pooch our mouth, pout or do anything that she didn't like. I went to stay with my grandmother a lot so I escaped some of the effects of the stress our mother was under. I was very close to my grandmother and was happy to have a place to go where I was safe and felt special.

4. Alfred's only escape was when he went to live with an older woman who lived nearby, Miss Mary. I had stayed with her before that but I preferred to go to my grandmother's.

5. Alfred got more whippings than the rest of us. He didn't seem to be able to control his behavior and know when to stop doing something that would get him in trouble. He would get beat for the same thing over and over like he just couldn't learn. Like the rest of us he got beat sometimes for nothing and then he got beat because he was just stupid and kept doing things that got him beat.

6. When Alfred was a teenager he had a bad accident right there close to our house. He was riding a four wheeler and ran it right into a big pole. He hit his head, was knocked out and then seemed kind of out of it. After that he seemed nervous and unable to sit still.

7. Alfred sometimes went into a rage and he would seem like a different person. His voice would change and his eyes would turn red. Sometimes he would forget what he had just done. His moods would change till you thought he had a split personality.

8. Alfred didn't get any better at dealing with stress when he got older. He was so stressed when he went on that last truck trip that I was very scared for him. He called and said that he was afraid he was going to hurt himself and implied that I might need to get my black dress out for his funeral. I got Robin on the phone and asked her to keep any weapons away from him because he was suicidal. I was concerned that he was so stressed and depressed that he was going to kill himself.

9. I was called to testify for the prosecution at Alfred's trial. Before I testified they made me look at pictures of the body. I would have testified to the things in this affidavit if I had been asked about them.

10. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Claudia Williams

Dated: 5/10/07

Case 2:02-cv-00216    Document 397-3    Filed 05/14/07 in TXSD    Page 80 of 164

41

Case 2:07-cv-00223 Document 23-3 Filed 05/14/07 in TXSD Page 81 of 164
Case 2:02-cr-00246 Document 337-3 Filed 05/15/2007 Page 81 of 164

## CURRICULUM VITAE

# Edward T. Blake

- Employment
- Education
- Professional Affiliations
- Publications

- Presentations
- Honors
- Personal
- Contact Information

## EMPLOYMENT

Paul L. Kirk & Associates, 1969-1970.

Contra Costa County Sheriff's Office Criminalistics Laboratory, intern, 1971-1972.

Teaching Assistant, Forensic Science Program, University of California, Berkeley, 1971-1972.

Graduate Research Fellow, University of California, Berkeley, 1973-1975.

Research Assistant, University of California, Berkeley, 1975-1977.

Consultant in Forensic Biology, 1975-present.

## EDUCATION

Bachelor of Science [Criminalistics], University of California, Berkeley, 1968.

Doctor of Criminology [Forensic Science], University of California, Berkeley, 1976.

## PROFESSIONAL AFFILIATIONS

California Association of Criminalists

Sigma Xi [Research Society of North America]

Case 2:07-cv-00223 Document 23-3 Filed 05/14/07 in TXSD Page 82 of 164
Case 2:02-cr-00246 Document 337-3 Filed 05/15/2007 Page 82 of 164

American Society of Human Genetics

American Association for the Advancement of Science

New York Academy of Sciences

American Academy of Forensic Sciences

Northwest Association of Forensic Scientists

---

## PUBLICATIONS

Blake, Edward T., Cashman, Paul J., and Thornton, John I., **Qualitative Analysis of Lysergic Acid Diethylamide by Means of the 10-Hydroxy Derivative.** Anal. Chem., 45:2, 1973, 394-395.

Blake, Edward T., and Dillon, D. J., **Microorganisms and the Presumptive Tests for Blood.** J. Pol. Sci. Admin., 1:4, 1973, 395-400.

Caldwell, Kevin, Blake, Edward T., and Sensabaugh, G. F., **Sperm Diaphorase: Genetic Polymorphism of a Sperm-Specific Enzyme in Man.** Science, 191, 1976, 1185-1187.

Blake, Edward T., and Sensabaugh, George F., **Genetic Markers in Human Semen: A Review.** J. For. Sci., 21:4, 1976, 784-796.

Blake, Edward T., and Sensabaugh, G. F., **Protein and Enzyme Polymorphisms in Human Semen.** For. Sci., 6, 1975, 108, [Abstract]; International Microform J. Leg. Med., 10, 1975, 21, [Text].

Blake, Edward T., and Sensabaugh, G. F., **Esterase D Typing in Bloodstains.** For. Serol. News, No. 5, 1975, 1-4.

Blake, Edward T., **Genetic Markers in Human Semen**, Doctoral Dissertation, University of California, Berkeley, 1976; University Microfilms International, #77-15, 567, Ann Arbor.

Blake, Edward T., and Sensabaugh, G. F., **Expression of Genetic Variation in Human Semen.** Am. J. Hum. Genet., 29, 1977, 24A, [Abstract].

Blake, Edward T., and Sensabaugh, G. F., **Genetic Markers in Human Semen: Quantitation of Polymorphic Proteins.** J. For. Sci., 23:4, 1978, 717-729.

Blake, Edward T., and Sensabaugh, G. F., **Haptoglobin Typing of Bloodstains: Electrophoresis of Immunoprecipitated Haptoglobin.** J. For. Sci. Soc., 18, 1978, 237-244.

Katz, David F., Blake, Edward T., Mills, Ross N., and Fatt, Irving, **A Microliter Oxygen Electrode System for Sperm Suspensions.** Fertil. Steril., 30:6, 1978, 691-695.

Sensabaugh, G. F., Blake, E. T., and Northey, D. H., **Genetic Markers in Human Semen: III. Alteration of Phosphoglucomutase [PGM] Isozyme Patterns in Semen Contaminated with Saliva.** J. For. Sci., 25, 1980, 470-478.

Sensabaugh, George, Blake, E. T., and Bashinski, Jan, **Acid Phosphatase Assay of Vaginal Swabs.** Proceedings of a Forensic Science Symposium on the Analysis of Sexual Assault Evidence, U.S. Dept. of Justice, July, 1983, 146-148.

Graves, Howard C. B., Sensabaugh, George F., and Blake, Edward T., **Postcoital Detection of a Male-Specific Semen Protein, Application to the Investigation of Rape.** N. Engl. J. Med., 312, 1985, 338-343.

Sensabaugh, George F., Bashinski, Jan, and Blake, Edward T., **The Laboratory's Role in Investigation of Rape.** Diag. Med., 8:3, 1985, 46-53.

Blake, E. T., Cook, Jr., C. E., and J.S. Bashinski, **Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product.** J. For. Sci., 32:4, 1987, 888-899.

Blake, E. T., **Progressive Desialidation of Human Transferrin.** J. For. Sci., 32:5, 1987, 1342-1347.

Blake, Edward T., **Scientific and Legal Issues Raised by DNA Analysis.** in Banbury Report 32: Technology and Forensic Science, J.Ballantyne et al., Eds., Coldspring Harbor Laboratory Press, 1989, 109-115.

Higuchi, Russell, and Blake, Edward T., **Applications of the Polymerase Chain Reaction in Forensic Science.** in Banbury Report 32: Technology and Forensic Science, J.Ballantyne et al., Eds., Coldspring Harbor Laboratory Press, 1989, 265-281

Von Beroldingen, Cecilia H., Blake, E. T., Higuchi, R., Sensabaugh, G. F., and Erlich, Henry, **Applications of PCR to the Analysis of Biological Evidence,** in PCR Technology: Principles and Applications for DNA

Amplification, Erlich, Henry A., Ed., Stockton Press, 1989, 209-223.

Erlich, Henry A., Higuchi, Russell, Von Beroldingen, Cecilia H., and Blake, Edward, **The Use of the Polymerase Chain Reaction for Genetic Typing in Forensic Samples.** Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis, June, 1989, Quantico, Va., 93-101, U.S. Government Printing Office, Washington, D.C.

Blake, E. T., Paabo, S., and Stolorow, M. D., **DNA Amplification and Typing from Aged Biological Evidence.** Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis, June, 1989, Quantico, Va., 267-268, U.S. Government Printing Office, Washington, D.C.

S. Walsh, Higuchi, R., and Blake, E., **PCR Inhibition and Bloodstains.** Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis, June, 1989, Quantico, Va., 281-282, U.S. Government Printing Office, Washington, D.C.

Helmuth, Rhea, Fildes, Nicola, Blake, Edward, Luce, M. C., Chimera, J., Madej, Roberta, Gorodezky, C., Stoneking, Mark, Schmill, Norma, Klitz, William, Higuchi, Russell, and Erlich, Henry A., **HLA-DQa Allele and Genotype Frequencies in Various Human Populations Determined by Using Enzymatic Amplification and Oligonucleotide Probes.** Am. J. Hum. Genet., 47, 1990, 515-523.

Sensabaugh, G. F. and Blake, E. T., **Seminal Plasma Protein p30: Simplified Purification and Evidence for Identity with Prostate Specific Antigen.** Journal of Urology, 144, 1990, 1523-1526.

Reynolds, Rebecca, Sensabaugh, George, and Blake, Edward, **Analysis of Genetic Markers in Forensic DNA Samples Using the Polymerase Chain Reaction.** Anal. Chem., 63, January, 1991, 2-15.

Gibson, D. R., Guydish, J. R., Wraxall, B. D. G., Blake, E. T., G. Clark, and P. Case, **Using Forensic Techniques to Verify Self-Reports of Needle-Sharing.** AIDS, 5:9, 1991, 1149-1150.

Blake, Edward, Mihalovich, Jennifer, Higuchi, Russell, Walsh, P. Sean, and Erlich, Henry, **PCR Amplification and HLA-DQa Oligonucleotide Typing on Biological Evidence Samples: Casework Experience.** J. Forens. Sci., 37:3, 1992, 700-726.

Sensabaugh, George F. and Blake, Edward T., **DNA Analysis in**

**Biological Evidence: Applications of the Polymerase Chain Reaction.**
Chapter 7 in <u>Handbook of Forensic Sciences</u>, ed. R. Saferstein, Prentice-Hall, New Jersey, in press.

Castro, R. C., Troup, G., Blake, E., Wheeler, C., Apple, R., and Erlich, H. A., **Analysis of HLA-Class II Alleles by PCR/Oligo Typing in Various Native American Populations.** Abstract #784, <u>Am. J. Hum. Genet.</u>, 53:3, 1993.

Waye, J. S., Newall, P., Blake, E. T., Williamson, J. M., and Bing, D. H., **A Review of the DNA Evidence in the Case of Guy Paul Morin.** Abstract, <u>Can. Soc. Forens. Sci. J.</u>, 28:4, 1995, 255.

## PRESENTATIONS

Blake, Edward T., and Dillon, D. J., **Microorganisms and the Presumptive Tests for Blood.** Presented at the 38th Semiannual Seminar of the California Association of Criminalists, October, 1971.

Blake, Edward T., Cashman, Paul J., and Thornton, John I., **Qualitative Analysis of Lysergic Acid Diethylamide by Means of the 10-Hydroxy Derivative.** Presented at the 39th Semiannual Seminar of the California Association of Criminalists, May, 1972.

Blake, Edward T., Lofgren, Donald L., and Sensabaugh, G. F., **Distribution of Acid Phosphatases in Human Tissues.** Presented at the 43rd Semiannual Seminar of the California Association of Criminalists, May, 1974.

Blake, Edward T., and Sensabaugh, G. F., **Esterase D Polymorphism in Bloodstains.** Presented at the 44th Semiannual Seminar of the California Association of Criminalists, October, 1974.

Blake, Edward T., and Sensabaugh, G. F., **Protein Polymorphisms in Human Semen.** Presented as Part of a Symposium on Rape Investigation at the 44th Semiannual Seminar of the California Association of Criminalists, October, 1974.

Blake, Edward T., and Sensabaugh, G. F., **Differential Expression of Amylase Loci [Amy1 and Amy2] in Human Body Fluids and Secretions.** Presented at the 46th Semiannual Seminar of the California Association of Criminalists, October, 1975.

Case 2:07-cv-00223    Document 23-7    Filed 05/14/07 in TXSD    Page 86 of 164
Case 2:02-cr-00246    Document 337-3    Filed 05/15/2007    Page 86 of 164

Blake, Edward T., and Sensabaugh, G. F., **Protein and Enzyme Polymorphisms in Human Semen.** Presented at the Seventh International Meeting of Forensic Sciences, Zurich, Switzerland, 1975.

Caldwell, Kevin, Blake, Edward T., and Sensabaugh, G. F., **Sperm Diaphorase: Genetic Polymorphism of a Sperm-Specific Enzyme in Man.** Presented at the 46th Semiannual Seminar of the California Association of Criminalists, October, 1975.

Blake, Edward T., and Sensabaugh, G. F., **The Biochemical Genetics of Semen and the Investigation of Rape.** Presented at the Western Regional Meeting of the American Chemical Society, October, 1975.

Blake, Edward T., and Sensabaugh, G. F., **Expression of Genetic Markers in Human Semen.** Presented at the American Academy of Forensic Sciences, Washington, D.C., February, 1976.

Blake, Edward T., and Sensabaugh, G. F., **Haptoglobin Typing of Bloodstains by SDS Gel Electrophoresis of Immunoprecipitates.** Presented at the 49th Semiannual Seminar of the California Association of Criminalists, May, 1977.

Blake, Edward T., and Sensabaugh, G. F., **Genetic markers in Human Semen: Quantitative Levels of Polymorphic Proteins.** Presented at the American Chemical Society, Chicago, August, 1977.

Blake, Edward T., and Sensabaugh, G. F., **Genetic Markers in Human Semen: III. Expression of Glyoxalase Activity in Seminal Plasma and Sperm.** Presented at the 51st Semiannual Seminar of the California Association of Criminalists, May, 1978.

Sensabaugh, G. F., Blake, E. T., and Northey, D., **Modification of PGM Isozyme Patterns in Semen Contaminated with Saliva.** Presented at the 51st Semiannual Seminar of the California Association of Criminalists, May, 1978.

Blake, Edward T., and Sensabaugh, G. F., **Synthesis and Clean-up Procedures for 4-Methylumbelliferone Phosphate.** Presented at the 51st Semiannual Seminar of the California Association of Criminalists, May, 1978.

Sensabaugh, G. F., Blake, E. T., and Northey, D., **Modification of PGM Isozyme Patterns in Semen Contaminated with Saliva.** Presented at the American Academy of Forensic Sciences, Atlanta, February, 1979.

Case 2:07-cv-00223    Document 23-3  Filed 05/14/07 in TXSD  Page 87 of 164
Case 2:02-cr-00216    Document 337-3  Filed 05/15/2007  Page 87 of 164

Blake, Edward T., **Concurrent Typing of Gc and Tf on Agarose Gels.** Presented at the 54th Semiannual Seminar of the California Association of Criminalists, October, 1979.

Blake, Edward T., and the Northern California Biology Study Group, **Human Hair Comparison: A Blind Trial Experiment.** Presented at the 54th Semiannual Seminar of the California Association of Criminalists, October, 1979.

Inman, Keith E., Sensabaugh, G. F., and Blake, E. T., **The Genetic Relationships of the Prostatic, Seminal, and Vaginal Acid Phosphatases.** Presented at the American Academy of Forensic Sciences, Atlanta, February, 1980.

Sensabaugh, George F., Bashinski, Jan, and Blake, E. T., **Rates of Drying of Vaginal Swabs.** Presented at the 55th Semiannual Seminar of the California Association of Criminalists, May 1980.

Sensabaugh, George F., Bashinski, Jan, and Blake, E. T., **Titers of ABH Blood Group Substances in Human Semen.** Presented at the 55th Semiannual Seminar of the California Association of Criminalists, May, 1980.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Survival of Markers in Preserved Semen Samples.** Presented at the 55th Semiannual Seminar of the California Association of Criminalists, May, 1980.

Sensabaugh, George F., Bashinski, Jan, and Blake, E. T., **Rates of Drying of Vaginal Swabs: An Update.** Presented at the 56th Semiannual Seminar of the California Association of Criminalists, November, 1980.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Levels of Genetic Markers in Vaginal Fluids.** Presented at the 56th Semiannual Seminar of the California Association of Criminalists, November, 1980.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **A Systematic Approach to the Analysis of Semen Evidence.** Presented at the 56th Semiannual Seminar of the California Association of Criminalists, November, 1980.

