# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-02-CR-216 |
| | § | (C.A. No. C-07-223) |
| ALFRED BOURGEOIS, | § | |

## MEMORANDUM AND ORDER

In 2004, a jury found Alfred Bourgeois guilty of murdering his two-year-old daughter, JG1999. After a separate punishment phase, the same jury decided that he should receive a death sentence. After he unsuccessfully appealed his conviction and sentence to the Court of Appeals for the Fifth Circuit, Bourgeois' appointed counsel filed a lengthy Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241. (DE 396). Bourgeois also filed an extensive memorandum of law supporting his motion. (DE 402). The Court has liberally allowed Bourgeois to develop the factual basis for his post-conviction claims, including through the presentation of testimony and evidence in several hearings. The Government has filed a response arguing that Bourgeois' claims are all procedurally insufficient or substantively without merit. (DE 442).

The Court has fully considered the arguments, evidence, and law supporting Bourgeois' claims. The Court has given ample consideration to the voluminous pleadings filed by the parties. After a full review of the record, and with particular emphasis on this Court's own observations from trial and afterward, the Court finds that Bourgeois has not shown that the Government secured his conviction and sentence in violation of the Constitution or laws of the United States. *See* 28 U.S.C. § 2255.

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    The Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    Bourgeois Fathers JG1999, Gains Custody, and Begins His Abuse . . . . 10

        B.    JG1999's Last Month . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.    The Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.    Defense Counsel's Pre-Trial Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    III.    The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        A.    Guilt/Innocence Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.    Sentencing Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    IV.    Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    V.    Post-Judgment Proceedings and Evidentiary Hearing . . . . . . . . . . . . . . . . . . . 36


PROCEDURAL ADEQUACY OF BOURGEOIS' CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . 40


ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    I.    Bourgeois' Alleged Mental Retardation (claim one) . . . . . . . . . . . . . . . . . . . . 42

        A.    Background of Bourgeois' *Atkins* claim . . . . . . . . . . . . . . . . . . . . . 43

        B.    Intellectual Functioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

            1.    Bourgeois' IQ Scores . . . . . . . . . . . . . . . . . . . . . . . . . . 50

            2.    Legal Evaluation of Intelligence in *Atkins Cases* . . . . . . . . . . . . 52

            3.    Bourgeois' IQ Does Not Persuasively Fall at the Lower End of the

         Confidence Interval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

C.    Significant Limitations in Adaptive Skill Areas . . . . . . . . . . . . . . . . . . 65

    1.    Assessment by Testing Instruments . . . . . . . . . . . . . . . . . . . . . . . 68

        a.    The Woodcock-Johnson . . . . . . . . . . . . . . . . . . . . . . . . . 71

        b.    The ABAS-II and the Vineland . . . . . . . . . . . . . . . . . . . . 72

    2.    Lay Accounts of Bourgeois' Functioning . . . . . . . . . . . . . . . . . . 77

    3.    Bourgeois' Adaptive Abilities . . . . . . . . . . . . . . . . . . . . . . . . . . 81

D.    Manifestation of Limitations Before Age 18 . . . . . . . . . . . . . . . . . . . . 91

E.    Trial Counsel's Failure to Develop Evidence of Mental Retardation . . . 92

F.    Conclusion of Bourgeois' *Atkins* Claim . . . . . . . . . . . . . . . . . . . . . . . . 95

II.    Ineffective Assistance of Counsel for Failing to Present Mitigating Evidence (claim

two) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

A.    The *Strickland* Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

B.    Trial Counsel's Investigation and Preparation of Mitigating Evidence .100

    1.    Counsel's Early Efforts to Prepare a Mitigation Defense . . . . . 100

    2.    Preparations Before the Guilt/Innocence Phase . . . . . . . . . . . . 105

    3.    Trial Counsel Made a Constitutionally Sound Investigation . . . 113

C.    The Unpresented Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

    1.    Lay Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    2.    Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

        a.    Dr. Cunningham's testimony . . . . . . . . . . . . . . . . . . . . 123

        b.    Borderline personality disorder . . . . . . . . . . . . . . . . . . . 129

        c.    Neurological impairment . . . . . . . . . . . . . . . . . . . . . . . 137

3

              d.       Premeditation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

      D.      Conclusion of Deficient Performance Analysis . . . . . . . . . . . . . . . . . 144

      E.      Cumulative Effect of Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

III.    Jurisdiction (claim three) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

      A.      The Autopsy and Trial Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

      B.      Bourgeois' Post-Judgment Arguments and Post-Conviction Testimony

            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

      C.      Evidence of Recent, Extensive, and Fatal Head Trauma . . . . . . . . . . . 160

IV.    Trial Counsel Provided Ineffective Assistance by Failing to Call an Expert Witness

     to Rebut Forensic Evidence Indicting Sexual Assault (claim four) . . . . . . . . . . 165

      A.      The Trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

      B.      Dr. Benton's Observation of Sexual Trauma . . . . . . . . . . . . . . . . . . . . 170

      C.      Forensic Evidence of Semen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

      D.      Prejudice From Trial Counsel's Defense Against Allegations of Sexual

            Assault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

V.     Trial Counsel Provided Ineffective Assistance by Not Litigating a *Daubert* Challenge

     to Three of the Government's Expert Witnesses (claims five and six) . . . . . . . 182

      A.      Dr. Oliver's Reliance on the Digitally Enhanced Autopsy Photographs (claim

            six) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

      B.      Testimony from Dr. Senn and Dr. Chrz Concerning Bite-Mark Evidence

            (claim five) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

VI.    The Government Violated its Duty under *Brady v. Maryland*, 373 U.S. 83 (1963), by

     Failing to Disclose That the Government Promised Inmates Some Benefit for

4

Testifying Against Bourgeois (claim seven) . . . . . . . . . . . . . . . . . . . . . . . . . 194

     A.    No Evidence of Concealed Deals with Government Witnesses . . . . . . 196

     B.    Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

VII.   Trial Counsel Labored under a Conflict of Interest Because of His Representation of Clients Associated with this Case (claim eight) . . . . . . . . . . . . . . . . . . . . . . . 204

VIII.  The Government Engaged in Misconduct by Making Improper Argumentative Statements in the Guilt/Innocence and Penalty Phases (claim nine) . . . . . . . . 207

IX.   Trial Counsel Provided Ineffective by Not Rebutting Evidence of Bourgeois' Indifferent Demeanor (claim ten) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

X.    A Witness Improperly Relied on Bourgeois' Interactions with Counsel as a Basis to Formulate an Adverse Opinion about Him (claim eleven) . . . . . . . . . . . . . . . 217

XI.   Ineffective Assistance of Appellate Counsel (claim twelve) . . . . . . . . . . . . . 219

XII.   Cumulative Error (claim thirteen) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

XIII.  Lethal Injection (claim fourteen) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

CERTIFICATE OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

# BACKGROUND

Where, as in this case, a jury has found a defendant's crime worthy of the death penalty, federal law guarantees a full and fair inquiry into his conviction and sentence. Bourgeois has raised several claims requiring serious judicial consideration. The events surrounding the murder Bourgeois committed, the pre-trial preparation by his appointed attorneys, and the circumstances of his trial provide an important context to the matters he now brings before the Court. The Court will discuss at length the background for Bourgeois' post-conviction challenge.

In doing so, this Court's role presiding over trial provides a particularly useful vantage point. Cold transcripts often do not convey the nuances and color of the trial itself. Post-conviction proceedings frequently fail to depict the tempestuous trial atmosphere. The printed page dulls the personalities, character, and credibility of the parties and the witnesses. Decisions made in the heat of trial lose some urgency when subjected to harsh light of hindsight. The slow pace and detachment of post-conviction review divorces itself from the stress, fear, and anxiety of trial. For example, passing years have dimmed the powerful effect of some testimony, such as that of Bourgeois' daughter AB1994 as she described the murder. In general, this Court's familiarity with the trial atmosphere, parties, and witnesses provides a colored mosaic that may otherwise be obscured on the black-and-white page.

This is especially the case with respect to the trial attorneys, Douglas Tinker and John Gilmore, whose efforts Bourgeois vigorously attacks at this stage of the case.[1] Lamentably, the record suffers because Mr. Tinker passed away after Bourgeois filed his 2255 motion. With all sensitivity and respect, the Court allowed the parties to glean what information they could from Mr.

---

[1]     Except as necessary to identify one of his attorneys, the Court will refer to Bourgeois' lawyers conjunctively as "trial counsel" or "defense counsel."

6

Tinker before he succumbed to cancer. With the omission of his testimony, a hole exists in the written record about his efforts to defend Bourgeois.

This Court's experience and observation partially fill in the otherwise empty spaces in the record. For example, this Court's familiarity with Mr. Tinker and Mr. Gilmore as attorneys, both in this case and in others, informs the consideration of Bourgeois' grounds for relief. The legal community highly regards both men as competent and zealous attorneys. Their extensive experience, trial lawyering, and overall sterling character cannot be gainsaid.[2] The Court appointed these attorneys because they were among the best in the legal community. As an example of their character, the Court had to goad Mr. Tinker into filing vouchers for his representation; his concern was for the client, not for a paycheck.

