mitigation evidence that their client and other witnesses fail to disclose." *Johnson v. Cockrell*, 306 F.3d 249, 252-53 (5th Cir. 2002). Bourgeois has not shown that trial counsel erred in not presenting evidence of sexual abuse.

Bourgeois has extensively relied on lay testimony to bolster his claims of mental retardation. Independent of the psychological testimony, the witnesses uniformly expressed that, at least as a child, Bourgeois was slow.[100] Their testimony, however, varied in the extent to which that impacted Bourgeois' life. Some witnesses described how, at least at a young age, Bourgeois had problems with activities such as cooking. Some testimony showed that Bourgeois had complained about being asked to perform "girl's work" such as washing clothes and making food. Other witnesses, however, described such activities as part of his daily routine at Ms. Mary's house.[101] Nevertheless, the Court is not convinced that a reasonable attorney would encourage the jury to choose a life sentence based on Bourgeois' intellectual limitations. The jury would have heard his cogent, descriptive testimony that lacked any sign of mental impairment. The jury would have viewed his interaction with counsel and his ability to follow the course of the legal proceedings. The jury would have known that

---

[100]    In addition to the information about Bourgeois' intellectual abilities as a child, witnesses talked about his adulthood. Donald Reese, a former co-worker, described problems Bourgeois experienced when they worked as team drivers. Bourgeois had problems with some of the equipment, got lost when driving, only brought a small amount of clothing with him on long trips, and was uncomfortably talkative. Kerry Brown, an attorney Bourgeois previously had retained for legal matters, provided testimony relating to his mental impairments. Mr. Brown described Bourgeois as controlling, continually in debt, a bad money manager, "dealing with a lot of issues" involving his family and business, and under stress. (DE 598 at 237-47). Cross-examination of Mr. Brown would have revealed that Bourgeois "was jealous, overbearing, owed everybody child support, beat up his mother-in-law, and then . . . destroyed property[.]" (DE 598 at 249). Mr. Brown's testimony, particularly that revealing that Bourgeois "beat the hell out of his mother-in-law," would not have helped the defense. (DE 598 at 248).

[101]    The witnesses did not agree on whether Ms. Mary rescued Bourgeois from an abusive atmosphere or whether his mother sent him to serve as a care giver to the elderly, physically impaired woman.

121

Bourgeois successfully worked for years as a truck driver. The Government would assuredly subject any witness attesting to his low intelligence to the same cross-examination from the evidentiary hearing. The Court finds that a reasonable attorney could weigh the probable benefit against the possible loss of credibility and decide not to focus the defense on Bourgeois' low intelligence.

The Court has reviewed the whole of the unpresented mitigation evidence and concludes that trial counsel did not provide ineffective assistance in the investigation, preparation, or presentation of lay testimony in the punishment phase. The Court, therefore turns to Bourgeois' claim that trial counsel should have amplified the case relating to his mental health.

### 2. Expert Testimony

Bourgeois claims that trial counsel should not have relied only on the cross-examination of Dr. Estrada, but should have called additional expert witnesses in the punishment phase. Bourgeois hopes that expert testimony would have discussed: (1) the effects of his abused childhood on his mental state (as explained by Dr. Cunningham); (2) his borderline personality disorder; (3) how neurological impairment affected his ability to control his impulses and make decisions; and (4) Dr. Holden's conclusion that he did not premeditate the crime. In those post-judgment proceedings, Bourgeois has called seven expert witnesses – Drs. Gelbort, Estrada, Swanson, Weiner, Toomer, Cunningham, and Holden – who testified to a greater or lesser extent about each of those theories. The witnesses described Bourgeois as a man with overlapping and interlacing mental illnesses that made him prone to excessively violent reactions when under stress. The Court will describe their testimony as it relates to each theory he faults trial counsel for not presenting.

As an initial matter, however, the Court notes that "[c]ounsel's decision not to hire experts falls within the realm of trial strategy." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also Colburn v. Cockrell*, 37 F. App'x 90 (5th Cir. 2002) ("The hiring of expert witnesses and the

122

presentation of their testimony is a matter of trial strategy."). To reiterate, trial counsel secured the assistance of mental health experts before the punishment phase. Trial counsel sought Dr. Holden's assistance to determine if Bourgeois had committed a premeditated filicide. Trial counsel sought testing for competency by Dr. Estrada and later relied on his cross-examination to place mental-health information before the jury. Dr. Cunningham synthesized the mitigating evidence and provided guidance about mental health issues. At Dr. Cunningham's direction, trial counsel had Dr. Weiner perform neurological testing. No doubt exists that trial counsel was amply aware of the results of their testing. The record contains numerous on-the-record discussions about whether trial counsel would use their proposed testimony. Trial counsel decided only to rely on Dr. Estrada. The Court will review whether that decision met constitutional standards.

     a.     Dr. Cunningham's testimony

Bourgeois claims that trial counsel should have put a psychological varnish on the evidence about his abused childhood, showing that it had a "'profound impact' on [his] behavior." (DE 402 at 37). Trial counsel sought Dr. Cunningham's assistance early in the case for that purpose. While Bourgeois claims that trial counsel was unfamiliar with Dr. Cunningham's conclusions, the record shows otherwise. As previously discussed, trial counsel had sufficient communication with Dr. Cunningham as the trial approached. Trial counsel reviewed Dr. Cunningham's report, spoke with him on the telephone, met with him for several hours, and sat by him at the counsel table during trial. Trial counsel even edited the PowerPoint slides that Dr. Cunningham had prepared to excise any reference to Dr. Weiner's testing.[102] This Court's interaction with the trial attorneys and the plain

---

[102] At some point before trial, Dr. Cunningham prepared a PowerPoint presentation and gave trial counsel a binder with the proposed slides. He provided for two presentations: a mitigating presentation and one showing Bourgeois' future threat. Dr. Cunningham would have testified that

                                                                        (continued...)

evidence in the record gives no reason to slight counsel's familiarity with Dr. Cunningham's proposed testimony.

While Bourgeois complains vigorously that trial counsel failed to get information to Dr. Cunningham about childhood abuse in an expeditious manner, the record does not show any similar concern from Dr. Cunningham as the trial approached. The investigators turned over to Dr. Cunningham the results of their investigation well before the guilt/innocence phase started. Other than an email sent by an employee months before trial, the record contains no contemporaneous complaint from Dr. Cunningham about the timing or completeness of that information. Dr. Cunningham interviewed potential witnesses himself. The record does not contain any indication that Dr. Cunningham's own interviews unveiled a wealth of evidence that still laid uncovered. Trial counsel relied on Dr. Cunningham and he did not signal to them that the mitigation investigation was substandard before trial.

---

[102]   (...continued)

various "damaging factors" – an overwhelmed family system, abandonment by his father, "childhood problems putting on the brakes," emotional rejection and abuse, physical abuse, and neuropsychological problems – served as a pressure cooker that exploded when set afire by Robin's infidelity, martial problems, and financial concerns. In his second presentation, Dr. Cunningham would have provided general information about behavior in secure environments, including the Bureau of Prisons, and specific items that would make Bourgeois less likely to be a threat in prison: his age, his "behavior in pre-trial custody," his continuing relationship and contact with family, and stable history in the community. Bourgeois attached a copy of some of the PowerPoint slides to his 2255 motion. (DE 397, Exhibits 5 and 6). Before the sentencing hearing began, the Court talked with Dr. Cunningham about how to best place his intended PowerPoint presentation on the record. (DE 348 at 2-4). After addressing the manner in which to preserve Dr. Cunningham's presentation, the discussion turned to the substance of his testimony. The Government wished to exclude any part of Dr. Cunningham's testimony that discussed the Bureau of Prison's policy and practices, and the related speculation about how offenders in general behave in prison, and focus instead on Bourgeois' own propensity toward violence. (DE 348 at 4-6). The Court refused to limit the scope of Dr. Cunningham's testimony, but allowed the Government to call its own witness to rebut Dr. Cunningham's testimony. (DE 348 at 5-6). The Government announced that it intended to rely on its own expert from the Bureau of Prisons, John Shaw, if the defense called Dr. Cunningham. (DE 348 at 5; 341 at 78).

124

In the end, trial counsel said that he decided not to call Dr. Cunningham because his theory of the case conflicted with Bourgeois' chosen defense.[103] Trial counsel discussed his abused childhood and history as a sympathetic, not explanatory or as a justifying factor. (DE 598 at 210-11).[104] Importantly, Bourgeois agreed with that decision. As Mr. Gilmore explained in the

---

[103] Trial counsel also knew that calling Dr. Cunningham would bring along "so many hazards." (DE 347 at 106). The Government informed the Court that, if Dr. Cunningham testified about Bourgeois' future danger, the door would be open to harmful evidence that did not come before the jury. (DE 347 at 106). This information possibly included additional information that Bourgeois claimed to have committed another killing, had told people he wanted to kill Robin, had sexually assaulted AB1994, and was cruel to animals. (DE 347 at 82, 88, 92-94, 105-06). Other aspects of his testimony would offend jurors. In one portion of his proposed testimony, he would have told jurors to excuse Bourgeois' repeated fierceness against women because domestic violence is a common, and in his view, apparently accepted feature in society. Jurors may be expected to react with revulsion to that information. This is not an isolated example. At its core Dr. Cunningham's testimony was detached from the extensive testimony that the jury had already seen about the person Bourgeois was. To the extent that Dr. Cunningham's testimony would deal with Bourgeois' threat of violence when incarcerated, rather than his "pressure cooker" theory, trial counsel adduced the same information through Dr. Estrada. Mr. Gilmore testified: "we elicited that testimony from Dr. Estrada, and I thought Dr. Estrada was effective for us." (DE 598 at 209). Dr. Estrada opined that Bourgeois would only be violent "in a family situation." (DE 341 at 50). Dr. Estrada testified that with "higher . . . supervision available" Bourgeois would have a "lesser degree of all kinds of violent incidents[.]" (DE 341 at 52). While probably not as extensively as anticipated by Dr. Cunningham, trial counsel adduced expert testimony to show that Bourgeois would not be violent when in "a cage within a cage within a cage." (DE 342 at 63).

