on federal property.[129]

Trial testimony helped place the killing injury on the naval base. Bourgeois asserts: "There was no evidence offered through [AB1994] or any other witness to demonstrate that the fatal blows were inflicted on the grounds of the [Naval] Air Station." (DE 402 at 28). Bourgeois seriously downplays how AB1994's testimony as it fits into the context of other trial testimony. True, she chronicled a weeks-long pattern of abuse toward JB1999 that fashioned the complex constellation of wounds observed by forensic experts. She saw her father spank, hit, bite, whip, and beat the young child. AB1994 recalled more than one head injury her father caused. He told AB1994 that he wanted to kill the child, and certainly acted like he wanted to kill her. Fresh blood was present in the bruises on JG1999's head which corresponded to the internal injuries that caused her death.

But most importantly, AB1994 saw the murder on federal property. Bourgeois takes advantage of AB1994's testimony told through her childhood view to argue that no time line would place his violent act on federal property. He fails to recognize how, even if her trial testimony drifted from event to event without always following chronology, it harmonizes with the accounts of others who saw Bourgeois on federal property. After entering the naval base, two individuals saw

---

[129]     Dr. Rouse emphasized the lack of any report showing impaired functioning before Bourgeois slammed his daughter's head into the truck window. Dr. Rouse credibly explained

> If she died from an injury that the insult that occurred a week prior, again, yes, at some point you would go from conscious to unconscious. But you would anticipate days of symptoms prior, lethargy, not eating, vomiting for several days' duration, you know, that you would anticipate a constellation of symptoms. Typically also it would be, the loss of consciousness would be closer to the insult, not a week later. Typically it may be a day or two, but you would expect it to occur more recently and with symptoms in the intervening period.

(DE 646 at 45).

161

Bourgeois before he arrived at the loading dock. Hal Resides, the Occupational Safety and Health Manager for Corpus Naval Air Station, saw Bourgeois' waving for him to stop just after 10:00 a.m. on July 27, 2002. Bourgeois leaned out of the driver's side window and asked for directions to the warehouse. After he turned the engine off so they could talk, Mr. Resides saw a young girl looking out the window. (DE 355 at 113-116).[130] Mr. Resides' description of his encounter with Bourgeois suggested that JG1999 had not yet suffered a life-threatening injury.

By 10:25 a.m. Bourgeois had notified his dispatch that he was on the naval base, but his truck would not start. (DE 337 at 283). Carl Mead Arnoux, an employee at the naval base, saw Bourgeois' truck in front of the compound with the hood up. (DE 355 at 132). He helped Bourgeois jump start his vehicle.[131] These witnesses observed no sign of emergency while Bourgeois was on federal property – Bourgeois was "very kind" and not "frustrated" or "upset." (DE 335 at 143-44). The testimony from Mr. Resides and Mr. Armoux suggest that there was no concern about JG1999's welfare before Bourgeois brought her on federal land.

At approximately 11:00 a.m., Bourgeois pulled the tractor-trailer parallel to the loading dock at the Navy Exchange warehouse. (DE 335 at 147). AB1994 then described how her father stopped, told her not to get out, and then went to ask for directions. (DE 241 at 36). AB1994 described JG1999 as active and wiggling around when they arrived to unload the truck. (DE 245 at 36-37). When the truck started to back up, JG1999 tipped the potty. (DE 241 at 36).

After she spilled the potty, Bourgeois ordered AB1994 to hand him the infant. Bourgeois

---

[130]    While Bourgeois asked for directions and shut off his vehicle, he did not describe either of them leaving their vehicles.

[131]    AB1994 remembered that her father's truck would not start, but she did not remember helping him start it as he and Mr. Arnoux jumpstarted it. (DE 241 at 36).

took off JG1999's pants and spanked her. AB1994 then described the murder:

AB1994:    He took her by the shoulders, and he started hitting her head on the window.

. . .

Ms. Booth:    And could you see her face, AB1994?

AB1994:    Yes.

Ms. Booth:    What was her face doing?

AB1994:    Like making a real, real sad face.

Ms. Booth:    Okay. And when she was making this real sad face, did you tell him, "Stop, Daddy, stop"?

AB1994:    No.

(DE 245 at 39). Bourgeois hit her head against the window four times, put JG1999's clothes back on, and told AB1994 "to catch her and put her right next to [her] seat." (DE 245 at 39). AB1994 "was awake, and then she just, like, fell asleep." (DE 245 at 40).[132] Bourgeois then concocted his story and played it out to the hilt.

Dr. Rouse's testimony harmonized with other testimony from other medical experts who examined JG1999 before she died. When she arrived at the hospital she bore signs of recent trauma.[133] Dr. Rouse credibly explicated: "She had a multitude of injuries, the relative role of which

---

[132] Bourgeois tries to create inconsistency between AB1994's account and the other trial testimony. AB1994's recollection harmonizes in many respects, other than the murder itself, with what Bourgeois said happened before he dashed the victim's head into the window. (DE 344 at 187). Also, her testimony does not hint that the killing blows happened somewhere other than the naval base they had entered an hour before. Bourgeois' and AB1994's actions in the hour leading up to the murder, as described by those who came into contact with them, do not even suggest the urgency that they showed once it became clear that JG1999 was dying. No basis exists to raise reasonable doubt about the location of the killing.

[133] For instance, Dr. Noorullah Akhtar, the pediatric intensive care physician that first evaluated and treated JG1999, realized when she was first brought to the hospital that the recent head
(continued...)

163

I don't think you can dissect out. But clearly that last injury pushed it till the brain could no longer compensate and resulted in her death." (DE 646 at 39). Abundant and conclusive evidence showed trauma both consistent with AB1994's testimony and amply sufficient to cause JG1999's death.

Most importantly, Bourgeois' own words place the killing injury on federal property. He described how, when he arrived on the naval base and his truck broke down "JG1999 came into the front of the truck with him. While he could not start his truck, Bourgeois described interacting with JG1999: "At that time we were playing. Me, her – at this time I was broken down. Me, her, AB 1994, we were singing ABC's." (DE 338 at 50). After a man helped jumpstart his truck, JG1999 went into the sleeper area of the truck. (DE 338 at 51). When they arrived to unload the truck, JG1999 was "sitting on a potty in the sleeper and getting her hair combed." (DE 338 at 49, 52). Bourgeois made similar statements to FBI Agents soon after the incident. (DE 344; 46 R. 185-186). His own words do not show any hint of critical injury before they stopped to unload at the naval exchange.

Dr. Spitz and Dr. Leetsma's opinions, far removed from trial proceedings and testimony, do not credibly challenge the location of the murder. The Court finds that Bourgeois has not adduced

---

[133]      (...continued)
injuries included extensive blood in the brain and edema of the brain. Ms. Carol McLaughlin, a registered nurse with expertise in child abuse, was on duty when JG1999 arrived and observed several pattern injuries on the child. Dr. Ronald R. Kuffel, Jr., a board certified ophthalmologist. who Dr. Akhtar requested examine JG1999 because she had so much blood in her eyes, observed "multiple hemorrhages . . . all over the back of the eye." (DE 345 at 87). He testified that trauma to the head could cause such injuries. (DE 345 at 89). He explained that he had previously observed mild hemorrages which "go away within days to a week or so" but JG1999's were "quite extensive" and "not mild at all." (DE 345 at 91). He described how he observed "massive subinterlimiting hemorrhages, a very extensive amount of blood throughout both eyes." (DE 345 at 91). He described that type of hemorrhage as "usually associated with life-threatening injuries." (DE 345 at 91). He credibly testified that the injury was consistent with AB1994's description of Bourgeois beating his young daughter's head against the window of his truck. (DE 345 at 91).

164

credible evidence to challenge the jurisdictional element of his crime. Bourgeois does not show that trial counsel could have initiated a valid jurisdictional defense. Trial counsel was aware before trial that the forensic evidence could be interpreted in such a manner that "it could have occurred more than two days before." (DE 350 at 80). Had trial counsel tried to argue insufficiency of the evidence showing jurisdiction, he might have lessened his credibility with jurors. The Court denies this claim and will not allow additional factual development on the issue.

## IV. Trial Counsel Provided Ineffective Assistance by Failing to Call an Expert Witness to Rebut Forensic Evidence Indicting Sexual Assault (claim four)

Bourgeois claims that trial counsel provided ineffective assistance in defending against the accusation that he sexually assaulted JG1999. The possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but not essential, part of the Government's case. The evidence about possible sexual assault came from two sources: (1) the examination of autopsy photographs by an expert in the sexual abuse of children and (2) testing done on rectal swabs taken during the autopsy. Bourgeois claims that trial counsel should have sought expert assistance to rebut both types of evidence.

### A. The Trial Evidence

During the autopsy, Dr. Rouse administered a sexual assault examination on the victim. She took swabs from JG1999's mouth, vagina, and anus. Dr. Rouse made slides from those swabs and turned them over to the FBI for testing. (DE 345 at 172, 176-77). Dr. Rouse however, did not observe any external trauma to JG1999's genital area. In fact, the autopsy report stated: "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic." (DE 397, Exhibit 52, Autopsy Report of Dr. Elizabeth Rouse, PA,

165

p. 3). Nevertheless, the Government used the autopsy photographs and the results from testing the swabs to argue that Bourgeois sexually assaulted his daughter.

