Parole Board, which she did. (DE 655 at 83). She had never promised to do that and her actions after trial did not retrospectively trigger *Brady*.

In all, Bourgeois has not brought forth any credible evidence that would show that the Government promised to help Longoria in return for his testimony. Mr. May, Mr. Sales, and Ms. Booth's testimony credibly proved that the Government did not make a deal with Longoria. There is absolutely no factual basis for the *Brady* claim based on the four inmates' testimony.

## B. Materiality

Notwithstanding Bourgeois' failure to meet the first two prongs of the *Brady* analysis, the Court likewise finds that he has not shown that any alleged suppression of information was material. The *Brady* materiality standard requires a defendant to show a "reasonable probability of a different result." *Kyles*, 514 U.S. at 434; *see also Bagley*, 473 U.S. at 682 ("The evidence is material only of there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."). A court must ask whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).[159] The Court considers all alleged *Brady* violations collectively. *See id.* at 421-22; *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000).

"[M]ateriality is a fact-intensive examination done on a careful, case-by-case basis." *Banks v. Thaler*, 583 F.3d 295, 322 (5th Cir. 2009). In the guilt/innocence phase, the Government called the inmates to provide testimony on main two points: (1) Bourgeois had caused his daughter's death

---

[159] This standard corresponds to *Strickland*'s requirement that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

201

and (2) he told Robin Bourgeois to lie about the source of the toddler's injuries.[160] The inmate witnesses were far from the centerpiece of the Government's case. *See United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."). Other testimony strongly confirmed that Bourgeois, despite his attempts to pin the murder on Robin, killed JG1999. In addition to forensic evidence and circumstantial factors substantiating the case against Bourgeois, AB1994 convincingly told the jury that her father beat JG1999 against the truck window. Both Robin Bourgeois and AB1994 testified persuasively that Bourgeois had ordered them to fabricate an explanation for the toddler's death. The additional evidence more that corroborated the inmates' testimony, it eclipsed their brief statements and provided a strong independent basis for Bourgeois' conviction. Bourgeois has not shown that the alleged *Brady* errors were material to his conviction.

In addition to emphasizing guilt/innocence testimony about Bourgeois' callous boasting about the murder, *see Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1784 (2009) ("Evidence that is material to guilt will often be material for sentencing purposes as well[.]"), the Government called the inmates in the penalty phase to emphasize Bourgeois' lawlessness and propensity toward violence. Some of the other testimony in the penalty phase covered the same ground as that provided by the inmates. For instance, the inmates' testimony established that Bourgeois had physically

---

[160] Moore explained that, while Bourgeois initially claimed that JG1999's death was an accident, he later claimed that she was a "bad child" who would shake her butt all the time." (DE 344 at 205-06). Bourgeois told Moore he whipped JG1999 with an extension cord and otherwise abused her. (DE 344 at 206). Bourgeois told Taylor that he killed the victim, Robin did not keep to their agreed-upon story, and he previously beat his wife. (DE 344 at 230). He called JG1999 "that fucking baby." (DE 344 at 231). Campos testified that, after telling one story, Bourgeois said that he "hit his little girl and that him and his wife . . . had a plan to go by and make it look like she had fell out of his 18-wheeler." (DE 344 at 219). Campos also testified that Bourgeois admitted to beating his wife. (DE 344 at 220).

202

abused his wife. Other witnesses, including Bourgeois' former wives, more vividly and dramatically expounded on Bourgeois' habitual violence against women. Robin's own mother provided detailed testimony about how Bourgeois abused her daughter. Also, other witnesses, including Robin, confirmed that he had issued violent threats from his prison cell. Also, Bourgeois' calloused statements about his young victim only echoed the indifferent attitude he repeatedly showed to her passing. The inmates' testimony largely repeated themes more vividly developed elsewhere in the Government's case. The inmates' testimony only showed that Bourgeois made efforts to actualize the threats he had already made. "[W]hen the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

To the extent that the inmates' testimony provided the only information about some issues, Bourgeois has not shown that any alleged *Brady* error impinged on the fairness of his trial. For instance, no other witnesses testified that Bourgeois had drug connections. In the entire context of the penalty phase, however, Bourgeois' drug running was only one piece of a detailed picture of his criminality. The jury had to consider more relevant acts of violence, such as his repeated and heartless aggression toward women and children. In the entire context of the highly incriminating case for a death sentence, the inmates' testimony only played a minor theme.

Even then, the inmates did not come before the jury unblemished. Trial counsel's opening argument accused the inmates of "look[ing] around [to] find somebody else to serve their time." (DE 216 at 5). Trial counsel extensively questioned each inmate about their lengthy criminal records. (DE 344 at 209-10, 232-33, 271-72; DE 348 at 167-68, 177-79). Trial counsel probed the inmates' incentive to testify for the Government. (DE 344 at 235). Trial counsel's closing argument hammered that the inmates were men who had committed crimes, were not trustworthy, and "were

paid or hoped to be paid" for their testimony. (DE 339 at 30-31). Trial counsel argued that they "are liars" who, when arrested, "try to find "someone else to serve their time." (DE 339 at 30). Whatever impeachment may have resulted from confirming the alleged deals only would have added one more layer of concern to what trial counsel already put before the jury.