Gibbons, Mary, Blake, E. T., Sensabaugh, G. F., and Bashinski, Jan, **A Systematic Approach to the Analysis of Semen Evidence: Case Reports.** Presented at the 56th Semiannual Seminar of the California Association of Criminalists, November, 1980.

Blake, Edward T., and Sensabaugh, G. F., **A Systematic Approach to the Analysis of Semen Evidence.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Sensabaugh, George F., Blake, E. T., and Bashinski, Jan, **Titers of ABH Blood Group Substances in Human Semen.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Levels of Genetic Markers in Vaginal Fluids.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Sensabaugh, George F., Blake, E. T., and Bashinski, Jan, **Acid Phosphatase Stability in Dried Semen Stains is a Function of Stain 'Dryness'.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Sensabaugh, George F., Blake, E. T., and Bashinski, Jan, **Rates of Drying of Vaginal Swabs.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **The Quantitative Acid Phosphatase Test: An Indicator for Decision Making in the Analysis of Semen Evidence.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Barnett, Peter D., Blake, E. T., and Ogle, R. R., **The Role of the Independant Expert: Several Case Examples.** Presented at the American Academy of Forensic Sciences, Los Angeles, February, 1981.

Blake, Edward T., **Recent Research in the Forensic Analysis of Semen.** Presented at the Northwest Association of Forensic Scientists, Missoula, March, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Considerations on the the Analysis of Semen Swab Evidence.** Presented at the Canadian Society of Forensic Sciences, Toronto, August, 1981.

Blake, Edward T., Kearney, James, Stolorow, Mark, and Wraxall, Brian [panelists], **Serology Panel Discussion,** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Harmor, Gary, Wraxall, Brian, and Blake, E. T., **Multisystem Approach**

**to Red Cell Black Population Markers: Group IV.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Blake, Edward T., Sensabaugh, G. F., and Bashinski, Jan, **Purification and Serological Studies on Two Lectin Specificities from Ulex europeus Seeds: A Preliminary Report.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Blake, Edward T., Gibbons, Mary, Bashinski, Jan, and Sensabaugh, G. F., **Comparative Stabilities of Markers in Semen.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Blake, Edward T., Gibbons, Mary, Bashinski, Jan, and Sensabaugh, G. F., **Population Survey and Stability Studies of p30 in Semen.** Presented at the Combined 58th Semiannual Seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

Sensabaugh, George F., Graves, Howard, Blake, E. T., and Bashinski, Jan, **Development of an Elisa Assay for Human Seminal p30.** Presented at the American Academy of Forensic Sciences, Orlando, February, 1982.

Blake, Edward T., Gibbons, Mary, Bashinski, Jan, and Sensabaugh, G. F., **Comparative Stabilities of Markers in Semen.** Presented at the American Academy of Forensic Sciences, Orlando, February, 1982.

Blake, Edward T., Gibbons, Mary, Sensabaugh, G. F., and Bashinski, Jan, **Population Survey and Stability Studies of p30 in Semen.** Presented at the American Academy of Forensic Sciences, Orlando, February, 1982.

Blake, Edward T., **Progressive Desialidation of Human Transferrin.** Presented at the Combined Meeting of the Interamerican Congress of Forensic Sciences and the 60th Semiannual Seminar of the California Association of Criminalists, Sacramento, November, 1982.

Blake, Edward T., **Transferrin: A Potential Diagnostic Indicator of Desialidation Reactions in Blood.** Presented at the Combined Meeting of the Interamerican Congress of Forensic Sciences and the 60th Semiannual Seminar of the California Association of Criminalists, Sacramento,

November, 1982.

Gibbons, Mary, Blake, E. T., and Sensabaugh, G. F., **Lewis A and B Levels in Vaginal Fluid: A Preliminary Study.** Presented at the Combined Meeting of the Interamerican Congress of Forensic Sciences and the 60th Semiannual Seminar of the California Association of Criminalists, Sacramento, November, 1982.

Blake, Edward T., **Progressive Desialidation of Human Transferrin.** Presented at the American Academy of Forensic Sciences, Cincinnati, February, 1983.

Blake, Edward T., **Transferrin: A Potential Diagnostic Indicator of Desialidation Reactions in Blood.** Presented at the American Academy of Forensic Sciences, Cincinnati, February, 1983.

Blake, Edward T., **Biochemical Analysis of Sexual Assault Evidence: Current State of the Art.** Guest Lecture, Presented at the American Academy of Forensic Sciences, Cincinnati, February, 1983.

Blake, Edward T., **Comparative Stability of Semen Proteins and Other Genetic Markers.** Guest Lecture, Presented at the Forensic Science Symposium on the Analysis of Sexual Assault Evidence, FBI Academy, Quantico, Virginia, July, 1983.

Blake, Edward T., Work Shop Instructor, **Prostate Antigen/p30 and Prostatic Acid Phosphatase.** Presented at the Forensic Science Symposium on the Analysis of Sexual Assault Evidence, FBI Academy, Quantico, Virginia, July, 1983.

Blake, Marty, Bashinski, Jan, and Blake, E. T., **Serology Hanging by a Thread.** Presented at the American Academy of Forensic Sciences, Anaheim, February, 1984.

Blake, Edward T., Cook, Jr., Charles E., and Bashinski, Jan, **PGM Survival in Actively and Passively Dried Vaginal Swabs: Studies on Case Specimens.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Distribution of Amylase Activity in Vaginal Swabs: Studies on Case Samples.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Semen and Saliva Revisited: Reversal of PGM Degradation in Mixtures by Reducing Agent.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Bashinski, Jan, Blake, E. T., and Cook, Jr., C. E., **The Detection of Spermatozoa on Vaginal Swabs from Victims of Sexual Assault: The ER versus the Crime Lab.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Bashinski, Jan, Blake, E. T., and Cook, Jr., C. E., **A Profile of the Medical Case Histories of Sexual Assault Victims in Oakland.** Presented at the 65th Semiannual Seminar of the California Association of Criminalists, May, 1985.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., **Detection of Antisperm Antibodies: A Case Report.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **A Gram Modified Christmas Tree Stain.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., **Desialidation of Gc Variants.** Presented at the 67th Semiannual Seminar of the California Association of Criminalists, May, 1986.

Blake, Edward T., Cook, Jr., C. E., and Bashinski, Jan, **Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Blake, Edward T., **Detection of Antisperm Antibodies: A Case Report.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Blake, Edward T., Cook, Jr., C. E. and Bashinski, Jan, **Inter- and Intra-Individual Variation in the Levels of ABO Blood Group Substances in Human Semen.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Case 2:07-cv-00223   Document 23-7-3 Filed 05/14/07 in TXSD   Page 92 of 164
Case 2:02-cr-00246   Document 337-3   Filed 05/15/2007   Page 92 of 164

Blake, Edward T., Cook, Jr., C. E. and Bashinski, Jan, **Inter- and Intra-Individual Variation in the Levels of Acid Phosphatase and p30 in Human Semen.** Presented at the American Academy of Forensic Sciences, San Diego, February, 1987.

Blake, Edward T., **Sexual Assault Evidence: The State of the Art.** Guest Lecture, Presented at the International Association of Forensic Sciences, Vancouver, August, 1987.

Blake, Edward T., **Serology Evidence Collection and Technique.** Guest Lecture, Presented at the National Association of Medical Examiners, San Francisco, September, 1987.

Blake, Edward T., **Scientific and Legal Issues Raised by DNA Analysis.** Guest Lecture, Presented at the DNA Seminar, California Association of Crime Laboratory Directors, November, 1987.

Blake, Edward T., **Use of PCR/Dot Blot for Dried Stain and Hair Analysis.** Guest Lecture, Presented at the DNA Technology in Forensic Science, FBI Academy, Quantico, June, 1988.

Blake, Edward T., **Reporting of Data to the Forensic and Legal Communities.** Panel Discussion on Formulation and Design of National DNA Data Bases and Information Management, Guest Lecture, Presented at the DNA Technology in Forensic Science, FBI Academy, Quantico, June, 1988.

Blake, Edward T., **DNA Amplification and Typing from Aged Biological Evidence.** Presented at the An International Symposium on the Forensic Aspects of DNA Analysis, FBI Academy, Quantico, June, 1989.

Madej, R., Helmuth, R., Louie, P., Horn, G., Blake, E. T., and Erlich, Henry, **HLA DQa Allele Frequencies Determined by PCR and Nonradioisotopic Dot-Blot ASO Analysis.** Presented at the An International Symposium on the Forensic Aspects of DNA Analysis, FBI Academy, Quantico, June, 1989.

Blake, Edward T., Guest Lecture, Presented at the Symposium on Forensic DNA Analysis, National Association of Criminal Defense Lawyers, Washington, D.C., March, 1990.

Blake, Edward T., **Experience with PCR Analysis in Criminal Investigation.** Guest Lecture, Presented at the DNA and the Law, State University of New York at Stony Brook, April, 1990.

Case 2:07-cv-00223    Document 237-3 Filed 05/14/07 in TXSD Page 93 of 164
Case 2:02-cr-00246    Document 337-3 Filed 05/15/2007 Page 93 of 164

Sims, Gary, Gima, Lance, Konzak, Kenneth, Super-Mihalovich, Jennifer, and Blake, Edward T., **The Recovery, Amplification, and DQa Typing of DNA from Partially Cremated Human Remains.** Presented at the 75th Semiannual Seminar of the California Association of Criminalists, May, 1990.

Blake, Edward T., **A Worldwide Map of the DQa Gene.** Presented at the 83rd Semiannual Seminar of the California Association of Criminalists, May, 1994.

Blake, Edward T., **The Role of DNA Evidence in Defense of the Wrongly Convicted.** Guest Lecture, Presented at the International Symposium of the Association in Defense of the Wrongly Convicted, May 4-6, 1995, Toronto.

Mihalovich, Jennifer S. and Blake, Edward T., **Quantitative Determination of Non-Sperm DNA in the Semen of Aspermic Males and It's Potential Use as a Genetic Marker in Sexual Assault Investigation.** Presented at the 85th Semiannual Seminar of the California Association of Criminalists, May 9-13, 1995.

Mihalovich, Jennifer S. and Blake, Edward T., **PCR Based DNA Diagnostic Analysis of Familial Dysautonomia [FD] from Hair.** Presented at the 85th Semiannual Seminar of the California Association of Criminalists, May 9-13, 1995.

Waye, John S., Newall, Pamela, Blake, Edward T., Williamson, Janice M., and Bing, David H., **A Review of the DNA Evidence in the Case of Guy Paul Morin.** Presented at the Canadian Society of Forensic Science, September 29, 1995, Toronto, Canada.

Blake, Edward T., **Molecular Genetics and Violent Crime.** Guest Lecture Presented at the Neyman Seminar, Department of Statistics, University of California, Berkeley, October, 1995.

Blake, Edward T., **The Application and Development of PCR in Forensic Science as Illustrated by the Case of Armando Quintanilla.** Guest Lecture, Presented at the Northern California American Society for Microbiology, November 16, 1996, San Jose, CA.

Blake, Edward T., Guest Panelist, **Is Something Wrong? Judge for Yourself: An Interactive Panel Discussion on the O.J. Simpson Case.** Presented at the 90th Semiannual Seminar of the California Association of Criminalists, October 8-11, 1997.

Blake, Edward T., Guest Witness, Crown Commission on Proceedings Involving Guy Paul Morin, Toronto, November, 1997.

## HONORS

Graduate Research Fellowship [2 years], NILE & CJ, Department of Justice. Grant #75-NI-99-0036. Grant Title: Determination of Genetic Markers in Human Semen.

Research Grant, NILE & CJ, Department of Justice. Grant Title: Genetic Markers in Human Semen: Application to Analysis of Semen Evidence in Sexual Assault Case Material, 1979-1981.

Research Grant, NILE & CJ, Department of Justice. Grant Title: Genetic Markers in Human Semen: Resolution of Some Current Issues Affecting the Interpretation of Semen Evidence in Sexual Assault Cases, 1983-1986.

Service Awards, California Association of Criminalists: 1976, 1977, 1984.

Distinguished Member Award, California Association of Criminalists, 1985.

## PERSONAL

Born July 31, 1945, Honolulu, Hawaii.

## CONTACT INFORMATION
Edward T. Blake
Forensic Science Associates
3053 Research Drive
Richmond, CA 94806
1-510-222-8883 voice
1-510-222-8887 fax
Email: ed *at* fsalab *dot* com

**Other Forensic Science Associates' Pages**

| FSA Home Page | Introduction | Staff Curriculum Vitae |
| Interesting Cases | | Useful Forensic Links |

Case 2:02-cv-00216   Document 397-3   Filed 05/15/2007   Page 95 of 164

42

*Dental and Forensic Services*

## C. Michael Bowers DDS, JD
2284 South Victoria Ave., Suite 1-G
Ventura, CA 93003
805-642-0381
805-656-3205 fax
805-701-3024  cell

email: cmbowers@aol.com
web: http://firms.findlaw.com/cmbowers

May 11, 2007

TO:    James McHugh Jr.
       Assistant Federal Defender
       Suite 545 West – The Curtis Center
       601 Walnut Street
       Philadelphia, PA 19106

RE:    U.S. v. Bourgeois

Dear Mr. McHugh,

I have received documents from your office regarding the forensic odontology evidence from this case. I have reviewed the following material:

1. One CD containing Drs. Senn and Chrz' Powerpoint exhibits from the trial.
2. One CD containing digital autopsy images of V/Gunter.
3. Bourgeois trial transcripts of Drs. Oliver, Senn and Chrz.
4. Three sets of stone dental models labeled Alfred Bourgeois, Alfredesha Bourgeois and Robin Bourgeois.
5. Written reports of Drs. Senn and J. Curtis Dailey.
6. A CD titled "U.S. v. Alfred Bourgeois  Enhanced Photos" which contained 78 digital images recorded in .jpeg format.

**Overview of Physical Evidence**

The victim has two human bitemark injuries. One is on an arm (A) and another is on the back (B), at the level of the left hip.

**Identification Value of the Bitemark Evidence**

Bitemark A is of no use for biter identification purposes because of insufficient detail. The physical details of the biting teeth are only reflected by diffuse bruising and are not clearly present. The bruising is generalized in nature and possesses poor edge detail.

1

**Photographic Issues**

The physical details of bitemarks A and B are only reflected by bruising and are not clearly present. The bruising is generalized in nature and possesses poor edge detail. The original image of bitemark B is poorly illuminated. The low light conditions when the picture was taken significantly impeded analysis by the Government's dental experts, since both dentists resorted to using various "enhancement" methods on the original image. The anatomical location of B is a curved surface. A large portion of the bruise is not in the same "plane" nor "parallel" to the camera. This creates "off angle" distortion of the pattern seen on the skin. The Government's experts used this area of distortion in their direct comparison. The only remedy was to have the original evidence photographed in sections with a ruler in place. This opportunity was obviously lost after the child left the autopsy suite.

**Computer Enhancement Issues**

A new concept in forensic science is "No bad evidence photograph can avoid being digitally enhanced." Computer enhancement of sub-quality pictures is a heavy foundation in Dr. Senn's methods and conclusions. In his words, digital enhancement "just makes that area that we're dealing with stand out a little bit better and makes it easier to analyze the image" (TT 3/8/04, 240). This is an understatement of the reality of the "enhanced" bitemark image. Both Government dental experts used the "enhanced" image from Dr. Oliver. Dr. Chrz used it in his court presentation but said he didn't use it in his analysis. I have not been able to find any articles supporting Dr. Oliver's methods that relate to testing of his methods. I have not even seen any record of what methods he used. Whatever means he used, his results produced the most overly "enhanced" images I have ever seen used in actual casework.