This is not to say that counsel was mistake-free. The Court will not manufacture justifications for mistakes plainly in the record.[3] Nevertheless, this Court's familiarity with defense counsel's efforts reinforces the "strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 790 (2011) (quotations omitted). Thus, this Court must "not simply . . . give the attorneys the benefit of the doubt," but also "affirmatively entertain the range of possible reasons

_____

[2]     As the Court observed at the close of the sentencing hearing: "I don't think . . . your client[] could have had a better . . . advocate or voice in the courtroom . . . throughout what has been a very difficult process." (DE 342 at 102).

[3]     Bourgeois' attorneys have argued that Mr. Tinker's absence now leaves them "kind of wrestling with a ghost, in quite a literal sense." (DE 646 at 88). While Mr. Tinker's passing removes the ability to place his strategic decisions on the record, *Strickland* is an objective standard which is also "highly deferential" to counsel's actions. *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 740 (2011); *Strickland v. Washington*, 466 U.S. 668, 693 (1984); *see also Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 791 (2011) ("*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

. . . counsel may have had for proceeding as they did[.]" *Cullen v. Pinholster*, ___ U.S. ___, ___ S. Ct. ___, 2011 WL 1225705, *16 (2011).

With this understanding, the Court will first provide a general background before addressing Bourgeois' individual grounds for relief.

## I. The Crime

On June 27, 2002, Bourgeois, a long-haul trucker, arrived to deliver a load on the Naval Air Station Corpus Christi with his wife (Robin), the two daughters they shared (AB1994 and AB2001), and his out-of-wedlock daughter (JG1999).[4] An hour later, Robin frantically begged workers to call an ambulance for two-year-old JG1999 who lay motionless on the ground. Robin said that JG1999 had slipped and fallen from the truck. Concerned bystanders looked on as efforts were made to save the child's life. Alfred Bourgeois, well aware that his daughter lay dying on the pavement, indifferently supervised the unloading of his trailer and arranged for his next load.

Emergency personnel arrived and tried to save the dying little girl. As the ambulance sped away, Bourgeois insistently remained behind to finish unloading his truck in preparation for another run. He casually mentioned that it was a "shame what happened" to the infant. Only with extensive prodding, and the fact that he could not continue making deliveries because his truck had become a crime scene, did Bourgeois follow his daughter to the hospital.

At the hospital, doctors soon saw that the extent of JG1999's injuries far exceeded the explanation given. Finding blood behind her eyes, the doctors ordered an MRI. Medical personnel disbelieved the explanation for her injuries; the extent of her head trauma was much worse than that

---

[4]     This Court's review of the facts comes from the entirety of the trial and post-trial record, with particular emphasis on the highly credible testimony AB1994 and Robin Bourgeois provided at trial.

8

which would be expected from a four-to-five-foot fall. Numerous other injuries in various stages of healing also raised suspicions. When doctors informed Bourgeois that they needed to transport JG1999 to another facility and that she may not live much longer, Bourgeois seemed unfazed.

Given the injuries to the infant, Child Protection Services (CPS) began an investigation. Bourgeois told Robin that, if CPS took custody of the other two children, he did not want them to stay with her parents. Bourgeois' preference was unsurprising; he had physically assaulted his mother-in-law not long before. Bourgeois told Robin not to panic and to "stick with the story." Suspicion increased when AB1994 told CPS workers that the falling-out-of-the-truck fiction was "the story my dad said to tell."

As the life ebbed from JG1999's body, Bourgeois returned to the naval base set on continuing his deliveries. After unsuccessfully trying to get back on the road, Federal Bureau of Investigation officers took Bourgeois back to the hospital. Bourgeois told agents the story from which he has not deviated: while driving to the Corpus Christi Naval Exchange, JG1999 sat on his lap and sang her ABC's. When they arrived, he unloaded his trailer until someone informed him that JG1999 had fallen from the truck. He claimed that he rushed to her and began CPR, using a towel to wipe blood from her head or nose. He would not explain the numerous injuries to JG1999 other than to say that he never whipped his children. He seemed singularly unconcerned with JG1999's critical injuries. He said that he "didn't want *it* to suffer" and saw no problem continuing his truck route because "her mother's going to be here in town. I'm coming back."

Robin, however, began to change her story. When doctors seemed incredulous, Robin divulged to FBI agents that Bourgeois had abused JG1999, but kept up the story that she fell from the truck. Only when JG1999 died did Robin admit that Bourgeois had actually killed his daughter. Witness accounts and forensic evidence began to unfold a horrific tale of savage abuse that

9

culminated in Bourgeois beating JG1999 to death.

### A.  Bourgeois Fathers JG1999, Gains Custody, and Begins His Abuse

Robin and Bourgeois had a turbulent relationship.  Since before their marriage in 1995, Bourgeois beat Robin, threatened to kill her, periodically refused to provide for his family, and repeatedly had extramarital affairs.  Robin twice sought restraining orders against her husband. During a separation, Robin also had an affair with a man who owned a limousine service.  As part of their reconciliation, Robin and Bourgeois vandalized her paramour's work vehicles.  Bourgeois threatened to kill Robin on numerous occasions.  Violence, disharmony, and selfishness defined Bourgeois' relationship with his wife.

Bourgeois fathered JG1999 during an extramarital affair he had with Katrina Harrison, a woman he met while on a truck route.  In April 2002, the State of Texas initiated paternity proceedings against Bourgeois.  In addition to the two daughters he shared with Robin, Bourgeois was already paying child support for two other children.  Without telling Robin where he was going, Bourgeois left for Livingston, Texas, to reacquaint himself with Ms. Harrison.  They shared a bedroom while he visited his daughter.

When he returned, Bourgeois told Robin about the paternity suit.  A confirmatory blood test debunked his claim that he did not know Ms. Harrison.  In May 2002, Bourgeois took Robin, his two children, and a niece to a child support hearing in Texas.  The Texas court ordered Bourgeois to pay around $160 a month child support.  Bourgeois in turn asked for visitation rights.  Immediately after the court hearing, Ms. Harrison prepared a suitcase for JG1999, who left with Bourgeois.

Bourgeois then entered into a pattern of conduct aimed at controlling or killing his child. Bourgeois contacted Child Protective Services in Louisiana and falsely claimed that JG1999's mother abused and neglected her.  The Louisiana authorities contacted Texas Child Protective

10

Services, who found no basis for the claim of neglect. The social worker became concerned that Bourgeois did not want custody, he wanted power over and possession of JG1999. Fearing that JG1999 was in danger, the social worker asked Child Protective Services in Louisiana to monitor Bourgeois' custody of JG1999. No government agency became aware of the vicious abuse JG1999 suffered until she died.

On May 18, 2002, Robin found blood in JG1999's diaper. Dr. Scott Benton, a forensic pediatrician, examined the little girl and found no evidence of abuse. His examination would be a baseline against which to measure Bourgeois' inhumane treatment.

Bourgeois' abuse of JG1999 began soon after they arrived at his home. Robin began noticing bruises, marks, and injuries on the infant. She noticed sores on JG1999's feet which would not heal because Bourgeois kept pressing his thumbs into the wounds. Bourgeois began calling JG1999 names like the "trifling little bitch" and "a mother fucker." When Bourgeois bathed the infant, Robin could hear screaming as he whipped her. A few days after JG1999 came to live at the Bourgeois home, Bourgeois proclaimed that he would teach her to swim. As a video recorder captured his actions, Bourgeois repeatedly tossed her into the air and let her fall into the swimming pool where she sank until Bourgeois pulled her out, coughing and gasping for breath. For approximately 30 minutes, Bourgeois brought the young girl to the brink of drowning until he let her go.

Bourgeois assumed control over potty training JG1999. Bourgeois would strike JG1999 if the two-year-old wet her pants. He began a systematic pattern of beating JG1999, often with electrical cords or other objects. While no conclusive evidence of sexual abuse existed, strange behavior hinted that Bourgeois engaged in sexual activity with his daughters. For example, by this point in their relationship Robin no longer shared a bed with Bourgeois, but each night Bourgeois

would lock himself in the bedroom with AB1994 and JG1999. JG1999 would spend the night tied to her potty chair under a window.

Bourgeois' brutal abuse of JG1999 intensified. Some nights Robin could hear pounding in the bedroom accompanied by crying. A bloodstain confirmed that one loud thump Robin heard was Bourgeois throwing JG1999 against a wall. Bourgeois' maltreatment of JG1999 stood in stark contrast to that of AB1994 whom he treated "like an angel."