[104] Mr. Gilmore's closing argument, for example, differentiated between abuse as sympathy and as an excuse:

> Now, these things are offered to you not as an excuse for committing this crime, but to try to help you understand his mindset, and trying to help you understand where he comes from. *This is – it's not an excuse for him, if you believe he committed this crime, for him doing it. It's something to show you that he's a human being.* We're all human beings. And we're – we're all capable of doing bad things in the right circumstances, or the wrong circumstances as it may be. At the time that this incident occurred, these factors came into play along with his current situation; the current situation being that he was having economic problems, he and his wife were having problems, they'd had problems since – since she had the affair. And I realize he had affairs, too. But this was what was going on in his mind, the fact that his wife had an affair.

(continued...)

125

evidentiary hearing:

| The Government: | Okay. And when you showed [a notebook containing a copy of the material in Dr. Cunningham's proposed PowerPoint] to Mr. Bourgeois, did he have any reflection on it? Did he make a statement as to this presentation? |
|---|---|
| Mr. Gilmore: | Well, his position all along was that he did not commit the crime. And so specifically what did he say? I just remember we told him that we didn't think we were going to call Dr. Cunningham, and he did not oppose that. And we told him why, because his theory of the mitigation part of the case didn't jive with our theory of defense. |
| The Government: | Did he make some kind of statement to the effect that, "This means that Dr. Cunningham's saying I'm guilty" |
| Mr. Gilmore: | It's something to that effect. I can't remember exactly what was said. But I, you know, explained to him that that's what those arrows meant that he had all the pressure on him, and that's why he exploded and did this. |
| The Government: | And after you explained that to him, did he want to present Dr. Cunningham? |
| Mr. Gilmore: | He agreed with our assessment. |

(DE 596 at 183).

In the evidentiary hearing, Mr. Gilmore further elaborated on other reasons why they decided not to call Dr. Cunningham as a witness: "We weren't impressed with Dr. Cunningham. We didn't particularly think he was going to impress the jury, and we did not like his presentation." (DE 598 at 211). From this Court's own observations, Dr. Cunningham would not have been a good witness for the defense. When trial counsel told Dr. Cunningham they weren't going to use him, he was

---

[104] (...continued)
(DE 342 at 48) (emphasis added). Trial counsel also explained during Dr. Estrada's cross-examination that he was "not asking these questions to help excuse what Mr. Bourgeois did, but to explain it." (DE 341 at 23-24).

"very angry." Mr. Gilmore explained: "If you tell a professional witness that you're not going to use them, you know, he should be professional about it, and he wasn't." (DE 598 at 186). Mr. Gilmore's recollection comports with this Court's own observations. In the evidentiary hearing, Dr. Cunningham's demeanor, even though his speech was generally of a level pitch, was consistently argumentative and condescending in tone and facial expression. Dr. Cunningham openly showed scorn, both in his physical manifestation and his substantive testimony, for the defense's case at trial. He did not appear as an impartial scientific expert, but as someone seeking to advance an agenda.[105]

Dr. Cunningham's testimony came off as distant from the facts of the case before the jury. For example, Dr. Cunningham vigorously asserted that his academic research proved that Bourgeois was not a violent risk while kept in a highly structured environment. The jury, however, would compare that opinion with Bourgeois' actual behavior before trial. While in custody in the state jail facility, he ordered hits on witnesses. His threats were not toothless; witnesses were murdered before trial. Even when security isolated Bourgeois, he continued to sneak out communications, threaten security personnel, and even tried to attack a United States Marshal.[106] Dr. Cunningham's testimony would seem hollow – and even unbelievable – given Bourgeois' vicious nature. His claim that Bourgeois would not be violent could offend the jury and lessen trial counsel's credibility with the finder of fact.

His evidentiary hearing testimony was removed from the reality of the defense's efforts

---

[105]    Testimony from a hearing at the time of trial showed that counsel was not only familiar with Dr. Cunningham's presentation, but had tried to excise any reference to Dr. Weiner's findings without sacrificing any important part of it. (DE 347 at 19).

[106]    Bourgeois' brother, Lloyd Ferdinand, made threats against witnesses and intimidated those who would testify against Bourgeois. When Bourgeois tried to hire Longoria to eliminate witnesses, Mr. Ferdinand was the one who would have paid him. (DE 347 at 52-54).

before trial. He bore an arrogant demeanor as he broadly faulted defense efforts and lauded his own. He criticized the mitigating investigators for not feeding him enough information, but the record does not show that he responded when counsel asked him whether he or the investigators should provide him with information. He complained about the cursory nature of the information, but never said whether he actually communicated that concern to trial counsel or the investigators. The Court appointed him as an expert eight months before trial, but his records show that he did little, if anything, until the last few weeks before trial. He himself interviewed witnesses, some of whom testified in the evidentiary hearing, and himself could have secured the information he claims went undiscovered. Even then, his presentation consisted of information he had apparently prepared in the numerous cases in which he had previously testified.

Dr. Cunningham's testimony showed that both the mitigation experts and trial attorneys gave him information and were familiar with the basic issues of the case. The Court has viewed not only Dr. Cunningham's testimony in the detached context of the federal evidentiary hearing, but can also plug that testimony into the trial context that it observed. The Court's observation of the trial landscape and the jurors' reaction to evidence provides a vantage point to consider the effect any proposed testimony would have. The jury already had before it evidence that Bourgeois' mother had abused him, and trial counsel concluded that Dr. Cunningham's proposed testimony was not convergent with or helpful to their chosen defense. A reasonable and zealous trial attorney could find that Dr. Cunningham was not a witness whose testimony, both in content and tone, would benefit the defense.[107]

---

[107] Once supported by an adequate investigation, "counsel's selection of a strategy is unchallengeable[.]" *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007); *see also Strickland*, 466 U.S. at 690. "A conscious and informed decision on trial tactics and strategy cannot be the basis

(continued...)

128

b.      Borderline personality disorder

Testimony from the evidentiary hearing showed that Bourgeois had some sort of mental disorder, though the testimony varied somewhat as to its etiology, effect, and treatability. Drs. Estrada, Gelbort, Swanson, Toomer, Price, and Moore all examined Bourgeois and agreed that he suffered from borderline personality disorder. Bourgeois claims that trial counsel should have put that information before the jury.

Each expert provided different insight to the nature and effect of borderline personality disorder. Dr. Estrada provided the fullest view into how that disorder effected Bourgeois. Dr. Estrada did not diagnosis Bourgeois with a borderline personality disorder when he initially examined Bourgeois before trial. Dr. Estrada testified in the evidentiary hearing that he had suspected that Bourgeois had a personality defect, but that additional information about his background confirmed it.[108] Dr. Estrada defined the psychological condition:

---

[107]      (...continued)
for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002). "*Strickland* requires. . . [courts to] defer to counsel's decision . . . not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." *Moore*, 194 F.3d at 615; *see also St. Aubin v. Quarterman*, 470 F.3d 1096, 1102 (5th Cir. 2006); *Riley v. Dretke*, 362 F.3d 302, 306 (5th Cir. 2004).

[108]      Dr. Estrada explained in his deposition:

In this case, I had only suspicions at the time, but then with all the information I have reviewed since, it has become clear that my suspicion regarding this person's background is correct and my suspicions regarding his personality organization were correct; and these are the two elements that, in my opinion, resulted in this terrible behavior. Regarding the background, the documentation that I reviewed now is clearly indicating that he suffered not only from rejection and abandonment and physical abuse by his natural mother, but in addition, he suffered from sexual abuse and exploitation by the people that he trusted; and finally, he suffered for many years

(continued...)

129

Borderline personality disorder is characterized by a chronic habitual and automatic pattern of relationships that is characterized by extremes of love and hate triggered by satisfaction. The person becomes idealized, if is fulfilling the individual needs, to extreme devaluation and rage if the person is frustrating. As a result of this basic problem, the individual has extremely unstable relationships, often leading to breaking up the relationship if the pattern is strong enough to leave or having the battered wife syndrome and family violence syndrome when the wife is – or the spouse is weak and cannot separate, resulting in having episodes of honeymoon, followed by episodes of hate and violence.

. . . [T]he person suffering from a borderline personality due to this instability of his attitudes about the people they are involved with, [is] extremely vulnerable to stress. And during episodes of stress, they are involved in impulsive behavior, behavior with very poor judgment, bordering in psychotic, irrational behavior. That's why the name borderline. It's a border between the psychosis and the neurosis come from and is often associated with drug and alcohol abuse.