The Government's opening argument promised to show that "there was seminal fluid in the rectum of that baby." (DE 335 at 42). Testimony about Bourgeois' sexual assault on his young daughter began after AB1994 testified on the fourth day of trial. Previously, the parties had carefully avoided asking about any sexual abuse Bourgeois inflicted on his daughters. The forensic evidence allowed the Government to prove that the murder was only the culminating event in a barrage of abuse that also contained a sexual component.

The Government first called Dr. Scott Anthony Benton, the Medical Director of the Children-at-Risk Evaluation Center and a Clinical Associate Professor with Louisiana State University and Tulane Schools of Medicine. Dr. Benton testified that he examined JG1999 on May 21, 2002, after Child Protective Services in Louisiana had received a complaint that JG1999 had vaginal bleeding. (DE 346 at 23-24). At that point, Bourgeois only had possession of the child for a few days. (DE 346 at 28). In his head-to-toe examination of her, Dr. Benton did not observe signs of abuse. Specifically, he found nothing in the vaginal or rectal area that would indicate bleeding or sexual trauma. (DE 346 at 31-32).[134]

Dr. Benton, however, found a much different picture when he reviewed the autopsy photographs. At trial, Dr. Benton briefly contrasted the appearance of the victim's genital area in his initial examination with what he saw later:

> [T]he autopsy photograph is specific that it is blood outside of a vessel. Okay? And the reason I can say that is because all of the other parts of her vagina are white. When you drain blood from a mucus membrane, it turns white. But that area doesn't.

---

[134]     He noticed inflamation around her urethra, but did not see any evidence of trauma. (DE 346 at 45).

It stays – it's a black red. And that tells me that that's blood outside of a blood vessel. So . . . this could have been trauma[.] . . . This one is blood outside and most likely is trauma[.]

(DE 346 at 46). The bulk of Benton's testimony about sexual assault did not focus on external observations, but on the possibility that the FBI had detected semen in her rectum.

Dr. Benton did not perform any testing on substances taken from JG1999's corpse. However, the Government laid a foundation for later testimony by asking Dr. Benton about how forensic testing can indicate sexual abuse. Dr. Benton testified that three tests could confirm the presence of semen: (1) a test for acid phospatase, which is a substance predominantly produced in the male prostrate and deposited in ejaculation or pre-ejaculation; (2) testing for the presence of the prostatic specific antigen, also known called by the terms "P30" or "PSA"; and (3) the "more confirmatory" observation of sperm cells. (DE 346 at 22-23). The Government asked what it would mean if testing found indications of semen, but no sperm could be observed. (DE 346 at 49). Dr. Benton explained that sexual abuse may still have occurred under some circumstances, such as if the man has had a vasectomy,[135] if he only deposits only pre-ejaculate fluid, or he has been ill. (DE 346 at 50-52). Finally, the Government asked Dr. Benton specifically about what substances contain the PSA protein, thus allowing for a positive result on the P30 test. Dr. Benton testified that the P30 could only be found in secretions from the prostate and in breast milk. (DE 346 at 53).

Cross-examination did not challenge Dr. Benton's observation of possible vaginal trauma. Instead, trial counsel focused on the reliability of P30 testing. Dr. Benton explained that, although "very low levels of false positives" are associated with the P30 test, "there is no such thing as 100

---

[135] Before trial, trial counsel told the Court that Dr. Johnson "asked [him], as a matter of fact, . . . .whether or not [their] client had a vasectomy, and [they] discovered he has not." (DE 388 at 33).

167

percent accuracy." (DE 346 at 55). He testified there are "multiple ways to test for the P30, just to confirm that it really is there." (DE 346 at 55). He conceded, however, that the P30 test still had a chance of being erroneous. (DE 346 at 55).

The Government next called Caroline Zervos, a forensic serology examiner with the DNA Analysis Unit for the FBI laboratory in Quantico, Virginia. Ms. Zervos testified about the Government's testing of postmortem swabs, labeled Q5 through Q7, taken from JG1999's rectum. Ms. Zervos described how the forensic laboratory generally uses two tests, the presumptive acid phospatase and the confirmatory PSA, to determine the presence of semen. (DE 346 at 63-64). Here, the laboratory only performed a confirmatory P30 test in order to avoid a false positive. (DE 346 at 87). The test was positive for samples Q5 and Q7. (DE 346 at 85). Throughout Ms. Zervos' testimony, she equated a positive score on the P30 testings with a positive finding of semen.

Cross-examination probed whether anything other than prostate proteins could result in a positive P30 test. Ms. Zervos testified that low levels of P30 could be in 'peripheral male blood, as well as male urine" but at "very low concentrations." (DE 346 at 104). She did not believe that the protein could be found in female fluids. (DE 346 at 105-06). Also, she did not know if anything could be injected that would have the same reaction. (DE 346 at 106). In a discussion with the Court, Mr. Tinker expressed that he "got more than he wanted" from Ms. Zervos because she "didn't know whether things in food might cause" a false positive. (DE 346 at 107).

Anthony Onorato, a forensic DNA examiner with the FBI, testified that the only DNA present on the rectal swabs, Q5-Q7, came from JG-1999. (DE 346 at 118). He explained, however, that it was not uncommon to have a sample where semen, but not male DNA, is detected. (DE 346 at 127-28). On cross-examination, Mr. Onorato testified that the only place outside of male semen where the P30 protein can be found is the blood of a male with prostate cancer. (DE 346 at 128-29).

168

Also, Mr. Tinker emphasized that the FBI testing was negative for sperm and for male DNA. (DE 346 at 130).

> During guilt/innocence closing, the Government argued:

> The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's little bottom had semen on them. There was semen in that baby's bottom. But the swabs were taken at the autopsy and the autopsy was done on June 29th. The baby was thrown on the side of the truck on June 27th and died on the 28th, two days. Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly. But when you get a confirmatory test for semen, you've got semen. It's an ejaculate from a man, not from a woman, from a man from sexual arousal. And that's what we know.

> The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and not show. You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes? I said, wt [*sic*] that Vaseline? No, we don't have Vaseline in the truck.

> What is so bad about having Vaseline? I thought that was interesting. It's a lubricant. Why would you have to deny that?

(DE 339 at 20).

The defense's closing argument responded by pointing out weaknesses in the evidence of sexual assault: "They say sexually abused. And they don't talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital." (DE 339 at 24). In addition to calling the post-mortem observations into question, trial counsel pointed out forensic weaknesses in the Government's testing. Trial counsel asserted that the testing should have "no reliability as far your decision making in this case" since the Government's case rested on "nothing but insinuations since that test for the semen, the advanced test, I don't know what it's call[ed], was negative. There's no evidence of semen, I suggest to you, being found on this child." (DE 339 at 41-42).

The Government did not adduce any additional evidence of sexual assault in the punishment

phase. In the punishment closing arguments, the Government chronicled the extensive physical injuries Bourgeois inflicted on the victim. Pages and pages of transcript recount his unrelenting torture. In that closing, the Government twice briefly mentioned that Bourgeois' semen had been found in the victim. First, when discussing how Bourgeois had laughed in videotapes while subjecting children to abuse and traumatic episodes, Ms. Booth asked: "Was he laughing when he beat JG-1999 to death? Was he laughing when he bit her, or he burns her, or *he put his filthy semen in her little body*?" (DE 342 at 70) (emphasis added). Second, the Government argued that Bourgeois had not shown remorse:

> Let's talk about lack of remorse. The Defendant spoke to you. Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever. He murdered this baby. His signature with his teeth marks *and his semen is all in that baby*.

(DE 342 at 75-76) (emphasis added).

Bourgeois argues that trial counsel should have presented expert testimony to undercut Dr. Benton's observation of sexual abuse and to blunt the forensic evidence. The Court observes, however, that to succeed on this claim Bourgeois must prove both that the Dr. Benton was incorrect in his physical observations and that the positive P30 did not necessarily equate to a positive result for semen. Absent evidence that would likely eviscerate the effect of either prong, the other would give the jury a sufficient basis to find that Bourgeois sexually assaulted his daughter.

## B. Dr. Benton's Observation of Sexual Trauma

Bourgeois argues that Dr. Benton had no reliable basis for his testimony about sexual trauma. Bourgeois premises his argument on (1) Dr. Rouse's autopsy report that did not find evidence of sexual trauma and (2) an affidavit from Dr. Spitz in which he criticizes Dr. Benton's testimony. Dr. Spitz has opined that:

170

As a forensic pathologist, being aware of the type of exposure of the body available to a pathologist performing an autopsy and directly viewing the body, I take exception with Dr. Benton's observations and consider them questionable. Dr. Rouse was in a much better position to determine if a bruise was present. She examined the entire area, described it, and determined it was normal.

(DE 397, Exhibit 53, Declaration of Werner U. Spitz, M.D., PA document at ¶ 15). [136] Bourgeois faults trial counsel for not questioning Dr. Rouse about her autopsy findings or otherwise verifying that JG1999 did not suffer sexual abuse.