Given the whole evidentiary landscape against Bourgeois, the corroborating evidence that verified the inmates' testimony, and the minor effect of the evidence unique to their testimony, the Court find that Bourgeois has not shown that, "had the evidence [of an alleged deal] been disclosed to the defense, the result of the proceedings would have been different." *Bagley*, 473 U.S. at 682. The Court will deny Bourgeois' *Brady* claim.

## VII. Trial Counsel Labored under a Conflict of Interest Because of His Representation of Clients Associated with this Case (claim eight)

Apart from his other arguments about trial counsel's representation, Bourgeois also claims that conflicting interests prejudiced his attorneys' ability to defend him zealously. This is not a case where trial counsel actively represented multiple defendants with competing interests. Nor did trial counsel's current or former clients testify against Bourgeois. Instead, Bourgeois' conflict-of-interest claim arises out of three circumstances involving his attorney, Mr. Gilmore:

- Mr. Gilmore had previously represented Ross Griffin in a federal criminal action. Bourgeois alleges that Griffin acted as a jailhouse informant for the Government. Bourgeois states that Griffin "had been offered favorable treatment to cooperate against [him]." (DE 396 at 110). Griffin never testified against Bourgeois.

- Mr. Gilmore had called Adam Longoria as a witness in the trial of another criminal defendant.[161]

---

[161]     In that case, Longoria apparently related conversations he heard while residing on the same cell block as Bourgeois, though Bourgeois does not allege that the testimony in that case concerned him directly. Mr. Gilmore's cross-examination of Longoria in this case discussed how

(continued...)

204

> • Mr. Gilmore had represented Roel Contreras who was a co-defendant of Orlando Campos. Campos initially testified against Contreras in exchange for a reduced sentence, but at some point tried to disavow his prior testimony against Mr. Gilmore's client.

Bourgeois summarily asserts that these three circumstances created a conflict of interest that fenced in trial counsel's efforts to defend him.

With its guarantee of effective legal representation, the Constitution promises a criminal defendant conflict-free counsel. "A conflict will exist only 'when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.'" *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (quoting *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000)); *see also United States v. Culverhouse*, 507 F.3d 888, 893 (5th Cir. 2007) (stating that an actual conflict exists "when the attorney knows that his clients' interests diverge and must then choose between the interests of multiple clients, or be compelled to compromise his duty of loyalty"). To succeed on a conflict-of-interest claim, however, an inmate must show more than a "mere possibility of a conflict of interest." *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). The Supreme Court has explained that "'an actual conflict of interest' mean[s] precisely a conflict that affected counsel's performance – as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 164 (2002). Accordingly, "[t]o establish a Sixth Amendment violation on the basis of a conflict of interest the defendant must demonstrate: (1) that his counsel acted under the influence of an actual conflict; and (2) that the conflict adversely affected his performance at trial." *Culverhouse*, 507 F.3d at 892; *see also Cuyler*, 446 U.S. at 348-50.

---

[161] (...continued)
he had called him as a witness in the earlier case. (DE 348 at 179-80).

Bourgeois has not shown "more than a speculative or potential conflict." *Culverhouse*, 507 F.3d at 892. Mr. Gilmore's relationship with criminal defendants tenuously connected to this case did not conflict with his advocacy for Bourgeois. Bourgeois, in fact, exaggerates and misrepresents the nexus between the three circumstances listed above and his own case. For example, Bourgeois alleges that "[p]rior to and during [his] trial, Mr. Gilmore represented . . . Ross Griffin . . .[who] was under indictment in the United States District Court for the Southern District of Texas for the distribution and sale of marijuana." (DE 396 at 110). Griffin was actually sentenced on June 17, 2003, before the Government even designated this a capital case. (*United States v. Griffin*, 2:02-CR-309-2 (S.D. Tex.)). Griffin did not appeal and it appears that Mr. Gilmore's representation of Griffin ended when judgment issued. Bourgeois also labels Griffin a "government witness" against him. (DE 402 at 107).[162] The Government never called Griffin as a witness in the case. In fact, Bourgeois has not shown that the Government made any attempt to act on the information Griffin provided, particularly because Griffin's account was inconsistent with known evidence. Moreover, Bourgeois has never substantiated his claim that Griffin, after he had already been sentenced for his crime, "had been offered favorable treatment to cooperate against [Bourgeois]." (DE 402 at 107). Nothing suggests that Griffin's action in making statements to a government agent after sentencing divided Mr. Gilmore's loyalties.

In the two other circumstances, Bourgeois likewise summarily speculates that the entangled web of information given by snitches in the Nueces County jail hindered Mr. Gilmore's ability to

---

[162]   An FBI agent did not interview Griffin until June 30, 2003. (DE 396, Exhibit 60). Bourgeois emphasizes that "Griffin was housed with [Bourgeois] in the Nueces County Jail along with Mr. Adam Longoria and Mr. Darrick Moore," both of whom testified against Bourgeois at trial. (DE 396 at 110). The record Bourgeois relies upon, however, does not arise out of conversations in the county jail facility, but in a federal court holding cell during earlier hearings.

206

cross-examine witnesses in his case. Bourgeois, however, does not show that anything limited Mr. Gilmore's ability to probe the truth. Speculation about tenuous relationships between criminal cases does not equate to an actual conflict of interest.