The underlying issue with his method is the uncontrolled digital "noise" that is produced. "Noise" is an artifact(s) introduced into the computer-manipulated image that does not reflect the original state of the picture. This noise is considered a main problem in medical imaging enhancement. In forensic applications, there are no base upper limit (or lower limit for that matter) thresholds to control what can be done with a computer program. What the Government in Bourgeois describes is actually excessive manipulation. In Bourgeois, Dr. Oliver's manipulation produced visual "evidence" that appeals to the operator, but is untested. Dr. Senn offered "proof" of no harm by directing the jury to look at the ruler seen in both the "original" and the manipulated images. His claim that the ruler was the same is not accurate. The enhanced ruler has undergone considerable alteration. The injury pattern has also undergone considerable change. Its contrast with the background color is degraded, artificial shadowing now exists, the incremental lines of the ruler are changed, the edge area of the bruise has been increased, and the gradations of color in the bruise (indicating either less or more pressure by the biter) are lost.

2

**Admissibility of "Enhanced" Images Used in U.S. v. Bourgeois**

Dr. William Oliver, M.D. "enhanced" the images used by Dr. Senn for his analysis and partially used by Dr. Chrz. The defense did not provide its own expert to counter Dr. Oliver's claims on the subject of enhancement.

The Government's position lacked any explanation by Dr. Oliver as to how he tested and proved his method's reliability **prior** to its use in Bourgeois. It is my understanding that the introduction of novel scientific evidence (or technical evidence) into the Bourgeois trial by the Government activates a necessity for special court proceedings established by *Daubert v. Merrell Dow Pharmaceuticals, Inc* [1] and *Kumho Tire Co., Ltd. v. Carmichael* [2] to establish empirical and theoretical underpinnings of the Government's proposal of admissibility for these extraordinarily over-enhanced digital images.

It is my understanding that the *Daubert*/*Kumho Tire* holdings require that the scientific truth be separated from assumption and supposition by careful attention to following criteria:

    (1) Whether the theory or technique can be (and has been) tested;
    (2) Whether the theory or technique has been subjected to peer review and publication (to subject the data and methods to peer review for weakness and/or poor analysis);
    (3) The known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and
    (4) "General acceptance" of the method or technique by the relevant forensic community.

Categories (1), (2), (3) and (4) are the requisite foundation for the admissibility of scientific and technical evidence. No such foundation exists for Dr. Oliver's analysis and presentation.

Category (1) requires substantial testing proof to underpin a method's admissibility in court as a valid and applicable use. As I have stated *supra*, there are no established thresholds or limits to the operator's use of digital enhancement in this case. The only control is the operator's subjectivity. In the realm of forensic computer use and enhancement methods, this subjectivity is not a legitimate safeguard.

Category (2) requires peer review of the forensic imaging applications used by Dr. Oliver. The record is silent regarding this data.

The Government has no data as to the known or potential error rate (Category 3) of their enhancement method due to their failure to satisfy Category (1).

---

[1] 509 U.S. 579 (1993).
[2] 526 U.S. 137 (1999).

Category (4) clearly requires that the appropriate scientific or technical community accept what Dr. Oliver digitally produced and then presented in <u>Bourgeois</u>. There is no empirical analysis of his methods; therefore, the general acceptance requirement is not satisfied. Standards regarding controls and digital limits to his methods are silent as to the degree of digital enhancement he used in Bourgeois.[3]

The scientific and technical methods utilized by Dr. Oliver were not valid. However, there are published cautions that must be exercised in the use of both basic and advanced digital enhancement. They are described in the next section.

**Traditional Enhancement Techniques**

Traditional enhancement techniques are techniques that have direct counterparts in traditional darkrooms. They include brightness and contrast adjustment, color balancing, cropping, and dodging and burning. These traditional and acceptable forensic techniques are used to achieve an accurate recording of an event or object.

Brightness adjustment is used when the image is too bright or too dark. **If the image is made too bright, there is a risk of loss of detail in light areas. If the image is made too dark, there is a risk of loss of detail in the dark areas** (emphasis added)**.**

Color balancing is the adjustment of the color components of an image. **The purpose of color balancing is to render the colors in the scene faithfully** (emphasis added). Improper color balance adjustment can render colors inaccurately, and objects will appear to have the wrong color when compared to the actual subject.

---

[3] Scientific Working Group Imaging Technology (SWIGIT), Version 1.1 2004.03.04 (draft). The necessity for proper documentation of basic digital image manipulation is stressed in this document. Acceptable and unacceptable digital methods are listed within this document. Prohibited imaging tools are listed as: "Tools prohibited for use on Working Images are those that add or delete content from the image. These include, but are not limited to, Rubber Stamp, Airbrush, Paintbrush, Paint Bucket, Eraser and Blur." Advanced enhancement techniques (used to extract information) are described: "Advanced image enhancement techniques are techniques applied to images for the purposes of extracting information. **These techniques may or may not improve** (emphasis added) the overall appearance of the image. The techniques include but are not limited to:
_ Frame averaging
_ Fourier Analysis (FFT)
_ Deblur
_ Noise reduction
_ Image restoration
_ Color channel selection and subtraction
_ Perspective control/geometric correction
_ Advanced sharpening tools (such as unsharp mask).

4

Contrast adjustment is used when the image lacks sufficient contrast. **If the image contrast is increased too much, there is a risk of loss of detail in both light and dark areas** (emphasis added)**.**

Cropping is used to remove that portion of the image that is outside the area of interest.

Dodging and burning have the same effect as brightness adjustment but are used in localized areas.

Spotting traditionally has been used to remove artifacts due to dust and scratches on the negatives, but it is not considered to be an acceptable practice on any forensic image. [4]

**Nontraditional Enhancement Techniques**

Some nontraditional image enhancement processes are used and accepted by a variety of scientific fields such as medicine, aerospace, and cartography. These processes have no direct counterpart within traditional silver-based photography. In fact, only recently have they been applied within the forensic environment; therefore, their general acceptance may be subject to challenge. Examples of nontraditional processes discussed here are color processing, linear filtering, nonlinear contrast adjustments, pattern noise reduction, and random noise reduction.

Color processing includes color space transformations, pseudocoloring, and hue and saturation adjustments. These techniques can be used to modify the color characteristics of objects within an image. **Caution: Application of these techniques can compromise the color fidelity of the image** (emphasis added).

Linear filtering techniques include sharpening, deblurring, edge enhancement, and deconvolution. They are used to increase the contrast of small detail in an image. If a low degree of enhancement is used, the image will remain an accurate representation of the scene. **If a high degree of enhancement is used, the image may no longer be an accurate representation of the overall scene, though still may be useful as an adjunct for interpretation of small details. Caution: A high degree of enhancement can also increase the visibility of existing noise and artifacts** (emphasis added)**.** [5]

---

[4] Recommendations and Guidelines for the Use of Digital Image Processing in the Criminal Justice System. Scientific Working Group on Imaging Technologies (SWGIT) Version 1.2, June 2002

[5] Id.

Dr. Oliver's expertise and methods were not scientifically or technically validated and did not meet any of the criteria of *Daubert/Kumho Tire Co*. Consequently, Drs. Senn and Chrz's reliance on Dr. Oliver's enhancements undermine and invalidate their analysis and conclusions.

**Anatomical Considerations**

Bitemark B is located in a curved area next to the iliac crest (hip). The degree of tissue flexibility in this area is considerable. The evidence of "Langer lines" in the autopsy photograph indicates this flexibility. The static posture of the body on the autopsy table does not mimic, in the least, the posture of the child during life. This means that, in this anatomic location, the shape Bitemark B should not be assumed to be the same shape as during biting.  No one knows what position the child was in during biting. We can safely say, though, she wasn't in the position seen in the morgue. This fact of postural change altering the bitemark shape is uncontrollable. The odontology literature supports this opinion. For this and other reasons stated above, the methods applied by the Government dental experts are inappropriate for this case.

Dr. Senn also stated there are: (1) a probable bitemark on the right hand, (2) a possible bitemark on the left hand, and (3) a possible bitemark on the left foot. In my opinion, the characteristics in these patterned injuries are lacking any dental information. They are ambiguous and indeterminable as to any opinion to cause of origin.

**Methods of the Government experts Dr. Senn and Dr. Chrz**.

Ignoring the use of Dr. Oliver's images, both experts otherwise adhere to the general rules and methods of their forensic board, the ABFO.[6] The acceptability of methods does not impact, however, on analytical judgment and interpretation of the evidence. In my opinion, the limits of the bitemark evidence in Bourgeois have been ignored by both of my colleagues.  The methods they used are inappropriate and not relevant to the injuries on the child's body.

**Report of Dr. J. Curtis Dailey**

The Bourgeois bitemark evidence is indicative of violence perpetrated on the unfortunate child. That is its only value.  I cannot include or exclude, using the evidence I have reviewed, any of the three parties examined by Drs. Senn and Chrz as biters of the child. This opinion concurs with the reports of Dr. Dailey written before Bourgeois was tried and convicted.

---

[6] The American Board of Forensic Odontology.

**Issues Regarding Admissibility of Bitemark Evidence.**

The validity, reliability and accuracy of bitemark identification have not improved to the point where it should be used as the sole means of identifying a biter.  This is in spite of the judicial history of its admissibility. The serious deficiencies of the "science" of bitemarks make its use as an identifier of a single perpetrator a very dangerous proposition.[7] In the last few years the advent of DNA analysis has begun to provide an independent source of identification information in cases containing bitemarks.[8] In my opinion, the recent DNA cases provide definitive proof of the unreliability/inconclusive nature of bitemark     identification evidence. In short, the odontologist identifying a specific biter or "probably the biter" via teeth marks is not rendering a reliable opinion.  Recent court cases prove the risks of bitemark misidentification.[9]

It is important to consider the history of bitemark evidence as a forensic process used to identify a specific criminal perpetrator. Admission of bitemark evidence by the courts seems to have convinced some forensic odontologists that, despite doubts expressed in the 1960's and 70's in the scientific and legal literature, they are able to perform positive (i.e., "with medical/dental certainty; probable, or possible") bitemark identifications. This same community has minimal scientific research supporting reliable positive identifications from bitemarks in skin, and instead uses its years of court admissibility as a substitute for scientific reliability and legitimacy.

The Bitemark Standards and Guidelines of the American Board of Forensic Odontology do not delineate a threshold for bitemark evidence below which an opinion may not be rendered. Drs. Senn, Chrz, Dailey and I are all ABFO members.  The divergence of opinion between the Government's dental experts in Bourgeois is another anecdotal indicator of the weak reliability and foundation of bitemark identification. The judicial record elsewhere is replete with similar dental expert contradiction and controversy. [10]

---

[7] Forensic Dental Evidence: An Investigator's Handbook. CM Bowers, page. 91, Elsevier Academic Press, 2004.

[8] Id. Page 112.

[9] See *New Scientist*; 15 March 2004. Discussion of the bitemark misidentification in State v. Krone. An excerpt states "There is also the compounding factor that forensic odontologists generally know which set of teeth belongs to the main suspect. This might make them more likely to come up with a positive match for that person." The article's writers interviewed two dental examiners who conducted a recent study regarding the accuracy of bitemark opinions using experimental bitemarks. The writers stated neither examiner would reveal the error rate of their study. An excerpt from the article elaborates: "What's more, in some cases the experts excluded the correct cast, saying they were certain it could not have made the mark. And there were examples where they assigned the wrong cast to a mark, a false match which in a real case could have led to a miscarriage of justice. Gould and Cardoza would not tell New Scientist how many of these errors there were."  url: http://www.newscientist.com/news/news.jsp?id=ns99994758

[10] See Chicago Tribune article from October 19, 2004.  "From the Start – A Faulty Science." URL: http://www.chicagotribune.com/news/specials/chi-0410190150oct19,1,3259394.story?coll=chi-

7

A 1999 study completed by a portion of volunteering ABFO members regarding the reliability of bitemark identification evidence produced data on the accuracy of results in forensic bitemark identification.  These results contradict years of assured self-confidence by dentists testifying on bitemark evidence. This study, called the ABFO Bitemark Workshop No. 4, underscores the gap between the optimistic assumptions odontologists bring to court and their ability to correctly identify a defendant as the creator of a bitemark.  In this experimental study with bitemarks of significant detail, the median overall error rate is 12.5% – out of a maximum possible error rate of 27%. Thus, they were wrong nearly half the time they tried to identify the source of a bitemark.

More specifically, it is their <u>false positive error rate</u> – the tendency to conclude that an innocent person's dentition matches the bitemark – that accounts for the bulk of that overall error rate.  On average, 63.5% of the examiners committed **false positive errors** in some of the test cases.[11]  If this reflects their performance in actual cases, then inculpatory opinions by forensic dentists are more likely to be wrong than right. They were, however, much less likely to overlook a true biter – reflected in a median **false negative error** rate of 22%. The persons who performed these tests are not novices; these are diplomates, the most accomplished members of the field. But experience provided no assurance of accuracy. The demography of the test takers failed to disclose any correlation between years in forensic practice casework and correct results.

Therefore, the reliability of dental opinion is based on intuition derived from the expert's "experience," not scientific data. The constant use of "experience" is a substitute for databased studies to determine the frequency of occurrence of dental features seen in the human dentition and bitemarks. The likelihood of a "chance" match to an innocent person's teeth to a bitemark injury has never been established.   A forensic dentist's credibility with the judge or jury generally is based on factors present in the dentist's testimony other than underlying science. These factors include years of experience, demeanor on the witness stand, proper use of terminology, meticulous adherence to procedures (e.g., not forgetting to bring his/her notes), and compelling personal demeanor.
        More recently, other authors have studied inter-examiner reliability and accuracy of experimental bitemark identification. Drs. Pretty and Sweet published

---

news-hed. An excerpt states "A Tribune examination of criminal cases in which bitemarks played a key role illustrates why credibility is a concern. The survey involved 154 cases, mostly murders and rapes, that reached appeals courts in state and federal jurisdictions around the country--just a sampling of the hundreds of times odontologists have testified. Though not comprehensive, the survey found a disturbing pattern. In more than a quarter of those cases, the prosecution and defense offered forensic dentists who gave diametrically opposed opinions."

[11] See Attachment No. 1. Ch. 30, page 634 Table 2. Error Rates of Forensic Odontology Diplomates on the Four Test Cases. Identification from Bitemarks, in Modern Scientific Evidence, Faigman et. al., West Publishing 2006.

8

results concerning this in the Journal of Forensic Sciences in 2001.[12] They used high quality three-dimensional evidence of post-mortem bitemarks made in pigskin to test three groups of dental examiners (N=30). The ABFO examiners were a subset of the total participants (N=10). Performance differences between the groups were nil. The pattern detail tested exceeded actual bitemark casework and allowed for control of bitemark variables that are uncontrolled in actual casework. The mean false positive rate was 15.9% with a range of from 0 to 45.5%. The mean accuracy (right or wrong in decision making) of all examiners was 83.2% with a range of 65.0 to 100%. The overall accuracy of ABFO members was 78.5% when two outlier participants were removed from the sample.[13] The mean accuracy result for all examiners was 77.9%.[14] Commenting on the results, the authors in an earlier draft stated that the inter-examiner scores, i.e. how much the odontologists agreed with each other, was rated as only moderate, and the intra-examiner agreement, as fair. The authors' final remarks in the published paper were: "the variation in individual performance of odontologists is of concern."[15]

---

[12] Pretty, IA, Sweet, DJ. Digital Bitemark Overlays-An Analysis of Effectiveness. J Forensic Sciences, 2001; 46 (6): pp 1385-1391.
[13] Id. Page 1390.
[14] Id. Page 1389.
[15] Id. Page 1390.

**Conclusion**

It is my opinion that the photographic enhancement and the bitemark evidence in this case is scientifically and technically invalid for use to identify Alfred Bourgeois as either a "possible", "included" or "probable" biter of the victim. It is further my opinion that the injuries to the decedent's left hand, left foot, and right hand are ambiguous and indeterminable as to any opinion to cause of origin. All of the opinions contained herein are given with a reasonable degree of dental/medical certainty.