### B.  JG1999's Last Month

For the last month of the little girl's life, Bourgeois' abuse extended beyond harsh discipline; a particular viciousness attended his continual maltreatment. Bourgeois took his family on the road. The five people – Bourgeois, Robin, their two children AB1994 and AB2001, and JG1999 – traveled across America in the tractor-trailer. JG1999 stayed on her potty chair as they drove. Bourgeois sent postcards to JG1999's mother describing a vacation to amusement parks and full of outdoor activity. In terse phone calls to her mother, Bourgeois instructed the formerly talkative JG1999 to tell her mother that she was all right. The reality, however, was far different from the picture Bourgeois portrayed.

AB1994 saw her father repeatedly bite JG1999 on her hands, feet, and forehead. Once, Bourgeois beat JG1999 with a belt so hard that it broke. JG1999 began to show bruises all over her body. Her hands and feet were swollen and had open sores. He beat her with electrical cords. He once beat her until she lost consciousness. He occasionally taped her mouth shut. He hit her with his shoe. She spent her days and nights on the potty chair. Bourgeois would curse at her. He once locked Robin out of the truck for hours while he remained in the cab alone with the girls. He hit JG1999 in the eyes with all his strength until she had to wear sunglasses to mask the injuries. He once forced JG1999 to drink urine from a bottle he used to relieve himself while driving. He beat

her with a toy baseball bat until her head swelled "like a football." He told JG1999 that she made him want to kill her. Robin began to notice injuries such as a hole the same size as a cigarette lighter in the infant's foot. He repeatedly held JG1999 under the waves on a trip to the beach. Foreshadowing her murder, Bourgeois once knocked JG1999 unconscious by striking her head against the truck's steering wheel because she referred to herself by her mother's, not his, surname.

As Bourgeois' violence increased, JG1999 became sullen. Bourgeois had broken her once vivacious spirit. It soon became apparent that Bourgeois' abuse would end in the child's death. Bourgeois told Robin he wanted to kill the child. Once he had killed her, he planned on leaving her body in the woods or in a swamp and having Robin report her as kidnaped.

### C.     The Murder

Bourgeois delivered the killing blows on the naval base on June 27, 2002. The day before, the Bourgeois family stopped at their home in Louisiana to collect the mail. Bourgeois received a court order requiring him to pay $519.99 a month in child support for another daughter. After delivering a load to the Ingleside Naval Station, Robin went to sleep. Bourgeois' truck entered the Corpus Christi Naval Air Station at around 10:00 a.m. After asking for directions and having his truck break down, Bourgeois approached the warehouse where he was to make a delivery. Robin was still sleeping in the back. After the truck stopped, JG1999 wiggled on her potty chair and tipped it over. Bourgeois angrily ordered AB1994 to hand him the toddler. Bourgeois pulled down the child's pants and spanked her. He then grabbed her by the shoulders and slammed her head into the window four times. JG1999's face became "real sad." Bourgeois handed the child to AB1994 and he exited the truck.

Robin woke up and saw the child sitting motionless. She touched the infant, but JG1999's arm fell limply. Robin began trying to revive JG1999. Panicking, she honked the truck's horn. She

confronted Bourgeois when he returned to the truck, asking: "What did you do to her? She's dying." Bourgeois bluntly said he had to finish unloading his truck when Robin begged him to take the child to the emergency room.

Robin began performing CPR, but fluid came out of JG1999's mouth. Robin handed Bourgeois the child and began crying hysterically. She implored: "You're going to have all of us going to jail." Bourgeois then crafted their story: AB1994 forgot to close the cab door as she exited and JG1999 fell as she followed. Bourgeois took JG1999 out of the truck and laid her on the ground. Moments later, Robin exited, saw JG1999 laying on the ground, and began administering CPR again. Paramedics took over the CPR. While Robin was "very upset" and could not "keep her eyes off the baby," Bourgeois was "on the phone most of the time trying to see about getting . . . his next load . . . [to] Kingsville."

As bystanders questioned what happened, Robin said the "little girl fell from the truck." With time, it became apparent that no one believed Bourgeois' story. Robin first told authorities about Bourgeois' cruelty toward the child. Finally, by the morning of the day that JG1999 died, Robin admitted that the story about her falling from the truck was a lie. Bourgeois was arrested.

## II.   Defense Counsel's Pre-Trial Preparation

On July 25, 2002, a grand jury returned a two-count indictment charging Bourgeois with murder under 18 U.S.C. §§ 7 and 1111, and injury to a child under 18 U.S.C. § 13. The Court appointed John Gilmore on October 2, 2002, to represent Bourgeois. Mr. Gilmore had extensive experience handling capital cases. As a prosecutor, he had tried two death penalty cases. As defense counsel, he represented ten or eleven defendants facing a death sentence. He also tried several capital cases in which the prosecution did not seek a death sentence. Outside the death-penalty context, he maintained an active criminal practice, trying an estimated twenty cases each year. In

14

2000 and 2008, the local bar named him criminal defense attorney of the year. Mr. Gilmore brought to the defense a background rich in criminal trial experience.

Soon after his appointment, Mr. Gilmore interviewed his client. Mr. Gilmore did not observe any indication of mental illness or mental retardation in Bourgeois' presentation. During their initial conversations, Mr. Gilmore discussed with Bourgeois the possibility of seeking a favorable plea deal with the Government. Bourgeois refused to talk about a plea, making his position clear and unmoveable: he blamed the murder on Robin.[5]

Mr. Gilmore began preparing a defense. Mr. Gilmore requested, and the Court granted, appointment of expert and investigative assistance. (DE 32, 33). Initially, the Court appointed Douglas Tenore as an investigator. Mr. Tenore would assist in the preparations throughout the course of the trial proceedings. As the defense team continued preparing for trial, the Court appointed additional investigative and expert assistance.

On April 9, 2003, a grand jury returned a superceding indictment against Bourgeois listing two counts: unlawful killing with premeditation and malice aforethought under 18 U.S.C. § 7 and 111, and physical assault of a child under 18 U.S.C. § 13 and Texas Penal Code § 22.04(a)(1). At rearraignment, Bourgeois again pleaded not guilty. (DE 44). At this stage of the proceedings, Mr. Douglas Tinker volunteered to help represent Bourgeois. (DE 86).[6] Mr. Tinker brought a wealth

---

[5]     In a hearing, Bourgeois expressed his steadfast decision not to plead guilty: "Your Honor, my mind is made up[.] I'm not going to plea. . . . My mind was made up when I got arrested that I wasn't going to plea. I don't want to plea. I don't want to talk about a plea." (DE 356 at 16-17). In fact, Bourgeois wrote the Court asking to dismiss his attorneys when they tried to discuss reaching a plea agreement with the Government. (DE 356 at 5-17).

[6]     The Court issued a written order appointing Mr. Tinker on July 28, 2003. (DE 83). The Court later amended the appointment of counsel to reflect his work on the case before his official designation as attorney of record. (DE 86).

of experience to the table. He had represented over a dozen clients facing a death sentence. In 1995, the Criminal Justice Section of the State Bar of Texas named him Outstanding Criminal Defense Lawyer of the Year. He often spoke at conferences for state and national criminal defense attorney organizations. He was well known as a "defense attorney's defense attorney." Importantly, his experience with cases involving genetic material gave him the reputation as an expert in DNA. The Court appointed Mr. Gilmore and Mr. Tinker because the Court's interaction with them showed that they were among the most zealous, competent attorneys in the local bar.

Defense counsel began a double-pronged effort to avert a death sentence even before the Government certified this as a capital case. *See* 18 U.S.C. § 3593(a) (requiring the Government to serve the defendant with notice of its intent to seek a death sentence "a reasonable time before the trial or before acceptance by the court of a plea of guilty").[7] First, defense counsel tried to convince the Government not to seek a death sentence. Mr. Gilmore met with the United States Attorney for the Southern District of Texas and had discussions with members of the Attorney General's Office in Washington, D.C., lobbying against the Government seeking a death sentence.

Second, defense counsel realistically evaluated the case against their client, acknowledging that a jury would likely convict and then have to decide his sentence. Accordingly, the defense began preparations for a capital sentencing hearing even before the Government noticed this as a death-penalty case. Defense counsel requested the appointment of a mitigating investigator and

---

[7]     The attorneys divided the responsibilities for defending Bourgeois. According to Mr. Tinker's recollection: "Mr. Gilmore was responsible for handling all of the government's lay witnesses and law enforcement witnesses. Additionally, he was in charge of coordinating the investigation of the availability of non-expert defense witnesses and presenting their testimony at trial." Mr. Tinker, however, "was in charge of dealing with the government's expert witnesses and obtaining and presenting rebuttal expert testimony." The two attorneys, however, "made the majority of the trial decisions jointly." (PX-82 at 4).

received authorization to expend significant funds in preparation for a mitigation case. On June 30, 2003, Mr. Gilmore contacted Dr. Marc Cunningham, a well-known psychologist who has routinely testified in capital trials, to secure his assistance. Dr. Cunningham agreed to participate as an expert witness on mitigation evidence and on violence in prison society. Dr. Cunningham outlined the assignment of responsibilities as he saw them: a mitigation investigator would examine Bourgeois' background and then Dr. Cunningham would "conduct more strategic interviews[.]" Dr. Cunningham informed trial counsel that, "assuming an investigator began aggressively working on a social history," he could be ready for a January trial date. (PX-8).[8]

On July 9, 2003, trial counsel asked Dr. Cunningham if he could recommend a competent investigator for the penalty phase preparation. Dr. Cunningham provided trial counsel a list of experienced mitigation specialists, including Lisa Milstein. After trying to contact others, trial counsel secured the help of Ms. Milstein. She, in turn, solicited help from her associate Gerald Bierbaum, an attorney who now works for the Capital Habeas Unit of the Federal Defender's Office in Las Vegas, Nevada. At Dr. Cunningham's recommendation trial counsel had every reason to trust that they would perform a competent and probing review of Bourgeois' life history.