(PX-163 at 28). Dr. Estrada noted two sources of the disorder: a genetic one and a childhood plagued by "rejection, neglect and abandonment[.]" (PX-163 at 25).

Dr. Estrada connected the disorder to Bourgeois' abuse of JG1999:

This is a pattern in which he reacts to frustration in this rage without any concern for consequences; and in my opinion, this is very poor judgment.

Then he's calmed down the following day, and he's able to navigate through the highways in the country without losing track like nothing has happened. This is, in my opinion, very poor judgment and a characteristic of borderline under stress. You do crazy things. You do terribly violent things, and they act the next day like so what, that was yesterday.

(PX-163 at 36). This rage would "impact his executive" function and inhibit his "[j]udgment, planning, decision making, control of impulses, control of affects, managing cause and

---

[108]    (...continued)
of teasing, humiliation and discrimination because of his mixed race and his limitations in intellect and physical conditioning. These, in my opinion, resulted in developing a narcistic and borderline personality disorder. The narcistic personality disorder is what is most obvious when one meets this man.

(PX-163 at 22).

130

consequences[.]" (PX-163 at 36). Thus, Bourgeois did not intentionally kill the child but succumbed to the stressors about him. (PX-163 at 39).[109]

Testimony from the other experts, both for Bourgeois and for the Government, also probed his borderline personality disorder, although not as deeply as Dr. Estrada did. Dr. Toomer testified that the borderline disorder "affects all aspects of an individual's functioning" including "instability that manifests itself across a variety of activities, interpersonal relationships, personal identity, mood and emotionality as well as self-image." (DE 594 at 297). Dr. Price agreed that Bourgeois had a "personality disorder that's longstanding and pervasive" and that such mental disorders are "oftentimes associated to childhood abuse." (DE 595 at 204, 232). Dr. Moore confirmed that people with borderline personality disorder most often act out at those with whom they have a close relationship. (DE 599 at 160). None of the experts questioned the diagnosis of borderline personality disorder. All agreed that the disorder caused Bourgeois to be emotionally unstable,

---

[109]  In Dr. Estrada's words:

> And my opinion, in summary, is this man under the serious stress that he was facing, finances, marital problems and being dumped with a new child that he didn't expect and fatherhood, care and financial obligations, under this stress, he reacted in a typical borderline fashion caused by his background of trauma, neglect and rejection by losing control of his anger and torturing, tormenting and abusing this child intermittently throughout six weeks with periods in which he was actually caring and nice to the child in typical borderline fashion that ultimately the abuse caused this child's death.
>
> It is my opinion, therefore, that this is not the act of a premeditation, an act where he was looking for some gain, getting rid of the child, getting rid of the wife or blaming the wife or the child. There would be better ways.

(PX-163 at 39). To some extent, this disorder mirrors Dr. Cunningham's "pressure cooker" demonstrative and would present similar concerns for the defense.

131

impulsive, and to have difficulties in his interpersonal relationships.[110]

Because Bourgeois relies on Dr. Estrada, the expert trial counsel relied on to place Bourgeois' mental state before the jury, the Court must address two questions. First, did trial counsel supply Dr. Estrada with sufficient information to allow him to come to a diagnosis of borderline personality disorder? Second, even with that diagnosis, would a reasonable attorney put that information before a jury? *See Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 789 (2011) (finding no error when counsel failed to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"); *Neal*, 239 F.3d at 687 ("We must determine whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances."). The Court finds that neither of the answers to those two questions supports a finding of *Strickland* deficient performance.

Dr. Estrada had significant information, apparently given by both parties, before he examined Bourgeois. He interviewed Bourgeois himself. Dr. Estrada sat in the courtroom and heard the entirety of the punishment-phase evidence. He had enough information to diagnose Bourgeois with the closely related disorder of narcissism. Yet he did not diagnose Bourgeois with borderline personality disorder. Instead, he concluded that narcissism explained much of Bourgeois' behavior.

After Bourgeois' conviction and sentence, and considering new information, Dr. Estrada reached this new psychological conclusion. Possibly because of Bourgeois' tangled mental-health issues, it would be a "difficult assessment" to diagnose him with borderline personality disorder. (DE 594 at 111). That, however, does not mean Dr. Estrada could not have done so with the

---

[110]     Dr. Cunningham's testimony, however, did not discuss borderline personality disorder but referred to a "history of rage attacks that had been occurring since his childhood or adolescence, with marked changes in his consciousness and demeanor, and with memory deficits that occurred afterwards for the events during that rage." (DE 597 at 234).

132

information before him at trial. Admitting that he has "more information now," Dr. Estrada conceded in his deposition that it is "possible" that he had sufficient information at the time of trial to arrive at a diagnosis of borderline personality disorder. (PX-163 at 60). At the time of trial Dr. Estrada already knew that Bourgeois had suffered neglect, rejection, and physical abuse at the hands of his mother. (PX-163 at 60, 62-63). He admitted that many of the same factors that underscored the diagnosis of narcissism he arrived at before trial contributed to his diagnosis of borderline personality disorder. (PX-163 at 61). Dr. Estrada attributed his new diagnosis to "thinking more about it and reviewing the pattern of relations, particularly the relations to women, and a social border interview of all of his wives, then it became more clear that that was a pattern of borderline personality." (PX-163 at 60).

Bourgeois has not convincingly shown that Dr. Estrada did not have the tools necessary to reach a borderline-personality-disorder diagnosis before trial. Dr. Estrada had interviewed Bourgeois and was aware of his violence toward his wives. (DE 341 at 45). The Government's case at the punishment phase emphasized a life-long unrelenting pattern of aggression. Dr. Estrada sat throughout the punishment phase of trial and listened as Bourgeois' ex-wives explained their turbulent and violent marriage to him. The instability of Bourgeois' relationships was fully before Dr. Estrada, as it was before the jury. He testified that he saw "a pattern of abusive relationships again and again and again." (DE 341 at 50). Still, he conceded that the "key features of his violent actions . . . haven't changed from the information [he] . . . received since the trial has been over." (PX-163 at 52).[111]

---

[111]     Dr. Estrada remembered:

discussions with both the government and the defense regarding Mr. Bourgeois'

(continued...)

133

Once given sufficient information, trial counsel has a right to rely on the conclusions of the experts he retains. No constitutional right exists to the effective assistance of expert witnesses. After placing the building blocks for the diagnosis before the expert witnesses, trial counsel complied with their duty to investigate possible mental illness. Trial counsel cannot be held accountable for relying on his experts after providing them sufficient evidence. *See Bell v. Thompson*, 545 U.S. 794, 810 (2005) (endorsing state court finding that because "two experts did not detect brain damage, counsel cannot be faulted for discarding a strategy that could not be supported by a medical opinion"). Trial counsel relied, as Bourgeois does now, on Dr. Estrada to identify salient mental health concerns. Bourgeois has not shown that trial counsel was to blame because mental-health experts did not diagnose him with borderline personality disorder earlier.

Even so, to succeed on this claim Bourgeois must show that a reasonable attorney would have presented evidence of that psychological disorder. While admittedly a more difficult question, the Court finds that a zealous attorney could weigh the value of the borderline-personality-disorder

---

[111]     (...continued)
background and information gathered from wives and other people who knew him and that I have given my opinion to both about the – the – the impact of the background of child abuse and rejections and neglect, the pattern of violence with multiple wives and intimate relationships, and the fact that this made him a potentially dangerous person, because the basic fault, so to speak, was not treated or fixed, and – but I also remember that I was not able or allowed to elaborate in how the background is affecting the current situation.

(PX--163 at 70). Bourgeois argues that Dr. Estrada was told not to base his opinion on Dr. Cunningham or Dr. Weiner's reports. (PX-163 at 70). Dr. Estrada, in fact, used the background information from Dr. Cunningham while testifying. (DE 341 at 25). The Court limited the ability to refer to Dr. Weiner's report, but did not prevent him from relying on the information from Dr. Cunnignham that did not directly implicate that derived from Dr. Weiner. (DE 341 at 33). Dr. Cunningham's report, however, did not address the problems Bourgeois had with his wives any more specifically than the trial testimony did. It is telling that Dr. Cunningham's report did not mention the possibility of a borderline personality disorder, while Bourgeois now finds the condition to be abundantly obvious.

134

diagnosis against possible harm, and stay his hand. Bourgeois has not sufficiently recognized the aggravating edge of that evidence, the Government's use of similar evidence against him at trial, and the absence of any testimony about rehabilitation.