Bourgeois did not call any witness in the evidentiary hearing to criticize Dr. Benton's observations. Bourgeois did not question Dr. Rouse during her post-conviction testimony about her sexual-assault examination. Bourgeois relies entirely on Dr. Spitz affidavit that does not necessarily eviscerate Dr. Benton's interpretation of the evidence, it only opines that the person performing the autopsy would be in a "better position to determine if a bruise was present."

Bourgeois has not presented any evidence showing that Dr. Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony. In particular, he has not shown that Dr. Benton's specialized knowledge about childhood sexual abuse and prior treatment of JG1999 did not provide sufficient support for his expert opinion. Unlike Dr. Rouse, Dr. Benton could comment on the condition of JG1999's genital area over time; he could compare her autopsy photographs with those taken a month before her death. Bourgeois' ineffective-assistance claim relies on the unproven speculation that Dr. Rouse would not defer to Dr. Benton's observations. Bourgeois has not shown that trial counsel should have relied on an expert witness such as Dr. Spitz, who can only say that it is better to defer to the autopsy doctor's observations. At best, Bourgeois has shown that experts can disagree on how to interpret the evidence collected during the autopsy.

---

[136] From the onset, Dr. Spitz's testimony on this issue is suspect. As previously noted, Dr. Spitz is not a credible expert.

171

Even without calling additional witnesses, trial counsel exploited weaknesses in the evidence of sexual trauma. For example, during the cross-examination of Carol Ann McLaughlin, the registered nurse who examined JG1999 the day after her death, trial counsel stressed that she saw no evidence of sexual trauma to her genitalia. (DE 595 at 65). Trial counsel also brought out that Ms. McLaughlin observed no trauma in her pelvic examination. (DE 595 at 69-70). During closing arguments, the first thing Mr. Tinker stressed was that "they found no evidence of trauma to the rectum or genitalia when they examined this child at the hospital." (DE 339 at 24). On post-conviction review, Bourgeois has not adduced any evidence or testimony that would put a stronger case against the evidence of sexual trauma than the essence of that brought out by trial counsel. Bourgeois has not shown that trial counsel performed deficiently in addressing Dr. Benton's testimony.

### C.    Forensic Evidence of Semen

Before trial, Bourgeois' attorneys sought expert help in performing their own testing on the rectal swabs. The Court appointed Dr. Elizabeth Johnson as a DNA expert pursuant to trial counsel's *ex parte* request well before trial. (DE 122; DE 351 at 18-19). Trial counsel had confidence in Dr. Johnson's abilities after seeing her presentations at a seminar. Trial counsel communicated with her repeatedly. (DE 388 at 14, 33, 35). Dr. Johnson identified sufficient biological material for further serological and DNA testing. Trial counsel made sure that the Government sent the remaining samples to Dr. Johnson in January 2004. (DE 388 at 32-34).[137] To

---

[137]    Bourgeois has raised a related *Brady* claim which asserts that the Government did not turn over a report relating to its testing. (DE 614). Specifically, Bourgeois notes the existence of a document now labeled PX-179 entitled "P30 Test Results" that "indicates that on the three swabs, Q5-Q7, that were subjected to p30 testing by the FBI, the results were 'very weak, very weak and weak,' respectively." (DE 611 at 6). The basis for this *Brady* claim is that this report, while

(continued...)

172

that point, Dr. Johnson had been "good about talking to [the defense] about issues." (DE388 at 35).

Dr. Johnson first ordered an acid phosphatase test, which detects an enzyme present in several body fluids, but in a particularly high concentration in seminal fluid, that came back negative. (DE 575 at 7-8). Next, she ordered her own P30 test which came back as a "weak positive." (DE 575 at 18).[138] The negative results from her microscopic sperm search, which was even more sensitive than that done by the FBI, made her question the accuracy of the P30 results. In light of the absence of sperm cells, Dr. Johnson interpreted the weak positive P30 test as a "false positive" that could be "due to bacterial proteins found in the rectal swab. If there was actually sperm on the swab, they should be observed." (DE 575 at 23). To that end, she formed the following opinion:

---

[137]   (...continued)
contained in additional collections of trial material, was not in the documents trial counsel submitted to Bourgeois' current attorneys. According to Bourgeois, PX-179 was also not in the material trial counsel turned over to Dr. Johnson and trial counsel apparently did not rely on that information in cross-examination. Bourgeois asserts that his attorneys only became aware of PX-179 during the evidentiary hearing. A *Brady* claim requires the defendant to show that (1) the Government intentionally or inadvertently suppressed (2) material favorable to the defense which (3) was materially prejudicial. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Brady v. Maryland*, 373 U.S. 83, 89 (1963). Bourgeois has not shown by a preponderance of the evidence that the Government, whether intentionally or by accident, withheld PX-179. The Government called a witness to explain how in late 2003, the Goverment received 358 pages of material from the FBI lab, including PX-179, and then soon thereafter sent the defense 358 pages of material. (DE 655 at 54-57). Also, the records trial counsel turned over to Bourgeois' current attorneys did not contain other documents the Government disclosed before trial. (DE 655 at 63-64). While PX-179 was not found in trial counsel's files, the preponderance of the evidence certainly indicates that the Government fulfilled its *Brady* obligation. At any rate, as the Court will discuss with respect to his *Strickland* claim, a notation of weak results on the P30 test does not indicate an absence of seminal fluid, but triggers a confirmatory search for sperm. The "weak" or "very weak' results from PX-179 signal a small amount, not an absence, of seminal fluid. At any rate, Dr. Johnson's own testing, fully available to the defense, came to the same conclusion.

[138]   Dr. Johnson explained that "P30 is a protein that is found in abundance in human seminal fluid, and it is found in lesser concentrations in some other fluids. . . . Amniotic fluid has been reported, breast milk, urine from men, some serum from men, and some female serum, and some female urine." (DE 575 at 13).

"Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." (DE 575 at 19).

By the time Dr. Johnson finished her testing, trial loomed near. Trial counsel faced an oncoming deadline for the disclosure of all expert reports. As the parties were tardy in disclosure, on February 25, 2004, the Court ordered that all experts whose reports were not produced within two days would be excluded from testifying. (DE 196). Trial counsel stepped up efforts to secure a report from Dr. Johnson.[139]

On March 1, 2004 – immediately before the guilt/innocence phase – Dr. Johnson provided trial counsel with a two-page summary of her proposed the testimony. In a handwritten report that she obviously prepared hastily,[140] Dr. Johnson summarized the results of her testing. She reported that her AP test and microscopic sperm search came out negative, but her P30 test yielded a weak positive. Dr. Johnson did not see the weak positive, however, as dispositive particularly because her microscopic search showed no sperm. She told counsel that the P30 result could be a false positive due to bacterial from the rectal swab or from other substances where prostatic specific antigen (PSA) has been detected, such as amniotic fluid, breast milk, saliva, female urine and female serum.

Trial counsel did not call Dr. Johnson as a witness. In his post-conviction answer to interrogatories, Mr. Tinker explained:

---

[139] She later testified that she did not previously known that there was any urgency to the preparation of her report. (DE 575 at 27).

[140] Dr. Johnson explained in the evidentiary hearing that she provided him "a handwritten document, because I was in Colorado on another case and didn't have my file, and he kind of caught me off guard needing something. So I put together a handwritten document for him, to assist him in cross-examination." (DE 575 at 21).

174

> I had met Dr. Johnson at a seminar and was very impressed with her presentation. I spoke with her afterward about helping us with Mr. Bourgeois' case. I had a great deal of problems getting her to return my phone calls. I learned, during my dealings with her that she did not have her own lab. She did not do the testing I requested in a timely fashion and, therefore, we did not utilize her services.

(PX-82 at 14).

In his Motion to Vacate, Bourgeois faults counsel for not calling an expert such as Dr. Johnson to challenge the forensic evidence of sexual assault. Bourgeois' attack to trial counsel's efforts emphasizes three themes: (1) the P30 result was only a "weak positive," which he argues raises the accompanying possibility that it was a "false positive"; (2) substances other than semen could have provided the P30 antigen that gave the weak positive result; and (3) no observation of sperm cells confirmed the presence of semen. Bourgeois' challenge, however, cannot stand independent of what his attorneys did at trial. In fact, Respondent persuasively argues that, although trial counsel did not call Dr. Johnson as a witness, the flow of his questioning suggests that he used her report to prepare for cross-examination.

Trial counsel did not leave forensic testimony about sexual assault unrebutted. For instance, trial counsel's cross-examination of Dr. Benton centered on whether the P30 test was susceptible to false-positive results. (DE 346 at 53-55). Trial counsel asked both Ms. Zervos and Mr. Onorato whether substances other than semen could give a positive result on the P30 test. (DE 346 at 102-06, 128-29). Trial counsel even elicited from Ms. Zervos that she did not know if digested food could contain the P30 antigen – a factor which Dr. Johnson's testimony would have refuted. (DE 346 at 106). Trial counsel's questioning and argument also highlighted that the Government's experts observed no sperm cells. (DE 346 at130). In fact, trial counsel's questioning showed that the absence of sperm made the Government experts recommend DNA testing. (DE 346 at 130).