Bourgeois has simply failed to show that an actual conflict impaired Mr. Gilmore's ability to advocate ardently on his behalf. The Court denies Bourgeois' speculative claim that Mr. Gilmore operated under a conflict of interest.

## VIII. The Government Engaged in Misconduct by Making Improper Argumentative Statements in the Guilt/Innocence and Penalty Phases (claim nine)

Given the horrific facts of this case and the emotionally charged trial atmosphere, both parties' closing arguments passionately championed their cause. The Government's attorneys in particular used strong language and forceful argument. Bourgeois claims that the Government crossed the line into constitutionally prohibited misconduct with certain comments made during the closing arguments in both phases of trial. Bourgeois complains that the Government improperly (a) disparaged Bourgeois and his attorneys; (b) appealed to the jury's civic responsibility and to religious sentiments; (c) knowingly made false arguments; (d) interjected personal information; and (d) diluted the jury's consideration of mitigating evidence. The Court finds that the Government's statements did not amount to prosecutorial misconduct.

In its zealous advocacy, the Government may strike hard, but not foul, blows. *See Berger v. United States*, 295 U.S. 78, 88 (1935). A criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone," *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002), which require relief only "in only the most egregious cases." *Ortega v. McCotter*, 808 F.2d 406, 408 (5th Cir. 1987). A two-step process governs claims of prosecutorial misconduct. "First, we . . . initially decide whether or not the prosecutor made an improper remark." *United*

207

*States v. Gallardo-Trapero,* 185 F.3d 307, 320 (5th Cir. 1999). Second, "[i]f an improper remark was made, we must then evaluate whether the remark affected the substantial rights of the defendant." *Id.* "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" *Bernard,* 299 F.3d at 488 (quoting *United States v. Iredia,* 866 F.2d 114, 117 (5th Cir. 1989)) Under that framework, the Court will evaluate Bourgeois' prosecutorial-misconduct claim.

With respect to each prosecutorial statement, the Government correctly responds that "[m]ost of the comments were nothing more than a fair comment upon the evidence" and some "were analogies that are commonly permissible during argument" while other "challenges are flatly incorrect." (DE 443 at 96). With a firm recollection of the atmosphere in the closing arguments, and having reviewed the record with respect to each allegation, the Court finds no merit to Bourgeois' prosecutorial-misconduct claim. In each instance, the Government's statements were strong, but not constitutionally improper.

For instance, Bourgeois asserts that the Government urged the jury to base its decision on religion. "Courts universally condemn" injecting religion into legal proceedings. *Hicks v. Collins,* 384 F.3d 204, 223 (6th Cir. 2004). However, the context of the questioning shows that the Government did not tell the jury to jettison legal standards or to let religion guide their deliberations. The Government twice mentioned that "pride comes before the fall," (DE 339 at 11, 46), a phrase which has a biblical origin but has also entered the common parlance.[163] The Government did so

---

[163] Bourgeois also objects to when the Government stated: "He called it 'it'. The kid that died. The fucking kid and those words are *sacrilegious when you speak about this lamb* because he didn't see it as human." (DE 339 at 17) (emphasis added). Bourgeois does not identify what Biblical passage the Government invoked by using the words "sacrilegious" or "lamb." While perhaps harkening to religious imagery, that statement does not directly refer to commonly known

(continued...)

rhetorically, not as an encouragement to convict him based on religious views. *See United States v. Bailey,* 123 F.3d 1381, 1401-02 (11th Cir. 1997) (finding no error when "[t]he prosecutor did not suggest that [the defendant] should be adjudicated under Biblical law, and he did not ask the jury to decide the case on a religious or emotional basis."). Bourgeois has not pointed to any case expunging similar comments from the courtroom setting.[164]

The phrase in which Bourgeois alleges that the Government told the jury it had a civic duty to convict him merely commented on its own duty to investigate and prosecute criminal acts:

> The Defendant never dreamed in his arrogance that the CPS would care about that baby, that FBI would be called, that FBI would care about that baby, that the United States would care about that baby because he saw it as thing for his pleasure. Shocked that he couldn't drive away. Shocked that he couldn't have his truck back and leave. The arrogance of his cruelty. *The arrogance to think that the United States would not care about one of its citizens even if it was a little citizen.* The arrogance of his cruelty.

(DE 339 at 17-18). This statement did not encourage the jury to protect society by convicting him; it inferred that Bourgeois did not think that the Government would act to prosecute. The Government did not ask the jury to apply extra-judicial standards in considering the evidence.

Bourgeois invited some of the challenged prosecutorial comments. For example, he says that the Government interjected personal information into the penalty-phase closing by conveying that

---

[163]   (...continued)
elements of religious belief, much less encourage the jury to let religious persuasion influence its decision.