*C. Michael Bowers*


C. Michael Bowers DDS JD
Diplomate, American Board of Forensic Odontology

10

# MODERN SCIENTIFIC EVIDENCE
## The Law and Science of Expert Testimony

DAVID L. FAIGMAN

DAVID H. KAYE

MICHAEL J. SAKS

JOSEPH SANDERS

EDWARD K. CHENG



POLICE LINE: DO NOT CROSS

# FORENSICS
## 2006 – 2007 Edition

# Volume 4

# MODERN SCIENTIFIC EVIDENCE

## The Law and Science of Expert Testimony

———

### Volume 4

By

### DAVID L. FAIGMAN
*University of California*
*Hastings College of the Law*

### DAVID H. KAYE
*Arizona State University*
*College of Law*

### MICHAEL J. SAKS
*Arizona State University*
*College of Law*

### JOSEPH SANDERS
*University of Houston*
*Law Center*

### EDWARD K. CHENG
*Brooklyn Law School*
*Law Center*

**THOMSON**

———*———TM

**WEST**

*For Customer Assistance Call 1-800-328-4880*

Mat #40417722

§ 38:12

Table 2 summarizes the results of the study. It is important to say something, first, about the meaning of the data and the way they are presented. Suppose one were told that the overall accuracy rate for a test case was 85%. One might conclude from that number that the examiners were doing reasonably well—not as well as one might hope from a forensic science that claims the ability to connect crime scene bitemarks to suspects "to the exclusion of all others in the world," but not terrible either. In truth, however, the performance is far more troubling than is apparent. What is not made evident by that number is the fact that the poorest level of performance that examiners could achieve in this study—if they got every single answer as wrong as they could get it—would still make them appear to be accurate 71% of the time. That is because if an examiner failed to match a bitemark with the correct dentition (one error) and linked it instead with the dentition of an innocent suspect (second error) he still gets the remaining five dentitions "right" by not erroneously inculpating them.[1]

### Table 2
### Error Rates of Forensic Odontology Diplomates on the Four Test Cases

| | Overall Error Rate (maximum possible error rate = 27%) | False Positive Errors as Percentage of Examiners Offering Opinions | False Negative Errors as Percentage of Examiners Offering Opinions |
|---|---|---|---|
| Case 1 | 14% | 62% | 38% |
| Case 2 | 7 | 42 | 4 |
| Case 3 | 12 | 65 | 15 |
| Case 4 | 13 | 65 | 27 |
| Medians | 12.5% | 63.5% | 22% |

Accordingly, Table 2 seeks to convey a more meaningful idea of how well examiners did by relating their performance to how well they could have done—or more to the point, how poorly they did in relation to how poorly

---

**[Section 38:12]**

[1]Once one set of dentition is linked (correctly or incorrectly) to a bitemark, the others are not linked, and therefore are scored as "correct." In other words, given the test design, an examiner could never make more than two mistakes, and all remaining dentitions are scored as "correct." If instead of providing a set of seven dentitions from which to choose, there had been 100, then the overall accuracy rate, using this seemingly straightforward method of counting, could never be lower than 98% correct—one false positive inculpation of an innocent suspect, one overlooked guilty suspect, and 98 remaining dentitions that get scored as "correct." And, thus, the poorest possible performance would be "2% error."

43

**Cherry Biometrics Inc.**
**51 Saddle River Road**
**Woodcliff Lake, NJ 07677**
**201 513-8300**
**http://www.cherrybiometrics.com/**

May 11, 2007

James McHugh Jr.
Assistant Federal Defender
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia , PA 19106

RE: United States v. Alfred Bourgeois

Dear Mr. McHugh,

At your request I have reviewed the following materials in the above captioned matter:

**A.    Direct Appeal Opinion**

**B.    Testimony**
Dr. Elizabeth Rouse
Dr. William Oliver
D. Dr. David Senn
Dr. Bryan Chrz

**C.    Reports**
Forensic Odontology Report of Dr. Senn – PowerPoint included on CD
Forensic Odontology Report of Dr. Chrz – PowerPoint included on CD
Autopsy Examination Report by Dr. Rouse
NCIS Report on Photographic Coverage of Autopsy

**D.    Images, Photographs and PowerPoint Presentations**
Dr. Senn PowerPoint
Dr. Chrz PowerPoint
Scanned and Digitized Autopsy Images
Original 35m photographs
Enhanced images

1

## Introduction

Dr. Oliver utilizing the Contrast-Limited Adaptive Histogram Equalization contrast enhancement method created digital images of numerous autopsy photographs including the bite marks on the decedent's body.  Dr. Oliver then utilized these images that he created to identify "between 25 and 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, between 7 and 9 healing ulcerations, one constellation suggestive of a bite mark, and three lacerations."

In creating the images Dr. Oliver chose colors that he then assigned to the injuries – that were not visibly present in the original photographs nor testified to by the doctor who had performed the autopsy –  but that he (Dr. Oliver) determined existed.  He assigned orange for contusions, yellow for whip marks and light blue for scars.  Dr. Oliver chose the range of parameters to be used to redistribute the colors in the images.  Dr. Oliver conceded that the accuracy of his analysis – and the numerous injuries he allegedly discovered – required comparison to the original photographs.  Dr. Oliver, however, did not compare the enhanced images to the original photographs instead he compared them to the digitized images he had scanned, compressed and then converted to PowerPoint.  Drs. Senn and Chrz relied upon Dr. Oliver's enhanced images of the bite marks in their analysis and testimony before the jury.

Dr. Oliver started with high quality 35mm photographs and then he digitized (scans) them using a low 600 dot per inch (dpi) resolution creating small computer images that are no longer accurate in color or clarity (detail)  He then alters some of these images using his version of the Contrast-Limited Adaptive Histogram Equalization Method.  The logic flaw in his approach is his reliance on small incomplete computer images.  Once information is lost or distorted it is lost or distorted and no amount of enhancement can accurately bring it back, even when he chooses the range of parameters to be used to redistribute the colors in the images.

## Original Evidence

Dr. Oliver took the original 35 mm autopsy photographs (the scientific and technical best evidence) and then converted these photographs into inaccurate digital images using a substandard 600 dots per inch (dpi) scanner.  Dr. Oliver then mislabeled the newly formed digital images as "Original Evidence." His approach introduces at a minimum, the following problems:

1.     Photographic information is lost as an accurate digital representation of a 35mm photograph requires at least 3600 dpi.

2.     Colors are no longer accurate as any conversion to digital forces a much narrower color spectrum. The colors the jury viewed in the newly created originals were only approximations.

3.     The photographic information is distorted as the digitized image shape (aspect ratio) is

2

shifted from 35mm photograph shape 3x2 to a digital display of either 4x3 CRT( monitor screen) or 16x9 (flat panel screen).

4.      The photographic information is lost as the images are compressed (made smaller) using glossy JPEG, instead of lossless compression e.g. TIFF.

5.      The digital image detail is lost and likely distorted when digital images are subsequently converted to PowerPoint as they were in this case for presentation to the jury. Since PowerPoint was the program used by Dr. Oliver in the courtroom, the scanning should have been directly into PowerPoint without intermediary steps. Every automatic image conversion into a program that has its own display and scaling capabilities e.g. Microsoft Word, Adobe Acrobat, etc. causes information loss and distortion.

If the true original photographs were shown side-by-side or even one after the other along with Dr. Oliver's so called enhancements; the jury would have been able to discern the extent of Dr. Oliver's over-reaching alterations. This comparison was never done despite Dr. Oliver's testimony that it was essential to the accuracy of his analysis. Dr. Oliver's improperly labeled originals shared many of the same inaccuracies found in Dr. Oliver's enhancements.

## Enhanced Evidence

Image enhancement is another way of saying image alteration. Dr Oliver's enhanced autopsy images are clearly inaccurate. Misplaced color is everywhere in almost all of Dr. Oliver's images. A perfect example of this misplaced color can be easily seen when one compares images numbered 156 and 157. In image number 157 it is obvious that the skin of the attendant holding the deceased in place is a sickly and very blotchy with red and white colors. The same skin of the attendant looks healthy and slightly tanned in the unenhanced image number156.

Furthermore, in image number 157 the edge of the fabric touching the right leg has a false aqua coloration and the right leg has a false magenta coloration. The right leg has picked up the color of the glove touching it.

A major reason for this problem is the well known concept of Bayer Pattern nearest-neighbor-coloration. Image elements look to their nearest neighbors, to determine their color and sometimes their shape. The technical term to describe this is interpolation and it is often responsible for getting wrong color and wrong shape. It becomes far more pronounced when an enhancement technique (contrast enhancement) logically breaks a large image into a number of smaller ones and then operates against each smaller image separately. In addition many more colors are needed. A perfect example of interpolation at work in Dr. Oliver's enhancements can be seen in image number 150. Government image number150 uses 102,813 individual colors Dr. Oliver's enhanced image number 151 uses 305,761 individual colors. Essentially Dr. Oliver's enhancement utilized almost three times the amount of colors as his "original" images.

3

Many of the enhanced images show both a ruler and an evidence tag.  Dr. Oliver's enhancement technique makes the writing on the evidence tags easier to read, almost as good as the original photograph.  On the other hand his technique shifts the ruler from excellent in original image to blurry and somewhat distorted after his enhancement.

**Daubert/Kumho Tire**

It is my understanding that utilization of scientific or technical methods in the forensic area must conform with the Daubert/Kumho Tire factors.  I understand these factors to be: 1) can and has the theory or technique been tested, 2) the known or potential rate of error, 3) existence and maintenance of standards controlling the technique's operation, 4) is the theory or technique generally accepted within the relevant scientific or technical community, and 5) whether the theory or technique has been subjected to peer review and publication.

For the following reasons Dr. Oliver's methods and techniques fall far short of the Daubert/Kumho Tire  requisite standards.

1. The numerous layers of modification the original photographs underwent creates a situation where the known or potential rate of error is impossible to determine.

2. Lossless compression of forensic evidence is the scientific and technical standard. In this instance it was not used, Lossy compression was used instead.

3. The 35 mm pictures should have been presented as original evidence. They were the "Best Evidence." The technique of not using "Best Evidence" is not generally accepted in the scientific/ technical community.

4. The digital images presented as "original images" were compressed and therefore they lacked original detail.

5. There are no standards controlling the technique, e.g. there are at least 100,000 colors associated with each enhanced image that do not belong there.

6. You cannot substitute enhancement for details that were lost during the digital conversion. The enhancement technique used is not well-known, regulated, regarded or accepted within the United States or international forensic community.

7. The techniques and methods utilized by Dr. Oliver have not been tested and have not been subjected to peer review and publication in the forensic community.

4

**Conclusion**

The original autopsy photographs should have been used by Dr. Oliver when he conducted his comparisons. Dr. Oliver's enhancements distort almost everything in the newly created image. There is no way to know whether his enhancements distorted the areas he claims he improved. Therefore his enhanced images cannot be used as a fair and accurate building block to analyze bite marks or "injuries" that were not visibly present in the original autopsy photographs. Larger computer images should have been used in order to improve image accuracy without resorting to image alteration/enhancement. The methods and techniques utilized by Dr. Oliver are not scientifically and technically valid and the conclusions he reached are not scientifically or technically reliable. All of the opinions and conclusions in this report are given to a reasonable degree of scientific and technical certainty.

Michael Cherry
*Michael Cherry*

President, Cherry Biometrics Inc.

Manfred Schenk
*Manfred Schenk* MAC

Senior Scientist, Cherry Biometrics Inc.

44

# FORENSIC ODONTOLOGY REPORT

29 September 2002

SA Thomas F. Brady
NCIS/FCU
3740 St. Johns Bluff Road
Suite 4
Jacksonville, Florida, 32224

Reference:     [CCN: 27JUN02-GCCC-0033-7HJF]

Special Agent Brady,

     Per your office's request, I have examined the following evidence related to the bites photographed on the body of V/Gunther.

    I.     One (1) FedEx Envelope shipped by SA Thomas F. Brady, containing:
       a.  A three (3) page document from the U.S. Naval Criminal Investigation Service (NCIS) Entitled: S/BOURGEOIS, ALFRED/CIV
          Subtitled:  Investigative Action: Photographic Coverage of Autopsy
             [CCN: 27JUN02-GCCC-0033-7HJF]
         In the body of this document it relates the photographs to the autopsy of V/GUNTER (2yrs, 8mnths)

       b.  Thirty (30), five (5) inch by seven (7) inch color photographs labeled:
          i.  Q through Z
          ii.  AA through LL
          iii.  PP through WW

    II.    One cardboard box shipped by Dr. Elizabeth Rouse containing:
       a.  A one page letter from the Federal Bureau of Investigation to Dr. Rouse with a file number (70A-HO-60227)

       b.  Three sets of stone dental casts (maxillary and mandibular dental arches) in individual boxes labeled for:
          i.  Alfred Bourgeois
          ii.  Robin Bourgeois
          iii.  Alfredesha Bourgeois

     I have examined the evidence provided. During my analysis I made wax bite registrations of the dental arches for each named individual and made several measurements of the dentition represented on the stone dental casts. I scanned all three sets of stone dental models and wax bit wafers into Adobe® Photoshop® 7.0 I also imported several of the photographs provide into Adobe® Photoshop® 7.0, in an effort to enhance the images of the bite marks in the photographs

Continued:    Forensic Odontology Report [CCN: 27JUN02-GCCC-0033-7HJF]

in a search for additional photographic evidentiary detail that would not otherwise be easily ascertainable to the human eye.

Due to the factors listed below, I cannot rule in, or rule out, any of the three individuals as the possible biter:
1.  The diffuse presentation of the bite marks in all of the photographs.
2.  The distorted position of the marks, in some of the photographs, at the time of photography.
3.  The ruler/scale being in a different spatial plane than the mark being photographed. [However, it must be noted that the photographic evidence provide was quite good as compared to the quality of evidence typically submitted for analysis, and I have examined over one-hundred-fifty (150) bite mark cases during the last seventeen years.]
4.  The very similar metric and spatial (pattern) relationships between the three individual's dentition.

Finally, the age of these marks cannot be determine from the photographs. Dailey and Bowers, in an article published in the Journal of Forensic Sciences (Vol. 42, #5, pp. 792 – 795, September 1997), discuss this issue and list the factors related to the appearance of patterned injuries with time.

# FORENSIC ODONTOLOGY REPORT

14 July 2003

SA Thomas F. Brady
NCIS/FCU
3740 St. Johns Bluff Road
Suite 4
Jacksonville, Florida, 32224

Reference:   [CCN: 27JUN02-GCCC-0033-7HJF]

Special Agent Brady,

Today I received 4 CD-ROMs from Dr. William Oliver, along with a note explaining the labeling of the images from Dr. Oliver. The CDs were labeled:
1. drake 1 tgas – containing 20 (.tga) images
2. drake 2 tgas - containing 20 (.tga) images
3. drake 1 tifs - containing 20 (.tif) images
4. drake 2 tgas (however this should have been labeled drake 2 tifs) – containing 20 (.tif) images

I had selected four (4) photographs [from the thirty (30) photographs originally sent to me last year for evaluation] for Dr. Oliver to enhance. These were photographs S, U, DD, and KK. Of all the photographs originally provided, I felt these four (4) offered the best potential for image enhancement.

I have examined the enhanced bite mark photographs provided by Dr. Oliver, and I can discern no additional information that would allow me to change the opinions I provided in my Forensic Odontology Report dated 29 September 2002. Again, that report stated:

"Due to the factors listed below, I cannot rule in, or rule out, any of the three individuals as the possible biter:
1. The diffuse presentation of the bite marks in all of the photographs.
2. The distorted position of the marks, in some of the photographs, at the time of photography.
3. The ruler/scale being in a different spatial plane than the mark being photographed. [However, it must be noted that the photographic evidence provide was quite good as compared to the quality of evidence typically submitted for analysis, and I have examined over one-hundred-fifty (150) bite mark cases during the last seventeen years.]
4. The very similar metric and spatial (pattern) relationships between the three individual's dentition.

Finally, the age of these marks cannot be determined from the photographs. Dailey and Bowers, in an article published in the Journal of Forensic Sciences (Vol. 42, #5, pp. 792 – 795, September 1997), discuss this issue and list the factors related to the appearance of patterned injuries with time."