In a status conference on July 16, 2003, the Government announced that they received authorization to seek a death sentence. (DE 74). The Government outlined the aggravating factors it would rely on as required by 18 U.S.C. § 3593(a). (DE 78, 79).[9] The Court set trial for February

---

[8]    The Court will refer to the exhibits introduced by Bourgeois in the evidentiary hearing held September 20 through 24, 2010, as "PX" and the Government's exhibits as "GX."

[9]    The Government's notice that it would seek a death sentence listed the following factors that the jury would eventually consider in evaluating whether Bourgeois' crime merited a death sentence: (1) the heinous, cruel, or depraved manner in which he committed the offense; (2) the substantial planning and premeditation that went into the crime; (3) the likelihood that Bourgeois
(continued...)

16, 2004. (DE 76).

On July 25, 2003, Mr. Gilmore sent Dr. Cunningham an email describing their efforts to secure the services of a mitigation expert and informing him that: "The case was reset to February 2004, to allow you to gather information for your evaluation. . . . There is one problem, however. The judge has ordered reciprocal discovery and has set a deadline of mid-December to disclose your information. Please let me know if you can work within these parameters." (PX-8 at 15). The Court, however, later changed the required discovery deadline until the end of jury selection. (DE 185). With several months remaining before the trial date, the defense team consisted of two highly experienced attorneys, an investigator, two mitigation investigators, and an expert witness on mitigation evidence.[10] In addition, Bourgeois himself took an intensely active part in the defense. An expert witness attested that Bourgeois seemed more like a member of the defense team than a defendant. (DE 348 at 286).

Yet defending Bourgeois would be a herculean undertaking for several reasons. The obviously horrendous facts of the case would trouble any juror. Expert and lay witnesses would chronicle at trial the unrelenting abuse that JG1999 suffered at Bourgeois' hands. Bourgeois had wished for the infant's death and made plans for disposing her body. His brutal beatings assured the toddler's eventual demise. He indifferently manipulated others into supporting his transparent attempt to label her death an accident. The crime itself made his conviction a near certainty. The

---

[9]     (...continued)
would commit future acts of violence; (4) the impact of the victim's loss to the family and her personal characteristics as a human being; and (5) the vulnerability of the victim. (DE 78, 79); *see also* 18 U.S.C. § 3592 (outlining the statutorily defined aggravating and mitigating factors).

[10]     In the months before trial, the mitigation investigators interviewed dozens of potential witnesses, some of them several times. The Court also liberally allowed the defense to retain other experts, including a jury selection specialist, a forensic pathologist, and two mental-health experts.

jury would not see Bourgeois as a sympathetic defendant.

Also, Bourgeois often provided misinformation to the defense team, making a mitigation defense difficult. Additionally, Bourgeois' violent behavior continued while he was incarcerated as a pre-trial detainee. Bourgeois threatened to have witnesses killed.[11] His threats were not toothless; witnesses, including JG1999's mother, were murdered before trial. (DE 24). Notwithstanding court orders designed to halt all communication (DE 24, 28), Bourgeois continued to imperil the safety of those involved in his trial. His threats to harm and attempted assaults on jailors and United States Marshals assured that custody could not contain his violent behavior. In a case where the punishment phase would examine his ability to comport to the rules and regulations of prison life, Bourgeois hobbled his attorneys' efforts to demonstrate that he could be a model prisoner if the jury spared his life.[12]

---

[11]     Bourgeois also threatened to kill prosecutors, FBI agents, and the trial judge. Even though Bourgeois made the threats at the same time, the Court decided that only those made against witnesses could come before the jury. (DE 387 at 8-10).

[12]     The Court cautioned Bourgeois:

There's some indication that you've intimidated witnesses, attempted to intimidate witnesses, get your brother on them or other family members. It's all going to come out at trial. It's certainly not going to be helpful to you. And you're in a deep enough hole right now without making it any worse.

So you have two of the greatest lawyers I've ever known representing you. You're going to have to put your trust in them. You're going to have to let them do the work that we've got them to do, whether it's mitigation experts or school records or interviews with people. They have really worked hard. And you're putting your whole defense at risk by doing this. I cannot emphasize it strongly enough. Not only are you disobeying this - there's nothing I can do to punish you for the contempt of court that you've done. You're already there. You're already in jail. And that may be why you're continuing to do it because you know that there's very little I can do.

(continued...)

And critically, Bourgeois' insiste nce that he bore no culpability for JG1999's death compounded the challenges trial counsel faced. The Constitution guaranteed that Bourgeois, if he so chose, could have his day in court. His truculent assertions of innocence in light of overwhelming evidence, however, limited his counsel's strategic choices. Aside from a brief flirtation with pleading guilty immediately before trial to save AB1994 from testifying (PX-8 at 31), Bourgeois eschewed any discussion of a favorable plea. Notwithstanding the highly incriminating evidence against him, Bourgeois took the stand in both phases of trial to blame his wife for JG1999's death. These vocal protestations of innocence posed a dilemma for counsel. Counterpoised between Bourgeois' persistent attempt to deflect responsibility and the character of the evidence against him, his attorneys were sometimes required to present inconsistent information to the jury.

## III.    The Trial

### A.    Guilt/Innocence Phase

The Government called three groups of witnesses in the guilt/innocence phase. First, several individuals put the murder into context. Witnesses described Bourgeois' first delivery on the day of the murder, his entry onto the naval base, the breakdown of his truck before reaching the warehouse, and the events immediately after he killed. The Government called several witnesses who observed Bourgeois' reaction to his daughter's life-threatening injuries, describing him as casual, preoccupied with making his deliveries, and indifferent. An FBI agent summed up Bourgeois' attitude: "He seemed to be more concerned about the delivery of his next load than he

---

[12]       (...continued)
But, what you are doing is putting the sand over your head, as we speak, with every one of these letters.

(DE 351 at 36).

was about the welfare of his soon to be deceased daughter[.]" (DE 338 at 102). Other law enforcement witnesses described their interaction afterward with Bourgeois and Robin. They explained how Robin's story broke down as the victim died.

Second, forensic witnesses described the injuries JG1999 sustained at her father's hands, both on the day of the murder and weeks before. Carole McLaughlin, a registered nurse on duty when JG1999 arrived, observed injuries on the infant such as bruising around the eyes, swollen extremities, and hard, calloused hands and feet. Dr. Noorullah Akhtar testified that JG1999 was "virtually dead" when she arrived at the hospital. (DE 344 at 95). He opined that falling from a truck could not cause the extensive blood in and edema of JG1999's brain. Instead, her injuries were equivalent to her falling "four or five stories, head first, on a hard floor." (DE 344 at 93). A CT scan showed "blood in all areas in and around the brain, and the brain is swollen." (DE 344 at 96). The injuries were so severe that JG1999 would not last long. When Dr. Akhtar told Robin that information she cried; Bourgeois "didn't show much expression or grief." (DE 344 at 97). In addition to the blood in her eyes, Dr. Ronald R. Kuffel, Jr., an ophthalmologist, observed several recent head injuries, including a fresh hemorrhage on the right of her head above the hair line.

Dr. Elizabeth A. Rouse performed the autopsy which revealed both the severe head injuries that caused her death and numerous non-lethal wounds all over her body. Of the ten different head injuries, Dr. Rouse identified internal injuries corresponding to the external wounds. Other than the brutal head wounds, Dr. Rouse observed scratch marks near the ears, deep injuries to the hands and feet, looped injuries as if struck with an electrical cord, burns possibly from a cigarette lighter, and deep tissue bruising in nearly every part of her body.

Dr. Scott Anthony Benton, a medical doctor who had examined JG1999 a month before her murder, reviewed the autopsy photographs. He observed a completely different child; none of the

injuries had been present before. Aside from intense head injuries, he also saw evidence of abuse all over her body. Of particular note, he concluded that there was some evidence of vaginal trauma since his earlier examination. (DE 346 at 45-46). Another witness testified that rectal swabs taken from the victim after her death suggested the presence of semen.