In many ways, Dr. Estrada's deposition testimony differed little from that adduced at trial by both parties, but particularly by the Government as an aggravating circumstance.[112] The Government had elicited testimony from Dr. Estrada that Bourgeois had engaged in "repetitive acts of violence" and was a "rageaholic or impulsive in [his] decisions." (DE 348 at 283). Even if the defense placed the mitigating influence of that diagnosis before the jury, cross-examination would go like it did in the hearing and even at trial. The Government would surely ask: "[E]very time someone's abused as a child, do the – do they act out and abuse children later in life?" (DE 341 at 57). The Government would ask, as it did Dr. Price, why this disorder was "directed at certain things[.]" (DE 595 at 231). The Government would be able to adduce rebuttal evidence similar to Dr. Price's testimony that the commission of the murder more as a function of "antisocial psychopathic traits and features." (DE 595 at 231).[113] The jury would respond to the information much in the same way

---

[112] The experts stated that a narcissistic personality disorder can be found in the same category of disorders as borderline. The Government adduced the evidence that he had a narcisstic personality disorder. (DE 348 at 284). The two disorders are apparently not entirely dissimilar. Dr. Swanson vacillated between I "put[ting] him personality disorder NOS, some put him narcissistic and some people put him borderline. I tend to probably want to go more borderline, but all those are in the same cluster of personality disorders that they have and there is definitely mood problems there[.]" (DE 594 at 103). Dr. Price also described the two disorders similarly. At trial, Dr. Estrada described the narcissism in a way similar to his description of borderline personality disorder. He described such people as being "lively, likeable, exiciting, interesting, sometimes very persuasive or charismatic" at the start of a relationship bit with time "their personal problems are inevitable and result in friction that may lead to simple break of relationships . . . or actual violence." (DE 348 at 285-86).

[113] Even Bourgeois' expert Dr. Gelbort had not decided whether he was a sociopath, but "would absolutely agree that many of the behaviors [he had] seen described can be caused by

(continued...)

135

as Dr. Gelbort: "I don't want them for my neighbor." (DE 560 at 75).

One problem trial counsel would face in presenting the evidence of Bourgeois' various mental disorders is that the testimony did not show any hope of diminishing or susceptibility to treatment. Dr. Estrada testified that, while the borderline personality disorder would explain what Bourgeois did, it would not make him less violent in the future. (PX-163 at 67). No evidence suggested that psychologists could control Bourgeois' mental issues or cause them to go into remission. The same evidence that would explain Bourgeois violence toward his child would predict violence toward others. One circuit has noted that sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate." *Foster*, 223 F.3d at 637. Without some indication that treatment or confinement would control the effects of his mental illness, the jury would be left to assume that Bourgeois' violent acts would persist immutably.

As the Fifth Circuit has explained, a juror could "have seen the evidence as only aggravating, because [the defendant's] borderline personality disorder and the difficulty of treating it increase the likelihood that [he] will act out violently again." *Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006); *see also Cantu v. Thaler*, ___ F.3d ___, 2011 WL 222986 at *5 (5th Cir. 2011) (finding no error when the defense chose not to have neuropsychological testing because "[t]he potentially detrimental results of such an examination could have strengthened the State's position that [the defendant] was a sociopath and thus a future danger, thereby warranting the death penalty."). Without additional evidence, the jury may think that successful treatment of his mental illness would

[113]    (...continued)
sociopathic etiology." (DE 560 at 73).

136

be unlikely.[114] The thrust of the evidence that would dull the Government's case would also sharpen the chance for a death sentence. The proposed evidence "would still acknowledge that [Bourgeois] has the same dangerous disposition; [his experts] now simply opine[] that [they] can explain why." (DE 443 at 119).

Bourgeois' new evidence of mental illness would blame the killing on an apparently intractable mental condition. A reasonable attorney may have viewed the whole of the evidence and face a difficult choice, but could rationally decide not to present evidence of borderline personality disorder.

c.      Neurological impairment

As previously discussed, at Dr. Cunningham's suggestion trial counsel retained Dr. Weiner to perform a neuropsychological examination based on head injuries Bourgeois claimed to have received as a child. Dr. Weiner administered the WRAT-III, the Halstead-Reitan Neuropsyhological Test Battery for Adults, and the Test of Memory malingering. Dr. Weiner concluded that Bourgeois' results on some categories of the Halstead-Reitan indicated brain damage. Dr. Weiner's report noted "overall mild impairment with moderate cerebral damage in the posterior portion of the cerebral cortex. In all likelihood, this damage is due to the injuries Mr. Bourgeois sustained in a three-wheeler accident that took place in 1984, resulting in a coma lasting 1-2 months." (DE 397, Exhibit 16).

Trial counsel seriously considered calling Dr. Weiner as a punishment-phase witness. After the guilt/innocence phase, the defense turned his report over to the Government. In a March 17,

---

[114]      The evidence before the Court in this case differs from one in which the parties presented evidence that "although borderline personality disorder is treatable, success is by no means certain and is expressly conditioned on intensive therapy" but "successful treatment is often the exception rather than the rule." *Nelson v. Quarterman*, 472 F.3d 287, 308-09 (5th Cir. 2006).

137

2004, hearing Government stated that Dr. Estrada had reviewed the material and had found serious flaws in his methodology. The Government told the Court that they were bringing in their own neuropsychologist to test Bourgeois. (DE 340 at 25-27). Trial counsel objected to any additional testing. (DE 340 at 27). According to the Government, Dr. Weiner had brain scans done that came back negative for impairment. (DE 340 at 27). The Court ordered a hearing on Dr. Weiner's proposed testimony to find out what testing he performed. (DE 340 at 36, 47-48).

In a hearing on March 19, 2004, the defense informed the Court that had decided not to call Dr. Weiner as a witness. (DE 347 at 14). Trial counsel informed the Court that "Dr. Estrada disagreed with some of Dr. Weiner's findings." (DE 347 at 18). The trial court told the defense that, if they were not going to call Dr. Weiner as a witness, they could not rely on the results from his testing. (DE 347 at 16). Accordingly, Dr. Cunningham and Dr. Estrada could not use Dr. Weiner's report during his potential testimony. (DE 347 at 16-19).

Bourgeois claims that trial counsel's choice not to call Dr. Weiner as a witness violated his constitutional rights. Bourgeois supports this claim with a new report and testimony from Dr. Weiner. Dr. Weiner explained that "as [he] understood the situation, the lawyers were concerned that [his] conclusions were not reliable because they were not sure that Mr. Bourgeois accurately reported the head injury referenced on page three of [his] report." (DE 397, Exhibit 16 at 2). He opined, however, that his "test results and conclusions are valid regardless of how the damage was caused, and regardless of what Mr. Bourgeois told [him] about the damage." (DE 397, Exhibit 16 at 2).

Bourgeois also presented testimony in the evidentiary hearing regarding the results of Dr. Weiner's testing. Dr. Weiner affirmed the validity of his testing and explained that the brain dysfunction would impair Bourgeois' cognition so that "he may at times perceive things in a

138

distorted way and act in an inappropriate manner." (DE 594 at 240). The brain impairment would influence his emotions, impulse control, and ability to make judgments. (DE 594 at 240). Dr. Gelbort testified that his testing agreed with Dr. Weiner, though he may have localized the injury in another part of the brain. In addition, Dr. Gelbort did not see the source of the impairment as influential as its effect.

Against that background, trial counsel obviously made a strategic decision not to rely on Dr. Weiner's testing. Mr. Tinker explained in his answers to interrogatories: "I do recall having a neurological exam done, because there was a claim that Mr. Bourgeois had been in a car accident and had been in a coma. I do not recall the exam resulting in any information that would have been helpful at trial. Further, the government informed us that they had evidence that Mr. Bourgeois was never in a coma and that he only sustained broken bones in the accident." (Mr. Tinker Interrogatories at 9). A strategic decision by trial counsel is "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Evidence since trial confirms that trial counsel made a reasonable decision. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

As an initial matter, Dr. Weiner premised his conclusion on Bourgeois' claim that he suffered a coma from a three-wheeler accident. The record plainly shows that Bourgeois lied; he had no coma, no serious head injury, and no neurological impairment from that injury. While Bourgeois now points to other potential episodes that may have resulted in brain trauma, the fact is that Dr. Weiner's testimony would have allowed the Government to label him a manipulator and a liar. With Bourgeois' chosen defense to blame the killing on Robin, and his decision to take the stand, trial

139

counsel would have incentive to shore up his credibility.[115] Trial counsel's decision not to call Dr. Weiner on that basis alone is a reasonable one, meant to avoid more harm to the defense.

Additional factors developed in the evidentiary hearing confirm the wisdom of trial counsel's decision. Bourgeois has repeatedly criticized Dr. Weiner for using an outdated IQ test. Dr. Price testified that he also used outdated methodology. Dr. Price testified that Dr. Weiner's attempt to "localize" the injury in Bourgeois' brain was an out-of-date approach, now jettisoned by current psychological thinking. (DE 595 at 218). More importantly, Dr. Price credibly testified that Dr. Weiner relied on the raw scores from the Halstead-Reitan rather than applying norms – called the Heaton norms – which research confirms as valid. The Heaton norms adjust the raw Halstead-Reitan scores for demographic factors, including race.[116] Neither Dr. Gelbort nor Dr. Weiner applied norms

---

[115] Dr. Price's testimony suggested that Dr. Weiner should have used greater care in relying on Bourgeois' self-reported coma. He testified:

> In a forensic evaluation you already go into this as the evaluator with a certain amount of skepticism and with an eye to evaluate the response style of anybody you talk to to evaluate how much weight you give to evidence, and when you find that some of the information that you have been provided by someone isn't accurate, then it would lead us to be even more critical or skeptical of other information. And it could be a sign that they are trying to present in a way as being more impaired than they actually are, or, in your hypothetical, creating a situation that would likely be interpreted as a traumatic event.

(DE 595 at 198).