Without calling an expert witness, trial counsel's cross-examination touched on the issues

175

raised in Bourgeois' Motion to Vacate. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, ___ U.S. at ___, 131 S. Ct. at 791. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* (noting also that "[w]hen defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict"). If based on an adequate investigation and understanding of the issues, an attorney's decision to attack the Government's expert witnesses on cross-examination rather than calling additional experts can be reasonable performance. *See Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007). Trial counsel's questioning manifested a familiarity with the issues presented in Dr. Johnson's report and, in fact, introduced doubts that could not have been raised by expert testimony, such as that digested food could contribute to the positive P30 results.

Validating trial counsel's cross-examination through expert testimony certainly could have provided some benefit to the defense. Bourgeois has made much of Dr. Johnson's opinion that the P30 testing resulted in a "weak positive," hoping that it would discount the possibility of sexual assault. In the hearing, Dr. Johnson's explanation of her testing tracked the pre-trial report she gave counsel, but she explicitly drew a distinction between her test results and that from the FBI testing on the P30 assay: they reported a "positive" and she reported a "weak positive" because the test line on the P30 test card "was barely visible . . . It's actually very difficult to see on a photograph even." (DE 575 at 72).[141] Bourgeois particularly hopes that her qualification of the P30 results as a "weak

---

[141]     Dr. Johnson explained that in 2004 she tested rectal swabs for the presence of seminal fluid and spermatozoa. (DE 575 at 6). The swabs were tested using the acid phospatase test, which came up negative. (DE 575 at 6, 8). A microscopic search for spermatozoa was negative. (DE 575 (continued...)

positive" would have undermined the certainty of the Government testing about semen. The value in Dr. Johnson's testimony, therefore, would have been in showing that the evidence should have compelled the Government to perform the more-confirmatory sperm search.

Dr. Johnson's testing, however, did not completely discount the possibility that Bourgeois sexually assaulted his daughter. On cross-examination, Dr. Johnson admitted that a finding of "weak positive" indicated that the test had only detected a lesser amount of PSA, not that it did not find any semen. (DE 575 at 74-75, 87-88). She elaborated: "the test is designed to detect p30. But whether or not – you can make some double-checks and checks and balances based on the intensity of the color reaction, which gives you an idea of concentration or the amount of material you're dealing with." (DE 575 at 87). In other words, a weak positive indicates the amount, not the presence of, PSA. Testimony in the evidentiary from Jerrilyn Conway, an FBI forensic examiner, confirmed that "[t]he weak positive result means that there is a limited amount of PSA present, which means that there is a limited amount of semen present." (DE 576 at 13).

In that regard, Dr. Johnson's proposed trial testimony would only have reconfirmed that a substance with PSA was contained in the victim's rectum. Dr. Johnson's testimony would most benefit the defense if she could identify a substance high enough in PSA content to react with the P30 test. The testimony at trial and on post-conviction review was not completely in agreement about what materials contain PSA. Ms. Zervos did not know if substances from female could

_____

[141]    (...continued)
at 9-10). She also performed a P30 test. She explained that the P30 protein had been found in "[a]mniotic fluid . . . , breast milk, urine from men, some serum from men, and some female serum, and some female urine." (DE 575 at 13). She did not know if studies identifying the P30 protein had included two-and-a-half year old children. (DE 575 at 17, 100, 105). She explained that: "Taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on the Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." (DE 575 at 19).

contain PSA/P30. The trial testimony allowed for it to exist in females from lactation. The post-conviction record shows that the P30 antigen exists in different substances produced by both males and females. Dr. Johnson explained that it had been found in "[a]mniotic fluid . . ., breast milk, urine from men, some serum from men, and some female serum, and some female urine. (DE 575 at 13). Because the blood on JG1999's underwear tested negative for PSA/P30, and Dr. Johnson agreed that her blood could not have been the source of the substance in her rectum (DE 575 at 106-08), the substance was likely foreign to the victim's body. Not even Bourgeois' other expert, Charles Alan Keel, however, could conclusively identify a substance naturally occurring in a two-year-old infant that would contain the P30 protein. (DE 575 at 13).[142]

Problematically for Bourgeois, Dr. Johnson did not discuss the level at which PSA occurs in substances other than semen. Ms. Conway, however, explained that the P30 test was designed not to react to substances with a lower concentration of PSA than semen. (DE 576 at 10, 20-21). According to Ms. Conway, research had shown that substances such as female urine or female serum, both of which Dr. Johnson identified as a source of PSA, would not trigger a positive reaction on the P30 test. (DE 576 at 20-21). Studies have shown that PSA levels in pre-pubescent girls were not high enough to account for a "false positive." (DE 576 at 26). The only substance containing PSA at a level near that which could trigger a positive reaction was breast milk. (DE 576 at 22). Especially where the circumstances of this case do not present a circumstance where breast milk would be present in JG1999's rectum, Ms. Conway credibly explained that "if the PSA test was

---

[142]      Mr. Keel did not know if a toddler can produce the P30 antigen. (DE 575 at 129). He also opined that "there's really no such thing . . . as a false positive. . . . It's whether or not the result is coming from P30 or not." (DE 575 at 130). Mr. Keel viewed the P30 test as "a screening tool, in the same way that we use acid phosphatase . . . it's only a presumptive test." (DE 575 at 135).

positive, they can be assured that that came from semen." (DE 576 at 20). With that understanding, Dr. Johnson's post-conviction testimony still allows for the P30 reaction coming from a substance external to the victim, which still carries with it the possibility of sexual assault.[143]

Taken in the context of the trial and post-conviction record, the testimony from Dr. Johnson and Mr. Keel does not show that trial counsel provided ineffective deficient in relying on cross-examination to poke holes in the Government's forensic evidence. Here, the forensic evidence of sexual assault was not of the strongest sort, but was not inconsequential either. Given the complex scientific issues at play, and the fact that his experts could question but not conclusively eliminate the possibility of sexual assault, Bourgeois has not shown that using experts to highlight that information would have swayed the jury. In particular, the Court's observation of Mr. Keel and Dr. Johnson showed that they would not be persuasive witnesses before the jury. They identified the same errors in the testing that trial counsel had, yet bogged down their testimony with fine distinctions which did not completely discount the possibility of sexual assault. A reasonable trial attorney could certainly be concerned that a prolonged attack without a clear-cut resolution could make a minor, but highly inflammatory, issue a much more prominent feature in the jury's

---

[143]    Bourgeois hopes that Dr. Johnson's testimony would have discounted Dr. Benton's testimony treating sperm as easily degradable. Dr. Johnson criticized Dr. Benton's testimony that the sperm could have degraded over time as "totally erroneous" because "[s]perm are very durable. They can be found in decomposing bodies 30 days after" death. (DE 575 at 15, 101-02). Dr. Johnson explained that, according to their own guidelines, the FBI testing should not have allowed a conformation of sexual assault because FBI protocol only allowed identification of sperm when it was "intact, with a tail attached[.]" (DE 575 at 103). Additional experts in the hearing bolstered Dr. Johnson's testimony. Charles Alan Keel, a forensic scientist with Forensic Science Associates who "specialize[s] in the identification and genetic characterization of human body" testified that "there's no proof of semen being detected . . . in the evidence that was presented at trial." (DE 575 at 123, 127). His testimony, in essence, was that a positive P30 could not reliably predict the presence of seminal fluid without the presence of sperm. Ms. Conway, however, disagreed and stated that sperm cells will break down quickly, likely only susceptible to identification for a day. (DE 576 at 25). She expected, though, the sperm cells to survive as long as the PSA would. (DE 576 at 47).

deliberation.

For the reasons outlined above, Bourgeois has not shown that trial counsel provided ineffective assistance by not calling expert witnesses such as Dr. Johnson or Mr. Keel at trial.

### D.      Prejudice From Trial Counsel's Defense Against Allegations of Sexual Assault

To succeed, Bourgeois must also show a reasonable probability of a different result had trial counsel vigorously attacked the evidence of sexual assault. In doing so, Bourgeois would both have to (1) discount the presence of semen through a false positive on the two rectal swabs and (2) conclusively show through Dr. Johnson's testimony that Dr. Benton incorrectly identified vaginal trauma.[144]  Even if he could rebut that evidence, testimony hinted that Bourgeois committed improprieties on his daughters when he spent nights locked in a bedroom alone with them. The testimony of bruising and semen only confirmed that Bourgeois sexually assaulted JG1999.

To some extent, an aggressive challenge to the sexual-assault evidence could have opened the door to additional prejudicial information. Trial counsel had acted to prevent the Government from adducing "[a]ny evidence that the defendant may have or did sexually abuse his daughter, [AB1994]." (DE 160 at 3). The Court refused to allow the Government to adduce evidence in its case-in-chief that witnesses "saw [him] french kiss AB1994," have her sit on his lap inappropriately, and treat her like a mature adult. (DE 347 at 92, 94-95). In fact, the Court commented without rejoinder from trial counsel that "everybody in the room knows what was going on with Mr. Bourgeois and AB1994." (DE 347 at 94). An additional and aggressive challenge to the allegation that he sexually assaulted JG1999 may have allowed the Government to discuss what he had done

---

[144]      Because *Brady*'s materiality standard is "identical to" the standard for prejudice under *Strickland, Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir. 1995), the discussion that follows above also shows why Bourgeois cannot succeed on his related claim that the Government withheld information about its DNA testing.