[164]   Even in cases where the Government has made the extremely troubling argument that a jury should return a sentence of death because the Bible required it, courts have found no error when the comments are isolated and the facts of the crime egregious. *See Middlebrooks v. Bell,* 619 F.3d 526, 543 (6th Cir. 2010); *Coe v. Bell,* 161 F.3d 320, 351 (6th Cir. 1998); *but see Romine v. Head,* 253 F.3d 1349, 1370-71 (11th Cir. 2001) (finding error under the circumstances of that case)

209

it was difficult to try this capital case.[165]  The Government, however, only responded to the final portion of Mr. Tinker's argument where he stated that "it's easy for Ms. Booth to say let's kill him, because she is not the one that does it." (DE 342 at 64).  Ms. Booth, who argued next, responded that seeking a death sentence was the most difficult thing she had done.  (DE 324 at 66-67).  A prosecutor may validly respond to the defense argument without committing misconduct. *See United States v. Mendoza*, 522 F.3d 482, 492 (5th Cir. 2008) (holding that a reviewing court does "not view the prosecutor's remarks in isolation but consider the effect of those remarks in the context of the entire trial."); *United States v. Saenz*, 747 F.2d 930, 939 (5th Cir. 1984) ("Allegedly improper prosecutorial comments must be considered in context when determining their propriety.").

Other challenged statements were permissible summaries of the evidence.  For example, Bourgeois alleges that the Government falsely argued that Orlando Campos testified "not because he hoped to get lesser time but because he had a child, a six year old, and he believed that this man

---

[165]  Bourgeois refers to the following colloquy in the penalty phase:

Ms. Booth:  Now, Mr. Tinker told you this was going to be very easy for me to ask for someone's death. And he's very wrong. I've raised five children, I've buried family –

Mr. Tinker:  She's outside the record here, your Honor, and I just –

Ms. Booth:  Judge I'm responding to – he opened the door.

Mr. Tinker:  About how many kids she's got doesn't have anything to do with the trial in this case.

The Court:  Go ahead, Ms. Booth

Ms. Booth:  My baby brother is in Iraq serving his country. Things are hard, and this is the hardest thing that I have ever done in my life.

(DE 324 at 66-67).

210

should be held accountable." (DE 339 at 58). Bourgeois complains that this was a false statement because "Orlando Campos more than 'hoped' he would be getting a sentence reduction for his cooperation with the Government, he <u>knew</u> he would be getting a deal." (DE 402 at 129). The Court has already found that Campos did not have a deal with the Government. The Government's statement accurately comports with the evidence: the federal government had no power to change Campos' state-court sentence and the prosecutor's comments accurately recalled Campos' testimony about why he testified.

In another instance, Bourgeois complains that the Government claimed that, by securing Dr. Senn's assistance after Dr. Dailey could not help them, they were not "expert shopping." (DE 339 at 19-20).[166] Bourgeois seems to believe that Dr. Dailey "was unable to provide them with favorable bite mark evidence," meaning that the Government shopped for experts until they found one who would testify in their favor. (DE 402 at 116). In reality, Dr. Dailey "could not rule in or out any of the three individuals as the possible biter." (DE 387, Attachment 45). Bourgeois has not shown that the Government "expert shopped" by seeking out someone who could answer the question asked of them, and thus the closing argument was not "false argument." In addition, as discussed above,

---

[166]     During the guilt/innocence phase closing, the prosecutor stated:

> Now the defense told you in their opening, first of all, that there was going to be testimony that a child could have made those marks. You didn't hear that. The only child whose bite was analyzed was excluded. He told you that there was forum shopping by the United States on our experts and what did you hear? We sent our teeth to Dr. Senn. Dr. Senn made his analysis and sent it for a second opinion. In serious and solemn matters of our health, like to get surgery or to do some kind of other procedure on us, many times we'll get a second opinion. Is that expert shopping or is that just making sure?

3/16/04 at 19-20. Bourgeois argues that "the Government <u>had</u> engaged in forum shopping for favorable bite mark evidence" by first consulting with United States Army Colonel J. Curtis Dailey, M.D. Dr. Dailey could not conclusively identify Borugeois as the biter.

211

forensic odontology requires a second opinion in similar cases. (DE 339 at 43).

Bourgeois also argues that the Government told the jury to abandon its duty to consider his mitigating evidence. In closing, the prosecutor stated:

> The mitigation that the Defense wants you to look at and decide that that overpowers the aggravating factors that he's alleged to, and they are that he was under substantial duress, that he was – that he was driving in an 18-wheeler with three children, that he had family and economic pressures. You know and I thought, "Oh, well, that's just life, that's not mitigation."

(DE 342 at 74). Bourgeois argues that "[w]hile the jury in this case was certainly free to decide that the mitigation proffered on behalf of Mr. Bourgeois did not outweigh the aggravating circumstances, the prosecutor's argument that Mr. Bourgeois' evidence 'was not mitigation,' improperly prevented the jury from considering the mitigating evidence." (DE 402 at 121). Nevertheless, if the jury instructions properly outline the use of mitigating evidence, the Government can freely comment on the weight the jury should accord it. *See Bland v. Sirmons*, 459 F.3d 999, 1026 (10th Cir. 2006). The Government did not tell the jury to ignore mitigating evidence, they only disputed the weight of that evidence.