1

Continued:   Forensic Odontology Report [CCN: 27JUN02-GCCC-0033-7HJF]

Please do not hesitate to contact me should you have any questions. I can be reached at:
jcd4n6dds@aol.com
jon.dailey@se.amedd.army.mil
706-650-9616 (H)
706-787-5204 (W)

J. Curtis Dailey, DDS

STATEMENT OF CHARGES
28 OCTOBER 03

*Now 13 April 07*
*I have No record of*
*ever being paid*

AUSA Patti Booth

Ref:    Supplies for Forensic Odontology Consultation

Ms. Booth,

        Now that you no longer require my consultation services, please process my claim for the
consumable supplies I required in order to evaluate the above referenced case. The total due is $204.94
Since I am a Forensic Odontology consultant to the Armed Forces Institute of Pathology and a U.S.
Government employee, and the referral agency for this case is the Navy, there is no charge for the many
hours I have spent reviewing the materials you asked me to look at during the past several months.

        Expenses (supplies purchased at OfficeMax):
                HP Inkjet Printer Cartridges
                        Black:                                          $54.99
                        Tri-Color:                                      $29.99
                HP Premium Plus Inkjet Photo Paper:
                        2 packages @ $19.99 per package:                $39.98
                50 pack CD-R:                                           $8.99
                FedEx Services (package to Dr. Bill Oliver): $39
                USPS Fees (package to Dr. Bill Oliver)                  **$6.15**

                TOTAL                                                   $204.94

        Thank you in advance for your attention to this statement and insuring prompt payment.

                                        Sincerely,

                                        J. Curtis Dailey, D.D.S., DABFO
                                        COL, DC, USA *(Retired) now*

                                        4504 Guildford Court    *old address*
                                        Evans, GA, 30809

                                        706-650-9616
                                        Jed4n6dds@aol.com
                                        jon.dailey@se.amedd.army.mil

        *Now*                           *cdailey @ pchcbangor.org*

45

## DECLARATION AND AFFIDAVIT OF JON CURTIS DAILEY
## PURSUANT TO 28 U.S.C. § 1746

Jon Curtis Dailey, pursuant to 28 U.S.C. § 1746 swears, affirms and deposes that the following is true and correct:

1.      My name is Jon Curtis Dailey, D.D.S.

2.      I am presently employed at the Penobscot Community Health Center as the Chief Dental Officer in Bangor, Maine.

3.      From 2003 to the present I have served as a Forensic Odontology Consultant to the Armed Forces Institute of Pathology in Washington, DC.

4.      I am presently an Adjunct Professor at University of North Carolina School of Dentistry, the Boston University School of Dentistry and the University of Iowa College of Dentistry.

5.      I presently serve as the Chairman of the Bitemark and Patterned Injury Committee of the American Board of Forensic Odontology.

6.      I graduated from the Ohio State University College of Dentistry in 1978.

7.      I served in the United States Army from January 1980 to December 31, 2004. I was assigned to the Dental Corps branch. I retired with the rank of Colonel.

8.      From 2002 to 2003 I participated in a one year General Dentistry Residency as the Chief of Prosthodontic Services and Prosthodontic Mentor in Fort Jackson, South Carolina.

9.      From 2003 to 2004 I participated in a Prosthodontic Residency as Assistant Director in Fort Gordon, GA.

10.       I am board certified in the area of Prosthodontics and Forensic Odontology. I have been previously qualified as an expert witness in the area of Forensic Odontology. I have testified for both the government and the defense. The majority of my testimony has been for the government and I have testified for the government in capital cases.

11.       I have published numerous scholarly articles in the area of Forensic Odontology and specifically in the area of bitemark comparison. I have also lectured extensively in this area.

12.       In the summer of 2002 I was contacted by Naval Criminal Investigative Service regarding the Alfred Bourgeois case. I was contacted pursuant to my position with the Armed Forces Institute of Pathology. I examined photographs, dental casts and other related documents in the case of the United States v. Alfred Bourgeois. Specifically I examined three sets of stone dental casts and was asked to compare them with photographs of bitemarks on the decedent's body. I performed this comparison and concluded that I could not rule in or rule out any of three individuals as the possible biter.

13.       Specifically, I was unable to rule in or rule out any of the three individuals as the possible biter because: 1) the diffuse presentation of the bite marks in all of the photographs, 2) the distorted position of the marks, in some of the photographs, at the time of the photography, 3) the ruler/scale being in a different spatial plane than the mark being photographed, and 4) the very similar metric and spatial (pattern) relationships between the three individual's dentition.

14.       I provided a detailed written report of my review and conclusions to

Special Agent Thomas F. Brady, Naval Criminal Investigative Service, on September 29, 2002.

15.     On July 13, 2003, I received from Dr. William Oliver additional materials to review in this case. Specifically, I received photographs of bitemarks on the decedent's body that I had previously reviewed, however, these photographs had been digitally enhanced by Dr. Oliver.

16.     Upon this additional review, I discerned no additional information that would allow me to change the opinions provided in my Forensic Odontology Report dated September 29, 2002. Upon examination of the enhanced bitemark photographs provided by Dr. Oliver my findings remained the same: I was unable to rule in or rule out any of the three individuals as the possible biter because: 1) the diffuse presentation of the bite marks in all of the photographs, 2) the distorted position of the marks, in some of the photographs, at the time of the photography, 3) the ruler/scale being in a different spatial plane than the mark being photographed, 4) the very similar metric and spatial (pattern) relationships between the three individual's dentition.

17.     I provided a second written report to Special Agent Thomas Brady dated July 14, 2003, wherein I again stated that I was unable to rule in or rule out any of the three individuals as the possible biter even with the additional digitally enhanced photographs provided by Dr. William Oliver.

18.     After I submitted the second report I recall receiving a telephone call from Assistant United States Attorney Patti Booth. I recall I was teaching a forensic dentistry course for the Army in Colorado Springs and I was on my lunch break. I

had spoken to Ms. Booth approximately three or four times prior to this phone call concerning my work on the Bourgeois case. In this particular telephone call Ms. Booth was very irate. As I recall, she told me that the defendant, Alfred Bourgeois, was a really bad man. As I recall, I told her that whether he was a bad man or not was irrelevant to my bitemark analysis and conclusions. I told her I can only evaluate the evidence and I again told her that I could not include or exclude any of three individuals as the possible biter. As I recall, she then told me that if I could not help her she would go out and find an expert who could help her. She then hung up the telephone on me. I remember this telephone call because I had never dealt with someone with that sort of hostility.

19.     At the time of my involvement on the Bourgeois case on behalf of the government, I had examined over 150 bitemark cases during my career as a Forensic Odontologist.

20.     I was never called as a witness in the case of United States v. Alfred Bourgeois by the defense or the prosecution. Had I been called I would have testified consistent with the conclusions and analysis described in my two written reports and this affidavit.

21.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

John Curtis Dailey

Dated:     04 May 07

46



**COPY**

United States Courts
Southern District of Texas
FILED

OCT 0 8 2003

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA §

§

V. § CASE NO. CR-C-02-216

§

ALFRED BOURGEOIS §

## MOTION OF DEFENDANT ALFRED BOURGEOIS FOR FOR GOVERNMENT FUNDS FOR EXPERT WITNESS
### *EX PARTE, SEALED*

**TO THE HONORABLE JANIS GRAHAM JACK, UNITED STATES DISTRICT JUDGE, FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION:**

**COMES NOW,** Alfred Bourgeois, indigent Defendant in the above-styled and numbered cause, by and through his attorneys of record, Douglas Tinker and John Gilmore, pursuant to the 5th. 6th, 8th, and 14th **Amendments** to the U. S. **Constitution** and other authority cited herein, and moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding in support of the Defendant's right to defend against the penalty of death sought by the government, and in support thereof, Defendant would show:

1. The defendant is charged with 1st degree Murder;

2. The defendant is indigent and without funds to assist the undersigned counsel with expenses for experts necessary to his defense in this case.

3. The funding requested will provide counsel with essential tools to defend against the indictment returned and the penalty sought by the government. The Defendant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a significant factor at trial. **Ake v. Oklahoma,** 470 U.S. 68, 108 S. CT. 1087 (1985).

4. This motion is made *ex parte.* It would be fundamentally unfair to require this indigent Defendant to divulge to the prosecution the nature of this motion for funding which will necessarily inform the Government of defensive theories in this case. If the undersigned counsel were retained by the accused, there would be no requirement that the Government be notified of the retention of expert assistance. Accordingly, counsel moves that the Court's Order, finding that a threshold showing of necessity has been made, also contain the following language:

THIS ORDER, AND THE DEFENDANT'S *EX PARTE* MOTION FOR FUNDING, SHALL BE SEALED IN THE RECORD AND PLACED IN AN ENVELOPE IN THE RECORD AND SHALL BE SEEN BY AND DISTRIBUTED TO DEFENSE COUNSEL AND THIS COURT ONLY.

**WHEREFORE PREMISES CONSIDERED**, Defendant prays that upon evidentiary hearing, this Court will: (1) Find that a threshold showing has been made that a DNA expert is an essential tool in the presentation of a defense against the indictment returned and the penalty sought; (2) Enter an order authorizing the undersigned counsel to engage Elizabeth A. Johnson, Ph.D., as an expert DNA witness for the defense and direct the United States to pay the expert witness' fee in addition to out of pocket expenses; (3) Order that this motion and the Court's

Order be sealed as prayed for herein; and (4) that Defendant have such other and further relief as he may show himself to be justly entitled.

Respectfully submitted,

John Gilmore, Attorney

Douglas Tinker, Attorney

**JOHN GILMORE**
Attorney for Defendant
State Bar No. 07958500
Admission No. 18181
622 S. Tancahua/P.O. Box 276
Corpus Christi, TX 78403
(361) 882-4378 (phone)
(361)882-3635 (fax)
jsgilmor@swbell.net (e-mail)

**DOUGLAS TINKER**
Attorney for Defendant
State Bar No. 20056000
Admission No. 956
622 S. Tancahua/P. O. Box 276
Corpus Christi, Texas 78403
(361) 882-4378 (phone)
(361) 882-3635 (fax)
dougtinker@hotmail.com

# Resume

**Elizabeth A. Johnson, Ph.D.**
**1534 N. Moorpark Road, No. 364**
**Thousand Oaks, CA 91360**
*telephone 805-553-0445*
*facsimile 805-553-0487*
*circej@earthlink.net*

## EDUCATION

College
BS Chemistry, cum laude
Department of Chemistry
Wofford College, Spartanburg, SC
1978-1982

Graduate
Ph.D. -- conferred July, 1987
Department of Microbiology and Immunology
Medical University of South Carolina, Charleston, SC
August 1982 - July 1987

Dissertation
*Production and characterization of a monoclonal antibody to an antigen present on subsets of natural killer cells and human tumor cells.*

## POSITIONS HELD

Private Forensic Consultation May, 2003 - present

Senior Forensic Scientist
Technical Associates, Inc.
4125 Market Street, Suite #3
Ventura, CA 93003
February 1997 – May, 2003

Director
DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
September 1993 - December 1996

Supervisor
DNA Laboratory / Serology Section
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
April 1993 - September 1993

Assistant
Toxicologist
DNA Laboratory
Joseph A. Jachimczyk Forensic Center
1885 Old Spanish Trail
Houston, TX 77054
November 1991 - April 1993

Post-doctoral Fellow
Department of Molecular Hematology
Advisor: Albert Deisseroth, M.D., Ph.D.
Chairman, Department of Hematology
M.D. Anderson Cancer Research Hospital
Houston, TX 77030
October 1988 - November 1991

Department of Microbiology and Immunology
Advisor: Alfred Tsang, Ph.D.
Medical University of South Carolina
Charleston, SC
September 1987 - September 1988

## CONTINUING EDUCATION - FORENSICS

### CLASSES and WORKSHOPS

Expert Witness Workshop, Southwestern Working Group on DNA Analysis Methods (SWGDAM), January, 2000.

Mitochondrial DNA Workshop, International Symposium on Human Identification, September, 1999.

FBI/SWGDAM STR Workshop, Austin, TX, 1998.

Statistics Workshop, International Symposium on Human Identification, September, 1996, 2002.

STR Workshop, The Promega Corporation, May, 1995.

Roche Amplitype Workshop, Roche Molecular Systems, December, 1992.

Armed Forces Institute of Pathology DNA Identification Laboratory, visiting scientist to learn methods of mitochondrial DNA sequencing on aged remains, October, 1992.

Advanced Aspects of Forensic DNA Analysis (courtroom testimony), FBI Academy, June, 1992.

### CONFERENCES

The Future of DNA Technology, Washington, DC, 1996.

CODIS Software Symposium, Quantico, VA, 1995.

International Symposium on Human Identification 1992, 1993, 1994, 1995, 1996, 1997, 1999, 2001, 2002, 2003.

Advances in DNA Technology, Bethesda, MD, 1992.

American Academy of Forensic Sciences 1992, 1993, 1994, 1995, 2001.

## OTHER INFORMATION

### CERTIFICATIONS

Certification of Qualification as Laboratory Director in Forensic Identity by the State of New York Department of Heath, issued August 12, 2002; expires August 12, 2004

### PROFESSIONAL SOCIETIES

Member of American Academy of Forensic Sciences

Association of Forensic DNA Analysts and Administrators (AFDAA)
(formerly Southwest Working Group on DNA Analysis Methods)

INVITED LECTURES

Invited speaker, Washington State Bar Association, "The Fundamentals of DNA Testing", September, 2003.

Invited speaker, Texas Criminal Defense Lawyers Association, "Forensic DNA Testing", August, 2003.

Invited speaker, Utah Criminal Defense Lawyers Association meeting, "Forensic DNA: Testing the Right Way and Recognizing the Wrong Way", April, 2003.

Invited panelist, The Innocence Project, "Case Screening and Junk Science", March, 2003.

Invited speaker, Second Annual Texas Capital Defense Conference, "DNA Protocols and Laboratory Standards-Testing the Right Way and Recognizing the Wrong Way", October, 2002.

Guest lecturer, University of Texas Law School, Advanced Criminal Defense class, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002.

Invited speaker, California Public Defenders Association (CPDA), The Advanced Trial skills Institute, "Understanding & Challenging DNA" January, 2001.

Invited speaker, Texas Criminal Defense Lawyers Association (TCDL) "Forensics and Habeas" seminar, October, 1997.

Invited speaker, Arizona Public Defenders Seminar, April, 1997.

Invited speaker on forensic DNA, The Amersham Corporation, April, 1996.

Invited speaker, multi-departmental seminar, College of the Mainland, April, 1995.

Invited speaker, spring meeting of Southwest Association of Toxicologists, May, 1993.


## BIBLIOGRAPHY

PUBLICATIONS

1.    Taylor, M.S., A. Challed-Spong, and E.A. Johnson. Co-amplification of the HLA DQα and amelogenin genes: optimization and validation. *J. Forensic Sciences*, 42 (1), 1997.

2.    Johnson, E., W. Henzel, and A. Deisseroth. An isoform of protein disulfide isomerase isolated from chronic myelogenous leukemia cells alters complex formation between nuclear proteins and regulatory regions of interferon-inducible genes. *J. Biol. Chem.*, 267:14412-14417, 1992.

3.    Seong, D., S. Sims, E. Johnson, J. Lyding, A. Lopez, M. Garovoy, M. Talpaz, H. Kantarjian, G. Lopez-Berestein, C. Reading, and A. Deisseroth. Activation of class I HLA expression by TNF-alpha and gamma-interferon is mediated through protein kinase C - dependent pathway in CML cell lines. *British Journal of Haematology*, 78:359-367, 1991.

4.    Deisseroth, A., O.M.Z. Howard, A. Wedrychowski, D. Seong, N. Paslidis, M. Romine, S. Sims, C.V. Herst, T. Yuan, K. Wu, T. Lopez and E. Johnson. Summary and Future Directions, in *Chronic Myelogenous Leukemia: Molecular Approaches to Research and Therapy*; A. Deisseroth and R. Arlinghaus, eds., 1991, pp.469-475.

5.    Wedrychowski, A., D. Seong, N. Paslidis, E. Johnson, O.M.Z. Howard, S. Sims, M. Talpaz, H. Kantarjian, J. Hester, J. Turpin, G. Lopez-Berestein, J. Gutterman, E.J. Freireich and A. Deisseroth. Characterization of nuclear proteins which bind to interferon-inducible transcriptional enhancers in hematopoietic cells. *J. Biol. Chem.*, 265:21433-21440, 1990.