William Russell Oliver, an expert in forensic pathology and forensic imaging, enhanced the autopsy photographs to accentuate the external injuries. He estimated that she had suffered the following external injuries: 25 to 26 whip marks, 78 healed scars, 73 to 105 nonspecific contusions, 8 pattern contusions, 9 to 10 abrasions or excoriations, 7 to 9 healing ulcerations, a possible bite mark, and three lacerations. (DE 345 at 226). Dr. David Senn, a forensic odontologist, could not exclude Bourgeois, Robin, or AB1994 as the probable biter for an injury on JG1999's arm. He could, however, exclude Robin and AB1994 as the possible biters for wounds on her back, leaving Bourgeois as the only possible biter with access to JG1999. Another forensic odontologist, Dr. Bryan Chrz, agreed that Bourgeois was probably the one who bit JG1999 on the back.

The final category of testimony came from the witnesses who observed Bourgeois' unrelenting, escalating, and homicidal abuse, saw the effects of the beatings, or heard his confessions to those acts. Some witnesses described seeing various injuries on JG1999's body, most of which Bourgeois attributed to her natural mother. The Government called three inmates – Darick Moore, Orlando Campos, and Wiley Taylor – who had been housed in county jail facilities with Bourgeois. These men explained that Bourgeois initially claimed that the victim died in an accident, but later, "as he . . . got comfortable, he started like telling [them] really what happened." (DE 344 at 205). Bourgeois said he killed his daughter and was going to make it look like an accident. (DE 344 at 219). Bourgeois admitted that he beat JG1999 with several objects. Bourgeois described his daughter as a "bad child" who "[u]sed to shake her butt all the time[.]" (DE 344 at 205). Also,

Bourgeois described "with pride" how he beat his wife.  (DE 344 at 219).

Bourgeois' sister Claudia Williams testified that he had made comments foreshadowing the murder.  He told Ms. Williams: "You get your black dress out. . . .  I'm just going through a lot.  I don't know what I'm going to do." (DE 223 at 8).  Ms Williams became so concerned that she asked Robin if Bourgeois had any weapons in the truck.  (DE 223 at 9).

The most damning testimony of the trial came from those who observed Bourgeois' cruelty firsthand.  Robin Bourgeois was asleep when her husband murdered JG1999, but she could still describe his incessant prior abuse and his manufacture of the story afterward.  The most chilling testimony came from AB1994 as she described how her father killed her little sister.  She credibly, and bravely, chronicled the events leading to the murder and sadly reported on how her father killed JG1999.  Nothing weakened her testimony or challenged her version of events.[13]

After the Government rested, the defense moved for an instructed verdict, arguing that insufficient evidence proved Bourgeois' guilt and his premeditation for the murder.  The Court denied the motion.

---

[13]     In his Motion to Vacate, Bourgeois brazenly argues that

[t]rial counsel also failed to present readily available evidence through either crossexamination or through the presentation of live witnesses of the bad character and reputation in the community of Robin and AB-1994 for being truthful and honest. The credibility of these witnesses was critical to the Government's case – simply put, if the jury believed either of these witnesses Petitioner was going to be convicted.

(DE 396 at 61).  Bourgeois has not supported his accusations with any evidence calling AB1994's credibility or honesty into question.  Any attempt by trial counsel to impugn her credibility would have seriously backfired.  This Court vividly remembers AB1994's heart-wrenching account of her father's abuse and murder.  Time cannot obscure her forthright testimony and its effect on the jury.  The only lies AB1994 told were those she initially conveyed at Bourgeois' direction.  The jury accepted her eyewitness testimony of the murder as a valid report of how Bourgeois killed his daughter, and Bourgeois has given the Court no reason to supercede its judgment.

Notwithstanding the overwhelming evidence against Bourgeois, the trial attorneys followed their client's instructions. The cross-examination of witnesses tried to place reasonable doubt on whether Robin could have been the killer. Bourgeois himself was the only witness called by the defense in the guilt/innocence phase. Bourgeois' testimony stuck to the same story he told investigators: that JG1999 fell from the truck. Notwithstanding the extensive credible testimony about the abuse JG1999 had suffered, Bourgeois testified that he never harmed her, never touched her inappropriately, and never killed her. (DE 338 at 5-6). A blistering cross-examination left Bourgeois looking even worse before the jury. Bourgeois admitted that he had disciplined JG1999 twice by spanking her, but disclaimed any other abuse. As the Government asked about the numerous injuries found on the infant's body, Bourgeois began supplying implausible excuses for each wound. With some injuries, such as the whip marks found on her thighs, Bourgeois denied having any knowledge about them. Instead, he cast blame on Robin Bourgeois. When asked to explain testimony that inculpated him, such as that given by his sister and others, he accused the witnesses of lying. Even with all the testimony showing his detached and indifferent demeanor about the loss of his baby, he unpersuasively claimed: "How can you say I'm not upset. I lost my baby. Yes, I'm upset. . . . I'm highly hurt by this." (DE 338 at 54).

The parties delivered their closing arguments on Tuesday, March 16, 2004. The Government emotionally and forcefully outlined the evidence showing that Bourgeois abused and killed the victim, emphasizing that Bourgeois had planned to kill his daughter beforehand. Both Mr. Tinker and Mr. Gilmore made closing arguments in the guilt/innocence phase. Mr. Tinker begged the jury not to be swayed by emotion and the horrible circumstances of the victim's death, but to look at the facts. Like Bourgeois' own testimony, Mr. Tinker tried to pin the murder on Robin Bourgeois. He hoped that the jury would find that she had a motive to kill the child and had abused the little girl

24

herself. He tried to minimize the testimony about Bourgeois' indifferent actions after the murder. In the event that the jury believed Robin and AB1994's account, Mr. Tinker discounted the testimony showing intent and premeditation, making the murder an act of momentary anger.

Mr. Gilmore also briefly argued that the Government had ignored Robin Bourgeois' role in the killing. He characterized Robin Bourgeois as one whose evolving story increasingly blamed Bourgeois as it exculpated herself.

The jury deliberated for less than two hours before finding Bourgeois guilty of both counts in the indictment.

### B.    Sentencing Phase

The defense's focus shifted to securing a life sentence for Bourgeois. Months before trial, the mitigation experts had interviewed many of Bourgeois' friends and family members. Although their reports of each conversation were brief, the investigators gave trial counsel and their expert Dr. Cunningham an outline of Bourgeois' background. As the actual sentencing hearing approached, trial counsel were still deciding precisely which witnesses to call, depending on the case put on by the Government. Before the hearing, defense counsel rented a conference room in a hotel nearby the courthouse. Over the course of a day, the attorneys spoke with approximately 50 individuals, shifting through their testimony to find that which would benefit and not harm Bourgeois. Trial counsel also still had to make difficult decisions about using its expert witnesses, including whether to call Dr. Cunningham to the stand.[14]

The sentencing hearing began on Monday March 22, 2004. The course of the Government's

---

[14]    For instance, on the first day of the sentencing hearing the Court noted that trial counsel did not want the jury instructed before proceeding on specific mitigating factors but "want[ed] to build their case as it goes along." (DE 348 at 7). The defense chose to have the mitigating factors listed in the jury's final charge.

case would shape the defense's response. The prosecutor's opening promised to bring forth witnesses who would "testify about Alfred Bourgeois, about the last couple of decades of [his] life, so you know who this Defendant is; other acts of cruelty and violence he has committed, so that you may use those and apply those with what you have already heard." (DE 348 at 24).

As a threshold matter, the jury had to find that Bourgeois intentionally killed the victim. Also, the Government alleged as statutory aggravating factors: that (1) Bourgeois killed in an "especially heinous, cruel, or depraved manner" that involved "torture and serious physical abuse"; (2) he killed after "substantial planning and premeditation"; and (3) JG1999 was "particularly vulnerable due to her youth." Non-statutory aggravating factors included that (1) Bourgeois "is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others"[15] and he "caused injury, harm, and loss to the family of JG1999 because of [her] personal characteristics as an individual human being and the impact upon the victim's family." The instructions required the jury to find any of those issues beyond a reasonable doubt.

The defense alleged that it had proven the following mitigating factors by a preponderance of the evidence: (1) Bourgeois had an impaired capacity to understand the wrongfulness of his conduct; (2) he was under "unusual and substantial duress"; (3) he did not have a "significant prior history of other criminal conduct"; (4) he committed the offense under "severe mental or emotional disturbance"; and (5) other relevant information. As non-statutory mitigating factors, the defense hoped the jury would find that (1) Bourgeois had been abused as a child; (2) other persons "who may be culpable in the offense may not be punished"; (3) he was "under stress from family and economic

---

[15]     The Government alleged that Bourgeois had (a) threatened others with violence, (b) demonstrated low rehabilitating potential, and/or demonstrated lack of remorse.

factors"; and (4) at the time of the offense he "was driving across the country with three children and one other adult in the cab of an 18-wheeler truck."