[116] Dr. Price explained:

> Well, using the norms most similar to the person, including race, that – what the literature describes race as an adjustment as a proxy for other factors in the person's life, cultural enrichment, educational opportunities, quality of education and a socioeconomic status. It stands as a proxy for that. And to avoid over identifying or – you would get a greater degree of impairment comparing someone to Caucasians as you would to comparing them to African Americans.

(continued...)

140

to their raw scores. (DE 621, Exhibit 1 at 32). When applying the norms for the general population, Bourgeois has mild mental impairment. However, Bourgeois, though of a mixed-racial background, was "raised in an African American family, in an African American community." (DE 621, Exhibit 1 at 35). Applying the Heaton norms for African-Americans to Weiner's testing places Bourgeois outside of the impaired range. (DE 621, Exhibit 1 at 18, 22).

While Bourgeois elicited testimony from Dr. Price that "some controversy" exists in psychology over the use of the Heaton norms, he did not show that their application was not good, or even necessary, psychological practice. (DE 621, Exhibit 1 at 17). With the scores from the Heaton norms finding no impairment, Dr. Price attributed the defects that Dr. Weiner described to a personality disorder, not a brain injury. (DE 595 at 223). Application of the Heaton norms would also "not be consistent with somebody that's mentally retarded." (DE 621, Exhibit 1 at 41-42).

In the end, counsel must approach the decision whether to present evidence of brain damage with careful deliberation. Evidence of mental and neurological conditions is double-edged: while it can create jury sympathy, it can equally bolster the Government's claims of future dangerousness by showing poor ability to control impulses and learn from past mistakes. The Fifth Circuit defers to counsel's strategic decision not to present such double-edged mitigation evidence. With the surety that presenting Dr. Weiner's testimony would reveal Bourgeois' manipulation, the credible testimony that he had applied the wrong norms, and the marginal benefit to the defense, trial counsel's decision not to adduce evidence of neurological impairment is not *Strickland* deficient performance.

---

[116]     (...continued)
(DE 621, Exhibit 1 at 16).

d.     Premeditation

Finally, Bourgeois claims that trial counsel should have called Dr. Holden in the punishment phase to testify that he did not premeditate his crime. The defense elicited Dr. Holden's help well before trial. After receiving a box of material from the defense, Dr. Holden provided a report that he later supplemented after receiving additional information. Dr. Holden opined that Bourgeois did not commit an intentional or premeditated "filicide": "[i]t is highly unlikely that Mr. Bourgeois had decided to (or thought about) killing [the victim]. Instead, what probably happened was that in a fit of rage over the spilled potty, he lost control of himself and in the course of administering physical discipline fatally injured [her]."

Trial counsel initially wanted to call Dr. Holden as a guilt/innocence phase witness. Dr. Holden wanted to testify that Bourgeois did not intend to murder JG1999, but that "this death resulted in a continuation of harsh punishment." (DE 350 at 37). Dr. Holden would have testified that "Bourgeois had never formed a close bonding, attachment, love relationship with the child. . . . So, he was stressed financially, emotionally with the child, fatigued, and then when the child spilled the potty, my interpretation is that he totally lost it and [be]came very punitive trying to teach her never to do that again." (DE 350 at 19-20). Dr. Holden conceded that he based his whole opinion about intent on the theory that Bourgeois was the murderer. (DE 350 at 17). Although the defense had supplied Dr. Holden with a "box of information" with "more than 100 pages" including the results of DNA analysis, CPS records, and the autopsy(DE 350 at 55-57), Dr. Holden seemed unaware of many facts surrounding the killing. After a more complete discussion of the evidence, Dr. Holden weakened his opinion on Bourgeois' guilt. In the end, he weakly stated "it's possible that it was not premeditated." (DE 350 at 65).

It was obvious that Dr. Holden's testimony would not benefit the defense in the

142

guilt/innocence phase. (DE 350 at 21). Dr. Holden himself agreed that he would not be much help to the jury on the question of guilt. (DE 350 at 54). The Court held that Rule 704(b) prevented Dr. Holden's testimony in the guilt/innocence phase. (DE 350 at 64, 69). The defense, though, indicated that "intend[ed] to make another offer [at] the punishment phase to have him testify." (DE 350 at 70). Trial counsel ultimately chose not to call Dr. Holden in the punishment phase.

The record does not contain a clear statement of why counsel chose not to call Dr. Holden as a witness. As the questioning before the guilt/innocence phase revealed, Dr. Holden would have premised his testimony on Bourgeois' having committed the murder – a theory incompatible with that chosen by the defense. Dr. Holden's testimony would have conflicted with Bourgeois' own statements before the jury in the punishment phase.

Bourgeois secured a new declaration from Dr. Holden in these proceedings. Unlike his earlier testimony, he now has backed away somewhat from his earlier focus on whether the crime was premeditated. Now, with new information, his focus would be on the "family violence . . . that sadly repeats itself through generations," which when combined with "numerous psychological factors that impaired Mr. Bourgeois' ability to control his actions," would have explained the murder as the act of "an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control." (PX-20 at 7).

At any rate, this Court's observation in the two times he has appeared before the Court was that a reasonable attorney would not have called him. His testimony came off as academic, speculative, and untethered to the facts of the crime. After seeing how his opinions fared when subjected to scrutiny, a reasonable and competent attorney might not have chosen for him to testify. In fact, the Government seemed eager to put his testimony before the jury knowing how it would benefit them. (DE 350 at 21). The Court's observations assure that trial counsel did not render

143

deficient performance in not calling Dr. Holden as a punishment phase witness.

## D.    Conclusion of Deficient Performance Analysis

This case differs fundamentally from those in which the Supreme Court has found deficient performance.[117] "This is not a case in which the defendants attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained[.]" *Van Hook*, ___ U.S. ___, 130 S. Ct. 13, 19 (2009) (citing *Rompilla*, 545 U.S. at 389-93 and *Wiggins*, 539 U.S., at 525). Trial counsel zealously gathered the tools necessary to make a probing investigation into a mitigation defense. Trial counsel used those tools to craft a defense which would remain true to Bourgeois' wishes but still advocate for a sentence less than death. In doing do, trial counsel amassed information not fundamentally different, for the most part, from that Bourgeois relies upon in this proceeding. In reviewing the accumulated defensive material, the Government's case, the credibility of witnesses, the jury's composition, and Bourgeois' wishes, trial counsel made hard choices. *See Richter*, ___ U.S. at ___, ___ S. Ct. at ___ ("There are, however, countless ways to provide effective assistance in any given

---

[117]    *See Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3264 (2010) (trial counsel essential failed to conduct any mitigation investigation and none of the evidence relied upon was known to trial counsel); *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 453 (2009) (with a month to prepare before sentencing the attorney "had only one short meeting with [the defendant] regarding the penalty phase. He did not obtain any of [his] school, medical, or military service records or interview any members of [his] family."); *Rompilla v. Beard*, 545 U.S. 374, 389 (2005) (finding deficient performance when defense lawyers failed to "to look at a file he kn[ew] the prosecution w[ould] cull for aggravating evidence . . when the file [was] sitting in the trial courthouse, open for the asking"); *Wiggins v. Smith*, 539 U.S. 510, 516-19 (2003) (trial counsel wholly failed to prepare a social history and ignored serious issues that required further investigation); *Williams v. Taylor,* 529 U.S. 362, 395 (2000) ("[T]rial counsel did not begin to prepare for [the punishment] phase of the proceeding until a week before the trial[,] . . . failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, . . .introduce available evidence that [he] was 'borderline mentally retarded' and otherwise ignored readily available evidence).

144

case. Even the best criminal defense attorneys would not defend a particular client in the same way."). This Court will defer to those decisions.

That is not to say that trial counsel did not make mistakes. No trial is perfect. *See United States v. Hasting*, 461 U.S. 499, 508 (1983) (noting that "there can be no such thing as an error-free, perfect trial"). But the Supreme Court recently emphasized that "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Van Hook*, ___ U.S. at ___, 130 S. Ct. at 17 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)); *see also Gentry*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). Hindsight and second-guessing may possibly suggest different courses of action, but with eyes focused on how trial counsel viewed the landscape before them, this Court finds that trial counsel engaged in reasonable decision making bolstered by a reasonable investigation. The Court finds that Bourgeois has failed to show deficient performance under *Strickland*.

### E.      Cumulative Effect of Prejudice

Even if Bourgeois could show that trial counsel's performance fell below constitutional expectations, he would still have to show actual prejudice. The Court will consider the entirety of Bourgeois' unpresented evidence conjointly. The Fifth Circuit "ha[s] construed [Supreme Court precedent] to require that an evaluation of *Strickland* prejudice include consideration of both the quantity and quality of the additional mitigating evidence." *Hood v. Dretke*, 93 F. App'x 665, 669 (5th Cir. 2004); *see also Strickland*, 466 U.S. at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). Particularly, "*Williams*, *Wiggins*, and *Rompilla*

145

looked at the quality of the mitigation case put forward by trial counsel as compared to what the petition suggested should have been presented." *Alexander v. Quarterman*, 198 F. App'x 354, 361 (5th Cir. 2006).