180

to his other daughter.

Regardless, the evidence of sexual abuse was an inflammatory, but not decisive, factor in both phases of trial. Without much question, Bourgeois' sexual abuse of his daughter did not substantially impact the factors the jury had to consider reaching a verdict as to his guilt. Bourgeois expresses the most concern about the Government's reliance on sexual assault at the punishment phase. The Court's review of the trial and the evidentiary hearing testimony indicates that he has not shown a reasonable probability of a different result had trial counsel's efforts disputed the sexual-assault evidence.

As discussed above, the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois sexually assaulted his daughter. Even so, that evidence was not a pronounced feature of the trial. Even if trial counsel had conclusively rebutted the testimony from both Dr. Benton and from the other forensic experts, the jury still had already heard vivid testimony about how Bourgeois viciously abused his daughter in numerous other ways. While the evidence of sexual abuse made Bourgeois seem more selfish, uncaring, and inhuman, the jury still had before it a graphic understanding of the unrelenting abuse he heaped upon the young child. The Government's brief mention of sexual assault in the punishment phase closing argument was only another reminder that JG1999 bore the signs of her father's abuse throughout the rest of her body. While certainly similar information could unduly inflame a jury in other circumstances, Bourgeois' abusive and violent tendencies prevent any reasonable likelihood that jurors would have reacted differently in the punishment-phase had they not known that Bourgeois had raped his daughter.

In sum, Bourgeois has not shown that, had trial counsel challenged the evidence of sexual abuse in the manner he proposed, there would have been a reasonable probability of a different result. The Court will deny Bourgeois' ineffective-assistance claim based on those allegations.

181

**V.     Trial Counsel Provided Ineffective Assistance by Not Litigating a *Daubert* Challenge to Three of the Government's Expert Witnesses (claims five and six)**

As discussed at length above, the autopsy revealed that JG1999's body bore numerous and varied wounds suggesting a long, tormented series of physical assaults. The Government sought expert assistance to describe those injuries to the jury. Those expert witnesses used the autopsy photographs to chronicle the dozens of bruises, lacerations, and other wounds throughout the young victim's body. For example, forensic odontologists Dr. Senn and Dr. Chrz's testimony linked Bourgeois to bite marks on JG1999's arm and lower back. As a demonstrative device, expert witnesses relied on digitally enhancements made to the autopsy photographs by Dr. Oliver.

Bourgeois faults trial counsel for not challenging the scientific and technical reliability of (1) Dr. Oliver's use of digitally enhanced autopsy photographs (claim five) and (2) Dr. Senn and Dr. Chrz's opinion about bite mark evidence (claim six). Bourgeois asserts that, had counsel asked the Court to subject the experts' opinions to the rigors of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), their testimony would not have come before the jury. The Court finds that Bourgeois has not met his burden under *Strickland* with regard to these claims.

**A.     Dr. Oliver's Reliance on the Digitally Enhanced Autopsy Photographs (claim six)**

The Government sought the assistance of Dr. William Oliver to ascertain the extent of external injuries on the victim. Dr. Oliver, a medical doctor board certified in anatomical, clinical, and forensic pathology who also possesses a master's degree in computer science, received copies of the autopsy photographs which had been taken with a 35mm camera. Dr. Oliver digitally enhanced the autopsy photographs using a method called Contrast-Limited Adaptive Histogram Equalization ("CLAHE") which redistributed colors to accentuate certain features. For his trial testimony, Dr. Oliver created a PowerPoint presentation with three representations of many autopsy

182

photographs: the original, a digital enhancement of the original image, and the enhanced photograph with markings indicating the external injuries. Other experts relied on Dr. Oliver's enhancements.

During a pre-trial hearing trial counsel raised concerns about the use of the enhanced images, but did not lodge a *Daubert* challenge. (DE 350 at 103; DE 345 at 14). Mr. Tinker informed the Court that his particular concern was that the photographs were more prejudicial than probative, not that Dr. Oliver's testimony lacked reliability. (DE 345 at 30). The Court told the parties that it would like to hear about Dr. Oliver's methodology before his enhanced photographs came before the jury. (DE 350 at 103-04).

Before Dr. Rouse began her testimony in the guilt/innocence phase that would use the enhanced photographs, the Court again said it wanted to hear about "whatever [Dr. Oliver's] expertise is on this enhanced picture taking." (DE 346 at 174). Dr. Oliver testified outside of the jury's presence about the enhancement of the photographs. (DE 345 at 7-9). As Dr. Oliver began discussing the digital enhancements, the Court asked if his imaging technique had been peer reviewed, which he said it had. (DE 345 at 14). Dr. Oliver outlined the process he used to accentuate the external injuries. He explained that his method of image processing changed the relative value or prominence of features already visible in the image. (DE 345 at 17). Mr. Tinker asked if "this is something that you do, or are there other people in the country that do this kind of thing?" (DE 595 at 29). Dr. Oliver described a "long history of all this" and referred to "contrast enhancement in the 1960s for bite mark analysis. So the general practice of doing image processing to evaluate imagery is actually fairly old." (DE 595 at 29). The specific technique he used "has been in use since the mid 1980s." (DE 595 at 30).

Nevertheless, Dr. Oliver stressed that his forensic conclusions came from the original photographs, not the enhancements. He stated that his "conclusions are based on going back to the

183

original image" and that the CLAHE technique only served to "make features in an image more obvious." (DE 345 at 13). When he later testified before the jury, he reiterated that "you don't want to draw conclusions from" the enhanced images but you must "go back to the previous image." (DE 345 at 26). The trial court allowed the admission of the enhancements "as an aid to the jury." (DE 345 at 30). Other witnesses, most notably Dr. Senn and Dr. Chrz, used Dr. Oliver's enhanced images to accentuate the injuries they identified. Only the unenhanced autopsy photographs went with the jury into deliberations. (DE 345 at 33).

Bourgeois claims that Dr. Oliver's method of enhancing the autopsy photographs is not reliable or scientifically endorsed. The Federal Rules of Evidence and the Supreme Court's *Daubert* jurisprudence govern the admission of expert testimony. Both essentially require that expert testimony be reliable and relevant. Bourgeois' attack on Dr. Oliver's testimony does not allege that all digital enhancement of photographic evidence violates scientific principles. Instead, Bourgeois claims that the specific CLAHE technique Dr. Oliver utilized has not been peer reviewed, distorts the original image, and otherwise insert a degree of unreliability into the expert's analysis. Bourgeois also contends that trial counsel should have sought expert assistance to dispute the Government's reliance on the enhanced images. To that end, Bourgeois has adduced significant technical evidence criticizing Dr. Oliver's methodology.

However, this Court's analysis cannot stray far from *Strickland*'s inquiry into what trial counsel should have done and how it would have made a difference at trial. The ultimate inquiry is not an expert's strict compliance with scientific principles or paradigms, but *Strickland* performance and prejudice.[145] With that in mind, the Court only needs to summarize the highly

---

[145]    In his answers to the interrogatories, Mr. Tinker stated: "I reviewed the government's

(continued...)

detailed evidence in order to conclude that Bourgeois has not met *Strickland*'s deficient performance or actual prejudice prong on these claims.

Bourgeois primarily relies on three sources to challenge Dr. Oliver's CLAHE technique. First, Bourgeois put forward C. Michael Bowers, a forensic odontologist and dentist, as an expert in photo imaging and enhancement. Dr. Bowers prepared a report that coupled his review of the CLAHE method with his own examination of the *Daubert* analysis. In the hearing, however, Dr. Bowers revealed that his expertise with digital enhancement came from "weekend courses in [his] town . . . put on by . . . the junior college." (DE 598 at 40). His scientific works on the subject consisted of a book he self-published. Dr. Bowers is not expert in image enhancement.[146] As the Court will discuss with respect to his testimony about the bite mark evidence, Dr. Bowers was also not a credible witness.

Second, in the hearing Bourgeois called United States Army Colonel J. Curtis Dailey, DDS, who the Government had initially consulted as a witness in this case, to testify about the use of the enhancements for identifying bite marks. Dr. Dailey opined that he had never seen Dr. Oliver's CLAHE procedure used before. (DE 597 at 425). Dr. Dailey, however, is not an expert in digital enhancement. As the Court will discuss at greater length below, Dr. Dailey's self-interest clouds his credibility in this case.

Finally, in a report bearing the names of Michael Cherry and Manfred Schenk, Bourgeois also

---

[145]    (...continued)
evidence and reports; and personally met and interviewed the government's experts. I believe I had an expert review the evidence, but at this time, I do not recall who that person was."

[146]    To the extent that he testified from his use of digital enhancements, he explained "Digital enhancement standards at this point are actually quite lax, even with the study working groups that they've established." (DE 598 at 81).