Bourgeois also complains that the Government called him names. In the guilt/innocence phase argument, the Government stated that its bite-mark experts "did the best they could to determine – to exclude, their goal was to see who they could exclude. And they excluded Robin. But who did they not exclude? They didn't exclude *this man, that thing that's sitting right there.* (DE 339 at 48-49) (emphasis added). The Government contends that was a reasonable response to Bourgeois' own use of "dehumanizing terms" for the victim. (DE 443 at 97). "The use of colorful pejoratives is not improper." *United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (quoting *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998)); *see also United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978) ("Unflattering characterizations of a defendant do not require a new

212

trial when such descriptions are supported by the evidence."). As with the rest of the challenged comments, the Government's reference to Bourgeois as a "thing" was isolated and not a pervasive feature of the trial. The Court has reviewed all of the comments Bourgeois challenges in the context of the whole trial and finds no prosecutorial misconduct.

Even assuming, *arguendo*, the Government's comments were improper, Bourgeois fails to show the requisite prejudice.[167] As an initial matter, the Court instructed the jury that the parties' arguments were not evidence. (DE 339 at 61); *see United States v. Pittman*, 401 F. App'x 895, 900 (5th Cir. 2010) (finding that a similar instruction "[a]meliorat[ed] the government's [allegedly] improper argument and cross-examination and their resultant prejudice"); *United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995) (presuming a similar instruction sufficient "unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the prosecutorial misconduct] is devastating."). Had this been a close case, perhaps the jury instruction itself may not have been enough to dispel the taint of the alleged prosecutorial misconduct. However, the evidence of Bourgeois' guilt was overwhelming and the case for a death sentence especially strong. The allegedly prejudicial comments were not the centerpieces of the Government's argument, but isolated rhetorical flourishes and intermittent

---

[167]     The prejudice step "sets a high bar . . . The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007); *see also Lowenberg*, 853 F.2d at 301 ("The ultimate question before us, however, is not the impropriety of the prosecutor's remarks but whether these remarks were so inflammatory that they entitle the defendant to a new trial."). Courts reviewing the prejudice from the prosecution's unfair arguments focus on three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction. *See United States v. McCann*, 613 F.3f 486, 496 (5th Cir. 2010); *United States v. Gallardo-Trapero*, 185 F.3d 307, 321 (5th Cir. 1999); *United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990); *United States v. Lowenberg*, 853 F.2d 295, 302 (5th Cir. 1988).

213

themes. Where, as here, "numerous witnesses, pieces of evidence, and issues [are] placed before the jury," it is highly unlikely that "the prosecutor's statements overshadowed what had come before and unduly prejudiced the [defendant's] case. *See Gallardo-Trapero*, 185 F.3d at 320-21. The overwhelming evidence against Bourgeois and the detailed jury instructions prove that the comments did not prejudice Bourgeois. The allegedly improper comments were not of a sufficient magnitude to cast serious doubt on the jury's verdict. The Court denies Bourgeois' claims of prosecutorial misconduct.

## IX. Trial Counsel Provided Ineffective by Not Rebutting Evidence of Bourgeois' Indifferent Demeanor (claim ten)

The Government portrayed Bourgeois as a heartless man who, while his infant daughter lay dying, only worried about his own interests. Multiple government witnesses related their surprise at Bourgeois' lack of emotion and inaction. Indifference marked what little attention Bourgeois paid to his dying daughter. One witness summed up the testimony about Bourgeois' demeanor as "just kind of heartless." (DE 335 at 289). Bourgeois faults his trial attorneys for not calling expert witnesses to explain that mental illness caused his apathy.

Testimony from the evidentiary hearing only inferentially addressed this claim. As previously discussed, experts have diagnosed Bourgeois with various interlocking psychological conditions. Bourgeois argues that his demeanor on the day he killed his daughter was not one of a deeply flawed character, but a deeply disturbed man. Bourgeois claims that his alleged mental retardation – or at least his impaired intelligence – inhibited his ability to process new information, making him unable to understand fully the events he caused. Overlapping mental conditions, such as borderline personality disorder, "which can cause individuals to dissociate, or separate themselves both emotionally and mentally, in times of stress" allegedly caused him to "'spac[e] out'" while his

214

daughter was dying. (DE 402 at 127). Bourgeois claims that trial counsel should have presented the mental-health evidence in the guilt innocence phase to "humanize him in the eyes of the jury." (DE402 at 127). He also claims that the information in the penalty phase would have mitigated against a death sentence.

With regard to the guilt/innocence phase, Bourgeois does not claim that his attorneys should have presented an insanity, diminished capacity, or other defense by which his mental state would exculpate him. Instead, Bourgeois hopes that a psychologist could have "humanized" him so that the jury would not see him as a calloused killer.[168] The proposed testimony was not relevant.[169] Bourgeois' theory addresses his apathetic attitude after the killing, but mental disorders do not explain his intent as he killed. As trial counsel recognized in the closing argument, the jury "had to decide one of three things. One, is it murder with malice and premeditation. Is it murder with malice not premeditated. Is it not murder at all." (DE 339 at 25). The lay depictions of the circumstances surrounding the crime were unquestionably properly before the jury; Bourgeois' still-

---

[168] In recognizing that "there are countless ways to provide effective assistance in any given case," the Supreme Court recently cited with approval a case stating that "[t]he current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it." *Cullen v. Pinholster*, ___ S. Ct. ___, 2011 WL 1225705, at *17 (2011) (citing *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (Kozinski, C.J., dissenting)).