6.   Deisseroth, A., C.V. Herst, A. Wedrychowski, S. Sims, D. Seong, E. Johnson, T. Yuan, M. Romine, N. Paslidis, P. Gao, L. Huston, D. Claxton, S. Kornblau, H. Kantarjian, M. Talpaz and C. Reading. Future directions in molecular and genetic therapy of leukemias and solid tumors. *M.D Anderson Cancer Bulletin*, 1990.

7.   Seong, D.C., S. Sims, E. Johnson, O.M.Z. Howard, J. Hester, M. Talpaz, H. Kantarjian and A. Deisseroth. A phosphatase activity present in peripheral blood myeloid cells of CML patients but not normal individuals alters nuclear protein binding to transcriptional enhancers of interferon-inducible genes. *J. Clin. Invest.*, 86:1664-1670, 1990.

8.   Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia and K.Y. Tsang. Specificity of anti-lymphocyte antibodies in sera from patients with AIDS-related complex (ARC) and healthy homosexuals. *Clin. and Exp. Immunol.*, 73:68-73, 1988.

9.   Tsang, K.Y., E.A. Johnson and M.F. LaVia. Anti-p24 antibody reactivity in Acquired Immunodeficiency Syndrome (AIDS) related complex patients treated with Isoprinosine. *Annals of Internal Medicine*, 107:595, 1988.

10.  Johnson, E., L. Miribel, P. Arnaud and K.Y. Tsang. Purification of IgM monoclonal antibody from murine ascitic fluid by a two step column chromatography procedure. *Immunol. Lett.*, 14:159-165, 1987.

## ABSTRACTS

1.   Ballard, K.D., R.S. Orkiszewski, P.R. DeForest, M.S. Taylor, E.A. Johnson, and L. Ragle. EDTA testing in forensics: direct derivatization for GC-MS/MS analysis and the quantity of dried bloodstain analyzed. *Proceedings of the 45th ASMS Conference on Mass Spectrometry and Allied Topics*, Palm Springs, California, June 1-5, 1997, p. 54.

2.   Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle. DNA typing and the determination of EDTA in forensic samples by GC-MS/MS. Presented at the Seventh International Symposium on Human Identification, Scotsdale, AZ, 1996.

3.   Ballard, K.D., R.S. Orkiszewski, M.S. Taylor, E.A. Johnson, and L. Ragle. Determination of EDTA in forensic samples by capillary GC-MS and GC-MS/MS. Presented at the 44th ASMS Conference on Mass Spectrometry and Allied Topics, Portland, Oregon, 1996.

4.   Stacy, T., E.A. Johnson, J. Krebsbach, S. Bowne, and R. Cotton. Chemiluminescence of forensic casework: a comparison of the hybridization and detection methods of three independent laboratories. Presented at the Sixth International Symposium on Human Identification, Scotsdale, AZ, 1995.

5.   Taylor, M.S., A. Challed, and E.A. Johnson. Co-amplification of the amelogenin gene with DQ-α utilizing the Amplitype reaction mix and amplification protocol. Presented at the Fifth International Symposium on Human Identification, Scotsdale, AZ, 1994.

6.   Taylor, M.S., A. Challed, and E.A. Johnson. Co-amplification of the amelogenin gene with DQ-α utilizing the Amplitype reaction mix and amplification protocol. Presented at the California Association of Criminalists spring meeting, Los Angeles, CA, 1994.

7.   Johnson, E., and M. Pennington. Use of alkaline phosphatase-labeled probes and chemiluminescence detection methods for establishing an RFLP data base and analysis of forensic cases. Presented at the Fourth International Symposium on Human Identification, Scotsdale, AZ, 1993.

8.   Johnson, E., W. Henzel, and A. Deisseroth. Elevated levels of phospholipase C alpha are associated with alteration of complexes formed between interferon-inducible transcriptional

enhancers and nuclear proteins in cells of interferon resistant chronic myelogenous leukemia (CML) patients. Presented at the annual meeting of the American Society for Hematology, Denver, CO, 1991.

9.    Johnson, E., D. Seong, A. Wedrychowski, S, Sims, M. Romine, L. Huston, R. Luttrell and A. Deisseroth. A cytoplasmic phosphatase which is elevated in CML myeloid cells alters the binding of nuclear proteins to interferon-inducible transcriptional enhancers. Presented at the annual meeting of the American Society for Hematology, Boston, MA, 1990.

10.   Tsang, K.Y., E.A. Johnson, L. Bishop, M.F. La Via H.H. Fudenberg and M.Arlen. Monoclonal antibodies to human colon carcinoma-associated antigen(s). FASEB, Washington, DC (abstract no.4322), 1987.

11.   Trojanowska, M., K.Y. Tsang, E.A. Johnson, L. Bishop, M. Christian and R.Q. Warren. Expression of *c-myc*, *c-myb* oncogenes and interleukin-2 receptor in human peripheral blood mononuclear cells after treatment with an immunopotentiator (isoprinosine). FASEB, Washington, DC (abstract no. 850), 1987.

12.   Johnson, E.A., J. Minowada, M.F. La Via, and K.Y. Tsang. A monoclonal antibody to human NK cells is reactive with various tumor cell lines. Federation of American Societies of Experimental Biology (FASEB), Washington, DC (abstract no. 956), 1987.

13.   Warren, R.Q., E.A. Johnson, R.P. Donnelly, M.F. LaVia, M.E. Christian and K.Y. Tsang. Analysis of anti-peripheral blood mononuclear cell (PBMC) antibodies in sera from AIDS, ARC, and healthy homosexuals. First Annual Conference of Clinical Immunology Society, Baltimore, MD, 1986.

14.   Johnson E.A., B. Koger, M. La Via and K.Y. Tsang. A shared antigen between human natural killer (NK) cells and various tumor cells is recognized by an anti-NK monoclonal antibody. First Annual Meeting, Clinical Applications of Flow Cytometry, Charleston, SC, 1986.

15.   Johnson, E.A., K.Y. Tsang, B. Koger, B. Ward, R.Q. Warren, M. La Via and H.H. Fudenberg. Production of a monoclonal antibody reactive with human natural killer cells. Federation Proceedings, 44, No. 4, 1330, 1985.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA    §

§

V.                     §    CASE NO. CR-C-02-216

§

ALFRED BOURGEOIS        §

## CERTIFICATE OF NON SERVICE

I, Douglas Tinker, do hereby certify that a true and correct copy of the foregoing Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* has been presented to the Court. A copy of the same was not furnished to the Government.

DOUGLAS TINKER

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

UNITED STATES OF AMERICA     §

                             §

V.                           §     CASE NO. CR-C-02-216

                             §

ALFRED BOURGEOIS             §

## ORDER

On this day, the foregoing Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* having been considered by this Court,

**IT IS HEREBY ORDERED THAT**:

_____ The foregoing motion is **GRANTED** and the following expert is appointed by the Court:

_____.

_____ The foregoing motion is **DENIED.**

**SIGNED** and **ORDERED ENTERED** this _____ day of

_____, 2003.

_____
UNITED STATES DISTRICT JUDGE

47

United States Courts
Southern District of Texas
ENTERED

OCT 2 1 2003

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. CR-C-02-216 |
| | § | |
| ALFRED BOURGEOIS | § | |

## ORDER

On this day, the foregoing Motion of Defendant Alfred Bourgeois for Government Funds for Expert Witness *Ex Parte, Sealed* having been considered by this Court,

**IT IS HEREBY ORDERED THAT:**

_✓_ The foregoing motion is **GRANTED** and the following expert is appointed by the Court:

_Elizabeth A. Johnson Phd._.

_____ The foregoing motion is **DENIED**.

**SIGNED** and **ORDERED ENTERED** this ___20th___ day of

_October_, 2003.

UNITED STATES DISTRICT JUDGE

48

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
ENTERED

FEB 2 5 2004

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA   §
                           §
vs.                        §   Crim. No. C-02-216(1)
                           §
ALFRED BOURGEOIS           §

## ORDER

On February 25, 2004, a status conference was held in the above-styled action. The Court ORDERS the following:

1. The Government's Third Motion for Reciprocal Discovery is GRANTED as follows:

   The Defense must provide the Government with written summaries of its expert witnesses Dr. Rupp, Dr. Holden, and Dr. Johnson by Thursday, February 26, 2004 at 10:00 a.m. These summaries must be in compliance with Federal Rule of Criminal Procedure 16 by describing the opinions that will be offered, the basis and reasons for those opinions, and the witness's qualifications including a current curriculum vitae listing publications. The Defense must provide the Government with the written summary for its expert witness, Dr. Weiner by Wednesday, March 3, 2004 at 12:00 noon.

2. All sealed motions for designation of experts expected to testify that contain relevant curricula vitae are hereby unsealed.

3. The Defense must submit to the Court proposed changes to the jury charges regarding lesser included offenses by Friday,

194

February 27, 2004 at 10:00 a.m.

4.   All Daubert challenges must be made by Friday, February 27, 2004 at 10:00 a.m.

5.   The next conference in this case will be held Friday, February 27, 2004 at 10:00 a.m.  The Court will address jury charges and Daubert motions at that time.  The Court will also pre-admit any exhibits to which the Parties have not objected.

SIGNED and ENTERED this the _____ day of February, 2004.

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

2

49

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
**1534 N. Moorpark Road, No. 364**
**Thousand Oaks, CA 91360**

**Phone 805-553-0445**            _circej@earthlink.net_            **Fax 805-553-0487**

3/1/04

To Doug Tinker
    Fax - 361-882-3635
    Re. Bourgeois

Doug -
    I'm in colorado so hope you can read my
writing. classues for cross exam of FBI
witnesses (both Carolyn + Anthony)

1) FBI did not test the rectal swab with AP
reagent or do a sperm search. They
only did a P30 test with the ABA card
and a DNA test. The ABA card was
positive but there is _no_ indication of
male DNA found either in the non-sperm
or the sperm fraction.

2) We did do an AP test (negative) and
a P30 test (weak positive) and a
microscopic sperm search (negative for sperm)

3) The P30 positive (weak on our test) test
could be a false positive due to bacterial
proteins found on the rectal swab.
If there was actually sperm on the
swab, they should be observed

Mar 02 04 09:30a    Pamela Mackey        970-328-4556        p.2
Case 2:07-cv-00243    Document 337-3    Filed 05/14/07    Page 144 of 164
Case 2:02-cr-00246    Document 337-3    Filed 05/15/2007 USD    Page 144 of 164

**Elizabeth A. Johnson, Ph.D.**
**Forensic Science Consultations**
1534 N. Moorpark Road, No. 364
Thousand Oaks, CA 91360
*circef@earthlink.net*

Phone 805-553-0445                                    Fax 805-553-0487

Bourgeois continued                          ②

if the P30 test is positive from semen:

Calculations:

a. Sensitivity of the ABA card = 4 ng/ul PSA

b. Semen contains a mean of 800,000 ng/ml PSA

c. $\frac{800,000}{4}$ = 1/200,000 dilution of semen should be detectable

d. Semen contains on average 100 million sperm per ml of semen

e. A 1/200,000 dilution of semen would then be expected to contain 500 sperm

$$\left[\frac{100 \times 10^6 \text{ sperm}}{200,000 \text{ dilution}} = 500 \text{ sperm}\right]$$

f) 500 sperm is enough to observe even if a small portion is used to make a slide, and 500 sperm is plenty to give a DNA result (which they did not find male DNA).

Hope this helps. I'll be back Wednesday.

Libby Johnson

100 µL of serum was mixed with 100 µL of HEPES (0.24 %, pH 7.2) to facilitate absorption, and added to the membrane. Blood samples from four nursing mothers were collected and dried on DNA cards. The bloodstains were extracted in 1 mL HEPES for two hours. The stains were centrifuged in Spin-Ease and 200 µL of extract was added to Seratec PSA *Semiquant* Kits.

Results of the Seratec PSA *Semiquant* Kits were read after ten minutes

**Results and Discussion**

It is now quite clear that the term prostatic specific antigen (PSA) is a misnomer. Although present in great amounts in seminal plasma, its presence has been detected in a variety of other body fluids (Table 1). The greatest concentrations of PSA outside of semen have been in breast milk and amniotic fluid. Generally, the forensic biologist does not encounter these fluids, however, one unusual case of the detection of PSA in a diaper originating from the colostrum in breast milk from a nursing child has been reported [20].

| Fluid | Concentration PSA (ng/mL) | Reference |
|---|---|---|
| Semen | 200,000 to 5.5 million | Sensabaugh [3] |
| Semen | 820,000 (mean) | Lovgren, et.al [21] |
| Amniotic fluid | 0.60 (avg.) 8.98 in one case | Lovgren, et.al [21] |
| Breast milk | 1 (avg.) 2100 in one case | Lovgren, et.al [21] |
| Breast milk | Majority < 1.0; > 100 in one case | Filella, et.al. [22] |
| Breast milk | 0.47 (median) | Yu and Diamandis [9] |
| Saliva | None | Lovgren, et.al [21] |
| Female urine | 3.72 (mean) | Breul, et.al. [11] |
| Female urine | 1.73 (mean) | Breul, et.al. [12] |
| Female urine | 0.12 – 1.06; 0.29 mean | Schmidt, et.al. [13] |
| Female serum | 0.53 (mean) | Breul, et.al. [11] |
| Female serum | Majority < 0.01 | Yu and Diamandis [14] |
| Female serum | Majority < 0.1 | Diamandis and Yu [23] |

**Table 1. Concentration of PSA in various body fluids (liquid).**

Substantial levels of PSA have been found in amniotic fluid and breast milk. Cases involving lactating or pregnant women should be treated with due caution.

Of particular concern to this analyst is the detection of PSA in female urine and female serum. The finding of urine on a pair of underwear from a rape survivor would not be uncommon. In addition, if trauma is present or the survivor is menstruating, blood may be present on vaginal swabs or on stains in underwear. When an extract is prepared from a stain on the underwear and PSA is detected, how sure can the analyst be that the result is from semen? In other words, what is the likelihood that the stain is from female urine or serum?

The Abacus Diagnostics *OneStep ABAcard p30 Test* is used quite extensively throughout forensic laboratories in the United States. It has a listed sensitivity of 4 ng PSA/mL.

2

50



The University of Texas
Health Science Center at San Antonio
Mail Code 7750
7703 Floyd Curl Drive
San Antonio, Texas 78229-3900

Graduate School of Biomedical Sciences
Department of Pathology

(210) 567-4000

## NEUROPATHOLOGY CONSULTATION

### FOR THE BEXAR COUNTY FORENSIC SCIENCES CENTER

**DATE CUT** 7/1/02    **PROSECTOR** Dr E Rouse    **ACCESSION #**   02-CX-235

**HISTORY:** J.G. was a 2-and-a-half- year-old hispanic female toddler who sustained head trauma initially blamed on a "fall from the cab of a 18-wheeler". Her step-mother called the EMS and at the health care facility where she was seen, a lumbar puncture showed subarachnoid hemorrhage, and no skull fractures. She died at 11 AM the next day. Subsequently it became apparent that the child has been physically abused. At autopsy there was subgaleal bruising and subdural hematoma, as well as pattern injuries to the skin.

**GROSS OBSERVATIONS:** There is mild to moderate cerebral edema, and a accompanying portion of dura showed a thin subdural hematoma. . There is patchy subarachnoid hemorrhage. Coronal sections show fairly normal ventricular size ,no intraventricular blood, and no herniation hemorrhages, including no brainstem (Duret) hemorrhages. No gross abnormalities of the cortical ribbon or deep white matter are noted.–no midline (deep grey nuclear, callosal ) petechiae, tears but small areas of white matter softening and greyish discoloration (no xanthochromia) are seen.. Sections through lower brainstem and cerebellum are unremarkable.



**MICROSCOPIC FINDINGS & COMMENTS:**
Sections of dura show mostly recent hemorrhage trapped among the arachnoid granulations. The "oldest" areas in these dural sections show a thin  membrane (upper photo), histolog-ically  consistent with a few weeks' duration. Sections of cerebral deep white matter (centrum semiovale) show, interestingly, prominent myelin tearing, foamy macrophages between the groups of disrupted white matter tracts ( top photo, next page,  arrows, luxol fast blue/H&E stain). An ubiquitin stain of this particular section show prominent axonal swellings (inset, arrows) which could even be found on routine sections on other slides of similar areas. A few areas show contusion-infarcts in a stage of early organization (sheets of foamy macrophages consistent with at least a weeks' duration. Older, gliotic or cystic lesions are not identified.  Focally severe acute neuronal hypoxic changes are also seen.