The Government adduced the following information in the punishment phase:

- Bourgeois' mother-in-law Veronica Batiste who described how, while Robin was in the hospital giving birth to AB2001, Bourgeois confronted Mrs. Batiste at her home. When Mrs. Batiste expressed disapproval of how Bourgeois abused Robin, he responded: "I'll beat her if I want. That's my fucking wife." (DE 348 at 35). After a heated, profanity-laden tirade by Bourgeois, she asked him to leave. He punched her in the mouth, grabbed a lamp and struck her with it, and then continued beating her. AB1994 witnessed the whole confrontation. (DE 348 at 35-37). Felony charges from the incident remained pending at the time of trial. (DE 348 at 38). At Bourgeois' wedding he fought with his brother-in-law when he told Bourgeois never to beat Robin. (DE 348 at 42-43). Bourgeois repeatedly hit Robin, including at a neighborhood gas station. (DE 348 at 48).

- A young nephew testified that once while driving Bourgeois got angry, pulled him from the car, and held him by the feet over the side of a high bridge. (DE 348 at 52-53). Bourgeois laughed as the scared child cried. That same day, Bourgeois again held the child by his ankles over a pier at a boat launch. (DE 348 at 53-54). Another time, Bourgeois repeatedly dunked the child who could not swim well under the water, even after he threw up from swallowing so much water. (DE 348 at 56-57). Once, Bourgeois woke the child from his sleep by grabbing his ankles. Bourgeois swung him around until the child's head hit their dog. (DE 348 at 55).

- Bourgeois' first wife, Sheila Bourgeois described how during their four-month marriage Bourgeois argued with her, pushed her, and choked her, even when she was pregnant. When he pushed her over a chair and she "busted up" her nose, she left him. (DE 348 at 61-62).

- Another ex-wife, Cynthia Bourgeois, explained how her young child from another relationship would "shake every time [Bourgeois] would come in her presence." (DE 348 at 70). Once when Bourgeois took the girl away alone she returned with a "big knot" on her head, a swollen forehead, a limp, and a mark like a footprint on her back. (DE 348 at 70-71). The child said that Bourgeois "had pulled her hair out, put her head in the commode." (DE 348 at 74). Cynthia left her husband and never let him see the child again.[16]

---

[16]     Trial counsel's cross-examination showed that she only divorced Bourgeois after she
(continued...)

- Another wife, Gaynell Belvin James, testified that one time after she divorced Bourgeois she let him take their son for the day. The three-year-old child returned "very shaky, nervous" and "withdrawn" with a bruise on his thigh. (DE 348 at 82). The child was too afraid to go with Bourgeois again for many years. When he was thirteen, Bourgeois took him for what was supposed to be a day. Bourgeois kept him for a month. (DE 348 at 87).

- Another wife, Gaynell Collins Bourgeois, testified that Bourgeois had a bad temper. During their marriage he would push and choke her. (DE 348 at 100). Bourgeois had an affair with Robin and got her pregnant while married to Gaynell. She saw Bourgeois repeatedly hit Robin while she was pregnant. (DE 348 at 102).

- Before trial, Bourgeois told a Deputy United States Marshal, "If I was going to hit somebody, I would hit you." (DE 348 at 108). Later, Bourgeois lunged at the officer during a transfer. (DE 348 at 109).

- Bourgeois' cousin, Isaac Bourgeois, III, got in a scuffle with Bourgeois over insults to his mother. Bourgeois bit his pinky finger to the bone. (DE 348 at 115). The next day Bourgeois and his brother Lloyd confronted Isaac and his mother with pistols and threatened to kill them. They then got in Lloyd's truck, circled around the two, and told them they "could die today." (DE 348 at 116). Bourgeois was convicted of disorderly conduct as a result of the incident. (DE 348 at 118). Isaac's mother, Beatrice Bourgeois, also testified about the event. She explained that, while Lloyd later apologized for the assault, Bourgeois never did. (DE 348 at 124).

- Inmates testified about Bourgeois' incriminating admissions and threats while incarcerated before trial.[17] Bourgeois knew that inmate Adam Longoria was a member of the Texas Syndicate prison gang. When a jailor jokingly told Bourgeois that Longoria was a hit man, Bourgeois communicated that he wanted his cousin Lisa Monroe killed because "he wrote a threatening letter to her, and she turned it in to the Judge." (DE 348 at 155). He said he also wanted his wife and girlfriend "eliminated." (DE 348 at 155-56, 162).

---

[16]     (...continued)
had an affair. (DE 348 at 79). Bourgeois had hired an investigator to follow her and prove she was committing adultery. (DE 348 at 79).

[17]     In a carefully crafted instruction, the Court informed the jury that "the parties have stipulated that as of January 23 of the year 2003, as part of the terms and conditions of Mr. Bourgeois's confinement, he was prohibited from communicating with any other inmate. He could only communicate with his attorneys or guards or the Court." (DE 348 at 144).

Bourgeois gave Longoria "names, addresses and everything." (DE 348 at 156). He promised that his brother Lloyd would give Longoria "[a] $100,000 18-wheeler, and names of people for drug runs[.]" (DE 348 at 157, 162). Bourgeois confessed that he beat JG1999 "[w]ith a bat, some extension cords." (DE 348 at 166). Bourgeois told inmate Orlando Campos that he "beat[] up his ex-girlfriends"and "was going to kill [Robin] when he got out[.]" (DE 341 at 81). He told Wiley Taylor and Darick Venore Moore that he beat his wives and girlfriends. (DE 341 at 82, 87). He told Taylor he "was trying to have [Robin] killed . . . so that she wouldn't testify against him." (DE 341 at 83). Bourgeois also confessed that he and his brother made most of his money from running drugs and illegal aliens (DE 341 at 83, 87).

•    Robin Bourgeois testified that Bourgeois admitted that he did not have a conscience. (DE 248 at 188). Robin read a lengthy letter that Bourgeois had written to her uncle. (DE 348 at 188-211). Bourgeois intended her uncle to tell Robin about the letter's contents. In the letter, Bourgeois repeatedly insulted Robin and accused her of dishonesty. Bourgeois wrote: "in the name of God, Robin['s] days will be short. That niece of yours will have a short life." (DE 348 at 196, 199). Robin understood the letter to be a threat against her. (DE 348 at 211). Bourgeois' letter also alternated between accusing Robin of killing JG1999 and writing that she "fell out of the truck." (DE 348 at 202). He claimed: "All this shit about extension cord beatings, biting this child, brutalizing this child, your niece told those people all this." (DE 348 at 198, 203). Bourgeois discussed extensively his view of the forensic evidence in the case. (DE 348 a 206-08).

•    JG1999's grandmother provided sympathetic victim-impact testimony about the toddler's life. (DE 348 at 219-41).

•    An FBI agent's testimony further indicated that Bourgeois was a liar and manipulative. (DE 348 at 249-51).

On the first day of the punishment hearing, the Government called Dr. Estrada to testify. As anticipated by the parties' agreement to his appointment as a witness, Dr. Estrada's testimony both hurt and helped Bourgeois' case. Dr. Estrada, a psychiatrist, conducted an evaluation of Bourgeois before trial which included reviewing letters and phone calls Bourgeois made while incarcerated.

Dr. Estrada briefly testified for the Government, primarily identifying aggravating psychological issues from his testing. Dr. Estrada opined that Bourgeois had a "narcissistic

personality disorder" which made his "basic motivation in life . . . the aggrandizing of his self-esteem." (DE 348 at 284). He "need[ed] to have this continuous positive feedback for [his] self-esteem[.]" (DE 348 at 284). Bourgeois' narcissism made him "lively, likeable. exciting, interesting, sometimes very persuasive or charismatic," but his self-interest would inevitably "result in friction that may lead to simply break-up of relationships . . . or actual violence." (DE 348 at 285). As a function of his narcissism, Bourgeois' self-reporting to Dr. Estrada exposed that he was a liar.[18]

Dr. Estrada also found that Bourgeois met "a number of specific items that have been found associated with violence" such as "being the subject of rejection, neglect, and abandonment, being the survivor of actual physical or sexual or emotional abuse," all of which can create "a very high predisposition for violence as adults." (DE 348 at 281). Because of that background, Bourgeois had "a much higher tendency toward violence than an ordinary person." (DE 348 at 285). In sum, Dr. Estrada found Bourgeois to be both narcissistic and violent.

The defense began its case for mitigation through the much-longer cross-examination of Dr. Estrada which left the jury with a more sympathetic picture of Bourgeois' life.[19] Dr. Estrada began by putting Bourgeois' early life into context. He was the child from an illegitimate relationship. He did not know his father when young. His mother singled him out for abuse. (DE 341 at 24). Importantly, Dr. Estrada showed how Bourgeois' early life transformed him into a violent adult. Dr. Estrada explained that, when he asked about abusive childhood, Bourgeois was "initially kind of

---

[18]     For instance, while Bourgeois claimed to lose consciousness from a car accident, Dr. Estrada could not corroborate that. (DE 348 at 276). Also, Dr. Estrada could not confirm that Bourgeois was as wealthy as he claimed to be. (DE 348 at 276).