In addition, the prejudice inquiry looks at all available evidence, not just that favoring the defense. *Strickland*, 466 U.S. at 695 ("In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."). In assessing the relative weight of the new mitigating evidence, a reviewing court compares and contrasts the new evidence with that from the trial. *See Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 390 (2009) ("[T]he reviewing court must consider all the evidence-the good and the bad-when evaluating prejudice."). The Fifth Circuit has indicated that a court looks to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007). For instance, the "horrific facts of the crime," *Martinez*, 481 F.3d at 259, the "brutal and senseless nature of the crime," *Smith*, 471 F.3d at 576, or the "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against a finding of *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989). Additionally, if the "evidence of . . . future dangerousness was overwhelming . . . it is virtually impossible to establish prejudice." *Ladd*, 311 F.3d at 360 (citing *Strickland*, 466 U.S. at 698).

Finally, federal courts consider whether or not the new evidence is double-edged or introduces new aggravating circumstances into the calculus of sentencing. A court must consider

146

whether the material upon which a petition bases his *Strickland* claim contains unhelpful information. *See Burger v. Kemp*, 483 U.S. 776, 793-95 (1987); *Strickland*, 466 U.S. at 700. The Fifth Circuit has refused to find prejudice if the unpresented evidence "also contained evidence that, if disclosed, would have been detrimental to [the defense] case." *Ransom v. Johnson*, 126 F.3d 716, 724 (5th Cir. 1997); *see also Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999); *Cockrum v. Johnson*, 119 F.3d 297, 304 (5th Cir. 1997); *West v. Johnson*, 92 F.3d 1385, 1410 (5th Cir. 1996), *Woods v. Johnson*, 75 F.3d 1017, 1035 (5th Cir. 1996); *Callins v. Collins*, 998 F.2d 269, 278 (5th Cir. 1993).

The facts of this case are atrocious. Bourgeois committed a horrible murder. This Court need not to recount again the evidence showing the torture, neglect, and abuse that he inflicted on his helpless victim. He was indifferent to JG1999's injuries, unremitting in his beatings, uncaring about her death, and unremorseful at trial. He bit her, beat her with various objects, and probably sexually assaulted her. The Government presented significant evidence that the rage he reserved for his young daughter resulted from financial concerns, not psychological conditions.

The episode that resulted in JG1999's death was not an isolated incident. Bourgeois had been violent in the past and continued his violence while in custody. He had been cruel to children before, beat his wives, assaulted his mother-in-law, threatened jail guards, and tried to assault a United States Marshal. He threatened that his daughter's death would not be the only one. In fact, he threatened to kill witnesses. The jury saw Bourgeois as a violent man.

Trial counsel adduced some of the evidence upon which Bourgeois now relies. The jury knew that his mother neglected and abandoned him. Psychological testimony from Dr. Estrada put some of the blame on mental health issues. While Bourgeois has now presented more nuanced and detailed defensive theories, the jury would not respond more favorably than to those trial counsel

147

fashioned to conform to Bourgeois' chosen defense. Given the whole of the evidence, the Court finds no reasonable probability of a different result. The Court denies Bourgeois' *Strickland* claim.

## III. Jurisdiction (claim three)

Bourgeois claims that he did not kill JG1999 on federal property. Under 18 U.S.C. § 1111(b), "*[w]ithin the special maritime and territorial jurisdiction of the United States*, [w]hoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life[.]" (emphasis added). "[C]rimes committed within the confines of federal military reservations [fall] within the special territorial jurisdiction of the United States." *United States v. Bell*, 993 F.2d 427, 429 (5th Cir. 1993).[118] The Corpus Christi Naval Air Station is within the United States territorial jurisdiction. According to Bourgeois, the Government did not meet its burden of showing, beyond a reasonable doubt, that JG1999 died from injuries inflicted on federal property.

Federal law decides jurisdiction by the place of the fatal injury, not death. *See* 18 U.S.C. § 3236 ("[T]he offense shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused the death, without regard to the place where the death occurs."). Jurisdiction in this case came from Bourgeois beating his daughter's head against the truck window on the naval base. Bourgeois' jurisdictional argument presupposes that earlier injuries, unrelated to the vicious beating, caused the victim's death. In other words, the prior injuries he administered in another jurisdiction killed the toddler, not the beating on federal property. Bourgeois faults trial counsel for not basing the trial defense around a

---

[118] Congress has defined this jurisdiction as including "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7.

148

jurisdictional challenge. He also asks the Court to reopen the evidentiary hearing to allow more testimony on this matter.

## A. The Autopsy and Trial Testimony

Dr. Elizabeth Rouse performed the autopsy and noted numerous external scars and wounds on JG1999's head in various stages of healing. The extent and severity of the numerous injuries Bourgeois inflicted over time created a complexly tangled patchwork of bruises, scars, wounds, lacerations, and other injuries. The overlapping and all-encompassing nature of the victim's external injuries chronicled weeks of abuse by her father.

The autopsy and Dr. Rouse's subsequent trial testimony provided important information about the victim's external and internal head injuries. Dr. Rouse discussed the "severe head injuries, what I call a closed head injury," including "the injuries that actually resulted in her death. And . . . there's a number of different components of those head injuries[.]" (DE 345 at 121). Dr. Rouse described layers of injuries, from the skin, to the undersurface of the scalp, to the brain itself. For example, Dr. Rouse described a "recent bruise" on tissue that "indicate[d] that at that spot on her head, there was an impact. . . . right at the hair line on the right forehead and a "fairly complex bruise . . . that would indicate actually multiple impacts at that site." (DE 345 at 126-27). She observed a "multitude of smaller [bruises] . . . across the back of her scalp, across the back of her head . . . where something either hit her head, or her head hit something." (DE 345 at 129-30). Dr. Rouse identified a total of 10 bruises on the undersurface of the scalp. (DE 345 at 123).[119] She also described a subgaleal hemorrhage that "indicates an impact to the head, the actual point on the head

---

[119]    JG1999 also had "impact bruises on the front of her scalp, on the right, and then all across the back. . . . Both sides in the back. . . . [A] fairly large one behind the right ear." (DE 345 at 144).

where force was transmitted." (DE 345 at 146). She explained: "all appear what we would call recent injuries. . . . within the past few days[.]" (DE 345 at 130-31, 146).

Bourgeois correctly observes that these wounds alone are not evidence of a recent life-threatening injury. Dr. Rouse explained that the bruises "did not result in the death. But what they indicate is the mechanism of what ultimately caused the injury to her head. *What she actually died from is the forces that were transmitted on the brain.* That's what resulted in her death." (DE 345 at 131) (emphasis added). The scalp wounds "are just markers for where those impacts occurred, where that force was transmitted to the brain." (DE 345 at 132). The most important part of the autopsy was its description of what that force did to JG1999's brain.

As part of the autopsy procedure, Dr. Rouse sent slides of JG1999's brain away for microscopic examination. The autopsy report incorporates a conclusion prepared by Dr. Kathlenne S. Kagan-Hallet, an associate professor of pathology with the University of Texas Health Science Center at San Antonio. In a report dated September 17, 2002, Dr. Kagan-Hallet noted that the autopsy revealed "subgaleal bruising and subdural hematoma, as well as pattern injuries to the skin."[120] In the portion of her report entitled "microscopic findings and comments," Dr. Kagan-Hallet noted older injuries and some "in a stage of early organization." In the section designated "neuropathologic diagnosis," she noted a "history of head trauma," and described "{Right} subdural hematoma, mostly recent, minimal organization (approximately 10 days' duration)" She also noted "Cerebral white matter. Organized contusion infarcts (7+ days' duration), myelin tearing and axonal bodies." (DE 397, Attachment 50).

---

[120]     The autopsy report notes "two discrete areas of recent subgaleal hemorrhage in the right frontal scalp" and "[a]cross the occipital scalp . . . a total of eight discrete areas of recent subgaleal hemorrhage." She also observed a "semisolid subdural hematoma . . . over the right occipital region" and a "patchy subarachnoid hemorrhage over the brain."

Dr. Rouse's trial testimony provided the most important insight into Dr. Kagan-Hallet's observations. In discussing the intercranial findings, Dr. Rouse described several indicators that the victim had experienced significant trauma: (1) a subdural hematoma ("where blood has leaked, and that indicates where tremendous forces have been applied to the brain, resulting in her death"); (2) a subarachnoid hemorrhage ("which is blood over the actual surface of the brain"); (3) swelling of the brain; (4) "feuxsaxonal" injury ("injury to the actual nerves and cells of the brain. . . the injury to the brain itself"); and (5) fresh hemorrhaging in the victim's retina ("[w]hen there are injuries to the brain, those forces are often commonly transmitted also to the eyes, and you'll also get hemorrhage. The blood doesn't leak from around the brain to the eyes."). (DE 345 at 132, 134, 138, 139). All those factors indicated significant blows to the head that transmitted force to the brain itself. (DE 345) ("[T]o get a hemorrhage within the brain, it certainly indicates significant impact to the head.").

Despite this recent bruising on the underside of her scalp, Dr. Rouse did not discuss the age of the intercranial features, particularly the subdural hematoma. She did, however, give her opinion as to the cause of death. She testified that "the feuxsaxonal (phonetic) injury, injury to the brain itself. *And that's what actually resulted in her death.* The scalp hemorrhages are just markers for where those impacts occurred, where that force was transmitted to her brain." (DE 345 at 132) (emphasis added). Dr. Rouse elaborated:

> The actual cause of death – we can go through my, basically the summary is my autopsy findings. The cause of death is what we call *a closed head injury, an impact to the head resulting in a devastating brain injury, which we could see looking at the brain, by the bruising of the scalp , the bleeding over the brain, both under the dura and over the lining of the brain, and then also microscopically, when we looked at the actual brain tissue, we could see injury throughout the brain.* I actually sent those sections to a neuropathologist to confirm that there was extensive injury in the brain which would have resulted in her death. *She has the hemorrhage along the optic nerves, as well as the hemorrhage on the back of the retina on both eyes, which*

151

*again that's very protected.* You do not see that type of retinal hemorrhage in accidental trauma, specifically not in any sort of trivial accident. Certainly, you could get it with something of the magnitude such as a car accident. That type of injury is required to get retinal hemorrhage.