185

included a report from CherryBiometrics criticizing Dr. Oliver's enhancement of the photographs. The report states that Dr. Oliver's use of CLAHE

> disort[ed] almost everything in the newly created image. There is no way to know whether his enhancements distorted the areas he claims he improved. Therefore his enhanced images cannot be used as a fair and accurate building block to analyze bite marks or 'injuries' that were not visibly present in the original autopsy photographs.

The report noted problems with Dr. Oliver's approach, including that he used a substandard scan of the original photograph, changed the image into inaccurate shapes and colors, lost information in the file structure of the images, and further distorted the images when converting them into a PowerPoint program. (DE 397, Exhibit 43 at 3). Bourgeois also presented testimony from Manfred Schenk, one of the co-authors of the report from Cherry Biometrics through a videotaped deposition. The Government objected to his qualification as an expert in digital imaging. (DE 609, Deposition of Manfred Schenk, at 18). Mr. Schenk complained that a loss of detail and accuracy could accompany Dr. Oliver's techniques.

As a counterbalance to Bourgeois' evidence, the parties also deposed Dr. Oliver, who defended his technique and explained his demonstrative use of the photographs.

The Court's summary only captures the briefest outline of the sizeable evidence Bourgeois has amassed to denigrate Dr. Oliver's enhancement technique. The wide-ranging development of this claim, however, threatens to side-rail the focus from what happened at trial. The knowledge that Dr. Oliver's digital enhancement technique somewhat distorts the resultant image is not new. At trial, Dr. Oliver explained how his process left "artifacts" or otherwise compromised portions of the image in order to enhance others. (DE 345 at 203). Alterations in the enhanced images were apparent to the Court and the jury through Dr. Oliver's three-part presentation in which the jury saw the original image, the enhancement, and the enhancement with the injuries marked. Even without

186

the layers of expert testimony from post-conviction review, Dr. Oliver has never denied that his CLAHE method alters the original image.

The question is how the enhancements affected the data upon which Dr. Oliver based his expert opinion, that is, the identification of the injuries Bourgeois inflicted. Dr. Oliver's use of the images has caused the parties to see the nature of his testimony differently. The Government considers the heart of Dr. Oliver's opinion to rest on his observations and conclusions drawn from the original photographs, with the digital enhancements serving as a demonstrative aid whose formation does not fall under *Daubert*'s strictures. Bourgeois instead views the enhancements as the foundational basis for Dr. Oliver's expert opinion, subjecting their creation to the rigors of *Daubert*.

It is obvious from the trial transcript and post-conviction hearing record that Dr. Oliver's trial opinions rested on observations he made from the original autopsy photographs. At trial, Dr. Oliver emphatically told the jury that if

> you notice a feature in one of these images, go back and look at the original. If you don't see it in the original image, it doesn't matter who says it's there, if I say it's there or anybody else says it['s] there. If you don't see it in the original image, don't believe them. It's that simple. This isn't rocket science.

(DE 345 at 204). In his deposition Dr. Oliver reiterated that he only counted injuries observable on the original autopsy photographs. (DE 609 at 31). Simply, the original photographs, not the challenged enhancements, formed the basis for his expert assessment. As Bourgeois has not seriously challenged Dr. Oliver's expertise to identify external injuries from autopsy photographs, he has not raised any concern that would have prevented Dr. Oliver from testifying.

Moreover, Dr. Oliver's digital enhancements were not the genesis for the claim that Bourgeois physically assaulted JG1999. The enhanced digital images were not by far the only

187

evidence that Bourgeois tormented his young daughter with extensive abuse. Dr. Oliver's testimony only served to reconfirm observations made by medical personnel when JG1999 arrived at the hospital. Ms. McLaughlin, the registered nurse who could not perform a typical head-to-toe examination because of her serious condition, observed numerous pattern injuries and bruising throughout JG1999's body. The original autopsy photographs themselves undeniably confirmed the graphic testimony recounting Bourgeois' abuse. Dr. Rouse's autopsy report included a section listing "injuries indicative of chronic abuse" with included a litany of severe trauma throughout the victim's body. In addition, Dr. Rouse observed deep tissue bruising when she cut into JG1999's body. Dr. Benton described the numerous wounds he observed in the unaltered autopsy photographs. An FBI agent describing visiting JG1999 in the hospital and observe bruising, whip marks, burn marks, and other extreme injuries. (DE344 at 176). Importantly, AB1994 provided a detailed account of Bourgeois' savage abuse that meshed seamlessly with the injuries highlighted in the digital enhancements. Removing the digital enhancements from the evidentiary equation would not have measurably changed the case before the jury.

Bourgeois' highly technical challenge to Dr. Oliver's digital enhancement obfuscates the sources, nature, and pervasiveness of the evidence showing that Bourgeois viciously abused his daughter. Given the fact that Dr. Oliver based his conclusions on the original autopsy photographs and in light of the mountain of additional evidence showing harsh physical abuse, Bourgeois has not shown *Strickland* deficient performance or prejudice respect to counsel's failure to raise a *Daubert* challenge to Dr. Oliver's digital enhancements. Any alleged error by trial counsel by not litigating a *Daubert* challenge did not call into question the fundamental fairness of either phase of trial.

188

**B.      Testimony from Dr. Senn and Dr. Chrz Concerning Bite-Mark Evidence (claim five)**

Bourgeois claims that trial counsel should have raised a *Daubert* challenge to the two experts – Dr. Senn and Dr. Chrz – who linked Bourgeois to bite marks found on JG1999's right arm and on her back just above the waist. As discussed below, strong evidence showed that Bourgeois was the one who bit his young daughter. Bourgeois has not presented any credible evidence that would undercut the trial testimony.

Dr. Rouse had testified that she observed multiple bite marks on the victim. (DE 345 at 156). In particular, Dr. Rouse described two "arched contusions, contusions that are, you know, this type of shape, that have discrete areas that are consistent with a bite mark . . . on the right forearm, and then one on her left flank . . . [j]ust kind of the side between her belly and her back, lower." (DE 345 at 174). Dr. Rouse testified that she took pictures of the bite marks. (DE 345 at 175-76).

Before trial, the Government had sought the assistance of United States Army Colonel J. Curtis Dailey, a consultant for the Armed Forced Institute of Pathology, to analyze the bite-mark evidence, but did not call him as a witness. Using only a portion of the available photographic evidence, Dr. Dailey compared dental casts taken from Bourgeois, Robin and AB1994 to the bite marks. Dr. Dailey could not "rule in, or rule out" Bourgeois, Robin, AB1994 "as the possible biter."[147] (DE 397, Exhibit 45). Dr. Dailey did not testify at trial. He did, however, try to bill the

---

[147]      Dr. Dailey explained that he could not include or exclude any of the three because the bite marks had diffuse presentation in the photographs, the bite marks were in distorted positions, the ruler in the photographs was in a different spatial plane than the marks, and the three individuals' dentition had similar metric and spatial pattern relationships. (PX-140 at 1). Bourgeois provided an affidavit from Dr. Dailey with his section 2255 motion. Dr. Dailey stated that, when he told the Government the results of his analysis, Assistant United States Attorney Booth was "irate" and told him that Bourgeois "was a really bad man." When he told her that information was irrelevant to his analysis, "she then told [him] that if [he] could not help her she would go out and find an expert who

(continued...)

189

Government for his work on this case. He also apparently tried to secure an appointment as an expert witness once his commission ended.

The Government sought the opinion of additional forensic odontologists, Dr. Senn and Dr. Chrz. Dr. Senn's role was twofold: (1) determine whether the injuries were indeed bite marks and, if so, (2) determine which of the individuals with access to JG1999 he could exclude as a possible biter. (DE 345 at 254-56). Dr. Senn testified that the injuries on her arm and back were consistent with bite marks. (DE 345 a 250, 252). Comparing models taken from the three potential biters, Dr. Senn could not exclude or include any of them from biting JG1999 on the arm. (DE 345 at 274). He could, however, exclude Robin and AB1994 from biting her on the back. (DE 345 at 279).

The American Board of Forensic Odontology Guidelines for Bite Mark Analysis require a second opinion. (DE 345 at 283-84; DE 388 at 28). Dr. Senn sent the photographs and dental models to Dr. Chrz, who is also a dentist and an expert in forensic odontology. Dr. Chrz conducted a similar bite mark analysis but utilized a technique called grey scale shading that allowed identification with greater detail. (DE 345 at 297-312). Dr. Chrz also identified the injury on JG1999's arm as a probable bite mark and excluded Robin and AB1994 as the one who left the bite on JG1999's back. (DE 345 at 311). Because this was a "closed situation" where only the three people in the truck could have bitten JG1999, Dr. Chrz explained that only left Bourgeois "as a suspect capable of causing the pattern injury that is seen on her back." (DE 345 at 311).

Well before trial counsel Mr. Tinker met with Dr. Senn and questioned him about his findings. (DE 388 at 28). Mr. Tinker was not unfamiliar with forensic odontology. During a hearing Ms. Booth told the Court that Mr. Tinker's pre-trial questioning of Dr. Senn was "brilliant"

---

[147]    (...continued)
could help her." (DE 397, Exhibit 45; DE 597 at 426-27).