[169] The federal rules do not commonly permit Bourgeois' proposed guilt/innocence defense. Under Federal Rule of Evidence 704(b),

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

FED. R. EVID. 704(b).

215

unproven explanation for his demeanor would not have been.

With respect to the punishment phase, Dr. Estrada examined Bourgeois but apparently did not come to the conclusion that mental illness made him grossly indifferent. Nevertheless, trial counsel elicited from Dr. Estrada that his disinterested demeanor toward his daughter's dying was common to those who, because they had been abused, became abusers themselves. (DE 341 at 36-38). Trial counsel secured expert assistance before trial and used Bourgeois indifference to benefit the defense, though for a different way than he proposes now. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.").

A reasonable attorney would not necessarily put forth mental illness as an excuse for Bourgeois' indifferent attitude. As previously noted, Bourgeois' claim of mental retardation is not strong and is inconsistent with a holistic view of his life. Placing evidence that mental disorders blunted Bourgeois' response after the killing would not seriously persuade the jury's consideration of his intent during the killing or his reaction to the murder.[170] The jury would have to place the mental-health evidence into the broader context of Bourgeois' relationship with his daughter. Bourgeois heartlessly mistreated her, callously cursed her, viciously abused her, and vocally wished her dead. Psychological testimony about his indifferent demeanor as she died did not explain his inhumane treatment of her over time. Emphasizing this aspect of Bourgeois' personality also would only have reinforced the Government's emphasis on his "decrease in the capacity for empathy or decrease in the regard for others" as a feature of his future danger to society. (DE 348 at 283). The Court finds that the proposed mental-health testimony does not show deficient performance by trial counsel or create a reasonable probability of a different result.

---

[170] The evidence as it was allowed trial counsel to argue that Bourgeois' actions did not show callous disregard, but a desire hurry on to the hospital. (DE 339 at 28)

216

**X.**     **A Witness Improperly Relied on Bourgeois' Interactions with Counsel as a Basis to Formulate an Adverse Opinion about Him (claim eleven)**

Bourgeois argues that the Government's questioning of Dr. Estrada violated his constitutional rights. Dr. Estrada's direct testimony revealed that Bourgeois would be a future societal danger, manipulated others, and was narcissistic. Dr. Estrada based his opinion, in part, on his in-trial observations of Bourgeois, particularly those relating to his interaction with counsel:

> I would say that in my opinion, Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim. He has been very attentive, has made profuse notes and has been able to discuss and provide assistance to his defense team as needed.
>
> In addition, he also, to me, portrayed the impression of feeling often disgusted with the presentation and answers of the witnesses and having a sense that whatever the witnesses may be saying was not going to shake him or affect him. And I think that these two characteristics that I mention are very consistent with a diagnosis of a narcissistic personality disorder.

(DE 348 at 286). Bourgeois claims that the Government used his constitutional rights against him through this statement. In essence, he argues that "[t]he Government's reliance on a mental health opinion that was based upon Petitioner's participation as 'part of the defense team' violated Petitioner's right to participate in his trial and to assist counsel. In effect, Petitioner was penalized by invoking and exercising these fundamental rights." (DE 396 at 129).

Bourgeois does not point to any case law limiting an expert witness' in-court observations only to issues unrelated to the exercise of constitutional rights. Instead, Bourgeois draws comparison to Supreme Court authority preventing the Government from commenting on a defendant's post-arrest silence. *See Doyle v. Ohio*, 426 U.S. 610 (1976); *Griffin v. California*, 380 U.S. 609, 614 (1965). However, Bourgeois' argument is similar to one rejected by the Supreme Court in *Portunondo v. Agard*, 529 U.S. 61 (2000). In *Agard*, the prosecutor's closing argument mentioned that, because he was the last witness called by the defense, the defendant had the benefit of listening

217

to all prior accounts before testifying. Drawing a comparison to *Doyle* and *Griffin*, the *Agard* defendant argued that the prosecutor's comments stifled his right to be present at trial, confront witnesses, and testify. The Supreme Court refused to extend *Doyle* and *Griffin* because a jury making observations about the courtroom events "*is* natural and irresistible" and "what the jury is perfectly entitled to do." *Agard*, 529 U.S. at 67-68. Also, the Supreme Court said that commenting on a defendant's credibility and other related issues fundamentally differs from commenting on his guilt. *See id.* at 69.

Here, the Government did not mention Bourgeois' failure to testify, nor could Dr. Estrada's testimony reasonably be construed to encroach on his right to silence. Dr. Estrada's testimony did not directly address Bourgeois' right to appear at trial or right to consult with his attorneys. The challenged comments related to Bourgeois' demeanor and actions before the jury. Courts have held that prosecutorial discussion of a defendant's trial demeanor does not violate his constitutional rights. *See Bates v. Lee*, 308 F.3d 411, 421 (4th Cir. 2002) ("[P]rosecutorial comments about the lack of remorse demonstrated by a defendant's demeanor during trial do not violate a defendant's Fifth Amendment right not to testify."); *Hall v. Wainwright*, 733 F.2d 766, 773 (11th Cir. 1984) (holding that the jury would not interpret a comment simply related to a defendant's demeanor during the trial as a comment on the defendant's failure to testify); *Cunningham v. Perini*, 655 F.2d 98, 100 (6th Cir. 1981) (holding that comments related to the defendant's demeanor in court did not run afoul of the Fifth Amendment). Bourgeois has not shown that the Constitution prevents witnesses for the Government from testifying about matters that inferentially touch upon a defendant's constitutional rights. *See Bates,*, 308 F.3d at 422 (finding no error in the prosecutor comments on the defendant's demeanor at trial); *Williams v. Chrans*, 945 F.2d 926, 953-54 (7th Cir. 1991) (finding that comments related to lack of remorse did not violate *Griffin* because jury could