02-CX-235                                                                                    2

Myelin tearing and axonal bodies are easily found in
these sections but as you know the presence of <u>abundant</u>
axonal bodies cannot be reliably used to either precisely
"date" an injury or provide evidence of more than one
episode of head trauma.



**NEUROPATHOLOGIC DIAGNOSIS:**
Child's brain, representative sections: history of
head trauma)

Cerebral edema, mild to moderate
          Hemorrhagic necrosis of cerebellar
          tonsillar tips
(Right) subdural hematoma, mostly recent, min-
imal organization (approximately 10 days' duration)

Cerebral white matter: Organized contusion infarcts (7+
days' duration), myelin tearing and axonal bodies


*Kathleen K. Ulh*
**KATHLEEN S KAGAN-HALLET MD**
**DEPARTMENT OF PATHOLOGY**
**ASSOCIATE PROFESSOR OF PATHOLOGY**
**(PEDIATRIC PATHOLOGY/ NEUROPATHOLOGY)**


                        DATE <u>09/17/02</u>

51

Case 2:07-cv-00223 Document 2-37-3 Filed 05/14/07 in TXSD Page 150 of 164
Case 2:02-cr-00246 Document 337-3 Filed 05/15/2007 Page 150 of 164

## CURRICULUM VITAE

# Charles Alan Keel

- Employment
- Education
- Professional Affiliations
- Presentations
- Personal
- Contact Information

## EMPLOYMENT

Criminalist, North Louisiana Crime Lab, Shreveport, Louisiana 1982-1984

Criminalist III, Oakland Police Department, Oakland, California 1984-1993

Consultant in Forensic Science, Shreveport, Louisiana, 1994-1996 Death Investigator, Caddo Parish Coroner's Office, Shreveport, Louisiana, 1994-1996

Criminalist, Tulsa Police Department, Tulsa, Oklahoma, 1996

Criminalist, San Francisco Police Department, San Francisco,California, 1996-1999

Criminalist/Consultant in Forensic Science, Forensic Science Associates, Richmond, California, 1999-present

## EDUCATION

Bachelor of Science (Zoology), Texas A & M University, CollegeStation, 1978

Graduate Course Work, Texas A & M University, College Station, 1978-80 in Food Science and Technology/Human Physiology

Graduate Course Work, University of California, Berkeley, 1993 in Nucleic Acid Biochemistry

## PROFESSIONAL AFFILIATIONS AND CERTIFICATIONS

The American Academy of Forensic Sciences

Case 2:07-cv-00223    Document 337-3 Filed 05/14/07 in TXSD Page 151 of 164
Case 2:02-cr-00246    Document 337-3 Filed 05/15/2007 SD Page 151 of 164

The American Board of Criminalistics
- Diplomate in General Criminalistics, 1991
- Fellow in Molecular Biology, 1994

DNA Technical Leader/Manager pursuant to the 1994 Identification Act and DNA Advisory Board Standard 5.2.1.1, advanced degree waiver conferred December, 1999

## PRESENTATIONS

*A Collaborative Study of DQA1 Typing by PCR* presented to the California Association of Criminalists, 1991 Spring Seminar, Berkeley

*A Collaborative Study of DQA1 Typing by PCR* presented to the American Academy of Forensic Sciences, 1992 Annual Seminar, New Orleans

*Penile Swab Evidence in the Investigation of Rape* presented at the 1993 International Forensic DNA Analysis Symposium, Quantico, Virginia

*Sampling Approach and DNA Analysis of Fingernail Evidence Specimens* presented at the Third Joint International Seminar of the Forensic Science Society [United Kingdom] and the California Association of Criminalists, May 2000, Napa, California

## CONTINUING EDUCATION

Recombinant DNA Technology, University of California Extension,Berkeley, 1986

Forensic DNA Analysis, University of California Extension, Berkeley, 1989 The Application of DNA Technology to Forensics, University of California Extension, Riverside, 1990

PCR/DQA1 Typing Methods, CETUS/California Department of Justice, Berkeley, 1991

Bloodstain Pattern Interpretation, California Criminalistics Institute, Sacramento, California, 1991

Advanced PCR Analysis Methods: PM, D1S80, and Quantiblot, Roche Molecular Systems, Alameda, California, 1993

Instrumental STR Analysis, Perkin-Elmer/Applied Biosystems, Foster City, 1996 Advanced Crime Scene Reconstruction, California Criminalistics Institute, Sacramento, 1996

## PERSONAL

Born July 5, 1956 in Lyons Georgia.

## CONTACT INFORMATION

Alan Keel
Forensic Science Associates
3053 Research Drive
Richmond, CA 94806
1-510-222-8883 voice
1-510-222-8887 fax
Email: akeel *at* fsalab *dot* com

FSA Home Page            Introduction            Staff Curriculum Vitae
Interesting Cases                                 Useful Forensic Links

52



# ARMED FORCES INSTITUTE OF PATHOLOGY
### Office of the Armed Forces Medical Examiner
1413 Research Blvd., Bldg. 102
Rockville, MD 20850
1-800-944-7912



## AUTOPSY EXAMINATION REPORT

Name: Gunter, Jakerenn
SSAN: 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
Date of Birth: 05 Oct 99
Date/Time of Death: 28 June 02, 1105

Date/Time of Autopsy: 29 June 02, 1330

Date of Report: 10 January 03

Autopsy No.: A02-42
AFIP No.: 2846051
Rank: Civilian
Place of Death: Driscoll Children's Hospital, Corpus Christi, TX
Place of Autopsy: Driscoll Children's Hospital, Corpus Christi

**Circumstances of Death:** This 2 year old civilian African American female child was found unresponsive 27 June 02 on the grounds of the Corpus Christi Naval Air Station outside the cab of a tractor trailer while in the care of her biological father and stepmother. She was taken to Driscoll Children's Hospital where she was found by head CT to have severe brain edema and interventricular and subarachnoid hemorrhage, and on retinal exam to have bilateral retinal hemorrhage consistent with abusive head trauma. An antemortem skeletal survey was normal. She was subsequently declared brain dead, and she died the following day following the withdrawal of life support.

**Authorization for Autopsy: The Armed Forces Medical Examiner, IAW 10 USC 1471. Civilian jurisdiction released to Federal.**

**Identification: Visual**

**CAUSE OF DEATH: Closed Head Injury with Subdural Hematoma**

**MANNER OF DEATH: Homicide**

**FINAL AUTOPSY DIAGNOSES:**

I. Closed Head Injury
    A. Multiple areas of subgaleal hemorrhage, occipital and right frontal scalp
        i. Ten impact sites identified
    B. Right subdural hematoma, recent, with minimal organization
    C. Subarachnoid hemorrhage over brain
    D. Cerebral edema with hemorrhagic necrosis of the cerebellar tonsillar tips
    E. Parenchymal cerebral brain inury (microscopic)
        i. Cerebral white matter organized contusion infarcts

AUTOPSY REPORT A02-42
GUNTER, Jakarenn                                                                    2

        ii. Prominent myelin tearing, axonal swelling and axonal bodies
           present

    F. Bilateral retinal hemorrhage, recent, consistent with non-accidental trauma
        i. Bilateral intraretinal and subretinal fresh hemorrhage
        ii. Hemorrhage within the nerve fiber layer above the optic nerve
           head
        iii. Bilateral optic nerve hemorrhage within the perineural,
           subarachnoid and subdural space
        iv. Focal hemorrhage within the left anterior chamber
        v. No evidence of intraocular foreign bodies, tumor or sympathetic
           ophthalmia
    G. Bilateral periorbital ecchymoses

II.    Additional Injuries Indicative of Chronic Abuse (Battered child)
    A. Multiple patterned linear elliptical skin contusions and abrasions of
       varying ages, consistent with looped electrical cord impact on chest,
       abdomen, left shoulder, legs, and buttocks
        i. Fourteen total patterned imprints identified
        ii. Multiple ill-defined linear healing scars and pigmentation changes
    B. Healing arched contusions with teeth imprints, consistent with bite marks
       on right forearm and left flank
    C. Multiple healing crusted abrasions on hands and feet
        i. Healing circular crusted skin ulcer on the sole of the right foot
    D. Healing tears of upper and lower frenulums of mouth
    E. Soft tissue hemorrhage of bilateral buttocks, upper right back, and left
       shoulder
    F. Resolving soft tissue hemorrhage of the thoracolumbar region

III.   No evidence of pre-existing natural disease
    A. Acute pneumonia, consistent with hospital colonization and respirator
       dependence

IV.   Toxicology (AFIP) negative for ethanol and substances of abuse

AUTOPSY REPORT A02-42                                                        3
GUNTER, Jakarenn

## EXTERNAL EXAMINATION

The body is that of a well-developed, well-nourished African American female child clad in a blue and white hospital gown and a clean diaper. The body is 88 cm in height, appears consist with the reported weight of 15 kg, and appears compatible with the reported age of 2 1/2 years. The body is cold. Rigor is present to an equal degree in all extremities. Lividity is present and fixed on the posterior surface of the body, except in areas exposed to pressure.

The scalp hair is dark and wavy, measuring 12.5 cm in length, and is pulled into multiple small twisted braids secured with black bands. The scalp beneath the hair is flakey. The irides are brown. The corneae are clear. The conjunctivae are pale and free of petechiae. The sclerae are white. The ears are normally formed and normally placed with the appropriate amount of cartilage. There is a single pierced hole in each earlobe, and there is a small, yellowed colored metallic post earring in the right earlobe. The external auditory canals, external nares and oral cavity are free of foreign material and abnormal secretions. The nasal skeleton is palpably intact. The teeth are natural and in good condition with moderate amounts of calculus formation (tarter). The palate is intact and normally formed.

Examination of the neck revealed no evidence of injury. The chest is symmetrical. Breast buds are palpable. The abdomen is flat and soft. The pigmentation of the skin over the chest and abdomen is variably mottled, with focal ill-defined darker and lighter areas. The extremities bilaterally are symmetrical and normally formed with all digits present and normally formed. Palmar creases are unremarkable. The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic. The back is straight, and the anus is unremarkable and atraumatic. On the upper left buttock, there is a hyperpigmented macule, 1.0 x 0.6 cm, consistent with a café au lait spot.

## EVIDENCE OF THERAPY

There is a nasogastric tube and an endotracheal tube in the mouth, secured with white tape extending over the checks. There are intravenous catheters in the left antecubital fossa secured with white tape and in the left radial wrist secured with tape and sutures. There are multiport intravenous catheters in the bilateral inguinal regions, secured with clear tape. There is a urinary catheter in place, and there is a multicolored bandaid just below the left knee, covering a needle puncture mark.

## EVIDENCE OF INJURY

On the upper central forehead, just beneath the hairline, there is a healing irregular 1.2 x 0.6 cm pale scar with central crust. Over the mid forehead, there are numerous fine, linear pale healing scars, up to 1 cm in length. There is ill-defined ecchymoses surrounding both eyes, involving both the upper and lower lids bilaterally. On the mid right cheek, there is a faint 2.0 x 1.2 cm contusion. On the lower right cheek, near the chin, there is a healing 0.4 x 0.2 cm scar. Beneath the chin, on the upper left neck, there is a cluster of small, healed pale scars, 3 x 2 cm in aggregate. On the back of the left ear, there is a vertically oriented 0.5 x 0.2 cm linear scar. Upon examination of

AUTOPSY REPORT A02-42                                                                    4
GUNTER, Jakarenn

the mouth, there are healing tears of both the upper and lower frenulums; the upper
laceration measuring 0.9 x 0.6 cm, and the lower laceration measuring 0.4 x 0.3 cm.

On the upper right chest, there is a well-healed 1.0 x 0.3 cm scar. On the chest and
abdomen, there are three patterned, healing areas of linear pigmentation alteration, all
consistent with wire loop imprints. On the mid anterior left chest, there is a healing "U"
shaped elliptical curvalinear dark mark, 2.4 x 0.2 cm, 0.9 cm in total width, oriented with
the open, noncontinuous end superior and laterally. On the lower right abdomen, there is
an inverted "U" shaped, healing dark linear mark, 2.5 x 0.2 cm, 2 cm in total width. On
the lower left abdomen, there is inverted "U" shaped, healing dark linear mark, 1.8 x 0.2
cm, 1 cm in total width.

On the back of the lateral left shoulder, there is a "U" shaped patterned linear
mark, consisting of two fine parallel abrasions with surrounding thin contusion, 5 x 0.3
cm, 3 cm in total width, consistent with a looped double corded electric cord. On the mid
lower left back, there are two vertically oriented curvalinear contusions with tooth
imprints, consistent with a healing bite mark, 2.9 cm in vertical dimension, 0.4 cm in
individual width, and 4.5 cm in total width. On the lower lateral right back, there is a
faint, inverted "U" shaped curvalinear hyperpigmented mark, 4 x 3 cm, oriented with the
noncontinuous end inferior and laterally. On the lower left buttock, there is an inverted
"U" shaped hyperpigmented scar, 5 x 3.5 cm, oriented with the noncontinuous end
inferior and laterally. Over both buttocks, there are numerous punctate and small irregular
pale scars. On the right buttock, there are numerous curvalinear hyperpigmented marks
and scars are identified, up to 3 cm in length.

On reflection of the skin of the torso, there are areas of recent subcutaneous and
deep soft tissue hemorrhage of the lateral left shoulder, measuring 4 x 2.5 cm; of the mid
medial right back, measuring 1 x 0.5 cm; of the left buttock, measuring 3.5 x 2.8 cm; and
of the right buttock in a patchy and less well defined distribution. There is an irregular 9
cm diameter region of resolving soft tissue hemorrhage with brown and yellow
discoloration in the mid thoracolumbar region.

On the back of the upper left arm, there is a 2 x 0.1 cm scar. On the back of the left
hand and on the back of the fingers, there are multiple punctate, healing pale scars, up to 0.2
cm. On the back of the left hand, there are central 0.6 cm and 0.3 cm diameter healing pale
scars with central crusted abrasions, and laterally, an irregular healing pale 1 x 0.4 cm scar.
On the back of the of the middle left finger, just beneath the fingernail, there is a crusted
healing 0.7 x 0.4 cm abrasion; and on the back of the left ring finger, just beneath the
fingernail, there is a 0.8 x 0.5 cm crusted healing abrasion. On the palmar aspect of the
middle finger of the left hand, at the distal interphalangeal joint, there is a horizontal healing,
linear 0.3 x 0.2 cm crusted wound with peeling skin; and on the palmar aspect of the middle
finger of the left hand, at the proximal interphalangeal joint, there is a healing 0.5 x 0.4 cm
scar with peeling skin.

On the back of the right elbow, there are multiple healed, hypopigmented scars, 2 x
1 cm in aggregate, and there is a 1 cm diameter healing pale scar with a central pink area.
On the back of the right forearm, there are two curvalinear dark, healing hyperpigmented
marks, nearly horizontally oriented, 3.5 x 3.2 cm with faint apparent teeth marks, consistent
with a remote bite mark. The skin of the back of the right hand is diffusely thickened,
hyperpigmented, and indurated. Within this area, there is a cluster of discernable vertically
oriented, dark, parallel linear marks, and a cluster of diagonally oriented, dark, parallel linear

AUTOPSY REPORT A02-42                                                         5
GUNTER, Jakarenn

marks. There is a central 2.8 x 2 cm pale scar and numerous small pale scars over the back of the right hand and on the back of the fingers of the right hand. Upon incising the skin of the back of the right hand, there is irregular deep and resolving soft tissue hemorrhage. On the back of the middle finger of the right hand, just beneath the fingernail, there is a 0.9 x 0.5 cm healing, crusted abrasion. On the back of the index finger of the right hand, there are numerous pale scars, and just beneath the fingernail, there is a 0.4 x 0.2 cm healing, crusted abrasion. On the palm of the right hand, there is an irregular 1 x 0.5 cm area of peeling skin. On the palmar aspect of the fingers of the right hand, there are contusions and areas of hyperpigmentation along the proximal interphalangeal joints. Upon incising the skin, there is underlying soft tissue hemorrhage of the proximal interphalangeal joint of the middle right finger.