[19]     This tactic allowed trial counsel to argue in closing that Dr. Estrada "is their expert. Dr. Estrada is some who – who they say you as a jury should believe. They wouldn't put him on there if they didn't think that you should be able to rely on what he tells you." (DE 342 at 57).

vague and a little reluctant." (DE 341 at 22). Dr. Estrada was not surprised because "individuals who later may be abusive of their own children . . . either gloss over or give excuses to their own parents' neglect or abuse." (DE 341 at 23). Bourgeois "had suffered neglect and rejection, and there was some physical abuse by his mother." (DE 341 at 23).

Dr. Estrada tied the abuse of JG1999 to Bourgeois' background and the stressors he felt at the time. Dr. Estrada explained that adults who abuse their children had commonly been abused themselves. (DE 341 at 39). Bourgeois lived in a "family or subcultural type of environment where a certain measure of violence in family relationships is accepted[.]" (DE 341 at 45). Because of his own abused childhood and the lack of cultural opprobrium of abuse, "[i]t is not unusual in that culture or context to be physically harsh in the disciplining of children." (DE 341 at 47). The stress Bourgeois found himself under exacerbated his violent tendencies. Dr. Estrada explained:

> My opinion was that Mr. Bourgeois at the time was going through a number of stresses. Number one, he was -- discovered that he had had an affair and a child as a result of that affair. He was very angry about that. Second, he was under financial stress with debts. Third, he had a serious marital problem with his wife, they had been arguing about a number of things, and their mutual affairs. And they were in a confined situation that made any little accident in the toilet the trigger for an explosion of anger that came from a number of different directions, and ended up focus[ed] on the child.

(DE 341 at 41). Notwithstanding his problems, Dr. Estrada opined that Bourgeois was not a sociopath. (DE 341 at 66).

Dr. Estrada explained that Bourgeois was hard working, had a successful career as a trucker, and had no history of violence outside the family context. (DE 341 at 46). Because he had "a pattern of abusive relationships again and again and again," Dr. Estrada opined that Bourgeois would continue to be violent "in a family situation." (DE 341 at 50). Dr. Estrada, however, could not reliably predict whether "the conditions in which he will be in the future are going to be such that

will allow [violent] behaviors to manifest itself or not." (DE 341 at 50, 51). Dr. Estrada conceded that with "higher . . . supervision available" Bourgeois would have a "lesser degree of all kinds of violent incidents[.]" (DE 341 at 52). Dr. Estrada could not predict how Bourgeois would act in a prison situation, but he anticipated Bourgeois would be in a highly structured environment and, given his age, would adjust better than others may. (DE 341 at 51-52).

The Government's redirect of Dr. Estrada questioned whether Bourgeois had actually suffered abuse as a child. (DE 341 at 54-56). The Government, however, got Dr. Estrada to agree to this summary of his testimony: "he's self-centered, . . . he's angry, and . . . he has a high risk towards violence." (DE 341 at 62).

The record plainly shows that trial counsel struggled with which other witnesses to call. (DE 341 at 5). At the time of trial, the defense had "a whole room full of witnesses[.]" (DE 342 at 91-92). Of those, trial counsel selected three people to testify in the penalty phase, each of whom knew Bourgeois as a child. Bourgeois' sister Michelle Denise Armont, his cousin Carl Kevin Henry,[20] and former neighbor Herman Clayton, Jr., described his impoverished and abused childhood. The witnesses described how Bourgeois "suffered a lot of abuse . . . from his mother." (DE 341 at 113). He received many "whippings." (DE 341 at 125). His mother singled him out for abuse and even "whipped [him] for something someone else did[.]" (DE 341 at 125). His mother would also "chastise" him severely. (DE 341 at 114). The witnesses described some specific incidents displaying his mother's cruelty. She would clean his nose with her long fingernails "and as time go on it developed a real, real bad sore" that "always would be bloody." (DE 341 at 114). His mother would "whip[] him with the extension cord from the fan" (DE 341 at 114). One time she threw the

---

[20]    Bourgeois insisted that trial counsel call Mr. Henry as a witness. The Government impeached Mr. Henry, a former police officer, with his prior convictions for insurance fraud.

telephone receiver at him and hit him in the head. (DE 341 at 115). This abuse continued until he reached high-school age. (DE 341 at 115).

During his childhood, Bourgeois went to live with Mary Clayton, an elderly neighbor who everyone called Ms. Mary. (DE 341 at 98). Ms. Mary repeatedly asked Bourgeois' mother to let him come live with her. Conditions improved for him as Ms. Mary "made sure that he had all his basic needs as far as going to school, his clothing, his books, and all his necessities[.]" (DE 341 at 116). Even so, children in the neighborhood teased him, primarily because his father was not around. (DE 341 at 116). His siblings joined in the teasing. When Ms. Mary died, Bourgeois went to live with his sister, Ms. Armont. (DE 341 at 99). He did not move back in with his mother "because there was a conflict that he had with his mother at that time[.]" (DE 341 at 99). Bourgeois had a temper and would "get[] red in the face," but his sister could usually calm him down. (DE 341 at 100). Despite her past abuse, however, Ms. Armont testified that Bourgeois and his mother "resolved the problem [in] the end[.]" (DE 341 at 98).

Bourgeois also addressed the jury himself in the punishment phase. He told jurors:

My sympathy goes out to the soul of JG1999, my baby, her family, relatives and friends, and I'm very sorry for the death of my child. It's a hurting pain and a sorrowful thing that happened. And I feel or believe that I have been wrongfully accused of this crime that I've been convicted for. . . .

So I feel like you all have been misled and I've been wrongfully convicted, and I'm just sorry for the pain and suffering, that I've been wrongfully accused for the death of my baby, and I did not kill my baby.

I just want to close with that I loved JG1999, she's an infant that didn't actually come in this world and I think the real murderer got off with this crime. I just think you all should know that I have been wrongfully convicted. I feel my wife had a lot to do with this and she walked away free, and I just had to say this. If I never get an opportunity to say this to nobody else, my family, Katrina's family, JG1999 came from a lovely family. When I picked her up, when she got in my custody I had no problems with JG1999. She was a lovely kid, very lovely. I realize some of the pictures that you all seen in the swimming pool, I will say I was a little rough like

33

that. I'm like that with all my children. And I just feel you all have been wrongfully misled.

I just think I want to close with that, saying that I love my baby, I love her family, I love my family. And I thank each and every one of you for participating, the lawyers for the job they did, and for everybody that communicated. And God bless all of you all.

(DE 342 at 23-24).

Mr. Gilmore's closing argument began with the recognition that defense counsel faced a daunting task: "[I]t's difficult for me to come up here and argue to you about this punishment and what you're going to do [to] him knowing that [Bourgeois] maintains his innocence, and knowing that you don't believe that[.]" (DE 342 at 45). The bulk of his argument, however, assumed that Bourgeois killed JG1999. After discussing the jury's role, Mr. Gilmore discussed mitigating factors in Bourgeois' background. Mr. Gilmore highlighted that "his brothers and sisters made fun of him. And his mother singled him out for abuse." (DE 342 at 47). Mr. Gilmore argued that Bourgeois' abused background was not an excuse, but put context into the crime. The highly stressful environment around Bourgeois – with economic, marital, and other difficulties – compounded lingering problems from his childhood. In the context of the events swirling around Bourgeois, Mr. Gilmore encouraged the jury to find that he "snapped. Intending to discipline her, . . . it got out of hand and it ended up killing her. That's not to excuse his behavior; it's to – in an attempt to try to explain what happened." (DE 342 at 50). Mr. Gilmore urged the jury to find that life imprisonment would be a sufficient, and violence-inhibiting, punishment for Bourgeois.

Mr. Tinker emphasized the severity of a life sentencing, including the high security that would surround Bourgeois. Mr. Tinker also wanted the jury to understand "who is Alfred Bourgeois?" (DE 342 at 58). He discussed how Bourgeois was an "unwanted child in a large family" with a mother who abused him. (DE 342 at 56). He discussed how, notwithstanding his

turbulent background, Bourgeois finished high school and worked as a trucker. Still, his poor home life – where "he grew up in a society where it was accepted conduct to hit children with items, sticks, switches, electrical cords" – was the "kind of rearing Alfred Bourgeois had and that's why he is what he is today." (DE 342 at 60). His culture allowed that violence as a means of dealing with other stressors, independent of the child's actions. (DE 342 at 61). But even so, Mr. Tinker argued that living his life in "a cage within a cage within a cage" would prevent him from acting violently. (DE 342 at 63). Mr. Tinker then begged the jury not to impose a death sentence. (DE 342 at 66).

The jury instructions required a death sentence if the jury unanimously found that the aggravating factors outweighed the mitigating factors. After five-and-a-half hours deliberation, the jury returned a verdict of death. The jury found that the Government had proven all of the aggravating and non-aggravating mitigating factors. The jury only found that Bourgeois had shown two mitigating factors: six jurors found that he was under stress and all found that he was driving across the country. (DE 299). The Court sentenced Bourgeois to die by lethal injection. (DE 303).