(DE 345 at 170) (emphasis added). Acknowledging that the medical evidence did not allow Dr. Rouse to establish precisely when and where JG1999 died, the Government asked her if the fatal injuries were consistent with the AB1994's version of the events. (DE 345 at 171). Dr. Rouse testified that the beating which AB1994 witnessed "could certainly explain the injuries that were seen on the child." (DE 345 at 171).

## B.      Bourgeois' Post-Judgment Arguments and Post-Conviction Testimony

Bourgeois' claim that he did not kill JG1999 on federal property turns on Dr. Kagan-Hallet's observations from the autopsy report. In his Motion to Vacate, Bourgeois based his jurisdictional argument on the subdural hematoma of "approximately 10 days' duration[.]" Treating the subdural hematoma as an indication of when JG1999 received the fatal blows, Bourgeois argued that he could not have inflicted the killing injury on federal property. As support, Bourgeois first secured an affidavit from Dr. Werner Spitz, a forensic pathologist. Dr. Spitz opined that the fatal injuries were a week or more old:

> The neuropathology report by Dr. Kathleen Kagan-Hallet indicates mild to moderate cerebral edema with hemorrhagic necrosis of cerebellar tonsillar tips, subdural hematoma of approximately 10 days duration and organized contusion infarcts of 7+ days duration as well as, myellin tearing and axonal bodies. The scalp bruises are relatively small and do not conform with one or more falls or forceful impacts. *I disagree with the witness testimony (AB1994) whereby the child's head was struck multiple times on the interior of the vehicle.* I am also surprised to see what appear to be fresh bruises of 1 or 2 days in the scalp, while the subdural bleed and contusion infarcs in the white matter show evidence or organization compatible with a week or longer. The findings place in question causation of the injuries and their timing. The scalp injuries in and of themselves would not have been life threatening and there is no question as to the life threatening nature of the cerebral injuries.

(DE 397, Declaration of Werner Spitz, MD dated May 10, 2007, Attachment 53) (emphasis

152

added).[121] Relying on Dr. Spitz's assumption that trial testimony claimed that the oldest part of the subdural hematoma represented the killing injury, Bourgeois claims that the federal government never properly had jurisdiction to try him for capital murder.

From the outset, Dr. Spitz's affidavits lacks credibility because he dismisses AB1994's testimony without having viewed her in court. His willingness to dispute a well-settled factual account calls his conclusions into question. The Court observed AB1994's trial testimony. AB1994 was a highly credible witness who convincingly described, to the best of her ability and beyond expectations for her young age, what her father did to her little sister. Dr. Spitz's disregard for her testimony, as well as the other evidence showing an obvious serious injury on federal property, makes his declaration not credible.

When this Court allowed limited factual development of this claim, Bourgeois wisely did not secure any additional testimony from Dr. Spitz. Instead, Bourgeois obtained two reports from Dr. Jan E. Leestma, a consultant in forensic neuropathology. Dr. Leestma examined the evidence, including the autopsy photographs and conceded that "[i]t seems inescapable that this child had been physically assaulted over a considerable period of time before death." (DE 641, Exhibit 2). He did not, however, give a definite answer to the "critical question . . . of when the fatal head injuries to the child were caused." Acknowledging that "she had sustained a number of head impacts allegedly due to having been beaten over a period of time," Dr. Leestma's report did not list a cause of death.

---

[121] The courts in this circuit that have considered Dr. Spitz's testimony have found him not useful or credible. For instance, one court in the Western District of Texas labeled his methodology "simplistic and preposterous[.]" *Bittner v. General Motors Corp.*, 2005 WL 5977561, at *1 (W.D. Tex. 2005). In another case, Dr. Spitz formed conclusions based on *"no evidence."* *Galvan v. City of San Antonio*, 2008 WL 5352945, at *6 (W.D. Tex. 2008) (emphasis in original); *see also Hill v. Carroll County, Miss.*, 2008 WL 2066526, at *5 (N.D. Miss. 2008) (noting that Dr. Spitz relied on a conclusion that was "wholly speculative").

He suggested that some of the brain injuries – specifically "a coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions" – may have "resulted in the child's death at any time with or without any new episode of trauma." (DE 641, Exhibit 2). He refused, however, to look at anything other than the medical evidence in ascertaining a cause of death. Where Dr. Spitz had criticized AB1994's testimony, Dr. Leetsma ignored her account and any other evidence that would put JG1999's injuries into context.[122]

The parties deposed Dr. Leetsma on January 10, 2011. (DE 641). In response, the Government called Dr. Rouse as a witness and the parties questioned her by telephone in a hearing on January 13, 2011. The resultant evidentiary record provides a highly technical view of the overlapping and interwoven injuries Bourgeois inflicted on his daughter. While disagreeing on many points, the experts found some areas of consensus. Both Dr. Leetsma and Dr. Rouse found serious brain damage in the victim. Both experts observed both recent ("acute") and older ("chronic") brain injury.[123] They both opined that the injuries were complex and hard to separate, age, and gauge. Dr.

---

[122]    In the end, he explained:

> Much of the pathology in this child is not acute. The scalp injuries are of variable ages in which the hemorrhages show aging of red cells cellular repair and inflammatory reactions and healing-scarring. The brain lesions range from possibly few days in age to days to weeks old. The child may have had coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions. These processes could have resulted in the child's death at any time with or without any new episode of trauma.

(DE 641, Exhibit 2). Admitting that the "child's condition deteriorated after the reported incident in the father's truck," Dr. Leestma opined that "there is very little information derived from the autopsy that can accurately pin point what physical injury resulted from this alleged incident or that it directly caused the child's death." (DE 641, Exhibit 2).

[123]    Dr. Rouse testified: "[C]learly the multitude of injuries makes this a complex picture. We can categorize the injuries into, you know, ones that appear to be six weeks old, you know, five,

(continued...)

154

Rouse explained that "you have a complex constellation of things going on in response to that injury." (DE 646 at 7). Dr. Leetsma agreed that the mixture of acute and chronic injuries made this a difficult case. (DE 641 at 88-89).

Without question, both experts could place injuries into two time periods – those more than a week old and those less than three days. The victim died around 24 hours after the ambulance took her from the naval base. Neither doctor could medically pinpoint the exact time of the newest injuries, though both agreed they occurred within three days of death. Dr. Leetsma explained:

> I don't know anyone who has a magical formula to break down into smaller increments this two- to three-day acute injury scenario. Red blood cells just don't change over that period of time. It's at the three-day mark and beyond that they begin to undergo some changes. The inflammatory reactions that can occur with an impact to the scalp, or any other place, are so variable between individuals that I know of no reliable reproducible scale that someone can use. That means they may have opinions on this matter, but I don't know of any reliable method that can sharpen our razor, so to speak, or turn up the power of the microscope to answer these kinds of question.

(DE 641 at 94-95). Dr. Rouse agreed:

> [S]he has many injuries of many, many ages, on different parts of her body. Unfortunately, we cannot, with medical certainty, get down very close on the aging of any of the injuries. We can, however, put them in categories of things that are more chronic, they're healing. The body is clearly healing in response to this injury. And some of those are where there's scarring. You know, that clearly takes weeks for a scar to develop. Other things show more along the time frame of about a week. And when I say, "a week," seven days, ten days. I can't differentiate between those two. But you know, clearly a few days have passed from the time of injury. And then she also has injuries that appear to have been in the last day or two. And you know, one to three days. I don't think you can distinguish between one day and two days, particularly when her last day was very altered.

(DE646 at 17).

---

[123]     (...continued)
six weeks old, to some that are, like I said, a week old, some that are days old. You know, days, weeks or months. We can't pinpoint exactly any injury, as far as pinpoint down to the day, this occurred on this date." (DE 646 at 22).

In another example of agreement, both experts thought that the subdural hematoma was not a major cause of the victim's death. Dr. Leetsma observed

> two components to the subdural hematoma. The chronic component . . . aged and dated ten days to two weeks before this incident. The fresh blood or more recent blood cannot be accurately aged and dated within about three days, two days from the time of death. So it is possible that some blood that is in this compound subdural hematoma came during the time period you just discussed, but there is absolutely no way I can tell you if that happened.