190

and that he had been "the very first Prosecutor in the State of Texas to get a conviction with bite mark evidence[.]" (DE 388 at 36). Trial counsel considered whether to challenge Dr. Senn's and the other experts' qualifications through *Daubert*, but informed the Court that they had instead chosen to just attack the substance of their opinions. (DE 388 at 38-42). Trial counsel filed a motion in limine asking that Dr. Senn only be allowed to testify "to a medical certainty," not that they "might be or could be or probably are teeth marks." (DE 160 at 3).

Bourgeois launches two attacks on the bite-mark evidence. First, Bourgeois claims trial counsel should have objected to Dr. Senn and Dr. Chrz's testimony because the science of forensic odontology is not sufficiently reliable under *Daubert*. Second, assuming that a court can consider bite-mark evidence, Bourgeois asserts that the science would not have pointed to him as the one who bit the infant girl. The Court will only discuss Bourgeois' claim briefly because, in the context of the testimony he adduced in the hearing and the trial record, he has not made a colorable showing of possible merit.

Bourgeois supported his Motion to Vacate with a report in which Dr. Bowers assumed expertise in digital imagery, made legal conclusions about *Daubert*'s application, and denigrated the relevance of his profession in court. He wrote:

> [B]oth experts otherwise adhere to the general rules and methods of their forensic board, the ABFO. The acceptability of methods does not impact, however, on analytical judgment and interpretation of the evidence. In my opinion, the limits of the bitemark evidence in <u>Bourgeois</u> have been ignored by both of my colleagues. The methods they used are inappropriate and not relevant to the injuries on the child's body.

(DE 397, Exhibit 52 at 3). Dr. Bowers was not a credible witness. Aside from his claim to be an expert in an area for which he had no expertise, he also assumed too much when he presumed as a forensic odontologist that he could inform the Court whether the Government's testimony should

191

have been excluded under *Daubert*. His decision to educate the Court on legal conclusions reflects his testimony in the evidentiary hearing. His testimony was condescending and argumentative. His testimony was slippery; he evaded giving answers that would not benefit Bourgeois.[148] Most troubling, the essence of Dr. Bowers' testimony was that forensic odontology's only role in criminal cases was to identify something as a bite mark, without attempting to identify who may have or may not have been the biter. (DE 598 at 109). On cross-examination, Dr. Bowers admitted that he did not know of any other forensic odontologist in the nation who was testifying in court that bite mark evidence is not reliable. (DE 598 at 85-86). To his knowledge, bite mark evidence has never been excluded in a case. (DE 598 at 86).[149] Dr. Bowers' testimony – both in general and relating to the specific factors a competent odontologist would consider in this case – was not credible or even useful to the Court. His testimony would not have resulted in the exclusion of Dr. Senn or Dr. Chrz under *Daubert*.

Bourgeois has not raised a credible attack on Dr. Senn or Dr. Chrz's conclusions. Aside from Dr. Bowers, Bourgeois relies on Dr. Dailey's testimony not to exclude Robin or AB1994 as possible biters. From the trial record and the evidentiary hearing, it was apparent that Dr. Dailey had not

---

[148] For instance, Dr. Bowers agreed that bite mark evidence is generally reliable for the purposes of excluding individuals as the biter, (DE 598 at 87), but refused to do so in this case. He carefully selected problems Dr. Senn had noted with forensic odontology without giving voice to guiding themes such as: "Bite mark analysis is too important and valuable to the investigation and adjudication of certain crimes to be discounted or overlooked" and "The use of bite mark analysis to exclude suspects is powerful and important." (DE 598 at 94-95). Aside from his conclusion about the evidence in this case, cross-examination showed that Dr. Bowers' testimony in another case shifted after one party agreed to pay him. (DE 598 at 109-13). In that case, Dr. Bowers apparently initially refused to exclude as a biter a man who had no teeth. (DE 598 at 110). He admitted that he gave "incorrect" testimony under oath in that case. (DE 598 at 112-13).

[149] At the same time he criticized the foundational aspects of Dr. Senn's testimony, Dr. Bowers asserted that he had no reason to question Dr. Senn's integrity and his reasons for coming to his conclusions in this case. (DE 598 at 118).

192

considered the whole of the evidence in this case. He based his conclusions on a limited amount of information. Worse, his request for reimbursement for his services while a government employee taints his testimony with self-interest. Even in his live testimony, Dr. Oliver did not appear credible. Neither of Bourgeois' post-conviction witnesses would have been persuasive in any way to the jury.

Even if trial counsel should have made the challenge to the bite-mark evidence that Bourgeois proposes, he has not shown a reasonable probability of a different result. Again, prolonged discussion of highly technical scientific factors cannot brush aside the heart-wrenching testimony the jury heard. Bourgeois brashly, and incorrectly, argues that "[t]he bite marks found on the victim cannot be traced to [him] with certainty any greater than guess work." (DE 459 at 2). AB1994's trial testimony is conspicuously absent from Bourgeois' discussion of prejudice on these claims. AB1994 provided vivid testimony showing that Bourgeois often bit JG1999.

AB1994 described how she saw her father bite JG1999's feet "[m]any times" until she would cry. (DE 245 at 14). Bourgeois never bit any of his other daughters, but he bit JG1999's hands until they got "ugly." (DE 245 at 15). AB1994 recalled that her father even bit JG1999 on the head: "He just opened his mouth wide, and he just started biting her right there." (DE 245 at 23). AB1994 testified that JG1999 wore socks "[b]ecause she was bitten all up, and her feet looked bad." (DE 346 at 3). She elaborated:

| The Government: | Okay. Did you ever see your dad hit her while she was sitting on the potty? Or do you remember? |
| AB1994: | I don't remember. |
| The Government: | Okay. Did you ever see her bleeding after your dad hit her? |
| AB1994: | When he bit her. |
| The Government: | Okay. And when he bit her, what do you mean? Where did he bite her? |

| | |
|---|---|
| AB1994: | Right on the forehead. |
| The Government: | How about her hands? Did you see her bleed when he bit her on the hands? |
| AB1994: | A little. |
| The Government: | How about her feet? Did you see her bleed when he bit her on the feet? |
| AB1994: | Yes. |

(DE 346 at 5). Even if trial counsel could have prevented Drs. Senn and Chrz from testifying, AB1994 had already provided emotionally wrenching testimony that Bourgeois repeatedly bit JG1999's feet and hands making her cry out in pain. The fact that AB1994 did not mention that Bourgeois bit JG1999 on the arm and back would aid the defense little in light of the unimpeached testimony of his ruthless biting elsewhere on the infant. The Court finds that Bourgeois has wholly failed to prove deficient performance or prejudice with respect to this claim.

## VI.   The Government Violated its Duty under *Brady v. Maryland*, 373 U.S. 83 (1963), by Failing to Disclose That the Government Promised Inmates Some Benefit for Testifying Against Bourgeois (claim seven)

Bourgeois' seventh claim alleges that the Government breeched its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to provide exculpatory evidence to the defense. "[T]he special role played by the American prosecutor in the search for truth in criminal trials" encourages the full disclosure to the defense of all exculpatory or impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.'" *Banks v. Dretke*, 540 U.S. 668, 697 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Bourgeois asserts that the Government breeched its duty to reveal deals it

194

allegedly made with inmate witnesses.

The Government relied on inmates to relate incriminating statements Bourgeois made while incarcerated before trial. In his Motion to Vacate, Bourgeois argued that the Government secured the testimony of four inmates – Adam Longoria, Orlando Campos, Wiley Taylor, and Darick Moore[150] – by making them promises that they did not divulge to the defense. At the time of trial, Longoria faced state drug charges and Campos was serving a 12-year state sentence. Taylor and Moore had not yet been sentenced on federal drug charges.[151] The inmates' collective testimony showed that Bourgeois said he killed his daughter and was going to make it look like an accident, admitted to beating his wife and the victim, had alleged drug trafficking connections, and had ordered hits from prison. The Government verified Bourgeois' ordering of hits from his prison cell through notes he passed to Longoria. (DE 348 at 159).

The parties questioned each of the inmates about what benefit they expected to receive for their assistance. Longoria and Campos testified that the Federal Government could not help with their state court cases. (DE 344 at 216; DE 348 at 167, 184-86). Longoria, in fact, explicitly stated that he did not expect the United States Government to "come in and testify on [his] behalf that [he] cooperated[.]" (DE 348 at 186). Campos agreed that the Government "told [him] clearly" that they "can't reduce [his] time," but he still "hop[ed] that [the Government] will relay to authorities that [he] came in and testified in a murder case[.]" (DE 344 at 216, 223-26). Moore and Taylor

---

[150] The pleadings, transcripts, and record provide various spellings for Moore's first name.

[151] At the time of trial, Moore had pleaded guilty to a federal charge of possessing with intent to distribute cocaine base but he had not yet been sentenced. (DE 344 at 200). Taylor had pleaded guilty to a charge of conspiracy with intent to distribute more than 50 grams of methamphetamine, but had not yet been sentenced. (DE 344 at 228)

explained that they hoped the Government would ask for a downward departure of their sentences because they cooperated against Bourgeois. (DE344 at 202-03, 209, 231). Bourgeois now argues that he can prove that the Government promised to help each of the men in exchange for their testimony.