218

consider remorse in light of defendant's demeanor and testimony);

Even when the Government improperly discusses a defendant's valid exercise of constitutional rights, a reviewing court must still decide if, beyond a reasonable doubt, the jury would have found against the defendant absent the prosecutor's improper statements. *See United States v. Martinez-Larraga*, 517 F.3d 258, 269 (5th Cir. 2008) (citing the harmless doubt standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). Dr. Estrada's remarks focused on his opinion that Bourgeois had a narcissistic personality. Before commenting on his trial observation, Dr. Estrada made that same diagnosis based on "all the information that [he] ha[d]," without mentioning anything that would implicate Bourgeois' constitutional rights. (DE 348 at 285). Dr. Estrada's testimony along this vein was brief and was not a decisive issue throughout the remainder of the sentencing proceedings. Even if the Government's witness improperly commented on the exercise of Bourgeois' constitutional rights, any error was harmless. This is particularly the case because the Court and the jury could make the same lay assessment of Bourgeois' courtroom behavior. In fact, the jury was in the best position to view and assess how Bourgeois interacted with his attorneys. For those reasons, the Court will deny this claim.

## XI. Ineffective Assistance of Appellate Counsel (claim twelve)

Mr. Gilmore and Mr. Tinker represented Bourgeois on appeal. They raised four issues on appeal that required a probing review by the Court of Appeals for the Fifth Circuit. Bourgeois' criticism of their representation extends to their appellate efforts. In three tersely briefed claims, Bourgeois argues that appellate counsel should have argued that:

- the Court improperly admitted into evidence inflammatory and prejudicial photographs of the victim.

- Dr. Estrada's testimony comparing his background to others sentence to death violated his Eighth Amendment rights, and trial counsel should have lodged

219

an objection on that basis.

- "failing to raise all of the record-based claims discussed herein, which were not properly raised or objected to at trial." (DE 396 at 127).

"[I]neffective assistance of appellate counsel claims are governed by the test set forth in *Strickland*[.]" *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006). An inmate challenging his appellate counsel's selection of claims must show both deficient performance and that "the outcome of the appeal would have been different." *Id.*; *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997); *Sharp v. Johnson*, 107 F.3d 282, 286 n. 9 (5th Cir. 1997). The Court finds that Bourgeois has not met *Strickland*'s demanding burden with respect to his ineffective-assistance-of-appellate-counsel claims.

Appellate counsel did not provide constitutionally deficit representation by not advancing a challenge to the admission of photographic evidence at trial. The Government carefully selected only photographs that were necessary for the trial testimony. Trial counsel reviewed the autopsy photographs and then strongly and repeatedly challenged their prejudicial nature. (DE 350 at 102; DE 345 at 1-8, 92-111). The Court carefully considered trial counsel's objections, studied the relative importance of each photograph, and weighed the impact it could have on the jury. The Court admitted into evidence only those photographs that would not be unduly prejudicial. With that background, the Court finds that a reasonable appellate attorney would not raise a claim based on the autopsy photographs and that the outcome of the appeal could not have been different had appellate counsel done so. *See Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2008) ("Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent.").

Similarly, appellate counsel would not be ineffective for not challenging Dr. Estrada's

220

testimony. During the Government's direct questioning of Dr. Estrada, it tried to extract information about how common it was for death row inmates to have been abused:

| The Government: | Do you know much about the background of people that have actually murdered somebody and been given the death penalty? Do you know much about any of that? |
|---|---|
| Dr. Estrada: | Unfortunately I have been involved in a number of those cases. |
| The Government: | And there are – are there people that have been abused as children that were ultimately sentenced to death because of their actions? |
| Dr. Estrada: | Not the majority. |
| The Government: | Okay. But some have been? |
| Dr. Estrada: | Yes. |

(DE 341 at 57). After Dr. Estrada's testimony, trial counsel objected that he had violated Bourgeois' right to individualized sentencing. (DE 341 at 74-78). Bourgeois now claims that appellate counsel should have argued that Dr. Estrada's testimony denied him sentencing as a "uniquely individual human being," because it compared him to others. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).[171]

Appellate counsel did not provide ineffective representation by not raising Bourgeois' variant on a *Woodson* claim. Bourgeois has not cited any case where the Supreme Court has reversed a death sentence because a witness discussed the outcome of mitigating circumstances in other cases. Nevertheless, Dr. Estrada's isolated comment by no means played a major part in the jury's consideration of mitigating evidence. To the extent that it had any effect, the testimony helped

---

[171] In *Woodson*, the Court struck down a statute that mandated an automatic death sentence for those convicted of first-degree murder because the statute failed to require a consideration of the defendant's character, record, or circumstances of his crime.