On the lateral aspect of the upper left thigh, there are two overlapping diagonally oriented "U" shaped, dark, curvalinear parallel abrasions, consistent with looped wire imprints. One is oriented with the noncontinuous end superior and posteriorly, and measures 4.5 x 0.2 cm, 2.0 cm in total width. The second is oriented with the noncontinuous end superior and anteriorly, and measures 6.5 x 0.2 cm, 2.9 cm in total width. On the back of the left thigh, there are numerous faint, curvalinear abrasions and contusions, up to 3 cm in length. On the medial aspect of the left calf, there is an inverted "U" shaped dark., curvalinear mark, consistent with a looped wire imprint, measuring 4.8 x 0.2 cm, 2.9 cm in total width. On the lateral aspect of the left calf, there are two overlapping horizontally oriented "U" shaped dark, curvalinear marks, consistent with loop wire imprints, 6.0 x 3.9 cm in aggregate. On the medial aspect of the top of the left foot, there is an irregular 4 x 1 cm healing scar with central crusted abrasion and underlying induration. On the medial heel of the left foot, there are multiple small healing crusted abrasions, 1.5 x 1 cm in aggregate.

On the medial aspect of the upper right thigh, there are two, slightly overlapping "U" shaped dark, linear marks, consistent with looped wire imprints; the upper measuring 5.0 x 0.2 cm, 2.5 cm in total width, and the inferior medial one measuring 6.0 x 0.2 cm, 2 .0 cm in total width. On the back of the right thigh, there is a similar "U" shaped dark, curvalinear mark, consistent with a looped wire imprint, 5.5 x 0.2 cm, 2.5 cm in total width. There are multiple faint linear imprints over the medial and lateral aspects of the back of the right thigh, up to 4 cm in length. On the top of the right foot and extending up the first toe, there are multiple irregular healing scars, 5 x 2.5 cm in aggregate, with focal crust formation. On the bottom of right foot, near the heel, there is a healing, deep circular skin ulcer with central crust formation and marked skin induration.

A lumbar puncture reveals the cerebrospinal fluid (CSF) to be thick and hemorrhagic.

Upon reflection of the scalp, there are two discrete areas of recent subgaleal hemorrhage in the right frontal scalp, one 2.5 x 2.2 cm just above the lateral aspect of the right eyebrow, and slightly superior and medially, a second area 3.5 x 3.5 cm. Across the occipital scalp, there are a total of eight discrete areas of recent subgaleal hemorrhage. Just behind the left pinna, there is a 1.5 x 1.5 cm area. In the mid left occipital region is an inferior 1.5 x 1.0 cm area of hemorrhage, and superiorly, a lateral 1.5 x 0.6 cm area and medially a 1.3 x 1.1 cm area. In the right occipital scalp, there is an inferior lateral 3.2 x 2.2 cm area, a mid-lateral 2.0 x 1.2 cm area, a mid medial 1.5 x 1.0 cm area, and a superior 1.5 x 0.5 cm area of recent hemorrhage. All of the areas of subgaleal hemorrhage are distinct and separate, and all are bright red in color.

AUTOPSY REPORT A02-42
GUNTER, Jakarenn                                                                            6

Upon removal of the calvarium of the skull and reflection of the dura, grossly there is a right-sided thin film of semisolid subdural hematoma, measuring approximately 2 ml. over the right occipital region. There is patchy subarachnoid hemorrhage over the brain. Upon removal of the orbital plates, there is diffuse hemorrhage surrounding the optic nerves bilaterally. The eyes and brain are fixed prior to further examination.

## INTERNAL EXAMINATION

### BODY CAVITIES:
The body is opened by the usual thoraco-abdominal incision and the chest plate is removed. No adhesions are present in any of the body cavities. There is approximately 30 ml of clear serosanguinous fluid within each pleural space, and there is approximately 50 ml of yellow fluid with small blood clots within the peritoneal cavity. All body organs are present in the normal anatomical position. The subcutaneous fat layer of the abdominal wall is 1.5 cm thick.

### HEAD: (CENTRAL NERVOUS SYSTEM)
The scalp is reflected. The calvarium of the skull is removed. The dura mater and falx cerebri are intact. The leptomeninges are thin and delicate. The cerebral hemispheres are edematous and symmetrical. The brain weighs 1000 grams and is fixed prior to further examination (see "Neuropathology Report"). The eyes are removed and fixed prior to further examination (see "Ophthalmologic Pathology Report").

### NECK:
Examination of the soft tissues of the neck, including strap muscles, thyroid gland and large vessels, reveals no abnormalities. The hyoid bone and larynx are intact. A posterior neck dissection reveals no evidence of hemorrhage or trauma.

### CARDIOVASCULAR SYSTEM:
The pericardial surfaces are smooth, glistening and unremarkable; the pericardial sac is free of significant fluid or adhesions. The coronary arteries arise normally, follow the usual distribution and are widely patent. The chambers and valves exhibit the usual size-position relationship and are unremarkable. The myocardium is dark red-brown, firm and unremarkable; the atrial and ventricular septa are intact. The foramen ovale is appropriately membrane protected. The aorta and its major branches arise normally, follow the usual course and are widely patent. The ductus arteriosus is anatomically and functionally closed. The venae cavae and its major tributaries return to the heart in the usual distribution and are free of thrombi. The heart weighs 56 grams. The left ventricle is 1.3 cm in thickness, and the right ventricle is 0.3 cm in thickness. The cardiac valve measurements are as follows: the aortic valve 3.4 cm, the pulmonary valve 3.2 cm, the mitral valve 4.7 cm, and the tricuspid valve 4.2 cm.

### RESPIRATORY SYSTEM:
The upper airway is clear of debris and foreign material; the mucosal surfaces are smooth, yellow-tan and unremarkable. The pleural surfaces are smooth, glistening and

AUTOPSY REPORT A02-42
GUNTER, Jakarenn

unremarkable bilaterally. The pulmonary parenchyma is red-purple, exuding slight amounts of bloody fluid; no focal lesions are noted. The pulmonary arteries are normally developed, patent and without thrombus or embolus. The right lung weighs 269 grams; the left 220 grams.

## LIVER & BILIARY SYSTEM:

The hepatic capsule is smooth, glistening and intact, covering dark red-brown, moderately congested parenchyma with no focal lesions noted. The gallbladder contains approximately 2 ml. of green-brown, mucoid bile; the mucosa is velvety and unremarkable. The extrahepatic biliary tree is patent, without evidence of calculi. The liver weighs 505 grams.

## ALIMENTARY TRACT:

The tongue exhibits no evidence of recent injury. The esophagus is lined by gray-white, smooth mucosa. The gastric mucosa is arranged in the usual rugal folds and the lumen contains a small amount of fluid. The small and large bowel are unremarkable. The pancreas has a normal pink-tan lobulated appearance, and the ducts are patent. The appendix is present and unremarkable.

## GENITOURINARY SYSTEM:

The renal capsules are smooth and thin, semi-transparent and strip with ease from the underlying smooth, red-brown cortical surfaces. The cortices are sharply delineated from the medullary pyramids, which are red-purple to tan and unremarkable. The calyces, pelves and ureters are unremarkable. The urinary bladder is empty, the mucosa is gray-tan and unremarkable. The uterus and bilateral ovaries are infantile, normally formed, and unremarkable. The right kidney weighs 62 grams; the left 63 grams.

## RETICULOENDOTHELIAL SYSTEM:

The spleen has a smooth, intact capsule covering red-purple, moderately firm parenchyma; the lymphoid follicles are unremarkable. The regional lymph nodes appear normal. The thymus is tan-pink and unremarkable. The spleen weighs 51 grams.

## ENDOCRINE SYSTEM:

The pituitary, thyroid and adrenal glands are unremarkable. The right adrenal gland weighs 5 gms; the left adrenal gland weighs 7 gms.

## MUSCULOSKELETAL SYSTEM:

Muscle development is normal. No bone or joint abnormalities are noted.

## MICROSCOPIC EXAMINATION:

Heart: Sections of the myocardium reveal intact striated muscle fibers. There is no evidence of atrophy, hypertrophy, or endocardial thickening.

Lungs: The alveolar spaces and small air passages are expanded and focally contain moderate amounts of edema fluid. Focally, there is acute pneumonia with accumulations of neutrophils filling the alveolar spaces. The alveolar walls are thin and focally

AUTOPSY REPORT A02-42
GUNTER, Jakarenn

8

congested. The arterial and venous vascular systems are normal. The peribronchial lymphatics are unremarkable.

Liver and gallbladder: The hepatic architecture is intact. The portal areas show no increased inflammatory component or fibrous tissue. The hepatic parenchymal cells are well preserved with no evidence of cholestasis, fatty metamorphosis, or sinusoidal abnormalities. The gallbladder mucosa shows the usual postmortem mucosal autolysis and bile staining. The fibromuscular wall of the gallbladder is not thickened. There is no evidence of acute or chronic cholecystitis.

Pancreas: The pancreas has the usual lobular architecture with moderate autolysis. The acini, islets of Langerhans', and ducts are unremarkable.

Spleen: The capsule and white pulp are unremarkable. There is minimal congestion of the red pulp.

Adrenal Glands: The cortical zones are distinctive and well supplied with lipoid. The medullae are not remarkable.

Kidneys: The subcapsular zones are unremarkable. The glomeruli are mildly congested without cellular proliferation, mesangial prominence, or sclerosis. The tubules are well preserved. There is no interstitial fibrosis or significant inflammation. There is no thickening of the walls of the arterioles or small arterial channels. The transitional epithelium of the collecting system is normal.

Skin: Multiple sections of the skin of the hands and feet show varying stages of healing, with well-developed granulation tissue and scar formation, focal acute hemorrhage, crust formation, and epidermal hyperplasia. There is no evidence of deep infection or abscess formation. Sections of the subcutaneous tissue of the scalp show acute hemorrhage.

Brain and Eyes: See "Neuropathology Report" and "Ophthalmologic Pathology Report".

**OTHER PROCEDURES:**

1. Blood, vitreous, CSF, pleural fluid, peritoneal fluid and tissue samples were submitted for toxicologic examination.
2. Tissue was retained for possible histologic examination and DNA identification.
3. Documentary photographs were taken.
4. Fingerprints were taken.
5. The dissected organs were returned to the body.
6. Personal effects were released to NCIS agents.
7. The brain was submitted to the University of Texas Health Science Center at San Antonio for a Neuropathology consultation.
8. The eyes and optic nerves were submitted to Brook Army Medical Center for a Ophthalmologic Pathology consultation
9. Full body radiographs were obtained and reflect the injuries described above.

AUTOPSY REPORT A02-42
GUNTER, Jakarenn

9

**OPHTHALMOLOGIC PATHOLOGY REPORT** (Wilford Hall Medical
Center/Brooke Army Medical Center, San Antonio, Texas)

Gross Observations: The right globe measured 21 x 20 x 21 mm. There are no obvious
signs of remote globe surgery. The cornea measured 10 x 9.5 mm. The pupil is round at 6
mm, and the iris is brown. The optic nerve segment was 15 mm. The proximal portion of
the optic nerve adjacent to the globe was thickened and pigmented. The globe was
opened in the equatorial plane to facilitate inspection of the posterior pole. On inspection
there appear to be fixed retinal folds with numerous dot and blot retinal hemorrhages.
The left globe measured 19 x 20 x 22 mm. The cornea was 10.5 x 10 mm. The
pupil was 4 mm and round, and the iris is brown. The optic nerve segment was 10 mm
and there was a pigmented swelling to the proximal portion of the nerve. The globe was
opened to the equatorial plane and on examination there were multiple dot and blot
retinal hemorrhages.

Microscopic Findings: A sections of the right optic nerve discloses a healthy optic nerve
surrounded by fresh hemorrhage. This hemorrhage is both within the subarachnoid and
subdural space.
A section of the posterior eyewall of the right eye discloses normal appearing
sclera. The choroid is congested with hemorrhage and contains a mild amount of acute
inflammation. Intraretinal and subretinal fresh hemorrhage is present. Hemorrhage within
the nerve fiber layer atop the optic nerve head is also present.
A section of the anterior portion of the right globe discloses an unremarkable
cornea. The anterior chamber on one side appears to have been recessed from a blunt
trauma. There is fresh hemorrhage near the face of the tear in the ciliary muscle. The iris
leafs are unremarkable. The eye is phacoic and the lens is not discolored. Lange's folds
are present in the peripheral retina and subretinal blood is also seen in this area.
Neurofibrillary is also present within the retina.
A section of the left proximal optic nerve again discloses fresh hemorrhage within
the perineural space.
A section of the posterior eyewall of the left eye again shows perineural
hemorrhage that is present both in the subdural and subarachnoid space.
A section of the anterior globe of the left eye reveals an unremarkable cornea.
Small foci of hemorrhage are present within the anterior chamber. The angle appears
recessed in this eye as well. The eye is phacoic and the lens is not dislocated. Again, a
Lange's fold is identified and there is intraretinal hemorrhage present.

Diagnosis Comment: There were no signs of intraocular foreign bodies, tumors or
sympathetic ophthalmia. This constellation of gross and microscopic findings in an
infant's eye are most consistent with non-accidental trauma.

**NEUROPATHOLOGY REPORT** (University of Texas Health Science Center at San
Antonio, Accession # 02-CX-235, Dr. Kathleen S. Kagan-Hallet)

AUTOPSY REPORT A02-42
GUNTER, Jakarenn                                                              10

<u>Gross Observations</u>: There is mild to moderate cerebral edema, and a accompanying portion of dura showed a thin subdural hematoma. There is patchy subarachnoid hemorrhage. Coronal sections show fairly normal ventricular size, no intraventricular blood, and no herniation hemorrhages, including no brainstem (Duret) hemorrhages. No gross abnormalities of the cortical ribbon or deep white matter are noted- no midline (deep grey nuclear, callosal) petechiae or tears, but small areas of white matter softening and greyish discoloration (no xanthochromia) are seen. Sections through lower brainstem and cerebellum are unremarkable.

<u>Microscopic Findings</u>: Sections of dura show mostly recent hemorrhage trapped among the arachnoid granulations. The "oldest" areas in these dural sections show a thin membrane, histologically consistent with a few weeks duration. Sections of cerebral deep white matter (centrum semiovale) show prominent myelin tearing, foamy macrophages between the groups of disrupted white matter tracts. A ubiquitin stain of this particular section shows prominent axonal swellings which could even be found on routine sections on other slides of similar areas. A few areas show contusion-infarcts in a stage of early organizaion (sheets of foamy macrophages consistent with at least a weeks' duration) Older gliotic or cystic lesions are not identified. Focally severe acute neuronal hypoxic changes are also seen. Myelin tearing and axonal bodies are easily found.

<u>Neuropathologic Diagnosis</u>:
  I.      Cerebral edema, mild to moderate
          a. Hemorrhagic necrosis of cerebellar tonsillar tips
  II.     Right subdural hematoma, mostly recent, minimal organization (approximately 10 days duration)
  III.    Cerebral white matter: Organized contusion infarcts (7+ days duration), myelin tearing and axonal bodies.

**OPINION:** This 2 1/2 year old female battered African American child, died of an acute closed head injury with a subdural hematoma. There are multiple recent impact sites on the child's head with subgaleal scalp hemorrhage, subdural and subarachnoid hemorrhage, bilateral retinal and optic nerve hemorrhage, and organizing contusions and myelin tearing within the brain tissue. In addition, the child shows chronic abuse with evidence of having been beaten with an electric cord and having had blunt force impacts to the left shoulder, back, and buttocks. There are two bite marks present, numerous linear electrical cord marks, multiple bruises and deep contusions of varying ages over

AUTOPSY REPORT A02-42
GUNTER, Jakarenn                                                                      11

the child's body, unexplained healing circular wounds of the hands and feet, and
microscopically, on neuropathologic consultation, evidence of prior head trauma. The
manner of death is homicide.

ELIZABETH A. ROUSE, Maj, USAF, MC, FS
Assistant Medical Examiner
Office of the Armed Forces Medical Examiner