## IV. Appeal

Mr. Gilmore and Mr. Tinker represented Bourgeois on appeal to the Court of Appeals for the Fifth Circuit. Bourgeois' appeal focused on the constitutionality of the aggravating factors that made his a death-eligible offense. Specifically, Bourgeois raised four claims:

> (1) the government failed to charge any aggravating factors in the indictment, (2) the FDPA statutory-intent factor that renders a defendant with a reckless state of mind eligible for the death penalty violates the Eighth Amendment, (3) the district court erred when it delegated to the Director of the Federal Bureau of Prisons supervision over Bourgeois's execution, and (4) the aggravating factors used in his sentencing were vague and ambiguous.

*United States v. Bourgeois*, 423 F.3d 501, 502 (5th Cir. 2005). In a detailed opinion, the Fifth Circuit found no reversible error. The Fifth Circuit commented that: "This is not a close case.

Bourgeois fails to prove that there was any error, much less plain error, in any aspect of his trial. Bourgeois's conviction and sentence are, in all respects, AFFIRMED." *Id.* at 512. The United States Supreme Court refused certiorari review. *United States v. Bourgeois*, 547 U.S. 1132 (2005).[21] The instant proceedings followed.

## V. Post-Judgment Proceedings and Evidentiary Hearing

This Court appointed counsel to represent Bourgeois in this post-judgment action. Bourgeois filed a lengthy Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241. (DE 396). Bourgeois also filed a Memorandum of Law in support of his motion. (DE 402). Federal law focuses a 2255 action on whether an inmate's sentence "was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992). Section 2255 actions are not a retrial. *See United States v. Kastenbaum*, 613 F.2d 86, 89 (5th Cir. 1980) ("The guilt or innocence of the defendant is not in issue on a § 2255 proceeding, but rather the validity and the fairness of the proceedings against him."). By this point, the presumption of innocence has run its course and the inmate appears as one lawfully convicted. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]he presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment."); *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998) ("Following a

---

[21]     Keith S. Hampton and Adrienne Urrutia represented Bourgeois before the United States Supreme Court.

conviction and exhaustion or waiver of the right to direct appeal, we presume a defendant stands

fairly and finally convicted."). A movant bears the ultimate burden of establishing his claims of

error by a preponderance of the evidence. *See Wright v. United States*, 624 F.2d 557, 558 (5th Cir.

1980).

Bourgeois' section 2255 motion raises the following grounds for relief:

1. Bourgeois suffers from mental retardation, making him ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002), and the Federal Death Penalty Act.

2. Trial counsel provided ineffective assistance at the punishment phase of trial by failing to present available mitigating evidence, including that of his alleged mental retardation.

3. Bourgeois' conviction violates due process because the fatal injury occurred outside the Territorial Jurisdiction of the United States. Trial counsel should have disputed the location of the crime.

4. Trial counsel provided ineffective assistance by failing to present available expert testimony that would have shown that Bourgeois did not sexually assault the victim.

5. Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Senn and Dr. Chrz concerning bite-mark evidence.

6. Trial counsel provided ineffective assistance by not litigating a *Daubert* challenge to testimony from Dr. Oliver concerning the digitally enhanced autopsy photographs.

7. The Government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that four inmates were promised some benefit for testifying against Bourgeois.

8. Trial counsel labored under a conflict of interest because of his representation of clients associated with this case.

9. The Government engaged in misconduct by making improper argumentative statements in the guilt/innocence and penalty phases.

10. Trial counsel provided ineffective assistance by not rebutting evidence of

Bourgeois' indifferent demeanor at trial.

11. A witness improperly relied on Bourgeois' interactions with counsel as a basis to formulate an adverse opinion about him.

12. Appellate counsel provided ineffective assistance by failing to advance several claims.

13. The cumulative effect of the claimed errors results in a constitutional violation.

14. The method by which the Government would carry out Bourgeois' execution violates the Constitution.

Respondent filed an answer and motion to dismiss arguing that Bourgeois' claims are all either procedurally insufficient or substantively without merit. (DE 442). Afterward, Bourgeois filed a motion asking the Court to hold an evidentiary hearing on his claims. (DE 460). A court should hold an evidentiary hearing and make findings of fact, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." § 2255(b); *see also* Rule 8, RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS (requiring an evidentiary hearing when "warranted"). The Court held oral arguments on April 20, 2010, to designate the issues needing resolution through an evidentiary hearing. (DE 496). In the end, the Court has, to a greater or lesser extent, allowed Bourgeois to present testimony and evidence supporting nearly all his section 2255 claims. This Court has liberally allowed Bourgeois to prepare the factual basis for his post-judgment claims through expert and investigative assistance. The parties have developed a rich factual record through the submission of written interrogatories, declarations, and record documents.

The Court held a week-long evidentiary hearing for the parties to present witnesses.[22]

---

[22] Bourgeois called the following witnesses in the hearing: Dr. Victoria Swanson, Dr. (continued...)

Testimony during that week often extended long after normal court hours. Aside from the witnesses called during that hearing, the Court has heard testimony at different dates and allowed the taking of video depositions of other witnesses.[23] The Court has spent many hours reviewing the testimony of the out-of-court witnesses. The Court has afforded Bourgeois a full and fair opportunity to develop his arguments.

The witnesses and evidence before the Court fall into three groups. First, Bourgeois called witnesses who challenged particular pieces of forensic evidence presented at trial. Specifically relating to claims 3, 4, 5, and 6, witnesses alleged that the Government's case at trial relied on inaccurate evidence about where Bourgeois killed JG1999, whether he sexually assaulted her, and if he was the one who bit her. Second, several witnesses provided testimony relating to claims 1 and 2. This testimony included testimony from trial counsel Mr. Gilmore, one of Bourgeois' trial investigators, and people who knew him while growing up. Importantly, experts provided detailed testimony about Bourgeois' alleged intellectual and psychological deficiencies. Finally, witnesses provided information about Bourgeois' seventh claim that the Government withheld the fact that it

---

[22]     (...continued)
Donald Weiner, Dr. Jethro Toomer, Kathleen Kaib, Claudia Williams, Beverly Frank, Brenda Goodman, Dr. Mark Cunningham, Carl Henry, Donald Reese, Murray Bourgeois, Jon Dailey, George Walker Holden, Jennifer Valdez, Dr. Charles Michael Bowers, John Gilmore, Kerry Brown, Timothy Allen, and Gerald Bierbaum. The Government called Danny Clark, Robert Patterson, William Shotts, Christopher Key, Rhonda Davis, Dr. J. Randall Price, and Dr. Roger Bryan Moore, Jr.

[23]     On September 10, 2010, the parties deposed Dr. Carlos Estrada. On that same date, Dr. Michael M. Gelbort gave live testimony in this Court. Most of the witnesses testified in the evidentiary hearing held from September 20 through September 24, 2010. The parties deposed Dr. William Russell Oliver and Dr. Manfred Schenk on October 28, 2010. The parties also took additional deposition testimony from Dr. Randall Price on November 10, 2010. They also deposed Dr. Jan. E. Leetsma on January 10, 2011. On January 13, 2011, the Court heard testimony from William Edward May, Jr., James Sales, Dr. Elizabeth Aldrich Rouse, Debra Hohle, and Patti Hubert Booth.

had made deals with trial witnesses. These three categories of witnesses inferentially provided testimony relating to the remaining claims, such as that the cumulative effect of the alleged errors prejudiced Bourgeois.

The Court will address the relevance, importance, and credibility of each post-conviction witness' testimony in conjunction with the related ground for relief.

## PROCEDURAL ADEQUACY OF BOURGEOIS' CLAIMS

Before turning to the substance of Bourgeois' claims, he must show that he brings them before the Court in a procedurally adequate manner. Respondent argues that Bourgeois has defaulted claims 3, 7-9, 11, 13, and 14 by not raising them on direct appeal. Post-judgment relief exists only for errors that an inmate could not raise on direct appeal. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (finding that, with the exception of ineffective-assistance-of-counsel claims, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice"). Bourgeois could, and should, have raised some issues on direct appeal. For instance, his allegations that the Government did not prove the jurisdictional element of his crime beyond a reasonable doubt (claim three); the Government's closing argument amounted to prosecutorial misconduct (claim nine); and a witness' testimony improperly relied on Bourgeois' trial demeanor to form an opinion (claim eleven), all rest on the trial record. Also, as the Court will discuss later, his fourteenth claim that attacks the Government's method-of-execution is not properly before the Court. The merits of those claims are not fully available for the Court's consideration.

However, the Court also finds that aspects of the challenged claims extend beyond the record as it existed on appeal. For instance, a portion of Bourgeois' third claim imputes ineffective assistance to trial counsel for failing to challenge the Government's proof of jurisdiction. Bourgeois' *Brady* claim (claim seven) and his conflict-of-interest claim (claim eight) both involve factual bases