(DE 641 at 48). "The estimate of the age of the healing of the subdural hematoma, or the reaction that we're talking about, on the order of ten days to two weeks." (DE 641 at 35). Dr. Leetsma opined that, while still a factor, the subdural hematoma was "a rather minor component because of the relatively small volume estimated of that subdural hematoma." (DE 641 at 25). Dr. Rouse agreed that the subdural hematoma, "'space-wise' . . . was not a large collection of blood. But there are other injuries to the brain that are all causing, that are – there are other markers of injury to the brain." (DE 646 at 7). In those other injuries was where the experts differed. Some of the matters on which the experts disagreed include:

- Dr. Leetsma considered venous thrombosis ("clotting of cerebral veins . . . and the superior sagittal sinus") to have caused the most significant precursor to the intercranial swelling that he thought caused her death. (DE 641 at 26). The clotting of the venous channel under the skull "led to infarctions in the brain and cerebral edema and bleeding." (DE 641 at 26-27). However, he could only date "some aspects" of the venous thrombus. (DE 641 at 32). He thought that the clot "ha[d] been there for some days . . .[T]he recent red blood cells could be anywhere two to three days from the time of death. The blood clot itself is probably more than that, several days. And that's about as good as we can do with that particular component." (DE 641 at 32-33). The thrombosis occurred before "the collapse and decompensation of this child that was discovered at the naval base and leading to the hospitalization and then ultimately the child's death 24 hours or so later. The thrombosis antedates that whole business, that whole process by several days most likely." (DE 641 at 50). Dr. Rouse, on the other hand, explained: "As you go to the thrombus, that appears I think all within a few days. . . . One to three days." (DE 646 at 18). She also testified that the thrombosis was "all a constellation of injury that is acutely going on two to three days, on top of

156

previous injury a week prior." (DE 646 at 20). In short, she testified: "I don't think the thrombus alone is a significant injury to the brain. I think it's in response to the other injuries to the brain." (DE 646 at 10).

- Dr. Leestma did not believe that the recent portion of the subdural hematoma was consistent with injuries sustained on the naval base. (DE 641 at 48). Dr. Rouse, however, "would argue that the acute [component] does not conflict with occurring 24 hours prior to her death." (DE 646 at 27).

- The experts also disagreed about the source of the retinal bleeding observed when JG1999 arrived at the hospital. Dr. Leetsma explained that the retinal bleeding was "a consequence of the increased intercranial pressure this child had." (DE 641 at 45). Dr. Rouse, however, thought that "a tremendous transmission of forces" had caused the retinal hemorrhage. (DE 646 at 14).[124]

- Dr. Rouse noted that Dr. Leetsma omitted any reference to intercranial evidence of trauma. He did not "mention[] the tearing of the myelin and the axonal body. That's sheering of the fibers in the brain. These are all traumatic." (DE 646 at 11). Dr. Rouse explained that "[t]he actual neurons and tissue of the brain itself was damaged" and credibly testified "we see microscopically different manifestations, but it's all due to trauma. Trauma explains all of the findings." (DE 646 at 7, 12).

- Dr. Rouse testified "You cannot ignore the scalp hemorrhage, which are impact sites on the head, meaning her head hit – either something hit her head or her head hit something." (DE 646 at 40).[125] Dr. Leetsma, however, would "argue about does that really represent an impact site" and stated that "it's difficult to tell when those [impacts] occurred or how they occurred." (DE 641 at 43).

---

[124] Dr. Leetsma opined that

First of all, physical forces generally do not and cannot cause the kind of retinal bleeding we see here. They can certainly lead to it if you have a car crash and a giant subdural or tremendous cerebral edema, that's going to produce intercranial pressure which can produce the retinal hemorrhages. But directly as a result of physical forces, that would not be acceptable or is not scientifically proven.

(DE 641 at 46-47).

[125] Dr. Rouse testified: "The scalp injuries, the bruising, which as we call it subgaleal hemorrhage, that means bruising of the scalp – and contusion is the same as a bruise – those are recent. And I would say within days. There's fresh blood in those bruises of the scalp. And they indicate an impact site." (DE 646 at 18).

• In the end, Dr. Leetsma found one cause of death: "increased intercranial pressure which had its consequences causing her to remain comatose, nonresponsive, nonbreathing, and ultimately destroyed the circulation of the brain[.]" (DE 641 at 24). Dr. Rouse clarified that the "intercranial pressure" was "one of the physiologic responses that led to her death" but "a complex constellation of things" such as trauma, swelling, the thrombus, and the subdural hematoma contributed to her death. (DE 646 at 8).[126] If the swelling had been occurring before the incident on the naval base, "[y]ou would have expected a different scenario, where she would have had more symptoms leading up to the death, nausea, vomiting, being somnolent, sleepy, head – you know, older people describe headaches, that she would have been irritable. There would have been signs, as she was incurring increasing intercranial pressure . . . rather than a very abrupt change." (DE 646 at 40).

Most importantly, the experts disagreed about the manner in which an expert must consider the bare medical findings in light of other evidence. Both experts saw evidence of recent injury. Both experts opined that the most recent of JG1999's injuries occurred within a three-day window.[127] Both also agreed that they could not with any degree of precision place a date and hour on the most recent injuries. However, the most substantive disagreement between the experts was how to factor additional information into their conclusions.

The Government criticizes this claim because Bourgeois "seeks to have this Court view evidence narrowly based upon a defense expert's opinion but without reference or reliance upon other contextual evidence." (DE 654 at 5). Dr. Leetsma turned a blind eye to anything other than the autopsy findings. Dr. Leetsma would not take into account any testimony about the circumstances

---

[126] Dr. Rouse described the difference between Dr. Kagan-Hallet's description of the edema as "mild to moderate" and the CAT scan as "severe" to be "broad terms" in which there is "a subjective assessment of a finding" and "overlap." (DE 646 at 46). "And I would attribute differences to a neuropathologist and a radiologist are looking at different, using different terminology, using different references." (DE 646 at 46).

[127] Dr. Rouse testified that dating the injuries did not take into consideration the time after JG1999 died, "[b]ecause the physiology stopped at the time of death." (DE 646 at 28).

of JG1999's death, such as AB1994's testimony. Accordingly, he could not say whether the victim died from the injuries on the naval base.[128]

Unlike Dr. Leetsma, Dr. Rouse testified that professionals use the circumstances surrounding the death to inform their findings: "We use the physical findings in conjunction with the investigative information. . . . Pull the two together, view each in light of the other." (DE 646 at 43). Dr. Rouse testified that a forensic examiner looks at

> all the investigative information. Some we discount, some does not fit, some fits. I mean, but we consider all the information that's available. . . . And we would, we certainly look at the medical evidence, but that is always looked at in conjunction with clinical evidence, with eyewitness statements, with medical records, physicians' previous examinations. We would pull that all together to come to our conclusion.

(DE 646 at 26). Dr. Rouse credibly explained that

> certainly the circumstances help place how significant the injury is in resulting in the death. For example, this child has evidence of brain injury that is a week old. By all

---

[128] He explained:

First of all, the aging and dating of the acute component of the subdural we have imprecision there, we can't do any better than a couple of days. Meaning if -- I couldn't tell you whether a red blood cell in that clot came five minutes before the heart stopped in this child or two days before. I can't. I can't do it. So that limits that.

We have other processes that are involved in this child. The older component of the subdural. The cerebral thrombosis clearly predates the arrival of this child at the naval base. The bruising on the scalp and so forth and so on, of which there are a number of them, all of those have both acute and chronic components and the issue is the same. I can't tell you if bleeding that is there of an acute nature or recent nature precisely when it occurred or how it occurred.

(DE 641 at 51). Even to the limited extent he considered the circumstances leading up to JG1999's death, Dr. Leetsma did not have a full understanding of the facts. For instance, he stated that "[t]he child apparently at some point was reported to have drunk her own urine because she was hungry or thirsty." (DE 641 at 79-80). He used that to infer that "this child had been ill in some fashion prior to this incident." (DE 641 at 79-80). Dr. Leedemsa had a misconstrued understanding of the incident in which the victim drank, and was forced to drink, her father's urine.

159

accounts, she was functioning neurologically fairly normally during that week. She was conscious, talking, walking. She has evidence microscopically of recent injury, days. At a point on the 27th, clinically her neurologic status changed abruptly. She lost consciousness, was no longer walking, talking. That fits very well microscopically with the acute injuries. The timing fits well.

(DE 646 at 22).

In this case, Dr. Rouse's testimony indicated that a medical expert cannot ignore the significant amount of recent trauma that would place the killing injury just before JG1999 arrived at the hospital. In essence, Dr. Rouse looked at the information like a jury would have to plugging scientific observations into eyewitness accounts.

### C.    Evidence of Recent, Extensive, and Fatal Head Trauma

Given the pervasive and prolonged abuse JG1999 suffered at Bourgeois' hands, the existence of different-aged brain injuries is not surprising. Unquestionably, Bourgeois' whipping, hitting, and beating the victim over time – including his barbarous assaults with a plastic baseball bat – inflicted head injuries. In his Motion to Vacate and related briefing, Bourgeois treated the subdural hematoma and related injuries' age as the only indicator of when JG1999 received the fatal injury. This is a myopic view of the trial testimony and autopsy findings. Trial testimony did not refer to the subdural hematoma as the only, or even a major, cause of death. Rather, trial testimony was consistent with the evidentiary hearing explanation that a complex serious of injuries caused JG1999''s death. In sum, she died from trauma to the brain.

The Court does not find Dr. Leetsma's testimony persuasive insofar as he contends that intercranial pressure from earlier wounds caused the victim's death. Regardless of the mention of a ten-day-old hematoma, Dr. Rouse's trial testimony convincingly described how recent injuries killed JG1999. Nothing in the record suggests any major neurological side effects before her arrival