Three essential elements compose a valid *Brady* claim: "'The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks*, 540 U.S. at 691 (quoting *Strickler*, 527 U.S. at 281-282). Here, Bourgeois claims that the alleged Government deals would have impeached the inmates' testimony. Without question, impeachment evidence "falls within the *Brady* rule[.]" *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Giglio v. United States*, 405 U.S. 150, 155 (1972) ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [a witness'] credibility and the jury [is] entitled to know of it.").[152]

### A.     No Evidence of Concealed Deals with Government Witnesses

Bourgeois did not call any of the inmates in the federal evidentiary hearing.[153] Without direct

---

[152]     For the first time in his Memorandum of Law in Support of Motion for Relief Pursuant to 28 U.S.C. Section 2255, Bourgeois argues that the Government's failure to disclose deals with its witnesses violated its affirmative burden to correct testimony which it knows to be false under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Supreme Court has not yet decided whether a *Brady* claim is distinct from a false-evidence claim. *See Banks v. Dretke*, 540 U.S. 668, 690 n.11 (2004). Courts generally assume that a *Napue/Giglio* claim has three components: "(1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004). For the same reasons discussed above, Bourgeois has not shown that the witnesses gave false testimony or that their testimony was constitutionally material.

[153]     Bourgeois, knowing that he was in custody in Kansas, sought a subpoena for Longoria
(continued...)

196

testimony from the inmates, Bourgeois' *Brady* claim rests on an uncertain foundation. Bourgeois largely supports his *Brady* claim on hearsay statements from others and inferences. "[S]peculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim." *Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004); *see also Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (denying a *Brady* claim based on "mere speculation"); *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999) ("[S]peculation does not support a *Brady* claim.").

Bourgeois did not adduce any evidence in the hearings suggesting that the Government concealed any agreement with Moore, Taylor, and Campos. The evidence does not hint that the Government made undisclosed deals with those inmates. Bourgeois claims that the two federal inmates – Taylor and Moore – more than hoped for a downward departure; the Government had promised to ask for a reduced sentence. Bourgeois has apparently abandoned his allegations regarding Taylor.[154] Bourgeois did not call Moore in the evidentiary hearing, but rests on a declaration in which Moore claimed that: "[Ms. Booth] told me if I testified against Bourgeois she would contact my prosecutor, Lance Duke, and make sure that my sentence was reduced." (DE 402, Affidavit/Declaration of Darrick Moore dated September 18, 2007, Exhibit 67). The facts reveal that

---

[153]  (...continued)
to appear. Bourgeois did not request that the Court issue a writ requiring the officials in Kansas to release Longoria to federal custody for his testimony. (DE 598 at 23, 30-33). The United States Marshals tried to serve subpoenas on Campos and Moore, but Bourgeois had not provided them with an accurate address. (DE 598 at 77). Bourgeois forfeited his opportunity to have those individuals testify.

[154]  In his Motion to Vacate, Bourgeois claimed that the Government entered into an undisclosed deal with Wiley Taylor. (DE 396 at 107-09). His Memorandum of Law in Support of his Motion for Relief does not mention Taylor. Bourgeois has not adduced any evidence showing that the Government engaged in a deal with Taylor. Bourgeois seems to have abandoned his claim with respect to Taylor.

197

he received a lighter sentence partially because of his assistance in this and another case.[155] Yet Bourgeois has not shown that a plea agreement or other formal understanding existed between Moore and the Government. The defense and the jury knew that Moore expected to receive something for his testimony. Bourgeois has not shown that the Government substantially withheld any additional promise that induced his testimony.

With respect to Campos who was serving a 12-year sentence for a drug charge in state court, Bourgeois claims that either Ms. Booth or an FBI agent promised Campos they would help him get a reduced sentence if he testified. According to Bourgeois, Campos was paroled after only serving three years of that sentence. Yet he has not provided a declaration, affidavit, or other competent statement from Campos detailing any promise from the Government that resulted in his testimony or his early release from State custody.[156] Bourgeois instead relies on an affidavit from an investigator who purports to relate what Campos told her. (DE 397, Declaration of Kathleen Kaib dated May 14, 2007, Attachment 30). Bourgeois has not shown how her hearsay account could be admissible. He has not otherwise verified what the investigator alleges Campos said. Bourgeois bases his claim relating to Moore entirely on speculation.

---

[155] Moore was sentenced on April 25, 2004. Assistant United States Attorney Lance Duke recommended that Moore receive 75 months where the original guidelines range was 151 to 188 months because of Bourgeois' assistance in this and another case. Also, the Government noted that Moore had experienced "a great deal of coercion and harassment by his fellow inmates for testifying on behalf of the Government." (*United States v. Moore*, C-03-CR-75 [S.D. Tex.], DE 41 at 6). Recognizing Moore's assistance in the instant case, this Court sentenced Moore to 65 months. AUSA Duke later filed a Motion to Reduce Sentence Pursuant to Rule 35(b) based on Moore's substantial assistance in another case.

[156] Ms. Booth did, however, communicate to Campos that: "The best thing I could do for you would be to tell the authorities that you cooperated here." (DE 646 at 198). Nevertheless, at trial she thought that nothing could be done to reduce Campos' sentence. (DE 340 at 56-57). In the end, she assured: "I promised him nothing." (DE 340 at 57).

Bourgeois has provided the most evidentiary support for his claims relating to Longoria. Longoria has provided a declaration in which he claims that AUSA Patti Booth said "she could not provide me anything now but after I testified she would be happy to help me in the future with my case or parole." Longoria claims that the state prosecutor in his case, James Sales, and his trial attorney, William May, each knew about the deal he made with the Government. Bourgeois claims that a letter Ms. Booth later wrote to the Texas Board of Pardons and Paroles confirms that she entered into a deal with him.

Bourgeois, however, has not verified Longoria's story. Bourgeois subpoenaed Longoria as a witness in the evidentiary hearing. Longoria did not appear, which is unsurprising as he currently faces state capital murder charges in Kansas. Bourgeois called other witnesses in an attempt to confirm Longoria's story, but their testimony did not show that the Government concealed a deal with him. For example, Bourgeois called Longoria's former girlfriend as a witness to provide hearsay recitations about what he allegedly said contemporaneous with trial.[157] She testified that Longoria told her several times that "he was planning on trying to make a deal [with prosecutors] so he can get out early to be with [her] and [their] baby." (DE 598 at 26-27). However, she had no personal knowledge if Longoria actually made a deal. She did not have any direct knowledge about any agreement; she only knew what Longoria told her. (DE 598 at 28). Her recitation of hearsay statements carries little weight, especially after she testified that Longoria was a liar. (DE 598 at 28, 30). She did not know if Longoria was being truthful when he claimed that he was going to cut a deal with prosecutors. (DE 598 at 30).

---

[157] Bourgeois also wanted another inmate to provide hearsay testimony about what he heard Moore say. (DE 598 at 255-56). The Court disallowed the presentation of hearsay testimony.

Longoria's former attorney Mr. May appeared in the evidentiary hearing by video.[158] Mr. May's testimony credibly established that the Government never promised to do anything on Longoria's behalf. (DE 655 at 14). Mr. James Sales, the prosecutor who handled Longoria's state case, testified that he did not remember having any communication with the Government prior to Longoria's sentencing. (DE 655 at 29). He explained that the State's plea agreement with Longoria had nothing to do with Bourgeois' case. (DE 655 at 32). Ms. Booth never told Mr. Sales that she made a deal with Longoria. (DE 655 at 39).

Importantly, Ms. Booth explained on the record that she did not offer Longoria any benefit for his testimony. (DE 655 at 79). At one point before his testimony Longoria hinted that he wanted help with his state case, but Ms. Booth clearly told him that she would promise him nothing. (DE 655 at 85-86, 100). She did not tell Mr. May that she would do anything to help his client. (DE 655 at 99). Years later, another attorney requested that she write a letter on Longoria's behalf to the

---

[158]     Mr. May testified that AUSA Booth contacted him and asked for permission to speak with Longoria. (DE 655 at 7). Longoria told Mr. May that he was "going to be a witness and that he hoped that Ms. Booth would eventually give him some benefit from that." Mr. May responded that, in his experience, "generally you would get some benefit from that, but what it would be, I had no way of knowing and we'd just have to wait and see, since she was not a state court prosecutor." (DE 655 at 9). Mr. May then filed a continuance in Longoria's criminal case, hoping that, with all of the evidence against Longoria, holding off trial until after the Bourgeois trial would allow him to seek some benefit from the state court. (DE 655 at 10). Mr. May explained what then happened:

> When I went into court, I approached the state court prosecutor, James Sales. I asked him if he had had a chance to talk to Patti Booth about the case. He said that he had. I asked him what he was going to recommend. He told me seven years on each case, concurrent with one another, and that he would be willing to drop it down to five years if Mr. Longoria testified against a different Defendant in a potential state court case. I can't recall who that target was. And I conveyed that to Mr. Longoria, and he accepted the offer.

(DE 655 at 11). On cross-examination Mr. May explained that Longoria only hoped to receive some benefit; the Government had not promised a quid pro quo deal. (DE 655 at 13-14).