221

Bourgeois more than it harmed him. The jury heard that childhood abuse could be a sufficient basis to impose a life sentence. Dr. Estrada's comment likely helped the defense because he told the jury that the "majority" of those who had been abused as children did not receive a death sentence. (DE 341 at 58).[172] That information would only help the jury facing a mountain of reasons to sentence Bourgeois to death. Bourgeois has not shown that appellate counsel violated his constitutional rights by not advancing a *Woodson* claim.

Insofar as Bourgeois raises a generalized complaint that appellate counsel should have raised each record-based claim that he advances in his Motion to Vacate, the Court has already extensively discussed each and finds them without merit. As the Court has found no error or prejudice flowing from the underlying claims, Bourgeois cannot meet the *Strickland* standard. *See Mayabb v. Johnson*, 168 F.3d 863, 869 (5th Cir. 1999) (applying *Strickland* to an ineffective assistance of appellate counsel claim and noting that "[w]hen we do not find prejudice from the trial error, by extension, we cannot find prejudice from an appellate error predicated on the same issue").

In the end, an appellate attorney cannot be faulted for not raising meritless claims. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); *Williams v. Collins*, 16 F.3d 626, 634 (5th Cir. 1994). "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994); *see also Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous

---

[172]    Interesting, Dr. Estrada's testimony bears strong similarities to Dr. Cunningham's comparison of Bourgeois's future risk for violence to that of other offenders. Bourgeois faults trial counsel for not calling Dr. Cunningham to compare him to other inmates.

objection does not cause counsel's performance to fall below an objective level of reasonableness . . . ."). The Court denies Bourgeois' ineffective-assistance-of-appellate-counsel claim.

## XII.   Cumulative Error (claim thirteen)

Bourgeois claims that, even if each claim raised by his Motion to Vacate alone does not require relief, accumulating the effect of them all does. He argues: "Each of the above-described claims of constitutional error stand on their own and independently require relief. However, should this Court find error, but believe that individually they do not merit relief, the Court should consider the cumulative impact of the constitutional violations." (DE 396 at 134). This Court sat at trial, has held numerous hearings, and has considered voluminous evidence. With complete surety, the Court concludes that Bourgeois received all the Constitution affords him, and then some. Whether taken singly or as a whole, the issues Bourgeois raises in his 2255 motion do not show a flawed trial laden with unfairness. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero."). Bourgeois was lawfully convicted and sentenced to death. The Court finds no merit to his cumulative-error claim.

## XIII.   Lethal Injection (claim fourteen)

As his final claim, Bourgeois argues that the United States of America employs an unconstitutional method of execution. Bourgeois summarily argues that "unnecessary pain and suffering in violation of the Eighth Amendment" will result when the Government carries out his death sentence because of "the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out." (DE 396 at 128). Nevertheless, Bourgeois provides two

223

reasons that make the instant action an improper vehicle to address his claims. First, because Bourgeois' execution "is far from imminent, the question is not yet ripe." (DE 396 at 128). Second, "a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983." (DE 396 at 128). Nevertheless, Bourgeois states that he "will be happy to litigate this Eighth Amendment challenge in whatever forum is deemed appropriate." (DE 396 at 128). In addition to those two reasons for dismissing Bourgeois' lethal-injection challenge, the Government observes that the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), recently upheld the constitutionality of a State's execution protocol which is similar to that used by the federal government.[173]

Both parties agree that this issue is not now properly before the Court. A motion pursuant to § 2255, by its own terms, challenges the constitutionality of a movant's conviction and sentence of death, not the means of carrying out that sentence. The Court will dismiss this premature and noncognizable claim.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a 2255 motion unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Bourgeois has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v, Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2255 CASES IN THE UNITED STATES DISTRICT COURTS.

A COA may issue when an inmate "has made a substantial showing of the denial of a

---

[173] 18 U.S.C. § 3596(a) provides that federal death sentences shall be implemented "in the manner prescribed by the law of the State in which the sentence is imposed."

224

constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Bourgeois' claims. Under the appropriate standard, Bourgeois has not shown that this Court should authorize any issue for appellate review. This Court will not certify any issue for consideration by the Fifth Circuit.

## CONCLUSION

The Court has fully considered the pleadings, the record, and the applicable law. Bourgeois has raised many issues requiring serious judicial consideration. The Court commends Bourgeois' current attorneys for their tireless efforts to defend him. They have zealously probed the legal and factual background of this case looking for issues meriting judicial review. In their briefing and argument, they have proven themselves competent and fervid defenders of their client's rights. Nonetheless, this Court finds no error invalidating Bourgeois' capital conviction or death sentence. As Bourgeois has failed to show that his sentence was imposed in violation of the Constitution or laws of the United States, was in excess of the maximum authorized by law, or is otherwise subject to collateral attack; his claims do not merit section 2255 relief.

Accordingly, the Court **DENIES** Bourgeois Motion to Vacate, **DENIES WITHOUT PREJUDICE** any outstanding motions, and **DISMISSES** this case. The Court will not certify any issue for consideration by the appellate court.

**SIGNED** and **ENTERED** on this 19th day of MAY , 2011.

Janis Graham Jack
United States District Judge

225